# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PENSION TRUST FUND FOR OPERATING ENGINEERS, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>DEVRY EDUCATION GROUP, INC., DANIEL HAMBURGER, RICHARD M. GUNST, and TIMOTHY J. WIGGINS,<br><br>　　　　　　　　　Defendants. | Case No.:<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................................1

II.    JURISDICTION AND VENUE ..........................................................................5

III.   PARTIES ............................................................................................................6

IV.    SUBSTANTIVE ALLEGATIONS ....................................................................7

       A.    Background of the Company .................................................................7

       B.    Defendants Materially Misrepresented DeVry University's Success..................8

       C.    Defendants Materially Misrepresented DeVry's Prospects for
             Continued Growth................................................................................16

       D.    The Truth Emerges ..............................................................................19

V.     CLASS ACTION ALLEGATIONS ..................................................................27

VI.    UNDISCLOSED ADVERSE FACTS................................................................29

VII.   LOSS CAUSATION..........................................................................................30

VIII.  SCIENTER ALLEGATIONS ...........................................................................31

IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-
       THE-MARKET DOCTRINE .............................................................................32

X.     NO SAFE HARBOR ..........................................................................................33

XI.    COUNTS AGAINST DEFENDANTS...............................................................34

       COUNT I ...........................................................................................................34

       COUNT II ..........................................................................................................38

XII.   PRAYER FOR RELIEF .....................................................................................39

XIII.  JURY TRIAL DEMANDED..............................................................................39

Plaintiff Pension Trust Fund for Operating Engineers ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by DeVry Education Group, Inc. ("DeVry" or the "Company") and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on DeVry's website concerning the Company's public statements; and (d) review of other publicly available information concerning DeVry and the Individual Defendants.

## I. NATURE OF THE ACTION

1. This is a class action on behalf of all persons or entities that purchased or otherwise acquired DeVry securities between February 4, 2011 and January 27, 2016, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. DeVry provides educational services worldwide through a number of subsidiaries, including DeVry University ("DVU" or "DeVry University"), one of the largest degree-granting higher education systems in the United States. Through its five colleges, DeVry University offers programs in healthcare, business, technology, accounting, finance and law.

3. During the Class Period, Defendants boasted about the employment prospects of DeVry University graduates to investors and students alike, emphasizing that 90% of DVU graduates obtained employment in their field of study within six months of graduation and that

DVU graduates' salaries one year after graduation were 15% higher than the average or median salaries of graduates with bachelor's degrees from all other colleges and universities.

4.     However, on January 27, 2016, the Federal Trade Commission ("FTC") filed suit against DeVry and DeVry University accusing them of deceptively advertising the benefits of obtaining a bachelor's degree at DeVry University.[1]

5.     Specifically, the FTC complaint charges that Defendants' claim that 90% of DeVry University graduates actively seeking employment landed jobs in their field of study within six months of graduating was deceptive.  Similarly, DeVry University's claim that, since 1975, 90% of its graduates seeking employment in their fields of study obtained employment within six months of graduation is false and misleading.  Lastly, the complaint also asserts that another key claim made by DeVry—that its graduates had 15 percent higher incomes one year after graduation on average than the graduates of all other colleges or universities—was also deceptive.

6.     The FTC noted that DeVry's claims frequently appeared in advertisements on television, radio, online, print and other media, and were a central part of many public filings and letters sent to shareholders.  According to the FTC, the 90% claim was central to DeVry's marketing efforts since at least 2008 and the income superiority claim began in 2013.  For example, one ad that ran on national television and YouTube featured individuals in business attire hanging hundreds of "offer letters" on a wall, with a voiceover discussing the importance of getting a job offer to college students.

7.     Moreover, the FTC accused DeVry of deceptively counting numerous graduates as working "in their field," including these examples from the 2012 graduating class: (1)

---

[1] https://www.ftc.gov/system/files/documents/cases/160127devrycmpt.pdf (last visited May 6, 2016).

graduate who majored in business administration with a specialization in health services management working as a server at a restaurant; (2) multiple graduates with majors in technical management whose employment was listed as unpaid volunteer positions at medical centers; a graduate who majored in technical management with a human resources specialization working as a rural mail carrier and another who worked as a driver delivering rain gutters for a construction company; and (3) a graduate who majored in business administration with a health care management specialization working as a car salesman.

8.      The FTC's complaint also contends that DeVry's calculations included graduates who were working in jobs they held prior to enrolling at DeVry, as opposed to those they obtained after graduating.  In addition to counting these and other graduates as working "in their field," the FTC's complaint also highlights that the Company excluded graduates from DeVry's count of those "seeking employment" as inactive when they were in fact actively seeking employment.[2]

9.      Also on January 27, 2016, the U.S. Department of Education ("Department of Education" or "DOE") issued DeVry University a Notice of Intent to Limit DeVry University's participation in programs authorized pursuant to Title IV of the Higher Education Act of 1965 as amended ("HEA"), 20 U.S.C. § 1070 *et seq.*, after finding that DeVry was in violation of federal law.[3]

10.     According to the Department of Education, starting in at least 2008 and continuing until at least August 2015, DeVry's marketing and promotional materials represented

---

[2] On May 9, 2016, Judge Michael W. Fitzgerald of the Central District of California rejected DeVry's request to dismiss the FTC's lawsuit against the Company, finding, among other things, that the "allegations show that the FTC's claims have factual basis and provide Defendants with adequate notice as to the FTC's reason for believing that the employment statistic is unsubstantiated and materially false."

[3] https://studentaid.ed.gov/sa/sites/default/files/devry-limitation-notice.pdf (last visited May 6, 2016).

that, "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation." (the "Since 1975 Representation"). On August 28, 2015, the DOE, concerned with the veracity of DeVry's Since 1975 Representation, sent a letter to DeVry University requesting it to substantiate the truthfulness of those representations. After several requests for information, the DOE concluded that **_"DeVry is unable to substantiate the truthfulness of those representations, as required by federal law_.**" As a result of DeVry's violation of federal law, the Department of Education imposed numerous conditions on DeVry in order for it to continue receiving Title IV funds.

11.     In reaction to these troubling disclosures, DeVry's common stock price dropped 15%, or $3.65 per share, from $23.68 per share on January 26, 2016 to $20.09 per share closing on January 27, 2016—wiping out over $230 million in the Company's market capitalization in one day, on unusually heavy volume.

12.     Over the next several trading days, DeVry's stock price continued to trade lower, closing at $18.08 on February 2, 2016. In total, from January 27, 2016 to February 2, 2016, DeVry's stock price share price dropped $5.66 per share, or 24%, wiping out approximately $360 million of the Company's market capitalization.

13.     As further detailed below, throughout the Class Period, Defendants made false and/or misleading statements and/or failed to disclose to investors that: (i) 90% of DeVry University students from a specific year (e.g., graduates from 2011-2016) who were actively seeking employment did not in fact land or obtain new jobs in their field of study within six months of graduation; (ii) 90% of DeVry University students since 1975 who were actively seeking employment did not in fact land or obtain new jobs in their field of study within six months of graduation; (iii) one year after graduation, the average or median salary of DeVry

University graduates with bachelor's degrees was not in fact 15% higher than the average or median salary of graduates with bachelor's degrees from all other colleges and universities; (iv) as a result, DeVry overstated its growth, revenue, and earnings potential by concealing the true employment prospects of DeVry University graduates to investors and potential students; and (v) as a result of the foregoing, Defendants' statements about DeVry's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

14. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

15. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

17. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). A substantial portion of the acts in furtherance of the alleged fraud, and the effects of the fraud, have occurred in this Judicial District. In addition, the Company's principal executive offices are located within this Judicial District. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

III.  **PARTIES**

18.    Plaintiff Pension Trust Fund for Operating Engineers is a defined-benefit pension plan based in Alameda, California.  Operating Engineers provides retirement, disability, survivor, and other benefits to more than 37,000 heavy equipment operators, construction workers, public employees, retirees, and their dependents in Northern California, Northern Nevada, Hawaii, and Utah.  As of January 2016, Operating Engineers managed more than $3.5 billion in assets.  As set forth in its certification submitted concurrently herewith, Operating Engineers purchased DeVry common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

19.    Defendant DeVry Education Group, Inc. is a Delaware corporation with its principal executive offices located at 3005 Highland Parkway, Downers Grove, Illinois 60515.

20.    Defendant Daniel Hamburger ("Hamburger") was, at all relevant times, President and Chief Executive Officer ("CEO") of DeVry.

21.    Defendant Timothy J. Wiggins ("Wiggins") has served as Chief Financial Officer ("CFO") of DeVry since January 3, 2012.

22.    Defendant Richard M. Gunst ("Gunst") served as CFO of DeVry from 2006 until January 3, 2012.

23.    Defendants Hamburger, Wiggins, and Gunst are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of DeVry's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to,

or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, and the result of the collective actions of the Individual Defendants.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background of the Company

24.    DeVry, founded in 1973, provides educational services worldwide through three segments: Business, Technology and Management; Medical and Healthcare; and International and Professional Education. The Business, Technology and Management segment comprises the operation of DeVry University; the Medical and Healthcare segment includes the operations of DeVry Medical International, Chamberlain College of Nursing and Carrington College; and the International and Professional Education segment includes DeVry Brasil and Becker Professional Education.

25.    DeVry University is a subsidiary of DeVry and one of the largest degree-granting higher education systems in North America. DeVry University was founded in 1931 and offers onsite and online undergraduate and graduate degree programs covering 34 different career fields within its five colleges of study: The College of Business & Management, which includes Keller Graduate School of Management; The College of Engineering & Information Sciences; The

College of Health Sciences; The College of Liberal Arts & Sciences; and The College of Media Arts & Technology.

**B.     Defendants Materially Misrepresented DeVry University's Success**

26.     Throughout the Class Period, Defendants repeatedly made false and misleading statements and omissions concerning the Company's business, operations and prospects.

27.     Since at least 2008, Defendants have been advertising that 90% of DeVry University graduates actively seeking employment had careers in their fields of study within six months of graduation.  Similarly, Defendants also represented that DeVry University graduates obtained jobs with significantly higher incomes than graduates of other colleges or universities. For example, in the Company's 2010 Annual Report's Letter to Shareholders, Defendant Hamburger emphasized that "DeVry University graduates continued to excel in the job market. For the most recent period, 88 percent of DeVry University graduates in the active job market were employed in their fields within six months of graduation," at an average salary of $43,605. The Letter to Shareholders also boasted that, "*[s]ince 1975, 245,988 students have graduated from DeVry University.  Of those active in the job market, 90.2 percent were employed in their field within six months of graduation.*"[4]

28.     On April 27, 2011,  DeVry University released its 2009-2010 Academic Annual Report,[5] asserting:

---

[4]http://investors.devryeducationgroup.com/Cache/1500053963.PDF?Y=&O=PDF&D=&FID=1500053963&T=&IID=4183694 (last visited May 6, 2016).

[5]http://newsroom.devry.edu/content/1114/files/102010_academicAnnualReport_v10_FINAL_4_28_11.pdf (last visited May 6, 2016).

## Graduate Employment Rates

Since 1975, more than 250,000 students systemwide have graduated from DeVry University. We have long held ourselves accountable and are proud to publish our performance on graduate employment goals.

Even in this year's tough job market, 88.3 percent of graduates (in the active job market) found jobs or were already employed in their education-related fields within six months of graduation.

The following table summarizes our 2009 Career Services results by currently offered degree program.

**2009 Career Services Results — by Degree Program**
Combined statistics for students who graduated from the
February 2009, June 2009 and October 2009 classes

| | Graduates who actively pursued and obtained employment and those who were already employed in education-related careers within 180 days of graduation | Average reported annual compen-sation | Graduates | Graduates eligible for career assistance | Graduates who actively pursued employment for up to 180 days and those who were already employed | Graduates employed in education-related positions within 180 days of graduation | Graduates employed outside their field of study |
|---|---|---|---|---|---|---|---|
| Accounting | 93% | $35,000 | 34 | 22 | 15 | 14 | 6 |
| Biomedical Engineering Technology | 84% | $41,672 | 75 | 64 | 55 | 46 | 9 |
| Business Administration | 91% | $38,549 | 1,523 | 1,265 | 1,145 | 1,045 | 48 |
| Computer Engineering Technology | 76% | $38,854 | 129 | 110 | 94 | 71 | 5 |
| Computer Information Systems | 79% | $45,235 | 668 | 560 | 457 | 360 | 76 |
| Electroneurodiagnostic Technology | 100% | $39,115 | 2 | 2 | 2 | 2 | 0 |
| Electronics & Computer Technology | 84% | $30,746 | 351 | 253 | 190 | 159 | 55 |
| Electronics Engineering Technology | 77% | $40,808 | 300 | 264 | 229 | 177 | 25 |
| Game & Simulation Programming | 59% | $39,686 | 275 | 242 | 154 | 91 | 55 |
| Health Information Technology | 83% | $35,450 | 333 | 253 | 198 | 164 | 48 |
| Network & Communications Management | 88% | $41,966 | 579 | 508 | 442 | 391 | 49 |
| Network Systems Administration | 88% | $41,782 | 476 | 273 | 197 | 173 | 65 |
| Technical Management | 93% | $47,540 | 3,213 | 2,768 | 2,542 | 2,363 | 129 |
| Web Graphic Design | 62% | $41,928 | 59 | 35 | 21 | 13 | 10 |
| Total | 88% | $43,074 | 8,017 | 6,619 | 5,741 | 5,069 | 580 |

29.     On August 26, 2011, DeVry released its 2011 Annual Report indicating that 89% of DeVry University's recent graduates had obtained jobs in their fields of study.  In this regard, in the Company's June 30, 2011 report, DeVry stated:

> Our goal is simple: we want to give our students the education, services, and support they need to succeed, both while they are our students and after they graduate.
>
> **We measure DeVry University's achievement towards that goal with our "90/40" standard: within six months of graduation, we want 90 percent of our graduates employed in their fields of study at an average salary of $40,000 or more.  Even in this year's challenging job market, 89 percent of our graduates had jobs in their fields with an average salary of more than $43,000."**

9

30.  The 2011 Annual Report's Letter to Shareholders was signed by Defendant Hamburger and was attached to the Company's Form 10-K filed with the SEC on August 26, 2011 and signed by Defendants Hamburger and Gunst.

31.  On June 13, 2012, DeVry University released its 2010-2011 Academic Annual Report, representing that 89% of all 2010 DeVry University graduates who earned a bachelor's degree were employed in their fields of study within six months of graduating.  In this regard, this Company indicated that:

| 2010 Career Services Results by degree program — Combined statistics for students who graduated from the February 2010, June 2010 and October 2010 classes. | Graduates who actively pursued and obtained employment and those already employed in education-related careers within 180 days of graduation | Average reported annual compensation [3] | Graduates | Graduates eligible for career assistance [4] | Graduates who actively pursued employment for up to 180 days and those who were already employed [5] | Graduates employed in education-related positions within 180 days of graduation |
|---|---|---|---|---|---|---|
| **ASSOCIATE DEGREE PROGRAM** | | | | | | |
| Accounting | 75% | $33,066 | 90 | 70 | 56 | 42 |
| Electroneurodiagnostic Technology | 100% | $47,840 | 2 | 2 | 2 | 2 |
| Electronics & Computer Technology | 87% | $33,381 | 331 | 254 | 210 | 182 |
| Health Information Technology | 76% | $31,561 | 489 | 356 | 283 | 215 |
| Network Systems Administration | 84% | $38,263 | 540 | 329 | 248 | 209 |
| Web Graphic Design | 50% | $30,827 | 273 | 131 | 60 | 30 |
| **TOTAL** | 79% | $34,145 | 1,725 | 1,142 | 859 | 680 |
| **BACHELOR'S DEGREE PROGRAM** | | | | | | |
| Biomedical Engineering Technology [2] | 80% | $42,480 | 76 | 70 | 64 | 51 |
| Business Administration | 90% | $39,220 | 1,550 | 1,314 | 1,237 | 1,115 |
| Clinical Laboratory Science | 100% | $49,640 | 7 | 7 | 6 | 6 |
| Computer Engineering Technology | 80% | $37,369 | 134 | 119 | 105 | 84 |
| Computer Information Systems | 84% | $43,849 | 718 | 628 | 530 | 443 |
| Electronics Engineering Technology | 88% | $41,297 | 256 | 238 | 215 | 190 |
| Game & Simulation Programming | 63% | $38,847 | 374 | 334 | 226 | 143 |
| Multimedia Design & Development | 0% | N/A | 1 | 1 | 1 | 0 |
| Network & Communications Management | 90% | $44,287 | 511 | 462 | 411 | 369 |
| Technical Management | 92% | $46,649 | 3,608 | 3,052 | 2,827 | 2,594 |
| **TOTAL** | 89% | $43,953 | 7,235 | 6,225 | 5,622 | 4,995 |

32.  Similarly, on February 4, 2013, DeVry University released its 2011-2012 Academic Annual Report, indicating:

| 2011 Career Services Results by degree program — Combined statistics for students who graduated from the February 2011, June 2011 and October 2011 classes. | Graduates who actively pursued and obtained employment and those already employed in education-related careers within 180 days of graduation | Average reported annual compensation [2] | Graduates | Graduates eligible for career assistance [3] | Graduates who actively pursued employment for up to 180 days and those who were already employed [4] | Graduates employed in education-related positions within 180 days of graduation |
|---|---|---|---|---|---|---|
| **ASSOCIATE DEGREE PROGRAM** | | | | | | |
| Accounting | 74% | $33,287 | 159 | 97 | 88 | 65 |
| Electroneurodiagnostic Technology (renamed Neurodiagnostic Technology November 9, 2012) | 100% | $35,391 | 9 | 8 | 8 | 8 |
| Electronics & Computer Technology | 82% | $37,043 | 336 | 218 | 201 | 165 |
| Health Information Technology | 69% | $33,321 | 849 | 523 | 460 | 318 |
| Network Systems Administration | 81% | $37,502 | 696 | 407 | 373 | 303 |
| Web Graphic Design | 52% | $31,739 | 412 | 140 | 110 | 57 |
| **ASSOCIATE TOTAL** | **74%** | **$35,327** | **2,461** | **1,393** | **1,240** | **916** |
| **BACHELOR'S DEGREE PROGRAM** | | | | | | |
| Biomedical Engineering Technology[1] | 81% | $43,568 | 113 | 101 | 94 | 76 |
| Business Administration | 91% | $38,180 | 1,703 | 1,334 | 1,269 | 1,150 |
| Clinical Laboratory Science | 100% | $44,075 | 15 | 14 | 14 | 14 |
| Computer Engineering Technology | 86% | $40,834 | 122 | 97 | 91 | 78 |
| Computer Information Systems | 85% | $44,178 | 806 | 613 | 570 | 484 |
| Electronics Engineering Technology | 91% | $44,386 | 285 | 240 | 232 | 211 |
| Game & Simulation Programming | 61% | $36,096 | 439 | 298 | 246 | 149 |
| Management | 100% | $29,062 | 9 | 5 | 5 | 5 |
| Multimedia Design & Development | 82% | $29,208 | 66 | 45 | 40 | 33 |
| Network & Communications Management | 90% | $43,838 | 543 | 433 | 407 | 366 |
| Technical Management | 90% | $47,001 | 4,099 | 3,176 | 3,033 | 2,726 |
| **BACHELOR'S TOTAL** | **88%** | **$43,849** | **8,200** | **6,356** | **6,001** | **5,292** |

**Graduate Employment Rates**

Even in today's challenging economic environment, a large percentage of 2011 DeVry University graduates in the active job market were either employed in their fields before graduating or found jobs within six months of graduation. For those who earned associate degrees, the employment rate was 74 percent; the rate was 88 percent for those who earned bachelor's degrees[5].

33.     On August 29, 2013, DeVry released its 2013 Annual Report, which included a Letter to Shareholders signed by Defendant Hamburger.  In the 2013 Letter to Shareholders, DeVry emphasized that the best way to measure the quality of DeVry's education is to gauge the successful outcomes of its students.  To this end, DeVry asserted that "90 percent of DeVry University's 2012 graduates active in the job market were employed in their fields of study within six months of graduation, earning an average of more than $43,500 annually."

34.     On December 10, 2013, DeVry University released its 2012-2013 Academic Annual Report stressing that "90 percent of DeVry University graduates who were actively seeking employment in 2012 had careers in their fields within six months of graduation." To that effect, the Company indicated:

## Graduate Employment Rate and Return on Investment

One critical measure of our success is the employment outcomes of DeVry University graduates. Ninety percent of DeVry University's 2012 graduates who were actively seeking employment had careers in their field within six months of graduation, at an average salary of $43,538. (These statistics include graduates of associate and bachelor's degree programs and those who were already employed in their field of study.) We believe that our graduates' employment in fields related to their programs of study is essential to achieving our mission and to strengthening our ability to attract and retain students.

| 2012 Career Services Results by degree program<br><br>Combined statistics for students who graduated from the February 2012, June 2012, October 2012 and December 2012 classes | Graduates who actively pursued and obtained employment and those already employed in education-related careers within 180 days of graduation | Average reported annual compensation [1] | Graduates | Graduates eligible for career assistance [2] | Graduates who actively pursued employment for up to 180 days and those who were already employed [3] | Graduates employed in education-related positions within 180 days of graduation |
|---|---|---|---|---|---|---|
| **ASSOCIATE DEGREE PROGRAM** | | | | | | |
| Accounting | 90% | $33,892 | 234 | 144 | 124 | 112 |
| Electronics & Computer Technology | 91% | $37,395 | 378 | 246 | 215 | 195 |
| Health Information Technology | 79% | $31,847 | 1,018 | 619 | 522 | 411 |
| Network Systems Administration | 87% | $39,937 | 797 | 437 | 377 | 329 |
| Neurodiagnostic Technology | 100% | $37,960 | 7 | 7 | 7 | 7 |
| Web Graphic Design | 64% | $33,327 | 403 | 145 | 88 | 56 |
| **ASSOCIATE TOTAL** | 83% | $35,436 | 2,837 | 1,598 | 1,333 | 1,110 |
| **BACHELOR'S DEGREE PROGRAM** | | | | | | |
| Biomedical Engineering Technology | 90% | $45,281 | 110 | 98 | 88 | 79 |
| Business Administration | 92% | $38,558 | 1,911 | 1,536 | 1,430 | 1,318 |
| Clinical Laboratory Science | 100% | $46,176 | 26 | 23 | 21 | 21 |
| Computer Engineering Technology | 87% | $44,421 | 119 | 102 | 93 | 81 |
| Computer Information Systems | 89% | $44,651 | 901 | 697 | 633 | 562 |
| Electronics Engineering Technology | 93% | $48,208 | 318 | 282 | 269 | 249 |
| Game & Simulation Programming | 69% | $38,688 | 362 | 248 | 194 | 133 |
| Justice Administration | 100% | $26,000 | 4 | 3 | 2 | 2 |
| Management | 96% | $42,353 | 74 | 52 | 48 | 46 |
| Multimedia Design & Development | 84% | $32,251 | 196 | 127 | 92 | 77 |
| Network & Communications Management | 93% | $44,891 | 660 | 525 | 494 | 461 |
| Technical Management | 94% | $48,101 | 4,620 | 3,614 | 3,413 | 3,196 |
| **BACHELOR'S TOTAL** | 92% | $45,031 | 9,301 | 7,307 | 6,777 | 6,225 |

35.     Throughout 2013, Defendants ran an advertisement on numerous national cable and satellite TV channels, which it titled "Graduation Present." The advertisement contained the following statements and depictions:

a)   A DVU student narrates the advertisement. She concludes by stating: "And when I finish my degree in business, a new job at a great company––that's the graduation present I want."

b)   Immediately after the student refers to wanting a new job at a great company, an announcer states: "In 2012, 90% of DeVry University grads actively seeking employment had careers in their field in six months."

c)   While the announcer is speaking, the following screen appears, with people walking in the background, for approximately five seconds:



The text in the middle of the screen reads: "90% of our grads actively seeking employment had careers in 6 months"

d)   The screen with the text then disappears, and the announcer then states: "Join the 90%. Learn how at devry.edu"

36.   Between October 2013 and April 2014, Defendants disseminated another advertisement on numerous national cable and satellite TV channels, which Defendants titled "Roommates." The advertisement, which appeared in the Spanish language, contained the following statements and depictions:

a)   During this advertisement, the announcer states: "En el 2012, el 90% de los graduados de DeVry University que buscaron empleo de forma activa

ejercían su carrera en menos de 6 meses." (Translation: "In 2012, 90% of graduates from DeVry University actively seeking employment had careers in less than 6 months.")

b) While the announcer is speaking, the following screen appears, for approximately five seconds:



The text in the middle of the screen reads: "el 90% de nuestros graduados que buscaron empleo de forma activa ejercían su carrera en 6 meses." (Translation: "90% of our grads actively seeking employment had careers in 6 months.").

37. In 2013, DeVry also advertised their 90% and higher income claims on various webpages on the DeVry University website, at www.devry.edu. Some examples include:



**Excellent employment results**

Nobody wants to go to college and just be a number...unless they're numbers like these. Each year, thousands of our grads find themselves right where they want to be - employed in their fields of study.

IN 2012, **90%** *of* **DeVry University GRADS** actively seeking employment **HAD CAREERS**[1] in their field within six months of graduation.



# An education that pays

Not only can a degree from DeVry University prepare you for a lifetime of career success, it can also increase your earning potential right from the start.

ONE YEAR AFTER GRADUATION, **DeVry University grads REPORT EARNING 15% MORE** than the median earnings reported by all other bachelor's degree graduates.[3]

DEVRY UNIVERSITY GRADS — OTHER GRADS

38.     On August 27, 2014, DeVry released its 2014 Annual Report, which included a Letter to Shareholders signed by Defendant Hamburger.  In the 2014 Letter to Shareholders, DeVry boasted to shareholders that:

> *[i]n 2013, 90% of DeVry University graduates actively seeking employment obtained careers in their field of study within six months of graduation or were already employed in their field when they graduated. These graduates earned an average salary of nearly $44,295. In strong job markets and weaker ones alike, employers value DeVry University graduates*.

15

* * *

**90+%** Graduate employment at DeVry University

39.     The 2014 Annual Report's Letter to Shareholders was signed by Defendant Hamburger and was attached to the Company's Form 10-K filed with the SEC on August 27, 2014 and signed by Defendants Hamburger and Wiggins.

40.     On March 20, 2015, DeVry University released its 2013-2014 Academic Annual Report stressing that "[o]ne critical measure of our success is the employment outcomes of DeVry University graduates."  To that effect, the Company indicated that, "[i]n 2013, 90% of DeVry University graduates actively seeking employment had careers in their field of study within 6 months of graduation at an average salary of $44,295."

**C.     Defendants Materially Misrepresented DeVry's Prospects for Continued Growth**

41.     Contrary to DeVry's representations during the Class Period concerning the Company's prospects for continued growth, Defendants were well aware from the start of the Class Period that DeVry was facing formidable hurdles stemming from the lackluster employment prospects of DeVry University graduates.  By purposefully misrepresenting the employment prospects of DeVry University graduates to investors and potential students, DeVry was able to hide its true financial state during the Class Period.

42.     Defendants' misrepresentations were present on February 4, 2011, the first day of the Class Period, and continued unabated until January 27, 2016, when their illegal behavior was disclosed by the FTC and the Department of Education.  On February 4, 2011, the Company

16

filed its Form 10-Q with the SEC for 2Q 2011, reiterating DeVry's previously reported financial results, including:

> Total consolidated revenues for the second quarter of fiscal year 2011 of $551.5 million increased $78.5 million, or 16.6%, as compared to the year-ago quarter. For the first six months of fiscal year 2011, total consolidated revenues increased 18.7% to $1,072.9 million as compared to the year-ago period. ***For both the second quarter and first six months of fiscal year 2011, revenues increased within all four of DeVry's business segments as a result of growth in total student enrollments, improved student retention and tuition price increases.***

43. With regards to undergraduate student enrollment, the 2Q 2011 Form 10-Q emphasized that "***[m]anagement believes the increased undergraduate total student enrollments were most significantly impacted by DeVry's strong track record of high-quality education, academic and graduate employment outcomes, and improved retention of existing students***." Management made this same claim in its 3Q 2011 Form 10-Q, which was filed with the SEC on May 5, 2011.

44. In addition, the 2Q 2011 Form 10-Q contained certifications signed by Defendants Hamburger and Gunst pursuant to §302 of the Sarbanes-Oxley Act of 2002 ("SOX"), which falsely stated:

> I, [Daniel Hamburger/Richard M. Gunst], certify that:

> 1. I have reviewed this Quarterly Report on Form 10-Q of DeVry Inc.;

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in

Exchange Act Rules 13a – 15(e) and 15d – 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a – 15(f) and 15d – 15(f)) for the registrant and have:

> (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report and based on such evaluation; and

> (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting. . . .[6]

45.    Defendants Hamburger, Gunst, and/or Wiggins made substantially similar false statements in DeVry's regulatory filings throughout the Class Period, including in Forms 10-Q for the periods 3Q 2011, 1Q 2012, 2Q 2012, 3Q 2012, 1Q 2013, 2Q 2013, 3Q 2013, 1Q 2014, 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, and 1Q 2016, and Forms 10-K for year-end 2011, 2012, 2013, 2014, and 2015.[7]

---

[6] 2Q 2011 Form 10-Q (filed on February 4, 2016), at Ex. 31.

[7] All quarterly and annual reports filed with the SEC between the start of the Class Period and January 3, 2012 were certified by Defendant Gunst pursuant to §302 of SOX.   Starting on January 3, 2012, and continuing through the end of the Class Period, all quarterly and annual reports filed with the SEC contained certifications signed by Defendant Wiggins pursuant to §302 of SOX.

46.     As further detailed below, throughout the Class Period, Defendants made false and/or misleading statements and/or failed to disclose to investors that: (i) 90% of DeVry University students from a specific year (e.g., graduates from 2011-2016) who were actively seeking employment did not in fact land or obtain new jobs in their field of study within six months of graduation; (ii) 90% of DeVry University students since 1975 who were actively seeking employment did not in fact land or obtain new jobs in their field of study within six months of graduation; (iii) one year after graduation, the average or median salary of DeVry University graduates with bachelor's degrees was not in fact 15% higher than the average or median salary of graduates with bachelor's degrees from all other colleges and universities; (iv) as a result, DeVry overstated its growth, revenue, and earnings potential by concealing the true employment prospects of DeVry University graduates to investors and potential students; and (v) as a result of the foregoing, Defendants' statements about DeVry's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

**D.      The Truth Emerges**

47.     On January 27, 2016, the FTC shocked the market when it filed suit against DeVry for engaging in deceptive practices by purposefully misrepresenting the benefits of obtaining a degree from DeVry University.  According to the FTC, DeVry falsely touted that: (1) 90% of DeVry University students from a specific year (e.g., graduates from 2011-2016) who were actively seeking employment did not in fact land or obtain new jobs in their field of study within six months of graduation; (2) 90% of DeVry University students since 1975 who were actively seeking employment did not in fact land or obtain new jobs in their field of study within six months of graduation; and (3) one year after graduation, the average or median salary of DeVry University graduates with bachelor's degrees was not in fact 15% higher than the average

or median salary of graduates with bachelor's degrees from all other colleges and universities.  In truth, the actual number of DeVry University graduates who found employment in their field of study within six months of graduating was "significantly smaller than 90%."  Similarly, the FTC stressed that DeVry University's own files belied Defendants' assertion that DeVry University's graduates earn significantly higher salaries than graduates from other colleges or universities.

48.      The FTC Complaint highlights that DeVry has falsely "advertised and promoted [DeVry University's] degree programs through television commercials, [DeVry University's] website, YouTube advertisements, radio spots, print advertisements, Facebook, Twitter, sales pitches with prospective students, and other advertising and promotional materials."  Through these means,  DeVry represented that:

> *as a result of obtaining a DVU degree, 90% of DVU graduates who were actively seeking employment landed or obtained new jobs in their field of study within six months of graduation.* In some instances when Defendants make this representation, they claim this statistic applies to DVU graduates from a recent year, while in other instances, Defendants claim this statistic applies to all graduates since 1975, or "for more than 30 years." In its advertising and in its presentations to prospective students, Defendants present this 90% "employment rate" as evidence of the likelihood that obtaining a DeVry degree leads to finding a job. While Defendants' advertisements and sales pitches most commonly express DVU's employment rate for recent graduates as exactly 90%, in some instances, during certain limited time periods, Defendants have stated a percentage that is slightly less or more than 90% (e.g., 87% or 92%). *As explained below, these representations (Defendants' "90% claims") are false and unsubstantiated.*

49.      As noted by the FTC, DeVry has been advertising its 90% employment and higher income claims on various webpages on the DVU website (www.devry.edu) since at least 2008.  Some examples include:

**Excellent employment results**

Nobody wants to go to college and just be a number…unless they're numbers like these.  Each year, thousands of our grads find themselves right where they want to be – employed in their fields of study.



**An education that pays**

Not only can a degree from DeVry University prepare you for a lifetime of career success, it can also increase your earning potential right from the start.



50. In order to substantiate its 90% claim, DeVry relied upon student records maintained by DeVry University's Career Services department. These student records contain information about students' majors, graduation dates, employment history, and DeVry University's classification of their employment status. According to the FTC,

*[t]hese student records, however, do not provide a reasonable basis that substantiates Defendants' 90% claims. Among other reasons, when calculating the 90% claims, Defendants count a substantial number of DVU graduates who should not be counted and similarly exclude a substantial number of DVU graduates who should not be excluded. For example, Defendants count graduates who did not obtain a job as a result of obtaining a degree from DVU. In fact, Defendants include the substantial percentage of DVU graduates who, after graduation, continued with the same job they had when they enrolled in DVU. Defendants also count graduates who did not obtain jobs in their field of study. A significant percentage of the jobs that Defendants count as being in the graduate's field of study include jobs that employers, industry experts,*

*graduates, and consumers would not reasonably consider to be in the graduate's field of study.*

51.     Several examples of DeVry University students from the graduating class of 2012 who were incorrectly classified as working "in field" include (but are not limited to):

a)      graduates with degrees in technical management who were working as: a rural mail carrier (human resources specialization); a yard salesman at a nursery (business information systems specialization); a sales associate at Macy's (general technical specialization); a driver delivering rain gutters for a construction services company; a data entry specialist for a radio station (human resources specialization); and unpaid volunteers at medical centers (human resources management and health services management specializations);

b)      a graduate with a degree in business administration (health services management specialization) working as a server at the Cheesecake Factory;

c)      a graduate with a degree in business administration (health care management specialization) working as a car salesman;

d)      a graduate with a degree in business administration (accounting specialization) working as a secretary at a prison; and

e)      graduates with various degrees working as customer service representatives.

52.     Additionally, the FTC asserts that Defendants relied on an income report prepared by a third-party to substantiate their claims that DeVry University graduates obtained higher incomes.  However, according to the FTC, this income report lacked a reasonable basis to substantiate Defendants' claim, as "[t]he sampling methods and methodology of the survey that underlay the income report all gave or should have given Defendants reason to question the reliability of the conclusions and information contained in the report."  Notably, DeVry University personnel voiced their concerns over whether the date contained in the income report sufficiently supported the higher-income claim.  The FTC further emphasized that:

Among other problems, the comparison of the incomes of DVU graduates with incomes of graduates from other schools did not account or adjust for significant salary drivers such as age, experience, and degree field. *In addition, statistics that DVU had directly collected from thousands of its graduates each year about their incomes differed significantly from the third party's statistics, which consisted of information from only several hundred individuals per graduation year*.

53.    Furthermore, Defendants had access to publicly available statistics regarding the incomes of graduates from other colleges and universities throughout the United States, by school and by field.  "Comparing the information in Defendants' own files with publicly available income date shows that DVU graduates a year after graduating do not in fact earn significantly more than graduates from all other schools combined…."

54.    Also on January 27, 2016, the U.S. Department of Education issued DeVry University a Notice of Intent to Limit DeVry's participation in programs authorized pursuant to Title IV of HEA, after finding that DeVry was in violation of federal law.

55.    According to the Department of Education, starting in at least 2008 and continuing until at least August 2015, DeVry's marketing and promotional materials represented that:

"Since 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation." (the "Since 1975 Representation").

56.    Concerned with the veracity of Defendants' Since 1975 Representation, the DOE sent a letter to DeVry on August 28, 2015 requesting information about its Since 1975 Representation, particularly the data used to substantiate its 90% employment claim.  As noted by the Department of Education in its Notice of Intent, federal law mandates that educational institutions participating in Title IV programs must be able to provide "the most recent available data concerning employment statistics and…any other information necessary to substantiate the

23

truth of the advertisements," 20 U.S.C. § 1094(a)(8); 34 C.F.R. § 668.14(b)(10). After attempting to garner additional information from DeVry on several occasions in September and October 2015, the Department of Education concluded that *"DeVry is unable to substantiate the truthfulness of those representations, as required by federal law."*

57. With regards to DeVry's representations, the DOE's Notice of Intent stated:

As described more fully below, starting in at least 2008 and continuing until at least August 2015, DeVry made representations to students and prospective students regarding the post-graduation employment outcomes of students who graduated from DeVry over a cumulative period stretching more than 30 years. The specific representation that forms the basis of this action was highlighted in DeVry's We Major in Careers campaign, a 2008 "career-focused brand marketing campaign" that sought to position DeVry as an institution that helped its graduates achieve career success. That campaign, which reflected more than a year's worth of in-depth consumer, marketplace, and brand research by DeVry, represented a conscious decision by DeVry to make certain representations to students and prospective students for marketing and recruitment purposes. *Yet with respect to certain representations that were made by DeVry as part of that campaign and which continued to be made until at least August 2015, DeVry is unable to substantiate the truthfulness of those representations, as is required by federal law.*

58. As a result of DeVry's illicit behavior, the Department of Education imposed numerous conditions on DeVry in order to continue receiving Title IV funds. To that effect, the DOE stated:

Accordingly, as a condition of its continued participation in the Title IV programs and consistent with existing statutory and regulatory requirements, the Department is hereby notifying DeVry that neither it nor its agents or employees may make any representations, in advertisements or otherwise, that include statistics consisting of or based upon the post-graduation employment outcomes of students who graduated during the time that DeVry has conceded it does not possess graduate-specific information, *i.e.*, the type of information that is necessary to substantiate the truthfulness of any post-graduation employment claims. Nor may DeVry make any representations that include or are based upon post-graduation employment statistics regarding other time periods that cannot be substantiated with graduate-specific information. Moreover, for a period of five years following the effective date of this action, DeVry must subject all such representations to review by an independent auditor prior to the utterance (*i.e.*, oral, written, or otherwise) of such representations. The Department is also

24

requiring DeVry to contact third parties who are repeating or re-publishing DeVry's unsubstantiated representations and demand that those entities cease doing so, to retain records used to develop and substantiate certain advertisements, to notify the Department of any legal claims, investigations, subpoenas or other inquiries regarding its post-graduation employment representations, and to notify its students of this limitation. DeVry's failure to comply with these limitations could subject DeVry to further actions pursuant to 34 C.F.R. Part 668, Subpart G, up to and including termination from its participation in Title IV programs.

59.     As a result of these shocking disclosures, DeVry's common stock price dropped 15%, or $3.65 per share, from $23.68 per share on January 26, 2016 to $20.09 per share closing on January 27, 2016—wiping out over $230 million in the Company's market capitalization in one day, on unusually heavy volume.

60.     Over the next several trading days, DeVry's stock price continued to trade lower, closing at $18.08 on February 2, 2016. In total, from January 27, 2016 to February 2, 2016, DeVry's stock price share price dropped $5.66 per share, or 24%, wiping out approximately $360 million of the Company's market capitalization.

61.     In an article entitled "DeVry Education Teaches Tough Investment Lesson," investor website *thestreet.com* recommended against owning shares of DeVry in light of the recent revelations. The article stated the following:

To offset its declining student population at its various campuses, DeVry has ratcheted its promotional activities and marketing campaigns, claiming that 90% of its graduates who actively sought employment found new jobs in their majors within six months of graduation. Plus, DeVry claims that within a year of graduation, its former students earned 15% more pay compared to other graduates. ***But these claims are at best deceptive, according to the FTC …With DeVry's earnings and revenue in retreat and with little prospect of higher enrollment, we recommend avoiding DeVry shares. And at around $18 per share, DeVry could see its stock reach single digits as the weight of the government investigation grows more heavy***.

62.     In reaction to these troubling disclosures, DeVry's price target was downgraded by a host of investment research firms, as shown in the table below:

| Firm | Old Target Price | New Target Price |
|------|------------------|------------------|
| BMO Capital Markets | $30.00 | $21.00 |
| Compass Point | $28.00 | $18.00 |
| Deutsche Bank | $28.00 | $22.00 |
| Morgan Stanley | $33.00 | $27.00 |
| Robert Baird | $29.00 | $20.00 |
| Barrington Research | $35.00 | $25.00 |

63.     On March 14, 2016, the U.S. Department of Veterans Affairs cautioned GI Bill participants about DeVry on account of the FTC's lawsuit and the Department of Education's Notice of Intent.     In a letter sent to DeVry University, Curtis Coy, the VA Deputy Undersecretary of Economic Opportunity, said: "Effective the date of this letter, VA is suspending DeVry University's status as a [Principles of Excellence] institution at least until the conclusion of the FTC lawsuit," and highlighted that "[t]he FTC findings, [Department of Education] conclusions, and GI Feedback System complaints indicate that DeVry University has not acted in accordance with … Principles of Excellence guidelines."

64.     On May 9, 2016, Judge Michael W. Fitzgerald of the Central District of California rejected DeVry's request to dismiss the FTC's lawsuit against the Company.[8]     The Court found that the SEC stated a plausible claim for express misrepresentations.     Judge Fitzgerald stated in his motion to dismiss order that the "allegations show that the FTC's claims have factual basis and provide Defendants with adequate notice as to the FTC's reason for believing that the employment statistic is unsubstantiated and materially false." In regards to DeVry's higher-income advertisement representations, the Court stated that "It takes no special knowledge of statistics to realize that comparing, for example, the incomes of a thirty-five-year old DeVry University graduate with ten years of experience and an average twenty-one-year-old

---

[8] *Federal Trade Commission v. DeVry Education Group, Inc., et al*., Case No. 2:16-cv-00579 (C.D. Cal. May 9, 2016), "Order Denying Defendants' Motion to Dismiss Complaint" (ECF No. 38).

college graduate with no experience could lead to misleading results…these allegations are plausible and particular enough to put Defendants on notice of the FTC's basis for its claim."

65.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

## V.     CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired DeVry securities during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of DeVry and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

67.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Throughout the Class Period, DeVry's securities were actively traded on the New York Stock Exchange ("NYSE") (an open and efficient market) under the symbol "DV."  Millions of DeVry shares were traded publicly during the Class Period on the NYSE.  As of January 29, 2016, DeVry had 63,177,000 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by DeVry and/or its transfer agents and may be notified of the

pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

68.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

69.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

70.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)      whether Defendants participated in and pursued the common course of conduct complained of herein;

c)      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of DeVry;

d)      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of DeVry;

e)   whether the market price of DeVry common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)   the extent to which the members of the Class have sustained damages and the proper measure of damages.

71.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.   UNDISCLOSED ADVERSE FACTS

72.   The market for DeVry's securities was an open, well-developed and efficient market at all relevant times.  As a result of these materially false and misleading statements and failures to disclose described herein, DeVry's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired DeVry's securities relying upon the integrity of the market price of the Company's securities and market information relating to DeVry and have been damaged thereby.

73.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of DeVry's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and

misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.

74. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about DeVry's financial well-being and prospects.

75. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## VII. LOSS CAUSATION

76. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of DeVry's securities and operated as a fraud or deceit on Class Period purchasers of DeVry's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of DeVry's securities fell precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of DeVry's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

77.    By failing to disclose the true state of the Company's financial statements, investors were not aware of the true state of the Company's financial status.  Therefore, Defendants presented a misleading picture of DeVry's business practices and procedures.  Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused DeVry to conceal the truth.

78.    Defendants' false and misleading statements had the intended effect and caused DeVry's common stock to trade at artificially inflated levels throughout the Class Period.  The stock price drop discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

79.    The decline in the price of DeVry's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of DeVry's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of DeVry's securities and the subsequent decline in the value of DeVry's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.    SCIENTER ALLEGATIONS

80.    As alleged herein, the Individual Defendants acted with scienter in that Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly

and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

81.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding DeVry, their control over, receipt and/or modification of DeVry's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning DeVry, participated in the fraudulent scheme alleged herein.

## IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

82.     At all relevant times, the market for DeVry's securities was an efficient market for the following reasons, among others:

a)     DeVry securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

b)     As a regulated issuer, DeVry filed periodic public reports with the SEC and the NYSE;

c)     DeVry securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

d)     DeVry regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

83.     As a result of the foregoing, the market for DeVry's securities promptly digested current information regarding DeVry from all publicly available sources and reflected such information in DeVry's stock price. Under these circumstances, all purchasers of DeVry's securities during the Class Period suffered similar injury through their purchase of DeVry's securities at artificially inflated prices and a presumption of reliance applies.

84.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding DeVry's business practices, financial results and condition and internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X.     NO SAFE HARBOR

85.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

86.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of DeVry who knew that the statement was false when made.

## XI.     COUNTS AGAINST DEFENDANTS

### COUNT I
### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

87.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

88.     During the Class Period, DeVry and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of DeVry securities; and (iii) cause Plaintiff and the other members of the Class to purchase DeVry securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

89.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for DeVry securities in violation of §10(b) of the

Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued herein as controlling persons of DeVry, as alleged herein.

90.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

91.     DeVry and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of DeVry as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of DeVry's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about DeVry and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading,

as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of DeVry's securities during the Class Period.

92. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

93. These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing DeVry's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the

Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

94.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of DeVry securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of DeVry shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired DeVry securities during the Class Period at artificially inflated high prices and were damaged thereby.

95.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of DeVry, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired DeVry securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

96.     By virtue of the foregoing, DeVry and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

97.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against The Individual Defendants

98.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

99.     The Individual Defendants were and acted as controlling persons of DeVry within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

100.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

101.     As set forth above, DeVry and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a) Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c) Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d) Awarding such other relief as this Court deems appropriate.

## XIII.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: May 13, 2016                    Respectfully Submitted,

*/s/ Norman Rifkind*
Norman Rifkind
Law Office of Norman Rifkind
100 E Huron Street #1306
Chicago, IL 60611
(847)372-4747
Norman@RIFSLAW.com

*Local and Liaison Counsel for Plaintiff Pension Trust Fund for Operating Engineers*

**SAXENA WHITE P.A.**
Joseph E. White, III
Lester R. Hooker
5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
Telephone: (561) 206-6708
Facsimile:  (866) 290-1291
lhooker@saxenawhite.com

*Lead Counsel for Plaintiff Pension Trust Fund for Operating Engineers*