**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **PENSION TRUST FUND FOR OPERATING ENGINEERS, Individually and on Behalf of All Others Similarly Situated,**<br><br>**Plaintiff,**<br>**v.**<br><br>**DEVRY EDUCATION GROUP, INC., DANIEL HAMBURGER, RICHARD M. GUNST, PATRICK J. UNZICKER, AND TIMOTHY J. WIGGINS,**<br><br>**Defendants.** | **Case No. 1:16-CV-05198**<br>**Hon. Jorge L. Alonso**<br><br>**JURY TRIAL DEMANDED**<br><br>**ECF CASE** |

**SECOND AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


**Page**

**I. NATURE OF THE ACTION .......... 4**

**II. JURISDICTION AND VENUE .......... 19**

**III. THE PARTIES .......... 20**

**A. Lead Plaintiff .......... 20**

**B. Defendants .......... 20**

**IV. THE FRAUD PERPETRATED BY DEFENDANTS .......... 24**

**A. Defendants Hamburger, Wiggins, Unzicker, and Gunst Misrepresented and Concealed the Actual DeVry University Student Outcome Statistics .......... 24**

**1. DeVry's Misleading SEC Filings and Public Announcements Tout the Success of Graduates to Attract Students and Grow Revenue and Earnings Per Share .......... 28**

**2. Defendants' Use of Misleading Academic Annual Reports .......... 83**

**B. Securities Analysts Following DeVry Recognized the Significance of DeVry's Job Placement Rates and Higher Salary Claims and Its Correlation to Revenue Generation and Growth Potential .......... 87**

**V. THE TRUTH EMERGES .......... 94**

**A. The FTC Lawsuit .......... 95**

**B. The DoE Action .......... 103**

**C. The Devastating Results On DeVry's Stock from these Disclosures .......... 108**

**D. After the Class Period, DeVry Settles the FTC Lawsuit for $100 Million and Reforms to Prevent the Company from Further Touting Misleading Student Outcome Data .......... 110**

**VI. CONFIDENTIAL WITNESSES FURTHER EXPLAIN HOW DEVRY MISLED THE PUBLIC .......... 114**

**VII. SCIENTER ALLEGATIONS .......... 122**

**VIII. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 131**

**A. Materially False and Misleading Statements and Omissions in the 2011 AR and 2011 10-K ........ 131**

**B. Materially False and Misleading Statements and Omissions in the 1Q 2012 Press Release and Earnings Conference Call ........ 133**

**C. Materially False and Misleading Statements and Omissions in the 3Q 2012 Earnings Conference Call ........ 135**

**D. Materially False and Misleading Statements and Omissions in the 2012 AR and 10-K ........ 136**

**E. Materially False and Misleading Statements and Omissions in the 1Q 2013 Press Release and Earnings Conference Call ........ 138**

**F. Materially False and Misleading Statements and Omissions in the 2Q 2013 Earnings Conference Call ........ 140**

**G. Materially False and Misleading Statements and Omissions at the Robert W. Baird and Co. Business Solutions Conference ........ 141**

**H. Materially False and Misleading Statements and Omissions at the Credit Suisse 15th Annual Global Services Conference ........ 143**

**I. Materially False and Misleading Statements and Omissions in the 3Q 2013 Press Release and Earnings Conference Call ........ 144**

**J. Materially False and Misleading Statements and Omissions at the William Blair Growth Stock Conference ........ 146**

**K. Materially False and Misleading Statements and Omissions in the 4Q 2013 Press Release and Earnings Conference Call ........ 148**

**L. Materially False and Misleading Statements and Omissions in the 2013 AR and 10-K ........ 150**

**M. Materially False and Misleading Statements and Omissions at the Robert W. Baird & Co. Inc. Growth Stock Conference ........ 152**

**N. Materially False and Misleading Statements and Omissions at the William Blair & Company LLC Growth Stock Conference ........ 153**

**O. Materially False and Misleading Statements and Omissions in the 4Q 2014 Press Release and Earnings Conference Call ........ 155**

**P. Materially False and Misleading Statements and Omissions in the 2014 AR and 10-K ........ 157**

**Q. Materially False and Misleading Statements and Omissions at the BMO Back to School Education Conference ........ 159**

**R. Materially False and Misleading Statements and Omissions at the J.P. Morgan Ultimate Services Investor Conference ........ 161**

**S. Materially False and Misleading Statements and Omissions at the Robert W. Baird & Co. Inc.'s Growth Stock Conference ........ 163**

**T. Materially False and Misleading Statements and Omissions in the 2015 AR and 10-K ........ 164**

**U. Defendants' False and Misleading SOX Certifications ........ 166**

**IX. LOSS CAUSATION ........ 168**

**X. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ........ 170**

**XI. THE PRESUMPTION OF RELIANCE ........ 170**

**XII. CLASS ACTION ALLEGATIONS ........ 171**

**XIII. CAUSES OF ACTION ........ 173**

**COUNT I ........ 173**

**COUNT II ........ 179**

**XIV. PRAYER FOR RELIEF ........ 180**

**XV. JURY DEMAND ........ 181**

Lead Plaintiff Utah Retirement Systems ("Lead Plaintiff"), on behalf of itself and all persons or entities similarly situated, alleges the following based on personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through its attorneys, which included, among other things, a review of: (i) DeVry Education Group Inc.'s ("DeVry" or the "Company") public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of DeVry's earnings conference calls; (iv) publicly available presentations by DeVry; (v) DeVry's press releases and media reports; (vi) economic analyses of the movement and pricing data associated with DeVry's common stock; (vii) consultations with relevant consultants and experts; (viii) information obtained from former DeVry employees throughout the course of counsel's investigation; and, (ix) other publicly available material and data identified herein.

Lead Plaintiff's allegations are also based, in part, on the investigation and resolution of the lawsuit filed by the U.S. Federal Trade Commission (the "FTC"), in which DeVry and DeVry University agreed to pay $100 million and implement several remedial measures to resolve, and the investigation and resolution of claims by the U.S. Department of Education (the "DoE"). The FTC launched its probe on January 28, 2014, when it issued a Civil Investigative Demand ("CID") to DeVry seeking documents and information concerning DeVry's advertising, marketing, or sale of secondary or postsecondary education products or services, or education accreditation products or services. After a two-year investigation which yielded more than 2.3 million pages of documents and responses to approximately 64 comprehensive interrogatories from DeVry, and an additional trove of documents and information from third parties, the FTC

filed a lawsuit against DeVry charging that DeVry University's much-touted graduate employment and salary statistics were either false or unsubstantiated.[1]

In similar fashion, on August 28, 2015, the Multi-Regional and Foreign School Participation Division of the Federal Student Aid Office of the DoE served on DeVry a request for documents and information regarding published employment outcomes and relative earnings information of DeVry University graduates. Much like the FTC, on January 27, 2016, the DoE publicly issued to DeVry a Notice of Intent to Limit (the "Notice of Intent"), informing DeVry University of the DoE's intention to impose certain limitations on the participation of DeVry University in programs authorized pursuant to Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070, *et seq*. ("Title IV") as a result of the school's failure to substantiate certain of its advertised graduate employment and salary statistics. Later that year, on October 13, 2016, the DoE announced that it had entered into a settlement (the "DoE Settlement") resolving the dispute, recognizing that "[s]tudents deserve accurate information about where to invest their time and money, and the law is simple and clear: recruitment claims must be backed up by hard data."

On December 15, 2016, both the FTC and DeVry announced that DeVry and DeVry University had agreed to a $100 million settlement to resolve the FTC lawsuit. Also on that day, the FTC and DeVry filed a Stipulation as to Entry of Order for Permanent Injunction and Monetary Judgment and proposed order, which was signed by Judge Michael W. Fitzgerald of the Central District of California on December 19, 2016 (collectively, the "FTC Settlement Stipulation and Order"). As described in more detail below, under the terms of the settlement, DeVry will pay $49.4 million to be distributed to qualifying students and $50.6 million in loan

---

[1] *See FTC v. DeVry Education Group Inc.*, *et al.*, No. 16-CV-579-MWF-SS (C.D. Cal.).

forgiveness for unpaid student loans and other student debt for certain former students. According to the FTC, the settlement also includes, among other things, "provisions designed to prevent DeVry from misleading consumers in the future."

Lead Plaintiff's allegations are further based, in part, on interviews with former employees of DeVry or DeVry University ("Confidential Witnesses" or "CWs")[2] who have knowledge of the relevant aspects of the Company's operations and financial reporting, including:

- CW1, an Admissions Advisor for DeVry University's online programs from August 2011 to November 2012 in Chicago, Illinois, who was responsible for recruiting students throughout the United States;

- CW2, a Regional Marketing Director of DeVry's Northeast region from September 2008 to August 2013, who was in charge of marketing efforts in that region, which included New York City. CW2 worked on physical advertisement campaigns as well as social media efforts. He reported to the National Marketing Director;

- CW3, an Associate Director of Career Services at DeVry University's Fresno and Bakersfield, California Campuses from January 2013 to January 2014, who worked directly with graduates to assist them in job placement. Because of this, CW3 was familiar with how many graduates obtained jobs as well as the types of jobs they obtained. CW3 was also familiar with the school's process for determining job placement rates and its policies that determined which students would be counted in those statistics. He reported to the individual that was the president of both DeVry University's Fresno and Bakersfield campuses;

- CW4, a National Admissions Advisor for DeVry University's online programs from 2007 to 2011 in Chicago, Illinois, who was responsible for speaking directly to prospective students and encouraging them to attend DeVry. He reported to the Assistant Director of Admissions;

- CW5, an online Graduate Career Advisor for DeVry's Keller School of Management from January 2011 to December 2012 based in Naperville, Illinois, who was responsible for making calls to graduates who were within six months of graduation in order to obtain and review their resumes and cover letters and provide feedback. He also advised these graduates on how to look for a potential job and provided interview tips. CW5 confirmed

---

[2] To preserve confidentiality, all CWs are referred to in the masculine gender.

that he was expected to meet a job placement rate minimum of what he believed to be 90%. He reported to a manager in Career Services for the online division;

- CW6, who was an Associate Dean at DeVry University's College of Engineering and Information Services in Irving, Texas, from July 2009 to July 2015. In July 2014, CW6's job title changed to Faculty Program Chair but his responsibilities remained the same. When he was named Faculty Program Chair in 2014, he began reporting to the Assistant Dean of Academic Affairs; and

- CW7, who was the Campus Director and then President of DeVry University's Fresno and Bakersfield, California campuses from January 2009 to May 2016. He last reported to the Northwest Group President and, prior to that, reported to the Group Vice President. CW7 confirmed that DeVry had a written national policy that described the process and rules for which students were included in or excluded from DeVry University's job placement statistics.

Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth in this Second Amended Complaint after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. Lead Plaintiff brings this federal securities class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons and entities who purchased or otherwise acquired DeVry common stock between August 26, 2011 and January 27, 2016, inclusive (the "Class Period"), against the Company and certain of its officers and former officers for executing a scheme whereby Defendants disseminated materially false and misleading information and omitted other material information that artificially inflated DeVry's stock price, causing damage to Lead Plaintiff and the Class.

2. DeVry provides educational services globally through a number of subsidiaries, including DeVry University—one of the largest postsecondary educational institutions in the United States with undergraduate and graduate degrees offered on campus and online. Through its five colleges, DeVry University offers programs in healthcare, business, technology, accounting, finance, and law. There is no question that DeVry University was a core DeVry asset

during the Class Period, accounting for more than half of the Company's revenues through fiscal year 2013. Indeed, even when enrollment at DeVry University was flagging during the latter portion of the Class Period, it still accounted for over $900 million in revenue (or more than 48% of DeVry's total revenues) in fiscal year 2014 and nearly $800 million in revenue (or more than 41% of total revenues) in fiscal year 2015.

3. DeVry's chief source of revenue is the tuition it collects from students enrolled in its schools. Thus, generally speaking, since tuition makes up the bulk of DeVry's revenues, DeVry grows its revenues by increasing and maintaining student enrollments at its schools. However, many of its schools, including DeVry University, operate in highly fragmented markets and are subject to fierce competition with not only other for-profit postsecondary schools, but also state institutions, community colleges, and independent universities, among others. DeVry has thus historically needed a way to differentiate DeVry University, and in turn lure new students and retain currently enrolled students, in order to boost revenues and profits. As such, to compete in this environment and drive student growth at DeVry University, Defendants conducted a sustained marketing scheme through television, radio, print, and internet channels pushing the message that roughly 90% of DeVry University's graduates obtain employment in their field of study within six months of graduation at average salaries somewhere in the low-to-mid-$40,000 range. This marketing scheme was highly effective and eventually caught the attention of the FTC and DoE. As CW1 suggested, the job placement and higher income claims were powerful statements in recruiting students. Defendants also used DeVry University's job placement and salary statistics (also referred to as "student outcomes") to portray DeVry to securities analysts and investors as a high-quality company with the potential to grow revenues and earnings. Securities analysts and investors looked to these student outcomes

as a critical component in evaluating DeVry's earnings potential. However, unbeknownst to securities analysts, investors, and students, the job placement and salary statistics were a fiction.

4. Among the many examples of Defendants' publicly disseminated false statements concerning student outcomes, on August 26, 2011, DeVry released its 2011 Annual Report, which boasted that ***"[e]ven in this year's challenging job market, 89 percent of our graduates had jobs in their fields with an average salary of more than $43,000."*** Similarly, on October 25, 2013, DeVry issued a press release for its 1Q 2013 financial results that contained misrepresentations about DeVry University's student outcome statistics as well as a chart which represented that for the 85.7% of DeVry University graduates who were employed, the average salary was $42,623. Yet again, on March 13, 2013, Defendant Daniel Hamburger participated in and presented at the Credit Suisse 15th Annual Global Services Conference wherein he emphasized:

> Well, ***the other measure of quality is successful student outcomes***. . . . At DeVry University, ***nearly 86% of our graduates in the active job market were employed in their field of study within 6 months of graduation. And these graduates earned an average salary of over $43,000***. So that's a marker of academic quality.
>
> * * *
>
> One question that we've asked is how do we compete? How does DeVry compete? What is it that attracts students to our institutions in this competitive environment that's out there in higher education? We refer to it as HIRE Education. It's spelled a little bit differently, H-I-R-E. . . . [T]he E, incredible employment outcomes like the ***86% employed [at] $43,000*** that I referenced earlier [at] DeVry University.

5. Even when Defendants acknowledged that certain business segments, particularly DeVry University, faced difficulties and economic headwinds, they did so inadequately and propped up the fiction that DeVry's financial position would improve because of its marketing of

student employment outcomes. For instance, in his "Fellow Owners, Students, Colleagues and Friends Letter" in the Company's 2012 Annual Report, Defendant Hamburger stated that even though DeVry's financial outcomes in 2012 "were not what we wanted, our student outcomes were—and our investments in quality and capacity mean that we are poised to transition to recovery and growth in our enrollments and financial results." Likewise, on April 23, 2013, the Company issued a press release announcing its 3Q 2013 financial results, emphasizing that the Company's "plan to improve enrollment results includes enhancing communications to students about DeVry University's excellent graduate employment results[.]" In a conference call with securities analysts later that day, Defendant Hamburger again attempted to assuage analysts and investors by touting DeVry's strategy to combat weakening enrollment at its flagship DeVry University by, among other things, stressing the strength and success of DeVry University student outcomes:

> Our strategy is centered on the fact that DeVry University offers a very strong return on investment, and we need to do more to demonstrate this inherent value proposition to prospective students. So first we're changing our messaging to be more hard hitting on DeVry University as the career university. You know, ***86% of graduates active in the job market are employed in their field of study within six months of graduation. And that's with an average salary over $43,000. . . . So we're going to do a better job of communicating these impressive results to prospective students.***

6. Defendants continued to push this story especially with securities analysts and investors, recognizing the importance this information carried with securities analysts when they issued their ratings and recommendations of the Company. For instance, on August 8, 2013, in a conference call with securities analysts to discuss DeVry's 4Q 2013 results, Defendant Hamburger emphasized that "90% of our graduates in the active job market are employed in their field of study within six months of graduation. And they're earning an average of over $43,500.

That's higher than the median family household income of our students before they enrolled at DeVry University." Likewise, on August 7, 2014, the Company issued a press release for its 4Q 2013 financial results, which stated that "90.9 percent of DeVry University graduates were employed in their field of study within 6 months of graduation, earning an average of $44,295."

7. Analysts took note of DeVry's seemingly strong growth potential because of the purportedly strong student outcomes, parroting DeVry's positive—but false—graduate success story and issuing positive ratings. For example, after the Company revealed a sharp drop in DeVry University enrollments during 4Q 2011, on August 12, 2011 Barclays Capital maintained its "Overweight" rating, underscoring that "[d]ue to strong student outcomes and diversification, we expect DV to weather the current challenging environment better than its peers." Morgan Stanley also highlighted that "the diverse nature of its programs, its focus on student outcomes, room for greater efficiency, and FCF buildup will drive earnings growth over the long-term." Similarly, on January 27, 2012, the day after DeVry reported disappointing 2Q 2012 results, Oppenheimer Equity Research emphasized that DeVry "is well diversified and ranks toward the favorable end of the industry's operational and regulatory measures, and has a long-standing track record of solid student outcomes." Following better-than-expected earnings but still weak new student enrollment at DeVry University for 2Q 2013, J.P. Morgan stated that it "appreciate[d] DV's focus on balanced growth and high quality student outcomes," and upgraded its rating of DeVry shares.

8. However, DeVry's history of duping students and investors was about to catch up to it. On January 27, 2016, after a two-year investigation that began on January 23, 2014, which yielded more than 2.3 million pages of documents and responses to approximately 64 comprehensive interrogatories from DeVry, and an additional trove of documents and

information from third parties, the FTC shocked the market when it filed a lawsuit against DeVry charging that DeVry University's much-touted graduate employment and salary statistics were either made up or unsubstantiated.[3] According to the FTC, the actual number of DeVry University graduates who found employment in their field of study within six months of graduating was "significantly smaller than 90%" as DeVry had claimed year after year. Similarly, the FTC stressed that DeVry University's own files belied Defendants' assertion that DeVry University's graduates earned significantly higher salaries than graduates from other colleges or universities.

9. Indeed, the FTC explained in its complaint, which was filed on January 27, 2016, that "when calculating the 90% claims, ***Defendants count a substantial number of DVU graduates who should not be counted and similarly exclude a substantial number of DVU graduates who should not be excluded***." For instance, "Defendants count graduates who did not obtain a job as a result of obtaining a degree from DVU," including the "substantial percentage of DVU graduates who, after graduation, continued with the same job they had when they enrolled in DVU." The FTC noted in addition that "Defendants also count graduates who did not obtain jobs in their field of study," and indeed "***[a] significant percentage of the jobs that Defendants count as being in the graduate's field of study include jobs that employers, industry experts, graduates, and consumers would not reasonably consider to be in the graduate's field of study***." Similarly, the FTC observed that "Defendants also exclude certain students from the calculation who in fact were actively seeking employment," and provided as an example one student who was counted as non-job-seeking even though the student had viewed 177 job leads in DeVry University's jobs database, had at least six job interviews in the prior two

[3] https://www/ftc.gov/systems/files/documents/cases/160127devrycmpt.pdf.

months, attended a DeVry University "Career Fair," and had been in contact with DeVry University's Career Services department on multiple occasions to provide updates on his search for a job. As such, the FTC concluded that DeVry lacked any "reasonable basis" to substantiate the 90% employment claims.

10. Moreover, the FTC criticized Defendants' reliance on an income report prepared by a third-party to substantiate their claims that DeVry University graduates obtained higher incomes than graduates of other for-profit and traditional colleges and universities. According to the FTC, "[t]he sampling methods and methodology of the survey that underlay the income report all gave or should have given Defendants reason to question the reliability of the conclusions and information contained in the report," and in fact "DVU personnel expressed concerns over whether the data sufficiently supported the higher-income claim." Remarkably, DeVry University's own data that it had internally collected from thousands of its graduates each year (in contrast to the several hundred per year used in the third-party report) "differed significantly" from the statistics in the third party's report. The FTC's conclusion was stunning: "Comparing the information in Defendants' own files with publicly available income data shows that ***DVU graduates a year after graduating do not in fact earn significantly more than graduates from all other schools combined[.]***"

11. Also on January 27, 2016, the DoE publicly issued to DeVry a Notice of Intent, informing DeVry University of the DoE's intention to impose certain limitations on the participation of DeVry University in programs authorized pursuant to Title IV. The proposed limitations specifically relate to DeVry's representations in advertising and marketing that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation" (the "Since 1975 Representation"). With

regard to those representations, the DoE's Notice of Intent stated that "starting in at least 2008 and continuing until at least August 2015, DeVry made representations to students and prospective students regarding the post-graduation employment outcomes of students who graduated from DeVry over a cumulative period stretching more than 30 years. . . . Yet with respect to certain representations that were made by DeVry as part of that campaign and which continued to be made until at least August 2015, ***DeVry is unable to substantiate the truthfulness of those representations***, as is required by federal law."[4]

12. As a result of these shocking disclosures, DeVry's common stock price dropped 15%, or $3.65 per share, from $23.68 per share on January 26, 2016 to $20.09 per share closing on January 27, 2016—wiping more than $230 million from the Company's market capitalization value in one day, on unusually heavy trading volume.

13. Over the next several trading days, DeVry's stock price continued to slide lower, closing at $18.08 on February 2, 2016. In total, from January 27, 2016 to February 2, 2016, DeVry's stock price dropped $5.66 per share, or 24%, eliminating approximately $360 million from the Company's market capitalization value.

14. Since the January 27, 2016 disclosures, on December 15, 2016, the FTC and DeVry announced that DeVry had agreed to a $100 million settlement (among other remedial penalties) to resolve the FTC's claims. FTC Chairwoman Edith Ramirez accurately summed up the settlement, emphasizing that "[w]hen people are making important decisions about their

---

[4] On October 13, 2016, the DoE announced that it had entered into a settlement "resolving the Department's charge that ***[DeVry] used unsubstantiated job placement claims in recruitment and advertising materials.***" In the DoE's press release issued that day, the DoE emphasized that the settlement "enhances the Department's oversight of DeVry and builds upon the Obama Administration's commitment to protecting students, safeguarding taxpayer dollars and increasing accountability among postsecondary institutions."

education and their future, they should not be misled by deceptive employment and earnings claims. . . . The FTC has secured compensation for the many students who were harmed, and I am pleased that DeVry is changing its practices." According to the FTC press release, "DeVry will pay $49.4 million in cash to be distributed to qualifying students who were harmed by deceptive ads, as well as $50.6 million in debt relief." But DeVry's settlement with the FTC goes beyond financial redress and tackles the same types of deceptive job placement and salary statistics peddled to Lead Plaintiff and the Class here. According to the FTC, the settlement "includes provisions designed to prevent DeVry from misleading consumers in the future," and, among other things, "prohibits DeVry from misrepresenting the likelihood that graduates will get a job as a result of their degree," and "specifically prohibits DeVry from including jobs students obtained more than six months before graduating whenever DeVry advertises its graduates' success in finding jobs near graduation." The FTC further provided that the settlement precludes DeVry from "misrepresenting the compensation or compensation ranges that students or graduates have received or can be expected to receive."

15. Certain former DeVry employees with information regarding this scheme to manipulate student outcome statistics have corroborated the facts revealed by the FTC and DoE. For instance, according to CW3, during his employment, DeVry omitted from the false student outcomes data the number of DeVry University graduates the Company had determined were "non-job seeking." CW3 specifically explained that DeVry University's career services department placed on graduates onerous requirements—including responding to calls and emails from the school, submitting resumes to the school, and applying to jobs recommended by the school—in order for the graduates to be deemed as "job-seeking." As a result, certain students who may have in fact been actively seeking jobs were nevertheless deemed "non-job seeking"

when they did not respond to the Company's repeated overtures. In fact, CW3 noted that some students opted out of the school's career services because they were frustrated with the burdensome requirements. Such students were also treated as "non-job seeking" and were similarly omitted from the employment statistics. As CW3 confirmed, the waivers and opt-outs were a "choice selection" used for the purposes of improving the student outcome statistics.

16. Numerous facts demonstrate that Defendants Hamburger, Wiggins, Unzicker, and Gunst knew, or were at least severely reckless in not knowing, that DeVry's statements with respect to the graduate employment statistics were false and misleading when made.

17. First, the FTC's determination that DeVry University's true job placement numbers were "significantly" smaller than the 90% DeVry had fed to investors and securities analysts (and prospective students) and that the Company lacked any reasonable basis for its advertised statistics indicates that Defendants Hamburger, Wiggins, Unzicker, and Gunst were at least reckless in disregarding the substantial risk that those statistics were false. Along these lines, there were obvious red flags that cast doubt on the advertised student outcomes statistics, and Defendants' egregious failure to investigate the basis of those statistics reflects a gross indifference to the truthfulness of their Class Period statements. For example, among other things, the FTC complaint stated that the 90% figure "count[s] a substantial number of [DeVry University] graduates who should not be counted and similarly exclude[s] a substantial number of [DeVry University] graduates who should not be excluded." The 90% figure also counts graduates who did not obtain jobs in their field of study, and indeed a "significant percentage of the jobs that Defendants count as being in the graduate's field of study include jobs that employers, industry experts, graduates, and consumers would not reasonably consider to be in the graduate's field of study." Thus, lacking any reasonable basis for asserting that 90% of

DeVry University graduates are employed in their field within six months of graduation, Defendants were at least severely reckless in making such statements.

18. Second, with respect to DeVry's claims as to DeVry University graduates' purported earning power, the FTC complaint makes clear that the "sampling methods and methodology" underlying a third-party survey used to substantiate those claims "***all gave or should have given [DeVry] reason to question the reliability of the conclusions and information***" of that survey, and "[i]n fact, ***[DeVry University] personnel expressed concerns over whether the data sufficiently supported the higher-income claim***." Notably, "statistics that [DeVry University] had directly collected from thousands of its graduates each year about their incomes differed significantly from the third party's statistics, which consisted of information from only several hundred individuals per graduation year." Moreover, DeVry had "extensive information in [its] own files about the income of [DeVry University] graduates" in addition to "publicly available data reflecting the incomes of graduates of schools throughout the United States, by school and by field." As the FTC explained, a comparison of DeVry's internal statistics with publicly available graduate income data "shows that [DeVry University] graduates a year after graduating do not in fact earn significantly more than graduates from all other schools combined," and so DeVry's "reliance on the third-party data for its higher-income claim was therefore unreasonable."

19. Moreover, in a joint Rule 26(f) report filed by the parties in the FTC's action on June 7, 2016, DeVry included both Defendant Gunst and David Pauldine, who was DeVry's Executive Vice President of Marketing and the President of DeVry University and reported directly to Defendant Hamburger, in a list of percipient witnesses likely to have discoverable information. The inclusion of Gunst and Pauldine in the list of percipient witnesses in that

litigation indicates that these individuals were knowledgeable regarding how the Company generated the DeVry University graduate employment and salary statistics, and therefore were aware or recklessly disregarded the substantial risk that the job placement and salary statistics touted by Defendants during the Class Period were false.

20. Third, Confidential Witnesses have provided additional information supporting a strong inference that Defendants recklessly disregarded the likelihood that the DeVry University student outcome statistics were false or misleading. For instance, CW2 explained that the job placement and salary statistics given to prospective students had been reviewed and approved by DeVry's legal and compliance department, and that the Company kept a repository of approved language for use by marketing employees. CW4 corroborated that assertion, stating that encouragement to use the job placement statistics "came down from the top," noting that "[o]ur managers told us, but their managers told them." CW2 came to doubt the accuracy of the advertised job placement statistics in part because there was a "grey area" in whether graduates actually obtained jobs in their field of study. In fact, CW2 suspected that certain graduates were employed in jobs that most people would not define as being in their field of study.

21. CW2 similarly described how DeVry actively monitored social media for complaints by DeVry University graduates who were struggling to find jobs. CW2 believed that criticism from students regarding the advertised job placement rates was likely reported to Pauldine. CW2 added that Pauldine reported to Defendant Hamburger. CW2 also stated that the "whole marketing department" suspected that the job placement rates advertised by the Company were not accurate.

22. As described above, CW3 stated that career services advisors and directors could classify graduates as "non-job seeking," which would exclude them from DeVry University's job

placement statistics. CW3 noted that the final classification of a student as non-job seeking required the approval of the campus president (in CW3's case, CW7). According to CW3, that campus president reviewed each student's file, regularly received reports about graduates' job placements, and "knew intimately everything that went on with every [graduate] file."

23. CW7, for his part, confirmed that DeVry had a written national policy that set forth the rules for which students would be included or excluded in the job placement statistics. CW7 separately explained that DeVry kept records on how many graduates were not counted in the job placement statistics, and that that data was kept in the HireDeVry computer system.

24. CW3 also stated that he was required to input all job placement information about each graduate into HireDeVry, which provided DeVry with the capability of running reports showing the actual job placement rate for graduates including students who had been waived in its official statistics. According to CW6, campus-specific job placement rates of DeVry University graduates were reported up the chain of command within the Company.

25. This obvious ability to manipulate the student outcomes data, as described by the Confidential Witnesses, indicates that Defendants Hamburger, Wiggins, Unzicker, and Gunst were at least reckless in disregarding the substantial risk that the employment and salary statistics were false. Indeed, during a September 13, 2012 analyst conference, Defendant Hamburger discussed then-recent training of the Company's admissions advisors, and specifically the advisors' concerns about what they were permitted to say and what points they should focus on when speaking with prospective students. As set forth in further detail below, the specificity of Defendant Hamburger's comments indicates that he had intimate knowledge of the Company's own scrutiny of its marketing practices. As such, Defendant Hamburger was in a position to

detect the errors in the Company's advertised employment and salary statistics, but his apparent failure to do so demonstrates his recklessness.

26. Next, the magnitude and duration of Defendants' misstatements was extraordinary. Over a nearly five-year period (and according to the FTC and DoE much longer), Defendants Hamburger, Wiggins, Unzicker, and Gunst each made repeated false statements regarding DeVry University's student outcomes and/or signed SEC filings containing such statements, certifying the statements' accuracy. The extraordinary magnitude and duration of the misstatements at issue in this case, which constituted a critical and core feature of the Company's primary marketing campaigns since at least 2008, demonstrates that Defendants Hamburger, Wiggins, Unzicker, and Gunst recklessly failed to ensure that their Class Period statements concerning DeVry University's graduate employment and salary statistics were accurate. Moreover, the dramatic scope of the Company's advertising campaign highlighting the false employment and salary statistics supports an inference that the similarly false statements in the Company's SEC filings, press releases, and analyst presentations were reviewed and approved by corporate officers sufficiently knowledgeable about the Company to know that the statements were false.

27. As described in further detail below, the foregoing is further underscored by DeVry's $100 million to settle the FTC lawsuit and the breadth of corporate reforms that DeVry has agreed to put in place. For example, DeVry must pay over $49 million directly to the FTC and provide over $50 million in debt relief to its undergraduates—for over a seven year period—between September 2008 and September 2015. In addition, DeVry and, among others, its officers, agents, employees, and attorneys are permanently restrained and enjoined from "[m]isrepresenting, expressly or by implication, the success that students or graduates have

realized or are likely to realize in starting or obtaining careers, jobs or employment." Moreover, for 20 years after the order is entered, DeVry must "establish and implement a training program for all principals, officers, directors, managers, employees, agents, and representatives who direct or engage in the promotion or sale of any educational product or service[.]" DeVry is also required to submit a compliance report one year after the order is entered and, for 10 years after the entry of the order, each DeVry entity must submit a compliance notice for any change in, among other things, "any process or procedure for calculating, documenting or substantiating any claim covered" by the order.

28. Finally, the initiation of an investigation by the FTC approximately two years before it filed its complaint supports an inference that Defendants knew, or should have known, that the advertised employment and salary statistics were false. Even assuming that Defendants were not already acting with scienter in making their false statements concerning DeVry University graduates' employment and salary prospects (an assumption readily refuted by the allegations in the FTC's complaint, the DoE's action, and the CWs' statements) at the time of the FTC's January 28, 2014 request for documents, the FTC's investigation should have put Defendants on notice that they needed to conduct their own investigation into the truth of such statements. Only three inferences can reasonably be drawn: (1) Defendants were already aware or recklessly disregarding the risk that their statements were false by the time DeVry received the FTC's request on January 28, 2014; (2) Defendants thereafter investigated the falsity of their statements in tandem with the FTC's investigation and learned that the statements were false, but continued to make the statements in spite of that knowledge; or (3) despite receiving the FTC's request on January 28, 2014, Defendants failed to investigate the truth of their statements and recklessly continued to tout the employment and salary prospects of DeVry University graduates.

Indeed, following the Company's January 28, 2014 receipt of the FTC's CID, Defendants highlighted the false and misleading student outcome statistics with declining frequency—strongly suggesting that Defendants finally began to appreciate the likely consequences of making such false statements. Under any of these three alternatives, Defendants acted with scienter in falsely promoting DeVry by pointing to the misleading DeVry University graduate employment and salary statistics.

29. Finally, as of the filing of this Second Amended Complaint, the restrictions on DeVry's ability to promote certain job placement statistics remain in place and DeVry is also now required to affirmatively maintain graduate-specific data to substantiate any representations to, among others, any student or prospective student on graduate employment rates and "maintain information sufficient to establish the methodology it used to formulate any representations regarding post-graduation employment outcomes of [DeVry University] students."

## II. <u>JURISDICTION AND VENUE</u>

30. This Second Amended Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

31. This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

32. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions that constitute the alleged violations of law, including the preparation and dissemination to the public of untrue statements of material facts, occurred in this District.

33. In connection with the acts alleged in this Second Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## III. THE PARTIES

### A. Lead Plaintiff

34. Plaintiff Utah Retirement Systems ("URS") is a public pension system that has been providing retirement benefits to Utah's public school and education employees since 1963. As of December 31, 2015, URS managed approximately $26.7 billion in assets for the benefit of its members. URS purchased DeVry common stock during the Class Period and suffered damages as a result of the violations alleged herein. On August 24, 2016, this Court appointed URS as Lead Plaintiff in this litigation.

### B. Defendants

35. Defendant DeVry Education Group, Inc. is incorporated in the State of Delaware. Its principal executive offices are located at 3005 Highland Parkway, Downers Grove, Illinois, 60515. DeVry, founded in 1973, provides educational services worldwide through three segments: Business, Technology and Management; Medical and Healthcare; and International and Professional Education. DeVry University is a subsidiary of DeVry and one of the largest degree-granting higher education systems in North America. DeVry University was founded in 1931 and offers onsite and online undergraduate and graduate degree programs covering 34 different career fields within its five colleges of study: The College of Business & Management, which includes Keller Graduate School of Management; The College of Engineering & Information Sciences; The College of Health Sciences; The College of Liberal Arts & Sciences;

and The College of Media, Arts & Technology. DeVry's common stock trades on the NYSE under the ticker symbol "DV."

36. Defendant Daniel Hamburger ("Hamburger") served at all relevant times as DeVry's President and Chief Executive Officer, ultimately leaving those roles on May 24, 2016. During the Class Period, Defendant Hamburger reviewed, approved, and signed DeVry's false and misleading SEC filings and certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 therein ("SOX Certifications"). Specifically, Defendant Hamburger signed: (1) the Forms 10-Q that the Company filed with the SEC on February 4, 2011, May 5, 2011, November 4, 2011, and February 6, 2012; (2) the Forms 10-K filed with the SEC on August 26, 2011, August 28, 2012, August 29, 2013, August 27, 2014, and August 27, 2015; and (3) the SOX Certifications attached as exhibits to the Forms 10-Q and 10-K filed with the SEC on August 26, 2011, November 4, 2011, February 6, 2012, May 3, 2012, August 28, 2012, November 5, 2012, February 7, 2013, May 3, 2013, August 29, 2013, November 5, 2013, February 4, 2014, May 5, 2014, August 27, 2014, November 5, 2014, February 5, 2015, May 8, 2015, August 27, 2015, and November 4, 2015. Defendant Hamburger also made false and misleading statements in the Company's Annual Reports issued on August 29, 2013, August 27, 2014, and August 27, 2015. Moreover, Defendant Hamburger participated in conference calls with securities analysts, during which DeVry's false and misleading SEC filings and press releases were presented and discussed. Specifically, Defendant Hamburger made false and misleading statements at analyst conferences and on DeVry's earnings conference calls set forth below, held on October 25, 2011, April 24, 2012, October 25, 2012, February 6, 2013, March 13, 2013, April 23, 2013, June 13, 2013, August 8, 2013, June 11, 2014, August 7, 2014, September 18, 2014, and May 5, 2015.

37. Defendant Daniel J. Wiggins ("Wiggins") served as DeVry's Senior Vice President and Chief Financial Officer from January 3, 2012 to May 31, 2016. Wiggins also served as Treasurer from January 3, 2012 until early 2015. During the Class Period, Defendant Wiggins reviewed, approved, and signed DeVry's false and misleading SEC filings and SOX Certifications. Defendant Wiggins also reviewed, approved, and signed false and misleading press releases and Forms 8-K issued during the Class Period. Specifically, he signed: (1) the Form 8-K that DeVry filed with the SEC on January 26, 2012; (2) Forms 10-Q that DeVry filed with the SEC on February 6, 2012, May 3, 2012, November 5, 2012, February 7, 2013, May 3, 2013, November 5, 2013, February 4, 2014, May 5, 2014, November 5, 2014, February 5, 2015, May 8, 2015, and November 4, 2015; (3) the Forms 10-K filed with the SEC on August 28, 2012, August 29, 2013, August 27, 2014, and August 27, 2015; and (4) the SOX Certifications attached as exhibits to the Forms 10-Q and 10-K filed with the SEC on February 6, 2012, May 3, 2012, August 28, 2012, November 5, 2012, February 7, 2013, May 3, 2013, August 29, 2013, November 5, 2013, February 4, 2014, May 5, 2014, August 27, 2014, November 5, 2014, February 5, 2015, May 8, 2015, August 27, 2015, and November 4, 2015. Defendant Wiggins also frequently participated in conference calls with securities analysts, during which DeVry's false and misleading SEC filings and press releases were presented and discussed. Specifically, Defendant Wiggins made false and misleading statements at an analyst conferences held on February 26, 2013, May 6, 2014, and November 12, 2014.

38. Defendant Patrick J. Unzicker ("Unzicker") served as DeVry's Vice President, Finance and Chief Accounting Officer from March 1, 2012 to May 31, 2016. In March 2015, Unzicker assumed the role of Treasurer, and since May 31, 2016 has also served as the Company's Senior Vice President and Chief Financial Officer. During the Class Period,

Defendant Unzicker reviewed, approved, and signed DeVry's false and misleading SEC filings and SOX Certifications. Defendant Unzicker also reviewed, approved, and signed false and misleading press releases and Forms 8-K issued during the Class Period. Specifically, he signed: (1) the Forms 8-K that DeVry filed with the SEC on April 25, 2012, July 23, 2012, August 9, 2012, October 25, 2012, February 6, 2013, March 6, 2013, April 23, 2013, August 8, 2013, October 24, 2013, February 4, 2014, April 25, 2014, August 7, 2014, October 23, 2014, February 5, 2015, April 23, 2015, August 18, 2015, September 2, 2015, and October 22, 2015; (2) Forms 10-Q that DeVry filed with the SEC on May 3, 2012, November 5, 2012, February 7, 2013, May 3, 2013, November 5, 2013, February 4, 2014, May 5, 2014, November 5, 2014, February 5, 2015, May 8, 2015 and November 4, 2015; and (3) the Forms 10-K filed with the SEC on August 28, 2012, August 29, 2013, August 27, 2014, and August 27, 2015. Defendant Unzicker also frequently participated in conference calls with securities analysts, during which DeVry's false and misleading SEC filings and press releases were presented and discussed.

39. Defendant Richard M. Gunst ("Gunst") served as Chief Financial Officer of DeVry from 2006 until January 2, 2012. He also served as a Director from 2000 through the present. During the Class Period, Defendant Gunst reviewed, approved, and signed DeVry's false and misleading SEC filings and SOX Certifications. Defendant Gunst also reviewed, approved, and signed false and misleading press releases and Forms 8-K issued during the Class Period. Specifically, he signed: (1) the Forms 8-K that DeVry filed with the SEC on April 26, 2011, August 12, 2011, October 25, 2011, and December 12, 2011; (2) Forms 10-Q that DeVry filed with the SEC on February 4, 2011, May 5, 2011, and November 4, 2011; (3) the Form 10-K filed with the SEC on August 26, 2011; and (4) the SOX Certifications attached as exhibits to the Forms 10-Q and 10-K filed with the SEC on August 26, 2011 and November 4, 2011. Defendant

Wiggins also frequently participated in conference calls with securities analysts, during which DeVry's false and misleading SEC filings and press releases were presented and discussed.

40. Defendants Hamburger, Wiggins, Unzicker, and Gunst are collectively referred to as the "Individual Defendants." The Individual Defendants, because of their high-ranking positions and direct involvement in the everyday business of DeVry, directly participated in the management of DeVry's operations, including its public reporting functions, had the ability to, and did control, DeVry's conduct, and were privy to confidential information concerning DeVry and its business, operations and financial statements, as alleged herein. The Individual Defendants were directly involved in controlling the content of, and in drafting, reviewing, publishing and/or disseminating the false and misleading statements and information alleged herein. Moreover, the Individual Defendants were aware of, or recklessly disregarded, the false and misleading statements and omissions, and approved or ratified these misstatements and omissions in violation of the federal securities laws.

41. DeVry and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. THE FRAUD PERPETRATED BY DEFENDANTS

### A. Defendants Hamburger, Wiggins, Unzicker, and Gunst Misrepresented and Concealed the Actual DeVry University Student Outcome Statistics

42. DeVry provides educational services worldwide through a number of subsidiaries, including DeVry University—one of the largest degree-granting higher education systems in the United States. Through its five colleges, DeVry University offers programs in healthcare, business, technology, accounting, finance, and law. DeVry directly competes with traditional, not-for-profit colleges and other for-profit schools in attracting students to enroll in its numerous programs. Because DeVry is a publicly traded business, Defendants' primary focus is generating

revenues, earnings per share, and increasing shareholder value, which is primarily achieved by increasing enrollment at its campuses. In other words, DeVry has to distinguish DeVry University from formidable competition coming from both other for-profit schools as well as traditional non-profit institutions of higher learning to attract the students necessary to drive revenue and profit growth quarter after quarter. To do this, Defendants devised a scheme—beginning in 2008 at the latest—to target students, who would spend tens of thousands of dollars to obtain a degree at DeVry University, with deceptive advertisements and marketing materials emphasizing positive student outcomes and specifically claiming that 90% of DeVry University's graduates obtain employment in their field of study within six months of graduation and obtain salaries 15% higher than the average salaries of graduates with bachelor's degrees from other colleges and universities.

43. This scheme, the subject of an FTC lawsuit that was filed after an exhaustive two-year investigation and ultimately settled on December 15, 2016, not only misled students, but falsely assured investors and securities analysts covering DeVry that the job placement rates and higher salaries would lead to continued financial growth and would mitigate the negative effects of a weakened economy on new enrollments and student retention. Securities analysts, for their part, understood that students' employment outcomes were a key benchmark in assessing the Company's potential to grow revenues and earnings, and consistently viewed DeVry as a high-quality institution that could attract new students or retain current ones based in part on the highly-publicized—but fictitious—graduate employment and salary statistics. For example:

- "DeVry enjoys a well-deserved reputation for providing quality programs with favorable student outcomes. A strong record of regulatory compliance adds to the stock's appeal in the current environment of heightened regulatory scrutiny. . . ." (Piper Jaffray, December 8, 2011);

- "While an investment in DV requires patience, and results are likely to deteriorate before they get better, we expect management's focus on improving the business will pay off. A well-rounded portfolio, ongoing focus on student outcomes, additional cost containment and easier comps in the back half of the year set the stage for improving results." (Morgan Stanley Research North America, January 27, 2012);

  "Due to DV undergrad's long history of >$40K starting salaries, 90% placement rates, and relatively low regulatory issues - we think it[']s significantly undervalued within DV overall." (Deutsche Bank Markets Research, June 6, 2012).

44. Indeed, even when flagging enrollment at DeVry's flagship DeVry University—primarily attributed to a sluggish economy and high unemployment that was deterring prospective students from taking on new debt—adversely affected the Company's revenues, analysts still remained bullish on DeVry. This was because they believed that even in a downturn in the economy and in the face of strong competition from other institutions, DeVry was able to remain competitive and attract new students due to, among other things, Defendants' statements that 90% of DeVry University's students founds jobs in their field of study within six months of graduation with higher salaries than their counterparts at other schools:

- "Even as questions surrounding program costs, recruiting tactics, and questionable student outcomes—among other issues—remain, DeVry management has been outspoken, reaffirming its message of, 'doing well by doing good.' The fact remains that . . . we continue to see select higher-quality, for-profit education providers such as DeVry included in a position to take incremental share from traditional schools, in aggregate, even if budgets shrink." (Morningstar Equity Research's Thesis, June 27, 2012);

- "Due to DeVry's long history of better than peer job placement and starting salaries, and only about 25% exposure to online only enrollment, we expect DeVry new enrollment to return to growth by YE13E." (Deutsche Bank Markets Research's Investment Thesis, August 10, 2012);

- "We continue to believe that DeVry's shares offer an attractive long-term opportunity in light of the company's strong brands,

minimal regulatory exposure, and consistent management focus on educational quality and outcomes, and maintain our Outperform rating." (William Blair, August 6, 2013);

- "Though we have not seen large new student growth across the group, we believe the demonstrated strength in employment (about 90% placement) and easier comparisons make the scenario of gradually improving starts plausible, if not assured." (Wells Fargo Securities LLC Equity Research Department, September 11, 2013);

- "In light of the . . . the solid regulatory profile highlighted by low student loan default and high job placement rates . . . we think DeVry warrants a significant premium to the majority of its private sector postsecondary peers, and reiterate our Outperform rating." (William Blair, April 24, 2014)

- "While postsecondary education remains a regulated industry, DeVry's student outcomes are best in class and we view DeVry as a good steward of government-funded student tuition payments. . . . DeVry remains a good actor, in our view, and we like its current and future policy profile and therefore its ability to operate its business with an eye on shareholder returns rather than potential regulatory interference." (William Blair's Key Points, August 4, 2014);

- "At the same time, it sees evidence of improving labor market outcomes for its graduates, which ultimately should be the driver of a recovery in demand. . . ." (Wells Fargo Securities LLC Equity Research Department, February 6, 2015).

45. Thus, Defendants embarked on their fraudulent scheme to boost student enrollment (and thus, revenues) since at least 2008, by advertising that 90% of DeVry University graduates actively seeking employment had careers in their fields of study within six months of graduation. Similarly, Defendants also represented that DeVry University graduates obtained jobs with significantly higher incomes than graduates of other colleges or universities. This deceptive information was not only disseminated in advertisements but, most importantly for shareholders, in the Company's SEC filings and other investor-oriented Company publications.

### 1. DeVry's Misleading SEC Filings and Public Announcements Tout the Success of Graduates to Attract Students and Grow Revenue and Earnings Per Share

46. Throughout the Class Period, Defendants touted the student outcomes at DeVry University in DeVry's SEC filings and other public announcements, specifically emphasizing the correlation between high graduate employment and salary statistics and the potential to grow revenues and earnings, increase enrollments, and successfully compete with other schools.

47. On August 11, 2011, prior to the beginning of the Class Period, DeVry issued a press release announcing financial results for 4Q and full-year 2011, ended June 30, 2011. In that press release, the Company announced quarterly revenues of $546.7 million (an 8% increase from the prior year quarter) and earnings per share of $1.08 (a 9% increase from the prior year quarter). For the entirety of Fiscal 2011, the Company also announced revenues of $2,182 million (a 14% increase from the prior year) and earnings per share of $4.68 (a 21% increase from the prior year). In regard to undergraduate student enrollment for the DeVry University Summer 2011 session, the press release announced 15,566 new students (a 25.6% decrease from the prior year) and 64,317 total students (a 5.8% decrease from the prior year).

48. Defendant Hamburger stated in the August 11, 2011 press release, "[w]e were not satisfied with our short-term enrollment performance this quarter . . . but we believe in our long-term opportunities for growth. Recently we have been experiencing a challenging external environment characterized by a prolonged tough economy and new regulatory changes. We believe that by remaining focused on our strategy of quality and diversification, we will return to

a long-term growth trend." The August 11, 2011 press release was attached as an exhibit to a Form 8-K filed with the SEC on the following day. That 8-K was signed by Defendant Gunst.[5]

49. At the beginning of the Class Period on August 26, 2011, DeVry released its 2011 Annual Report ("2011 AR") and filed with the SEC its Form 10-K ("2011 10-K") for the fiscal year ended June 30, 2011. The 2011 10-K, which was signed by Defendants Hamburger and Gunst, reiterated DeVry's previously reported financial results in its August 11, 2011 press release. The 2011 AR emphasized both the Company's strong financial performance and the success of its programs resulting in 89% of DeVry University's recent graduates obtaining jobs in their fields of study. The Company reported an increase of 14% in revenues ($2,182,371,000 in 2011 compared to $1,915,181,000 in 2010), an 18% increase in net income ($330,403,000 in 2011 compared to $279,909,000 in 2010) and an increase of 20.9% in earnings per common share ($4.68 in 2011 compared to $3.87 in 2010).

50. In his Fellow Shareholders, Students, Coworkers, and Friends Letter, Defendant Hamburger specifically tied the Company's financial success with its students and career success:

> Achieving that vision [of preparing students for careers that would improve the quality of life for themselves] requires strong financial results – and in 2011, DeVry delivered. In fiscal 2011, our revenues totaled $2.2 billion, a 14 percent increase over 2010, and net income grew by 18 percent to $330 million. These results enabled us to make significant investments to support the execution of our "Achieve-Grown-Build" strategy.
>
> * * *

[5] On June 9, 2011, DeVry announced that Defendant Gunst had informed the Company of his intent to retire from his position as Chief Financial Officer, but that he would stay in that position while the Company searched for his replacement.

> We are committed to investing in the services, programs, and infrastructure that enable us to provide excellent service to our 119,000 students. We know that these investments are the key to our students. We know that these investments are the key to our students' academic and career success. ***We also know that their success builds our schools' reputation and drives DeVry's growth.***[6]

51. The 2011 AR boasted the success of the Company's graduates with the success of its "90/40" standard:

> Our goal is simple: we want to give our students the education, services, and support they need to succeed, both while they are our students and after they graduate.
>
> We measure DeVry University's achievement towards that goal with our "90/40" standard: within six months of graduation, we want 90 percent of our graduates employed in their fields of study at an average salary of $40,000 or more. ***Even in this year's challenging job market, 89 percent of our graduates had jobs in their fields with an average salary of more than $43,000***.

52. In the Company's 2011 10-K, the Company discussed enrollment trends for both its DeVry University undergraduate and graduate programs:

> New student undergraduate enrollment in summer 2011 decreased 25.6% to 15,566 students as compared to the prior year. Total undergraduate enrollment in summer 2011 was 64,317 students, a decrease of 5.8% compared to 68,290 in the previous summer. There were 21,576 coursetakers for the July 2011 session in DeVry University's graduate programs, including its Keller Graduate School of Management, representing an increase of 1.9% over the prior year. Coursetaker enrollment in DeVry University online program offerings in summer 2011 was 69,617, a decrease of 0.7% over the prior year.

53. As the 2011 10-K noted, a "strong motivation for students considering a postsecondary education is the prospective income premium." At the same time, the Company noted the competitive nature of the postsecondary education market which is "highly fragmented

[6] All emphases herein are added unless noted otherwise.

and competitive; no single institution has a significant market share." Thus, the Company stated that:

> In every market in which DeVry University operates, there are numerous state institutions, community colleges, and independent universities. In particular, there is growing competitive pressure from community colleges, traditional universities, and technical colleges . . . . In addition, there is growing competition from online programs (by private-sector, publically-funded and independent institutions) and site-based private-sector school programs.

54. The 2011 10-K also discussed the Company's marketing and outreach, noting that:

> DeVry University currently advertises on various Internet sites, on television and radio, in magazines and newspapers, and utilizes telemarketing and direct mail to reach prospective students. DeVry University frequently updates its marketing programs in order to better communicate the quality of its degree programs and the value of a DeVry University education. DeVry University's highly integrated brand initiative focuses on the university's graduate employment success, while emphasizing DeVry University as an accredited, highly-respected academic institution. The brand campaign is grounded in ongoing in-depth consumer, marketplace and brand research, and leverages a number of channels, including broadcast, print and Internet advertising, public relations, and social media, as well as local marketing efforts.

55. In addition, the Company recognized that its financial success—and that of its graduates—depends on the employment of its graduates. Thus, the 2011 10-K stated with respect to DeVry University:

> DeVry University believes that the employment of its graduates is essential to the achievement of its mission and the ability to attract and retain students.
>
> * * *
>
> DeVry University attempts to gather accurate data to determine how many of its undergraduates, both at the associate and bachelor's degree levels, are employed in positions related to their

> program of study within six months following graduation. To a large extent, the reliability of such data depends on the quality of information that graduates self-report.
>
> One measure of success is the employment outcomes of DeVry University graduates. ***Eighty-nine percent of DeVry University's June 2009, October 2009 and February 2010 graduates in the active job market were employed in fields of their study within six months of graduation at an average salary of $43,035.***

56. Finally, the 2011 10-K contained certifications signed by Defendants Hamburger and Gunst pursuant to §302 of the Sarbanes-Oxley Act of 2002 ("SOX"), which falsely stated:

> I, [Daniel M. Hamburger/Richard M. Gunst], certify that:
>
> 1. I have reviewed this annual report on Form 10-K of DeVry Inc. for the fiscal year ending June 30, 2011;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> * * *
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > * * *
> >
> > c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and

> procedures, as of the end of the period covered by this report and based on such evaluation[.]

57. Defendants Hamburger, Gunst, and Wiggins made substantially similar false statements in SOX certifications attached to DeVry's regulatory filings throughout the Class Period, including in Forms 10-Q for the periods 1Q 2012, 2Q 2012, 3Q 2012, 1Q 2013, 2Q 2013, 3Q 2013, 1Q 2014, 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, and 1Q 2016, and Forms 10-K for the 2012, 2013, 2014, and 2015 fiscal years.[7]

58. On October 6, 2011, the Company issued a press release titled "Graduates from DeVry Inc. Schools Earn up to 65 Percent More with Degrees, According to New Research" which touted the value of a degree from DeVry University:

> DeVry Inc. . . . a leading global provider of higher education, released a research study today showing that graduates increase their annual wages significantly when they earn a degree from DeVry University, Chamberlain College of Nursing or Carrington College California.
>
> The independent economic-impact analysis, conducted by The Cicero Group for DeVry Inc., tracked wage growth from 2003 to 2010 for graduates from three DeVry Inc. schools in seven states, as well as a control group of individuals who expressed interest in DeVry University, Chamberlain College of Nursing or Carrington College of California, but ultimately did not pursue a college degree. Both groups had statically similar starting salaries of $25,000-$27,000 in 2003. But by the end of the seven-year period, graduates form the three DeVry Inc. schools out-earned those in the control group by significant margins in all degree categories.
>
> Specifically, graduates who earned a bachelor's degree from a DeVry Inc. school increased their earnings by 65 percent to an average $44,262 at the end of the seven year period, compared to

[7] All quarterly and annual reports filed with the SEC between the start of the Class Period and January 3, 2012 contained SOX certifications by Defendants Hamburger and Gunst. Beginning on January 3, 2012 and continuing through the end of the Class Period, all quarterly and annual reports filed with the SEC contained SOX certifications signed by Defendants Hamburger and Wiggins.

> the control group's average final earnings of 18 percent, or $29,224. Associate degree earners saw wage growth of 42 percent to an average $39,478; and certificate holders increased their wages 22 percent to an average $31,782.
>
> * * *
>
> **Economic Impact Beyond Graduate Wages**
>
> Beyond increases in graduate earnings, the study also analyzed the overall economic impact DeVry Inc. schools have on seven state and local economies. In California, Florida, Illinois, New Jersey, New York, Ohio and Texas, DeVry Inc. schools had a total economic impact of $822 million in FY2010, including $324 million in direct spending, which led to an additional $497 million in indirect sending. This overall impact is an increase of $135 million from the previous fiscal year.
>
> * * *
>
> "This research is yet one more example of DeVry's commitment to transparency and accountability. We want students, prospective students and taxpayers to have objective information to evaluate the impact of a DeVry education," Hamburger said. "By quantifying the ways in which our schools positively impact the careers of our students, as well as contribute to local and state economies, I hope people gain a better understanding of DeVry's overall value and our role in higher education in America."

59. On October 25, 2011, the Company issued a press release announcing financial results for 1Q 2012, ended September 30, 2011. In that press release, the Company announced quarterly revenues of $519 million (a 0.5% decrease from the prior year quarter) and earnings per share of $0.83 (a 19.4% decrease from the prior year quarter). With respect to DeVry University graduates' employment statistics following graduation, the Company noted that:

> Despite the continued tough job market, ***87.3 percent of DeVry University's June 2010, October 2010 and February 2011 graduates in the active job market were employed in their fields of study within six months of graduation at an average salary of $42,645***. These statistics include graduates of associate and bachelor's degree programs and those who were already employed in their field of study.

The Company sought to hedge these numbers by qualifying that the employment figures "[e]xclude[] graduates continuing their education, foreign graduates ineligible to work in the United States/Canada and those unable to accept career advising because of extreme circumstances," and further "[e]xclude[] graduates who actively pursued employment for less than 180 days and did not become employed."

60. Defendant Hamburger stated in the October 25, 2011 press release, "[w]e are confident that what we are seeing now is a near-term discontinuity in the long-term growth trend. Our confidence is bolstered by the fundamental need for career-focused education both in the United States and in emerging markets, and by the strong value proposition we offer our students." The October 25, 2011 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Gunst.

61. On the same day the Company issued its press release announcing 1Q results, it held its 1Q 2012 Earnings Conference Call. Participating on the call were Defendants Hamburger, Unzicker, and Gunst. In his opening presentation, Defendant Hamburger discussed the value of a DeVry University education with respect to employment following graduation. Defendant Hamburger noted that:

> [O]ur confidence is bolstered by this fundamental need for career focused education. And by the strong value proposition that we offer our students. Recently we released a study we had commissioned by the Cicero Group which tracked wage growth from 2003 to 2010 for graduates from three of our institutions in seven states alongside a control group of individuals who expressed interest in one of these colleges but ultimately didn't pursue a degree. By the end of the seven-year period, the Bachelor's Degree graduates from the DeVry institutions increased their earnings on average by 65%; compared to that control group, the average was 18%. And similarly for Associate Degree graduates, wages increased on average 42% compared to 22% for the control group. This study demonstrates that our graduates are receiving a significant return on their educational investment.

> ***As another indicator of the value proposition that we offer students, even in this tough job market, our graduate employment rate for DeVry University students in the active job market employed in their field of study within six months of graduation is 87%.*** Now the goal we hold ourselves accountable to had always been 9 out of 10. So to hold ourselves accountable, we're investing more resources to help our students like our new partnership with CareerBuilder.

62. On November 4, 2011, the Company filed its Form 10-Q with the SEC for the 1Q 2012 ended September 30, 2011 ("1Q 2012 Form 10-Q"), which was signed by Defendants Hamburger and Gunst. The 1Q 2012 Form 10-Q reiterated DeVry's previously reported financial results in its October 25, 2011 press release, stating "[t]otal consolidated revenues for the first quarter of fiscal year 2012 of $519.0 million decreased $2.4 million, or 0.5%, as compared to the year-ago quarter."

63. With regards to student enrollment, the 1Q 2012 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were driven mainly by the negative impact on student decision making of the prolonged economic downturn and economic conditions generally, resulting in a reduction of interest from potential students. In addition, management believes a near-term distraction of DeVry University employees associated with the implementation of new regulations also contributed to the decreases in DeVry University undergraduate enrollments. To address these issues, DeVry University is adding new programs and locations, and making investments to enhance the strength of its brand, improve customer service and increase awareness among potential students through new and innovative advertising campaigns.

64. On December 12, 2011, the Company issued a press release announcing Fall 2011 enrollment results for DeVry schools. In regard to undergraduate student enrollment for DeVry University, the press release announced 13,558 new students (a 24.6% decrease from the prior year) and 64,112 total students (a 12.8% decrease from the prior year). The Company stated in the press release that "weak economic conditions and persistent unemployment continued to

impact consumer confidence and enrollment results, coupled with adjustments associated with new regulations. DeVry University continues to mitigate the effects of this challenging environment by prudently controlling costs, and by increasing employee training to improve the student admissions experience."

65. Defendant Hamburger stated in the December 12, 2011 press release that "[w]hile we experienced lower enrollment at some of our institutions during this period, there's no change in the fundamental long-term demand for career-oriented education. . . . We are focused on turning around our performance in the near-term, and remain confident in our ability to grow over the long-term." The December 12, 2011 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Gunst.

66. On December 14, 2011, the Company announced that Defendant Wiggins would replace Defendant Gunst as DeVry's Senior Vice President, Chief Financial Officer, and Treasurer, effective January 3, 2012.

67. On January 26, 2012, the Company issued a press release announcing financial results for 2Q 2012, ended December 31, 2011. In that press release, the Company announced quarterly revenues of $524 million (a 5% decrease from the prior year quarter) and earnings per share of $0.13 (an 89.6% decrease from the prior year quarter). For the six-month period ended December 31, 2011, the Company also announced revenues of $1,043 million (a 2.8% decrease from the prior year period) and earnings per share of $0.97 (a 57.5% decrease from the prior year period).

68. Defendant Hamburger stated in the January 26, 2012 press release that the Company was "disappointed with these results," but that it was nevertheless "focused on improving [its] performance by implementing initiatives that will drive revenue growth, while

controlling costs." As set forth in the press release, such initiatives included "[e]nhancing awareness to drive student interest in DeVry's career-oriented educational programs." The January 26, 2012 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Wiggins.

69. On February 6, 2012, the Company filed its Form 10-Q with the SEC for the 2Q 2012 for the quarter ended December 31, 2011 ("2Q 2012 Form 10-Q"), which was signed by Defendants Hamburger and Wiggins, reiterating DeVry's previously reported financial results in the January 26, 2012 press release, stating:

> Total consolidated revenues for the second quarter of fiscal year 2012 of $524.0 million decreased $27.4 million, or 5%, as compared to the year-ago quarter. For the first six months of fiscal year 2012, total consolidated revenues decreased $29.8 million, or 2.8%, to $1,043.1 million.

70. With regards to student enrollment, the 2Q 2012 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were driven primarily by the negative impact on student decision making of the prolonged economic downturn and economic conditions generally, resulting in a reduction of interest from potential students. In addition, management believes a short-term distraction of DeVry University employees associated with the implementation of new regulations also contributed to the decreases in DeVry University undergraduate enrollments. To address these issues, DeVry University is adding new programs and locations. It is also making investments to enhance the strength of its brand, improve customer service and increase awareness among potential students through new and innovative advertising campaigns.

71. On March 1, 2012, DeVry announced that Defendant Unzicker had been named as the Company's Vice President, Finance and Chief Accounting Officer. Unzicker had previously been the Company's Vice President and Controller since 2008.

72. On April 24, 2012, the Company issued a press release announcing financial results for 3Q 2012, ended March 31, 2012. In that press release, the Company announced

quarterly revenues of $540.8 million (a 4% decrease from the prior year quarter) and earnings per share of $1.00 (a 24% decrease from the prior year quarter). For the nine-month period ended March 31, 2012, the Company also announced revenues of $1,584 million (a 3% decrease from the prior year period) and earnings per share of $1.96 (a 45.6% decrease from the prior year period). In regard to undergraduate student enrollment for the DeVry University Spring 2012 session, the press release announced 12,025 new students (a 19.7% decrease from the prior year) and 60,196 total students (a 15.1% decrease from the prior year). The Company stated in the press release that these enrollment results "were impacted by a focus on adjusting to new regulations and prolonged unemployment, which continued to affect consumer confidence."

73. Defendant Hamburger stated in the April 24, 2012 press release that the Company "continued to execute on [its] five-point performance improvement plan." The April 24, 2012 press release was attached as an exhibit to a Form 8-K filed with the SEC on the following day, which was signed by Defendant Unzicker.

74. Also on April 24, 2012, the Company held its 3Q 2012 Earnings Conference Call. Participating on the call were defendants Hamburger, Unzicker, and Wiggins. In response to a question posed by a securities analysts with respect to graduate employment statistics at the Chamberlain school, Defendant Hamburger noted the following with respect to DeVry University:

> … and also ***the graduate employment statistics for DeVry University are also holding up pretty strong, still 80%. We're not meeting our 90% goal, but still holding up very well***. It's more a factor of prospective students. We've just seen that among their environment or their neighbors or their friends, in the popular press just causing the hesitation on the front end. But the good news that help us spread the word is the graduates of institutions are doing quite well.

75. On May 3, 2012, the Company filed its Form 10-Q with the SEC for the 3Q 2012 for the quarter ended March 31, 2012 ("3Q 2012 Form 10-Q"), which was signed by Defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results in its April 24, 2012 press release, stating:

> Total consolidated revenues for the third quarter of fiscal year 2012 of $540.8 million decreased $21.9 million, or 3.9%, as compared to the year-ago quarter. For the first nine months of fiscal year 2012, total consolidated revenues decreased $51.7 million, or 3.2%, to $1,583.9 million.

76. With regards to student enrollment, the 3Q 2012 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were driven primarily by the negative impact on student decision making of the prolonged economic downturn and persistent unemployment, resulting in a reduction of interest from potential students. In addition, management believes a short-term distraction of DeVry University employees associated with the implementation of new regulations in July 2011, along with the heightened competition, also contributed to the decreases in DeVry University undergraduate enrollments. To address these issues, DeVry University is enhancing the effectiveness of its recruiting efforts. During the third quarter, DeVry University provided additional training to its admissions advisors on revisions that were made to their performance management system stemming from the implementation of new regulations in July 2011. It is also making investments to enhance the strength of its brand, improve customer service and increase awareness among potential students through new and innovative advertising campaigns.

77. Less than a week later, on May 9, 2012, at the Robert W. Baird's Growth Stock Conference, in response to an analyst's question, Defendant Hamburger recognized that career-oriented education is critical for DeVry University's competitive position:

> But the key is what's our competitive position, what's our value proposition, how are we going to enhance that to compete.
>
> And there what's really important is enhancing that focus on career-oriented education [still] enhancing, for example, our career services, and we've taken that up over the last couple of years to

> 200 career service and professionals just at DeVry University. So that is a way to compete with any other universities who (inaudible) a career service and don't offer that.

78. On June 12, 2012, Defendant Hamburger participated in and presented at the William Blair and Co. LLC Growth Stock Conference wherein he discussed the success of DeVry and in particular DeVry University student outcome statistics:

> So we have a diverse family of educational institutions, and they all share a common operating philosophy -- that is that quality leads to growth.
>
> Our focus on academic quality drives strong student outcomes that strengthens our reputation and results in continued enrollment growth. And this growth ultimately leads to strong financial results as well.
>
> * * *
>
> So let me turn now to our long-term strategy for driving growth and value. Ask anyone at DeVry what our strategy is and they will summarize it for you in three words -- achieve, grow, and build.
>
> Achieve superior student outcomes. How do we do that? By providing high-quality, career-oriented academics, service excellence, and innovative educational technology. . . . Many students are attracted by our focus on career-oriented education. . . . That's career-oriented academics.

79. During the Question and Answer session, in response to a question from an unidentified audience member, Defendant Hamburger confirmed that "[w]e revolve around basically two pillars. One, our metrics of outcomes, and the other is standards of professional practice. Some metrics of outcomes would include, do the students learn? Did they graduate? Are they employed in their field of study? Are they repaying their loans?"

80. On July 23, 2012, the Company issued a press release previewing financial results for 4Q 2012, ended June 30, 2012. In that press release, the Company announced quarterly revenues of between $500 million and $510 million and earnings per share of between $0.43 and

$0.46 before certain discrete items decreasing earnings by approximately $0.35 per share. In regard to undergraduate student enrollment for the DeVry University Summer 2012 session, the Company stated that it expected to report a decline of 15% to 17% in new enrollments.

81. Defendant Hamburger stated in the July 23, 2012 press release, "[w]hile we are disappointed with this quarter's results, we are optimistic about mid- and long- term growth in higher education." The July 23, 2012 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

82. On August 9, 2012, the Company issued a press release announcing financial results for 4Q and full-year 2012, ended June 30, 2012. In that press release, the Company announced quarterly revenues of $505.9 million (a 7.5% decrease from the prior year quarter) and earnings per share of $0.12 (an 88.9% decrease from the prior year quarter). For Fiscal 2012, the Company also announced revenues of $2,089 million (a 4.2% decrease from the prior year) and earnings per share of $2.09 (a 55.3% decrease from the prior year). In regard to undergraduate student enrollment for the DeVry University May 2012 session, the press release announced 5,730 new students (a 14.3% decrease from the prior year) and 60,044 total students (a 14.7% decrease from the prior year). For DeVry University's July 2012 undergraduate session, the press release announced 7,532 new students (a decrease of 16.6% from the prior year) and 50,503 total students (a decrease of 15.8% from the prior year). The Company stated in the press release that "[e]nrollment results for DeVry University at both the undergrad and graduate levels continue to be negatively impacted by the prolonged economic downturn and low consumer confidence, trends being experienced across higher education." The August 9, 2012 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

83. On August 28, 2012, the Company issued it 2012 Annual Report ("2012 AR) and filed with the SEC its Form 10-K ("2012 10-K") for the fiscal year ended June 30, 2012. The 2012 10-K was signed by Defendants Hamburger, Wiggins, and Unzicker. In the 2012 AR, the Company reported a decrease of 4% in revenues ($2,089,781,000 for 2012 compared to $2,182,371,000 in 2011), a decrease of 57% in net income ($141,565,000 for 2012 compared to $330,403,000 for 2011) and a decrease of 55% in earnings per share ($2.09 for 2012 compared to $4.68 in 2011).

84. In his Fellow Owners, Students, Colleagues and Friends Letter, Defendant Hamburger stated:

> 2012 proved to be a challenging year not just for DeVry but also for the entire U.S. higher-education system. . . . While our financial outcomes in 2012 were not what we wanted, our student outcomes were—and our investments in quality and capacity mean that we are poised to transition to recovery and growth in our enrollments and financial results. The years ahead hold tremendous promise for DeVry's institutions and our students. We are confident that our hard work in 2012 will yield great opportunities in the years that follow.

85. In the 2012 10-K, in addition to noting the decrease in revenue, net income and earnings per share, reported the decrease in new student enrollment:

> New student undergraduate enrollment in July 2012 session decreased 16.6% to 7,532 students as compared to the prior year. Total undergraduate enrollment in July 2012 was 50,503 students, a decrease of 15.8% compared to 59,966 in the previous summer. There were 16,397 total students for the July 2012 session in DeVry University's graduate programs, including its Keller graduate school of Management, representing a decrease of 9.7% from the prior year.

86. With respect to marketing and outreach, the 2012 10-K notes the following:

> DeVry University currently advertises on various Internet sites, on television and radio, in magazines and newspapers, and utilizes telemarketing and direct mail to reach prospective students. DeVry

> University frequently updates its marketing programs in order to better communicate the quality of its degree programs and the value of a DeVry University education. DeVry University's highly integrated brand initiative focuses on the university's graduate employment success, while emphasizing DeVry University as an accredited, highly respected academic institution. The brand campaign is grounded in ongoing in-depth consumer, marketplace and brand research, and leverages a number of channels, including broadcast, print and Internet advertising, public relations, and social media, as well as local marketing efforts.

87. In addition, the Company recognized that its financial success and those of their graduates, depend on the employment of its graduates. Thus, the 2012 10-K states with respect to DeVry University:

> As *THE* Career University, DeVry University believes that the employment of its graduates is essential to the achievement of its mission and the ability to attract and retain students.
>
> * * *
>
> DeVry University attempts to gather accurate data to determine how many of its undergraduates, both at the associate and bachelor's degree levels, are employed in positions related to their program of study within six months following graduation.. To a large extent, the reliability of such data depends on the quality of information that graduates self-report.
>
> One measure of success is the employment outcomes of DeVry University graduates. Each year, thousands of DeVry University graduates have started careers in their chosen fields within 6 months or less of their graduation. ***Eighty-six percent of DeVry University's February 2011, June 2011 and October 2011 graduates in the active job market were employed in their fields of study within six months of graduation at an average salary of $42,626. These statistics include graduates of associate and bachelor's degree programs and those who were already employed in their field of study***.

(Emphasis in first quoted paragraph in original).

88. On September 13, 2012, Defendant Hamburger participated in and presented at the BMO Capital Markets Back to School Education Conference wherein he discussed the

success of DeVry and in particular DeVry University graduates' employment statistics. In response to an analyst's question about the thesis of investing in DeVry, he emphasized that "[e]verybody knows DeVry's reputation for quality. And, certainly, students and families know DeVry. DeVry University equals careers. They know that reputation. Employers -- we have a great reputation with employers for those career outcomes." In response to another question by the same analyst about DeVry's priorities, Defendant Hamburger stated:

> The second area is regaining enrollment growth. That involves improving our marketing, recruiting and retention, all three of those count. Retention counts every bit as much as recruiting a new student. Marketing is focused on both the media mix in the tactics, as well as the message itself and the branding. So a lot of focus on social, digital, website optimization, search engine optimization. And we're adding to the dedicated group that we have doing that. The message -- reinforcement of our brand.
>
> * * *
>
> And then, recruiting -- we had a dislocation or a disruption in our conversion rates, is probably the best way to measure that, in July of 2011 when we had new regulations. So changing the way I do your performance review, Jeff, might change -- that might be a little distracting for you. And we've worked our way through that. So we've done a lot of training. For a while there, I think our admissions advisors kind of froze up, our managers froze up. They were not sure -- what am I allowed to say? What am I not allowed to say? So we've done a lot of training that says, you know what, don't focus on that. Focus on the student in front of you. You were compliant before. This is DeVry. You've never done the wrong thing. You're compliant now. But they needed to hear that. Because there was just sort of, hearing so much negative press and everything, wondering, am I doing something wrong? No, you're not doing anything wrong. And over the course of the year, we've worked our way through that. And now, I'd say that we are up a good 20%, 30% off the bottom, in terms of improving our conversion rate from where we were. And the result of all these efforts to improve our enrollments is actually starting to work.

89. On October 25, 2012, the Company issued a press release announcing financial results for 1Q 2013, ended September 30, 2012. In that press release, the Company announced

quarterly revenues of $482.7 million (a 7% decrease from the prior year quarter) and earnings per share of $0.49 (a 41% decrease from the prior year quarter). In regard to undergraduate student enrollment for the DeVry University September 2012 session, the press release announced 6,580 new students (an 8.6% decrease from the prior year) and 56,086 total students (a 14.9% decrease from the prior year). With respect to the launch of DeVry University's marketing campaign underscoring employment for its graduates due to its "career-focused programs," the Company noted:

> DeVry University recently launched a new advertising campaign that underscores the growing need for an educated workforce to fill tomorrow's jobs in high-demand sectors.
>
> As an example of the strong value proposition of our career-focused programs, ***graduate employment at DeVry University was 85.7 percent in the most recent annual reporting period***. This average includes graduates of associate and bachelor's degree programs for the twelve-month period ending February 2012.

90. A chart which appears in the press release notes that in addition to 85.7% of DeVry University graduates being employed, the average salary was $42,623 and that the "[i]formation presented is based on graduate-provided data." In reaching the 85.7% number, the Company misleadingly explained that the "[d]enominator excludes graduates continuing their education, foreign graduates ineligible to work in the United States/Canada and those unable to accept career advising assistance because of extreme circumstances, such as military service or critical illness," and the "[n]umerator excludes graduates who actively pursued employment for less than 180 days and did not become employed."

91. The October 25, 2012 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

92. In the same day, the Company held its 1Q 2013 Earnings Conference Call. Participating on the call were Defendants Hamburger, Unzicker, and Wiggins. In his opening presentation, Defendant Hamburger discussed career-oriented education in terms of its return on investment (ROI) and return on educational investment (ROIE) and their relation to employment statistics of DeVry University graduates. Defendant Hamburger noted that:

> DeVry's programs across all our institutions are focused on these types of high ROI programs or high ROEI programs. And this is why DeVry is so confident about the future. The new DeVry University employment statistic we announced today shows that ***86% of DeVry University graduates who are active in the job market were employed in their field of study within 6 months of graduation. Average salary? $42,626***. Now that's remarkable in this economy. It demonstrates the quality of our academic offerings and the return on investment for our students.

93. On November 5, 2012, the Company filed its Form 10-Q with the SEC for the 1Q 2013 ended September 30, 2012 ("1Q 2013 Form 10-Q"), which was signed by Defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results in the Company's October 25, 2012 press release, stating "[t]otal consolidated revenues for the first quarter of fiscal year 2013 of $482.7 million decreased $36.3 million, or 7.0%, as compared to the year-ago quarter."

94. With regards to student enrollment, the 1Q 2013 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were driven by the negative impact on student decision making from the prolonged economic downturn and persistent unemployment, resulting in a reduction of interest from potential students. In addition, management believes heightened competition contributed to the decreases in DeVry University undergraduate and graduate enrollments. To regain enrollment growth at DeVry University, management's plan includes channel-focused initiatives, technology and brand awareness. . . . DeVry University's brand awareness campaigns are helping drive higher quality inquires and steadily improving conversion rates.

95. On February 6, 2013, the Company issued a press release announcing financial results for 2Q 2013, ended December 31, 2012. In that press release, the Company announced quarterly revenues of $505 million (a 3.6% decrease from the prior year quarter) and earnings per share of $0.78 (a 500% increase from the prior year quarter). For the six-month period ended December 31, 2012, the Company also announced revenues of $988 million (a 5.3% decrease from the prior year period) and earnings per share of $1.27 (a 30.9% increase from the prior year period). In regard to undergraduate student enrollment for the DeVry University November 2012 session, the press release announced 6,488 new students (a 15.5% decrease from the prior year) and 60,103 total students (a 17.6% decrease from the prior year). For DeVry University's January 2013 undergraduate session, the press release announced 5,593 new students (a 4.7% decrease from the prior year) and 62,435 total students (a 14.9% decrease from the prior year).

96. Defendant Hamburger stated in the February 6, 2013 press release that "DeVry's focus on quality and diversification is helping us as we work through the cyclical weakness." The February 6, 2013 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

97. Also on February 6, 2013, the Company held its 2Q 2013 Earnings Conference Call. Participating on the call were Defendants Hamburger, Unzicker, and Wiggins. In response to a question concerning how DeVry University is enticing students to enroll in the University, Defendant Hamburger pointed to the statistic that graduates are employed in their field of study within 6 months of graduation as a fact for attracting students:

> [Question:] You both alluded to the fact that the issue with DeVry University seems to be inquiry that the top of the channel being challenging. I'm just curious how you're changing your message to students, prospective students, to make it less challenging to entice them to enroll. . . .

> [Hamburger:] Sure. We're really focusing on DeVry's long-time reputation for being the career university. . . . We've been at this for decades and we've got a long track record of a data, third-party review data back to 1975. And since that time our graduates in the active job market have been employed within their field of study within 6 months of graduation. So that's the kind of message that we think is important to tell[.]

98. On February 7, 2013, the Company filed its Form 10-Q with the SEC for the 2Q 2013 for the quarter ended December 31, 2012 ("2Q 2013 Form 10-Q"), which was signed by Defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results in its February 6, 2013 press release, stating "[t]otal consolidated revenues for the second quarter of fiscal year 2013 of $505.2 million decreased $18.8 million, or 3.6%, as compared to the year-ago quarter. For the first six months of fiscal year 2013, total consolidated revenues decreased $55.1 million or 5.3% to $988.0 million."

99. With regards to student enrollment, the 2Q 2013 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were driven by the negative impact on student decision making from the prolonged economic downturn and persistent unemployment, resulting in a reduction in interest from potential students. In addition, management believes heightened and innovated competition from both public and private sector education providers contributed to the decreases in DeVry University undergraduate and graduate enrollments. To regain enrollment growth at DeVry University, management's plan includes channel-focused initiatives, technology and brand awareness. . . . DeVry University's brand awareness campaigns are helping drive higher quality inquires and steadily improving conversion rates.

100. On February 26, 2013, Defendant Wiggins participated in and presented at the Robert W. Baird and Co. Business Solutions Conference wherein he discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> As Daniel Hamburger said recently and I thought very aptly, he said, when the students think about advancing their education, one thing that is guaranteed is the debt. And I think in their minds they

> are not sure that the career at the end is there. Even though at DeVry University, we have very good statistics, some 88% of students that persist and graduate, if you look at those that are actively looking within six months, will find a position in their field of study, and the average pay is $43,000.
>
> So that's a message I think we can do a better job articulating to the students, and that is because we are very much career focused.
>
> * * *
>
> And one of the things that is encouraging when we look at DeVry University, one, is that we have these good employment statistics; two, we know that we do well in supporting students to get through this process.

101. On March 6, 2013, the Company issued a press release announcing that DeVry University had received reaffirmation of its accreditation by the Institutional Actions Council of The Higher Learning Commission of the North Central Association of Colleges and Schools. As explained in the press release, the Higher Learning Commission accredits degree-granting educational institutions such as DeVry University, and is recognized by the DoE. The March 6, 2013 press release stated that more information regarding DeVry University's accreditation could be found at http://www.ncahlc.org. That website provides information concerning the accreditation process and the criteria for accreditation of educational institutions. Notably, such criteria include the requirement that an "institution evaluates the success of its graduates" including by "assur[ing] that the degree or certificate programs it represents as preparation for advanced study or employment accomplish these purposes." The criteria also require that an institution "looks to indicators it deems appropriate to its mission, such as employment rates[.]" The March 6, 2013 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

102. On March 13, 2013, Defendant Hamburger participated in and presented at the Credit Suisse 15th Annual Global Services Conference wherein he discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> Well, the other measures of quality is successful student outcomes. . . . ***At DeVry University, nearly 86% of our graduates in the active job market were employed in their field of study within 6 months of graduation. And these graduates earned an average salary of over $43,000. So that's a marker of academic quality***.
>
> * * *
>
> One question that we've been asked is, how do we compete? How does DeVry compete? What is it that attracts students to our institutions in this competitive environment that's out there in higher education? We referred to it as HIRE education. That's spelled a little bit differently, HIRE. The H is for hands-on, small class sizes, individual attention, from professors who know you by name, not a number. The I, in 3 years, you can get a 4 year Bachelor's degree. In other words, that's speed to the degree. The R is for the reputation that our institutions enjoy with students, with accreditors and especially, with employers. And that leads to the E, ***incredible employment outcomes, like the 86% employed [at] $43,000 that I referenced earlier [at] DeVry University***.

103. On April 15, 2013, the Company announced that it had received a subpoena from the Office of the Attorney General of the State of Illinois and a Civil Investigative Demand issued by the Office of the Attorney General of the Commonwealth of Massachusetts. As stated by the Company, the Illinois subpoena "was issued pursuant to the Illinois False Claims Act in connection with an investigation concerning whether the compensation practices of DeVry and certain of its affiliates are in compliance with the Incentive Compensation Ban of the Higher Education Act." Moreover, the Massachusetts demand "was issued in connection with an investigation into whether DeVry caused false claims and/or false statements to be submitted to the Commonwealth of Massachusetts relating to student loans, guarantees, and grants provided

to DeVry's Massachusetts students." The Company stated that it could not predict the outcome of the investigations at that time.

104. On April 23, 2013, the Company issued a press release announcing financial results for 3Q 2013, ended March 31, 2013. In that press release, the Company announced quarterly revenues of $509 million (a 5.9% decrease from the prior year quarter) and earnings per share of $0.88 (a 12% decrease from the prior year quarter). For the nine-month period ended March 31, 2013, the Company also announced revenues of $1,497 million (a 5.5% decrease from the prior year period) and earnings per share of $2.15 (a 9.7% increase from the prior year period). In regard to undergraduate student enrollment for the DeVry University March 2013 session, the press release announced 6,533 new students (a 21.2% decrease from the prior year) and 56,958 total students (a 16.5% decrease from the prior year). The Company stated that while "[e]nrollment results continue to be impacted by lower cyclical demand among the university's target segment of students," the Company's "plan to improve enrollment results includes enhancing communications to students about DeVry University's excellent graduate employment results[.]" The April 23, 2013 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

105. Also on April 23, 2013, the Company held its 3Q 2013 Earnings Conference Call. Participating on the call were Defendants Hamburger, Unzicker, and Wiggins. In his opening presentation, Defendant Hamburger discussed the steps the Company was taking to increase enrollment growth at DeVry University which included becoming aggressive in its message that that a degree from DeVry University translates into quick employment at a very good salary. Defendant Hamburger stated:

> [L]et's focus on the steps that we're taking to address these challenges and regain . . . enrollment growth at DeVry University.

> Our strategy is centered on the fact that DeVry University offers a very strong return on investment, and we need to do more to demonstrate this inherent value proposition to prospective students. So first we're changing our message to be more hard hitting on DeVry University as the career university. You know, ***86% of graduates active in the job market are employed in their field of study within 6 months of graduation, and that's with an average salary over $43,000. And the percent is trending up as we're going through this fiscal year***. So we're going to do a better job communicating these impressive results to prospective students.

106. On May 3, 2013, the Company filed its Form 10-Q with the SEC for the 3Q 2013 for the quarter ended March 31, 2013 ("3Q 2013 Form 10-Q"), which was signed by Defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results reiterating in its February 6, 2013 press release, stating "[t]otal consolidated revenues for the third quarter of fiscal year 2013 of $508.8 million decreased $32.1 million, or 5.9%, as compared to the year-ago quarter. For the first nine months of fiscal year 2013, total consolidated revenues decreased $87.2 million or 5.5% to $1,497 million."

107. With regards to student enrollment, the 3Q 2013 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were due to lower cyclical demand from the University's target student segment driven by the prolonged economic downturn, persistent unemployment, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction of interest from potential students. In addition, management believes heightened competition from both public-sector and private-sector education providers and issues with internal execution contributed to the decreases in DeVry University undergraduate and graduate enrollments. To regain enrollment growth at DeVry University, management's plan includes channel-focused initiatives, technology improvements and brand awareness.

108. On June 13, 2013, Defendant Hamburger participated in and presented at the William Blair Growth Stock Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> So in addition to academic quality investments, the other measure that I would give you of academic quality is successful student outcomes. . . . At DeVry University, nearly 86% of our graduates in the active job market were employed in their field of study within six months of graduation. And these graduates earned an average salary of $43,000[.]
>
> * * *
>
> And so we are confident in the growth opportunities over the long-term, and for private sector education specifically, but for DeVry in particular. For three main reasons. First, there's a growing need for career-oriented education. . . . . The second reason is strong ROI from education -- or, as we like to refer to it, an ROEI -- Return On Educational Investment. The US Census Bureau recently released a report showing that the difference in lifetime earnings between a high school grad and a college grad is $1 million. The difference, of course, even greater in fields like engineering, computer science, and healthcare. And DeVry is focused on these types of high ROEI programs.
>
> * * *
>
> And so we are confident in long-term growth, given this growing need for career-oriented education, the public sector struggling to meet the demand, and the strong ROEI. And we think perspective students understand ROEI very well. But right now, many are waiting. They're just not sure if this is the right time to commit to college. And this leads us to believe that there may be some pent-up demand building to be released as the economy improves.

109. In response to a question from an unidentified audience member concerning the Department of Education's scrutiny of employment statistics, Defendant Hamburger stated:

> Okay, so, two-part question. How would the Department of Education, which has increased scrutiny on higher education generally, as well as in the private sector specifically, view our outcomes? And then how about that -- those employment results, of the 86% I mentioned? By the way, that's our goal, is that 9 out of 10 DeVry University graduates in their -- in the after-job market should be employed in their field of study, not just any job, in their field of study within six months. Not 12 months, not 100 years. It's got to be within six months.
>
> Third party reviewed statistics that we have disclosed publicly with third-party review since 1975. So there is a lot of talk now about

> more disclosure. We should have tough rules and make everybody disclose it. We have been disclosing it for a long time. . . . I don't know of too many universities that even talk about what their current statistics are, let alone have third-party review. And despite those on their website and hand that to every prospective student who interviews. I think the Department of Education would also acknowledge, and has many times, that there are good actors and bad actors in the public sector and the private sector. There is no monopoly on one or the other. We need to make sure we have strong rules of the road for all.
>
> * * *
>
> And that's our advocacy at DeVry, is basically, two pillars -- pillar one is outcomes metrics. So, are the students learning? Are they graduating? Are they repaying their loans? Are they employed? And pillar two is professional standards, conduct, strong disclosure, professional standards, maybe even like a trial period where kind of like when you buy a car, you can return it in three days or something like that.

110. On August 8, 2013, the Company issued a press release announcing financial results for 4Q and full year 2013, ended June 30, 2013. In that press release, the Company announced quarterly revenues of $480 million (a 4.4% decrease from the prior year quarter) and a per share loss of $0.51 ($0.63 lower than the prior year quarter). For the entirety of Fiscal 2013, the Company also announced revenues of $1,964 million (a 5.2% decrease from the prior year) and earnings per share of $1.65 (a 21.1% decrease from the prior year). In regard to undergraduate student enrollment for the DeVry University May 2013 session, the press release announced 4,616 new students (a 19.4% decrease from the prior year) and 48,842 total students (an 18.7% decrease from the prior year). For DeVry University's July 2013 session, the press release announced 5,674 new students (a 24.7% decrease from the prior year) and 42,374 total students (a 16.1% decrease from the prior year). The Company stated in the press release that "DeVry University is focused on highlighting the university's strong value proposition to students."

111. In the August 8, 2013 press release, the Company noted under the heading "Academic and operational accomplishments" that "***[t]he percentage of DeVry University graduates who were actively seeking employment and had careers in their field within 6 months of graduation increased to 90 percent in calendar 2012***," at an average salary of $43,539. As a misleading caveat to these figures, the Company stated that the employment and salary statistics are "based on 2012 graduates' self-reported data to DeVry University Career Service Center who were employed at graduation or who were actively seeking employment after graduation and found employment in their field within six months." The Company hedged, noting that these figures "[do] not include graduates who were not actively seeking employment, as determined by DeVry University Career Services, or who did not report data on employment status to DeVry University Career Services."

112. In addition, Defendant Hamburger stated in the August 8, 2013 press release that "[w]e are responding to a challenging environment by executing a turnaround plan at DeVry University and Carrington including aligning our cost structure, regaining enrollment growth and making targeted investments to drive future growth. Our formula of quality plus diversification equals growth is helping us as we work through the cyclical weakness and we remain confident in the opportunities for long-term growth in career-oriented education." The August 8, 2013 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

113. On the same day, the Company held its 4Q 2013 Earnings Conference Call. Participating on the call were Defendants Hamburger, Unzicker, and Wiggins. In his opening presentation, Defendant Hamburger touted the improved DeVry University graduate employment

statistics as a result of its marketing campaign emphasizing the value of a DeVry University degree after graduation. Defendant Hamburger noted that:

> A recent Gallup poll found that the factor adult Americans say is most important in selecting a college is the percent of graduates who find a good job. This is what DeVry University does. The latest numbers are in, and DeVry University employment statistics increased to more than 90%. ***90% of our graduates in the active job market are employed in their field of study within six months of graduation. And they're earning an average of over $43,500***. That's higher than the median family household income of our students before they enrolled at DeVry University.
>
> Employers see value from DeVry University, as they repeatedly hire our graduates to fill their jobs. And they send their existing employees to us for continuing education as well. New students from our corporate and government partnerships have grown more than 20%. Today, we have more than 400 agreements in place. We work with corporations, including Walmart, Xerox, Allstate, and others.
>
> Three of our DeVry University campuses placed in the top 100 for return on investment in a ranking by PayScale, and they rated over 1,000 institutions. PayScale's report examined the return on investment given the cost of tuition and the payoff in lifetime earnings. And out of that, we had three in the top 100.
>
> * * *
>
> Moving to regaining enrollment growth, the biggest factors depressing demand at DeVry University as well as the overall education market in the U.S. continue to include prospective students' lack of confidence in the job market and in the ROI of college. So the plan to increase enrollment starts with sharpening the communication of DeVry University's value proposition, which is educational quality, career outcomes, and exceptional student support. We'll more aggressively communicate this value proposition, including new, more focused advertising.
>
> Our plan includes investing $20 million more in media spend in fiscal 2014, increasing our weeks on air by about 50%. And we're funding this from other marketing areas, so our overall marketing spend will be flat.

114. On August 29, 2013, the Company issued its 2013 Annual Report ("2013 AR") and filed with the SEC its Form 10-K ("2013 10-K") for the fiscal year ended June 30, 2013. The 2013 10-K was signed by Defendants Hamburger, Wiggins, and Unzicker. The Company reported a decrease of 5% in revenues ($1,964,375,000 for 2013 compared to $2,071,783,000 in 2012), a decrease of 24% in net income ($106,786,000 for 2013 compared to $141,565,000 for 2012), and a decrease of 21% in earnings per share ($1.65 for 2013 compared to $2.09 for 2012).

115. In his Fellow Owners, Students, Colleagues and Friends Letter, Defendant Hamburger noted the "challenging time" and the "current economic environment" which impacted the Company's financial performance:

> We felt the impact in lower 2013 enrollments at DeVry, which represents half of our organization and therefore had a significant effect on our results: revenues decreased 5 percent to $1.96 billion, and net income declined 25 percent to $107 million.

116. Defendant Hamburger, referencing the University's student outcome statistics, was upbeat about the future of the Company, expressing confidence in its "turnaround plan" "because DeVry University's value proposition is fundamentally strong." Specifically, Defendant Hamburger noted that:

> The best measure of our quality is the successful outcomes that our students achieve. ***Notably, 90 percent of DeVry University's 2012 graduates active in the job market were employed in their fields of study within six months of graduation, earning an average of more than $43,500 annually***.

117. The 2013 10-K noted, in addition to the decrease in revenue, net income and earnings per share, reported the decrease in new student enrollment:

> New student undergraduate enrollment in July 2013 session decreased 24.7% to 5,674 students as compared to the prior year. Total undergraduate enrollment in July 2013 was 42,374 students, a decrease of 16.1 % compared to 50,503 in the previous summer. There were 13,281 total students for the July 2013 session in

> DeVry University's graduate programs, including its Keller Graduate School of Management, representing a decrease of 19.0 % from the prior year.

118. With respect to its marketing, the 2013 10-K notes that:

> DeVry University currently advertises on various Internet sites, on television and radio, in magazines and newspapers, and utilizes telemarketing and direct mail to reach prospective students. DeVry University frequently updates its marketing programs in order to better communicate the quality of its degree programs and the value of a DeVry University education. DeVry University's highly integrated brand initiative focuses on the university's graduate employment success, while emphasizing DeVry University as an accredited, highly respected academic institution. The brand campaign is grounded in ongoing in-depth consumer, marketplace and brand research, and leverages a number of channels, including broadcast, print and Internet advertising, public relations, and social media, as well as local marketing efforts.

119. In addition, the Company recognized that its financial success—and that of its graduates—depends on the employment of its graduates. Thus, the 2013 10-K states with respect to DeVry University:

> As The Career University, DeVry University believes that the employment of its graduates is essential to the achievement of its mission and the ability to attract and retain students.
>
> DeVry University attempts to gather accurate data to determine how many of its undergraduates, both at the associate and bachelor's degree levels, are employed in positions related to their program of study within six months following graduation. To a large extent, the reliability of such data depends on the quality of information that graduates self-report.
>
> One measure of success is the employment outcomes of DeVry University graduates. Each year, thousands of DeVry University graduates have started careers in their chosen fields within 6 months or less of their graduation. ***Ninety percent of DeVry University's calendar 2012 graduates in the active job market were employed in their fields of study within six months of graduation at an average salary of $43,539***. These statistics include graduates of associate and bachelor's degree programs and those who were already employed in their field of study.

120. On October 24, 2013, the Company issued a press release announcing financial results for 1Q 2014, ended September 30, 2013. In that press release, the Company announced quarterly revenues of $450.9 million (a 6% decrease from the prior year quarter) and a loss per share of $0.11 ($0.60 less than the prior year quarter). In regard to undergraduate student enrollment for the DeVry University September 2013 session, the press release announced 6,589 new students (a 0.1% increase from the prior year) and 46,966 total students (a 16.3% decrease from the prior year).

121. Defendant Hamburger stated in the October 24, 2013 press release that the Company was executing on its "formula of quality plus diversification equals growth, which is mitigating the cyclical weakness in certain segments of U.S. postsecondary education." Hamburger added that the Company's "turnaround plans at DeVry University and Carrington Colleges are producing early signs of operational improvement." The October 24, 2013 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

122. On November 5, 2013, the Company filed its Form 10-Q with the SEC for the 1Q 2014 for the quarter ended September 30, 2013 ("1Q 2014 Form 10-Q"), which was signed by Defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results in the Company's October 24, 2013 press release, stating "[t]otal consolidated revenues for the first quarter of fiscal year 2014 of $450.9 million decreased $29.0 million, or 6.0%, as compared to the year-ago quarter."

123. With regards to student enrollment, the 1Q 2014 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were due to lower demand from DeVry University's target student segment driven by the prolonged low level of economic growth, persistent

> higher levels of unemployment, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. In addition, management believes heightened competition from both public-sector and private-sector education providers contributed to the decreases in DeVry University undergraduate and graduate enrollments. To improve performance at DeVry University, management is focused on implementing a turnaround plan which includes these points:
>
> · Further improve academic quality;
> · Align the cost structure with enrollment levels;
> · Regain enrollment growth;
> · Make targeted investments with the intent to drive future growth; and
> · Manage the change, while developing the team.
>
> * * *
>
> The plan to stabilize enrollments includes communication of DeVry University's value proposition, which is education quality, career prospects and high levels of student services.

124. On November 6, 2013, the Company announced that it had changed its name from DeVry Inc. to DeVry Education Group Inc.

125. On February 4, 2014, the Company issued a press release announcing financial results for 2Q 2014, ended December 31, 2013. In that press release, the Company announced quarterly revenues of $491.3 million (a 1.9% decrease from the prior year quarter) and earnings per share of $0.74 (a 5.1% decrease from the prior year quarter). For the six-month period ended December 31, 2013, the Company also announced revenues of $942.2 million (a 3.9% decrease from the prior year period) and earnings per share of $0.63 (a 50.4% decrease from the prior year period). In regard to undergraduate student enrollment for the DeVry University November 2013 session, the press release announced 4,824 new students (a 12% decrease from the prior year) and 43,726 total students (an 11.7% decrease from the prior year). For the January 2014 session of DeVry University's undergraduate program, the press release announced 4,911 new students

(a 7.9% decrease from the prior year) and 45,097 total students (a 15.1% decrease from the prior year).

126. Defendant Hamburger stated in the February 4, 2014 press release that DeVry's "formula of quality plus diversification equals growth is mitigating the current weakness in certain segments of U.S. postsecondary education." The February 4, 2014 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

127. On the same day, the Company filed its Form 10-Q with the SEC for the 2Q 2014 ended December 31, 2013 ("2Q 2014 Form 10-Q"), which was signed by Defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results in the Company's February 4, 2014 press release, stating "[t]otal consolidated revenues for the second quarter of fiscal year 2014 of $491.3 million decreased $9.4 million, or 1.9%, as compared to the year-ago quarter. For the first six months of fiscal 2014, total consolidated revenues decreased $38.4 million or 3.9% to $942.2 million."

128. With regards to student enrollment, the 2Q 2014 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were due to lower demand from DeVry University's target student segment driven by the prolonged low level of economic growth, persistent higher levels of unemployment, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. In addition, management believes heightened competition from both public-sector and private-sector education providers contributed to the decreases in DeVry University undergraduate and graduate enrollments. To improve performance at DeVry University, management is executing a turnaround plan which includes:
>
> · Sharpening DeVry University's value proposition which is education quality, career outcomes and exceptional student support;
> · Aligning the cost structure with enrollment levels; and

> · Strategic use of scholarships to attract new students and improve student persistence.
>
> * * *
>
> The plan to stabilize enrollments includes communication of DeVry University's value proposition, which is education quality, career prospects and high levels of student services.

129. Also on February 4, 2014, the Company disclosed that, on January 28, 2014, it had received "a compulsory request from the FTC to provide documents and information relating to the advertising, marketing, or sale of secondary or postsecondary educational products or services or educational accreditation products or services by DeVry Group during the past five years." The Company explained that the "purpose of the request is to determine whether unnamed persons and/or entities have violated or are violating Section 5 of the Federal Trade Commission Act and, if so, to determine whether further FTC action would be in the public interest."

130. Several securities analysts expressed limited concern about the FTC's "compulsory request" to DeVry to provide information relating to the advertising, marketing, or sale of educational products or services during the past five years. Wells Fargo Securities remained upbeat suggesting that the "compulsory requests for marketing information from DeVry for the past five years from the FTC represents a rare regulatory blemish" and noted that the request was "likely part of an effort announced last September that has included a number of lead generation companies and involves coordinated efforts with the Department of Education, the [Consumer Financial Protection Bureau], the Department of Justice and various states." In fact, Wells Fargo went as far as stating that "DeVry's marketing practices are among the most circumspect in the group, in our opinion, and much more comparable to typical not-for-profit school advertising than to that of its for-profit brethren and so we rate the prospect of a 'federal

case' as unlikely." Deutsche Bank considered the FTC inquiry as "odd" because it did not originate from a state attorney general, the SEC, or the Consumer Financial Protection Bureau. Deutsche Bank expressed its belief that "this is the first school specific FTC inquiry since the late 1990s so it is unclear if other schools will be receiving similar requests or if the FTC is only looking at DeVry." Securities analysts' lack of concern about the FTC's investigation reflected that they had been misled by the years of flawed data that Defendants had spoon-fed them in pushing the narrative that approximately 90% of DeVry University graduates were placed in jobs in their field of study within six months at salaries that typically exceeded $43,000.

131. On April 24, 2014, the Company issued a press release announcing financial results for 3Q 2014, ended March 31, 2014. In that press release, the Company announced quarterly revenues of $496.1 million (a 1.5% decrease from the prior year quarter) and earnings per share of $0.86 (a 2% decrease from the prior year quarter). For the nine-month period ended March 31, 2014, the Company also announced revenues of $1,438 million (a 3.1% decrease from the prior year period) and earnings per share of $1.49 (a 30.7% decrease from the prior year period). In regard to undergraduate student enrollment for the DeVry University March 2014 session, the press release announced 5,018 new students (a 2.5% decrease from the prior year) and 42,583 total students (a 10.4% decrease from the prior year).

132. Defendant Hamburger stated in the April 24, 2014 press release:

> During the quarter we made good progress on our plan to turn around and transform DeVry University, including narrowing the rate of decline in new student enrollment, improving student persistence, and accelerating our cost reduction initiatives. As we look ahead to fiscal 2015, we will continue to enhance our strong student value proposition and to grow and diversify in healthcare, international and professional education.

The April 24, 2014 press release was attached as an exhibit to a Form 8-K filed with the SEC on the following day, which was signed by Defendant Unzicker.

133. On May 5, 2014, the Company filed its Form 10-Q with the SEC for the 3Q 2014 for the quarter ended March 31, 2014 ("3Q 2014 Form 10-Q"), which was signed by Defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results in the Company's April 24, 2014 press release, stating "[t]otal consolidated revenues for the third quarter of fiscal year 2014 of $496.1 million decreased $7.7 million, or 1.5%, as compared to the year-ago quarter. For the first nine months of fiscal 2014, total consolidated revenues decreased $46.1 million or 3.1% to $1,438.3 million."

134. With regards to student enrollment, the 3Q 2014 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were due to lower demand from DeVry University's target student segment driven by negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. In addition, management believes heightened competition from both public-sector and private-sector education providers contributed to the decreases in DeVry University undergraduate and graduate enrollments. To improve performance at DeVry University, management continues to execute a turnaround plan which includes:
>
> · Stabilizing enrollments and positioning the university for long-term growth;
> · Reducing DeVry University's cost structure, while maintaining and enhancing our service to students;
> · Regaining DeVry University's technology edge; and
> · Developing and supporting the team to execute the strategy.
>
> * * *
>
> The plan to stabilize enrollments and position DeVry University for long-term growth includes communication of DeVry University's value proposition, which is educational quality, career prospects and high levels of student services.

135. On the following day, May 6, 2014, in response to an analyst's questions about academic outcomes at the Robert W. Baird & Co. Inc. Growth Stock Conference Defendant Wiggins stated:

> So the profile of students at DeVry are what I call nontraditional students, by and large. You know, it's not everybody, but DeVry really excels at students that have had some academic challenge along the way, need additional service or support or care. We're proud of the students that persist and we'll talk a bit about that in a second.
>
> Our graduation rate's in the 30% range. We'd like to see that higher and we're working hard. But the students that persist, our graduate employment data is that over 90% of students actively seeking jobs have them within six months and the average pay of those folks is $44,000, give or take. So the students that come and persist do well. We see good results inside the four walls of the schools. Our net promoter score is very high with our students. We like the graduate employment.
>
> We'd like to see more of the students persist. So certainly the students that come -- and many of our students are first-time college goers, first in their family or in their generation. Our students tend to have less economic means, which means they borrow more. So it's important that students complete their program.

136. On June 11, 2014, Defendant Hamburger participated in and presented at the William Blair & Company LLC Growth Stock Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> So that's who we are. And what's the investment thesis on DeVry Group? It's a clear and powerful formula: quality plus diversification plus long-term thinking, long-term approach. That is what drives long-term growth. And when we talk about quality, the key measure is successful student academic outcomes.
>
> Let me share three recent examples of quality across our institutions. At DeVry University, more than 90% of our graduates in the active job market were employed in their field of study within six months of graduation, and these graduates earned average salary of $44,000. So that's that [90% $44,000] statistic.

> In strong and weak job markets, employers value DeVry University graduates.

137. On July 18, 2014, the Company announced that it had received a letter from the Office of the Attorney General of the State of New York ("NYOAG") on July 15, 2014, requesting cooperation with the NYOAG's inquiry into whether recent television advertisements and website marketing regarding DeVry University had violated federal and state laws prohibiting false advertising and deceptive practices. The letter requested information from January 1, 2011 to the present. The Company stated at the time that it intended to cooperate with the investigation, but that it could not predict its outcome.[8]

138. On August 7, 2014, the Company issued a press release announcing financial results for 4Q and full-year 2014, ended June 30, 2014. In that press release, the Company announced quarterly revenues of $485.1 million (a 1% increase from the prior year quarter) and earnings per share of $0.58 (a $1.09 increase from the prior year quarter). For Fiscal 2014, the Company also announced revenues of $1,923 million (a 2.1% decrease from the prior year) and earnings per share of $2.07 (a 25.5% increase from the prior year). In regard to undergraduate student enrollment for the DeVry University May 2014 session, the press release announced 4,388 new students (a 4.9% decrease from the prior year) and 41,977 total students (a 14.1% decrease from the prior year). For DeVry University's July 2014 undergraduate session, the Company announced 4,915 new students (a 13.4% decrease from the prior year) and 37,210 total students (a 12.2% decrease from the prior year).

---

[8] In its 2016 Form 10-K, DeVry stated that it "has produced, and continues to produce, responsive information in cooperation with the [NYOAG]'s inquiry, and presently is in discussions with the [NYOAG] to address certain concerns the [NYOAG] has raised that could form the basis for potential claims by the [NYOAG] if not addressed to [its] satisfaction."

139. In a section titled "Graduate Employment Statistics," the Company noted in the August 7, 2014 press release that for DeVry University undergraduates, 90.9% were employed earning an average salary of $44,295. As in previous announcements of employment statistics, the Company qualified those statistics by noting that the figures were based on graduates' "self-reported data to DeVry University Career Services who were employed at graduation or who were actively seeking employment after graduation and found employment in their field within six months." In addition, the Company stated that the figures did "not include graduates who were not actively seeking employment, as determined by DeVry University Career Services, or who did not report data on employment status to DeVry University Career Services."

140. The August 7, 2014 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

141. On the same day, the Company held its 4Q 2014 Earnings Conference Call. Participating on the call were Defendants Hamburger, Unzicker and Wiggins. In his opening presentation, Defendant Hamburger touted DeVry University graduate employment statistics, emphasizing the value of a DeVry University degree after graduation and the value employers attach to it. Defendant Hamburger, emphasizing the student outcome statistics, noted that:

> One of our strongest messages is the value employers attach to a DeVry University education, as they consistently hire our graduates to fill their jobs and send their existing employees to us for continuing education. We announced the latest graduate employment results in today's release and they remained above our goal of 90%. ***Actually 90.9% of our graduates in the active job market were employed in their field of study within 6 months of graduation. And they're earning an average of about $44,300 annually***.

142. On August 27, 2014, DeVry released its 2014 Annual Report ("2014 AR") and filed with the SEC its Form 10-K ("2014 10-K") for the fiscal year ended June 30, 2014,

reiterating the previously reported financial results in the Company's August 7, 2014 press release. The 2014 10-K was signed by Defendants Hamburger, Wiggins, and Unzicker. The Company reported a decrease of 2% in revenues ($1,923,371,000 for 2014 compared to $1,964,375,000 in 2013), a decrease of 20% in net income ($134,032,000 for 2014 compared to $106,786,000 for 2013) and a decrease of 20% in earnings per share ($2.07 for 2014 compared to $1.65 for 2013).

143. In his Fellow Owners, Students, Colleagues and Friends Letter, Defendant Hamburger boasted:

> ***In 2013, 90% of DeVry University graduates actively seeking employment obtained careers in their fields of study within six months of graduation or were already employed in their field when they graduated. These graduates earned an average salary of nearly $44,295***. In strong job markets and weaker one alike, employers value DeVry University graduates.

144. Within the discussion of "The Vital Role of Private-Sector Education" in the 2014 AR, the Company noted the following with respect to the success of its graduates:

> Increasingly, students and taxpayer are expecting colleges to prepare student for employment and careers. ***In 2013, 90 percent of DeVry University graduates actively seeking employment had careers in their fields within six months of graduation, at an average compensation of $44,000***. In addition, a study conducted by the Cicero Group found that graduates of DeVry Group institutions experienced significant growth in their earnings.

145. The 2014 10-K noted, in addition to the decrease in revenue, net income and earnings per share, under the heading "Enrollment Trends" for DeVry University, the Company reported the decrease in new student enrollment:

> New student undergraduate enrollment in the July 2014 session decreased 13.4% to 4,915 students as compared to the prior year. Total undergraduate enrollment in July 2014 was 37,210 students, a decrease of 12.2% compared to 42,374 in the previous summer. There were 11,467 total students for the July 2014 session in

> DeVry University's graduate programs, including its Keller Graduate School of Management, representing a decrease of 13.7% from the prior year. Management believes the decreases in enrollments are due to lower demand from DeVry University's target student segment. This is driven by the prolonged low level of economic growth, persistent higher levels of unemployment, negative perceptions of the value of a college degree and increased reluctance to take on debt. These factors have resulted in a reduction in interest from potential students. In addition, management believes heightened competition from both public-sector and private-sector education providers contributed to the decreases in DeVry University undergraduate and graduate enrollments.

146. The Company recognized that its financial success and those of their graduates, depend on the employment of its graduates. Thus, the 2014 10-K states with respect to DeVry University:

> DeVry University believes that the employment of its graduates is essential to the achievement of its mission and its ability to attract and retain students. Career Services professionals across the DeVry University system work diligently to partner with graduates to attain positions in their career fields. Although DeVry University cannot guarantee employment, it is dedicated to helping guide and motivate its students and graduates through the career process.
>
> ***In 2013, 90.9% of graduates of DeVry University's associate and bachelor's degree programs who were actively seeking employment had careers in their chosen fields within six months of graduation at an average salary of $44,295***. To a large extent, these figures are based upon self-reported data from graduates. They reflect graduates who were employed in positions relating to their field of study within 180 days of graduation from among those graduates who were eligible for career assistance and who actively pursued employment relating to their field of study.

147. With respect to its marketing, the 2014 10-K notes that:

> DeVry University advertises on various Internet sites, on television and radio and utilizes telemarketing and direct mail to reach prospective students. DeVry University is updating its marketing programs in order to better communicate the quality of its degree programs and the value of a DeVry University education. DeVry

> University's highly integrated brand initiative focuses on the university's graduate employment success, while emphasizing DeVry University as an accredited, highly respected academic institution. Its campaigns are grounded in ongoing in-depth consumer marketplace research, and leverage multiple channels, including broadcast, print and Internet advertising, public relations, content marketing and social media, as well as local marketing efforts.

148. In addition, the 2014 10-K again disclosed that on January 28, 2014, DeVry had received a CID for information from the FTC relating to advertising, marketing or sale of secondary or postsecondary education products or services, or education accreditation products or services. The 2014 10-K noted that "[t]he stated nature and scope of the CID was to determine whether unnamed persons and/or entities have violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended and, if so, whether further FTC action would be in the public interest."

149. On September 18, 2014, Defendant Hamburger participated in and presented at the BMO Back to School Education Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics. For example, in response to questions from a securities analyst about the value proposition of higher education, he stated:

> And in terms of value proposition and brand, DeVry University has a very strong brand. That's one of the anchors on which we are basing our turnaround and transformation process.
>
> And a very strong value proposition. And that value proposition at DeVry University centers around two concepts: careers and care. So careers and care. Careers, that's one of our strongest messages. ***We just announced the latest graduate employment statistics, as we do every August, and we remained above 90%. Actually, it was 90.9% of our graduates actively seeking employment were employed in their field of study within six months of graduation.*** And those figures include students with careers prior to graduation. So, careers.

* * *

> So the value proposition of DeVry University is very clear, it's very strong and it's around careers and care.

* * *

> And we've published the results of those career statistics long before it was cool, long before the administration thought it was a good idea. And we think it's a good idea, too. ***That's why for 30 or 40 years we have published our statistics very consistently, transparency; by program, by market. You as a prospective student or a family can get that information and see what those outcomes are.***

150. On October 23, 2014, the Company issued a press release announcing financial results for 1Q 2015, ended September 30, 2014. In that press release, the Company announced quarterly revenues of $462.0 million (a 2.5% increase from the prior year quarter) and earnings per share of $0.31 (a $0.42 increase from the prior year quarter). In regard to undergraduate student enrollment for the DeVry University September 2014 session, the press release announced 5,268 new students (a 20% decrease from the prior year) and 39,857 total students (a 15.1% decrease from the prior year).

151. Defendant Hamburger stated in the October 23, 2014 press release that "DeVry Education Group's strategy of quality plus diversification plus long-term focus continues to differentiate us and position us well for growth opportunities." Moreover, the Company stated that DeVry University continued to execute its plan of "enhancing the institution's programmatic focus, optimizing its pricing structure, enhancing its marketing and recruiting efforts, and reducing the cost structure of the organization." The October 23, 2014 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

152. On November 5, 2014, the Company filed its Form 10-Q with the SEC for 1Q 2015, ended September 30, 2014 ("1Q 2015 Form 10-Q"), which was signed by Defendants Wiggins and Unzicker. The 1Q 2015 Form 10-Q reiterated DeVry's previously reported financial results in its April 23, 2014 press release, stating "[t]otal consolidated revenues for the first quarter of fiscal year 2015 of $462.0 million increased $11.1 million, or 2.5%, as compared to the year-ago quarter.

153. With regards to student enrollment, the 1Q 2015 Form 10-Q emphasized that:

> Management believes the decreases in enrollment have been due to lower demand from DeVry University's target student segment believed to be driven by heightened competition from both public-sector and private-sector education providers, the availability of lower cost degrees, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. To improve performance at DeVry University, management continues to execute a turnaround and transformation plan which includes:
>
> · Attracting the right students into strong programs;
> · Reducing DeVry University's cost structure, while striving to maintain and even enhance our service to students;
> · Regaining DeVry University's technology edge; and
> · Developing and supporting the team to drive execution.

154. On November 12, 2014, Defendant Wiggins participated in and presented at the J.P. Morgan Ultimate Services Investor Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> So that's kind of a quick review of who we are. What's the strategy for DeVry Group? Well, the good news is it's a clear and powerful formula. Quality, plus diversification, plus long-term focus equals growth.
>
> * * *
>
> Let me talk about quality. One of the key measures of quality is successful student outcomes and I'd like to recite or give you three examples. At DeVry University, more than 90% of graduates active

> in the job market were employed in their field of study within six months of graduation. And the average compensation of these graduates was nearly $44,000. In strong and weak job markets, employers value DeVry University grads.

155. In response to an analyst's questions about the types of students enrolling at DeVry University, Defendant Wiggins provided:

> And that's why we feel good about our statistic of over 90% of our students that persist find work in their field of study. So I think what we find is many students are -- don't have money. They're concerned about going into debt. They read the stories -- and maybe there's some generational things going on as well.
>
> * * *
>
> So when you're trying to attract students at a big institution like DeVry University, they run the gamut from people that are employed, want to seek a master's degree, getting help from their employer, so they have a job, they'll have a job when they're done, to people -- maybe a single mother that's currently unemployed and hasn't been to school in a number of years. Those are profoundly different audiences and that's why I'm so confident that the programmatic focus gives us an opportunity.

156. On February 5, 2015, the Company issued a press release announcing financial results for 2Q 2015, ended December 31, 2014. In that press release, the Company announced quarterly revenues of $484.9 million (a 1.3% decrease from the prior year quarter) and earnings per share of $0.65 (a 12% decrease from the prior year quarter). For the six-month period ended December 31, 2014, the Company also announced revenues of $946.9 million (a 0.5% increase from the prior year period) and earnings per share of $0.96 (a 52% increase from the prior year period). In regard to undergraduate student enrollment for the DeVry University November 2014 session, the press release announced 4,201 new students (a 12.9% decrease from the prior year) and 38,235 total students (a 12.6% decrease from the prior year). For DeVry University's January 2015 undergraduate session, the Company announced 4,282 new students (a 12.8% decrease from the prior year) and 37,922 total students (a 15.9% decrease from the prior year).

The Company repeated its claim that DeVry University continued to execute its plan of "enhancing the institution's programmatic focus, better communicating its value proposition to students and employers, and reducing its cost structure through workforce reductions and real estate consolidations." The February 5, 2015 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

157. On the same day, the Company filed its Form 10-Q with the SEC for the 2Q 2015 for the quarter ended December 31, 2014 ("2Q 2015 Form 10-Q"), which was signed by Defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results reported in the Company's February 5, 2015 press release, stating "[t]otal consolidated revenues for the second quarter of fiscal year 2015 of $489.9 million decreased $6.4 million, or 1.3%, as compared to the year-ago quarter. For the first six months of fiscal year 2015, total consolidated revenues increased $4.7 million or 0.5% to $946.9 million, as compared to the year-ago period."

158. With regards to student enrollment, the 2Q 2015 Form 10-Q emphasized that:

> Management believes the decreases in enrollment have been due to lower demand from DeVry University's target student segment driven by heightened competition from both public-sector and private-sector education providers, the availability of lower cost degrees, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. To improve performance at DeVry University, management continues to execute a turnaround and transformation plan which includes:
>
> · Attracting the right students into strong programs;
> · Reducing DeVry University's cost structure, while striving to maintain and even enhance its service to students;
> · Regaining DeVry University's technology edge; and
> · Developing and supporting the team to drive execution.

159. On April 23, 2015, the Company issued a press release announcing financial results for 3Q 2015, ended March 31, 2015. In that press release, the Company announced

quarterly revenues of $489.8 million (a 1.3% decrease from the prior year quarter) and earnings per share of $0.72 (a 16% decrease from the prior year quarter). For the nine-month period ended March 31, 2015, the Company also announced revenues of $1,436.8 million (a 1.3% decrease from the prior year period) and earnings per share of $1.68 (a 12.8% increase from the prior year period). In regard to undergraduate student enrollment for the DeVry University March 2015 session, the press release announced 4,156 new students (a 17.2% decrease from the prior year) and 36,188 total students (a 15% decrease from the prior year).

160. Defendant Hamburger also introduced in the April 23, 2015 press release a marketing initiative that, despite being characterized as a new branding effort, was designed to continue attracting students in the face of formidable competition and a weakened economy with the same employment-outcome focus that the Company had previously been touting during and prior to the Class Period. In other words, DeVry's new strategy to differentiate itself from its competitors was the same as its old one:

> Today we have announced the next phase of the significant transformation strategy underway at DeVry University to improve its competitive positioning and return the institution to growth. We are confident that this strategy, together with the sustained expansion of our healthcare, professional and international institutions will drive positive student outcomes and DeVry Group's future growth.

Along those same lines, the Company stated:

> DeVry University announced the next phase of its strategy to return to growth and transform the institution through new, student-focused innovations. Near-term, the university is taking action to differentially invest in its strongest markets and programs; reduce its cost structure; and establish a distinct voice for its brand. In addition, DeVry University is implementing strategies to place it on a path for growth by enhancing the teaching and learning model, addressing affordability, and strengthening employer workforce solutions. Taken together, these actions are designed to maintain positive economics in fiscal 2016.

> DeVry University recently relaunched its brand to emphasize what it is best known for, careers and care. To view the campaign, which illustrates how DeVry University is "Different. On Purpose" please click on this web link: http://bit.ly/1EdBznH.

The April 23, 2015 press release was attached as an exhibit to a Form 8-K filed with the SEC on the following day, which was signed by Defendant Unzicker.

161. On the same day, the Company announced that it had received from the Office of the United States Attorney for the Northern District of Ohio compulsory requests for documents and information from 2007 through April 1, 2015. The Company stated that the "requests address allegations under the False Claims Act that DeVry University offered an associate degree program in Health Information Technology without providing necessary information to applicants regarding requirements for obtaining a degree and a job in the health information technology field upon graduation." The Company further claimed that it could not predict the outcome of that investigation.

162. On April 23, 2015, the Company held its 3Q 2015 Earnings Conference Call. Participating on the call were Defendants Hamburger, Unzicker, and Wiggins. In his opening presentation, Defendant Hamburger discussed the relaunch of DeVry University's brand as part of its strategy of quality, plus diversification, plus long-term focus to differentiate it from other schools. With respect to its communication campaign emphasizing "career outcomes" and how that is a contributing factor in attracting students to DeVry University which affects revenue of the Company, Defendant Hamburger noted the following:

> And third, we relaunched the DeVry University brand. Our new communications campaign emphasizes how DeVry University is different on purpose. . . . We're emphasizing what DeVry University is known for, which is careers and care. Students give us a great deal of credit for our ability to deliver strong career outcomes and for the care and support we provide them to help them achieve these outcomes. The new messaging is designed to clearly establish a distinct voice for the brand and to instill pride in

> the students we serve. Taken together, these and other near-term actions are designed to maintain positive economics in fiscal 2016.

163. On May 5, 2015 Defendant Hamburger participated in and presented at the Robert W. Baird & Co. Inc.'s Growth Stock Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> So the employment statistics of the graduates at DeVry University -- I'm assuming you're talking about DeVry University because you can speak to the other institutions as well -- and they all have good employment results. DeVry University's employment results are actually trending up. That's one of the reasons that we're very confident in the ability, among many other reasons, in the ability that we have to improve our results and to turn it around, is the fundamental value proposition which is, I think, what your question gets at, for the student is very strong, in fact strengthening. Employment results are up. Salaries are up as well for the graduates. So the percentage who are employed in fields of study within six months of graduation or in the active job market is up, and their salaries are going up. The employers are very happy with our graduates, and so the Cisco's and the IBMs and the GEs and the Accentures, you know, they're coming back again and again for our graduates.
>
> The value proposition in terms of return on that educational investment that you asked about I think is also very good because the salaries are going up. . . .

164. On May 8, 2015, the Company filed its Form 10-Q with the SEC for the 3Q 2015 for the quarter ended March 31, 2015 ("3Q 2015 Form 10-Q"), which was signed by Defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results reported in the Company's April 23, 2015 press release, stating "[t]otal consolidated revenues for the third quarter of fiscal year 2015 of $489.8 million decreased $6.3 million, or 1.3%, as compared to the year-ago quarter. For the first nine months of fiscal year 2015, total consolidated revenues decreased $1.5 million or 0.1% to $1,436.8 million, as compared to the year-ago period."

165. With regards to student enrollment, the 3Q 2015 Form 10-Q emphasized that:

> Management believes the decreases in enrollment have been due to lower demand from DeVry University's target student segment driven by heightened competition from both public-sector and private-sector education providers, the availability of lower cost degrees, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. To address the issue of declining enrollment, DeVry University is focused on implementing management's transformation strategy which includes both, near-term actions to improve enrollment, and longer-term investments to increase competitiveness and differentiation.

166. On August 18, 2015, the Company issued a press release announcing financial results for 4Q and full-year 2015, ended June 30, 2015. In that press release, the Company announced quarterly revenues of $473.2 million (a 2.5% decrease from the prior year quarter) and earnings per share of $0.46 (a 20% decrease from the prior year quarter). For the entire 2015 fiscal year, the Company also announced revenues of $1,909.9 million (a 0.7% decrease from the prior year) and earnings per share of $2.14 (a 3% increase from the prior year). In regard to undergraduate student enrollment for the DeVry University May 2015 session, the press release announced 3,817 new students (a 13% decrease from the prior year) and 34,524 total students (a 17.8% decrease from the prior year). That press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

167. On the same day, the Company held its 4Q 2015 Earnings Conference Call. Participating on the call were Defendants Hamburger, Unzicker and Wiggins. In his opening presentation, Defendant Hamburger discussed the relaunch of DeVry University's brand which was already having a positive effect. With respect to its communication campaign emphasizing "career outcomes" and how that is a contributing factor in attracting students to DeVry University which affects revenue of the Company, Defendant Hamburger noted the following:

> And we've relaunched the DeVry University brand. Our new communications campaign emphasizes how DeVry is Different.

> On Purpose. We're emphasizing what DeVry University is known for, which is careers and care. Several of the investors I've spoken with have commented on our Different. On Purpose campaign. While it was just launched in July, we're seeing very early signs of success. For the last couple of years, we've seen brand awareness indicators flipping but with the launch of this campaign, we've now seen an uptick in both brand recognition and memorability. So, we're encouraged by the early results of the combination of our programmatic and local focus supported by our strong brand.

168. On August 27, 2015, DeVry released its 2015 Annual Report ("2015 AR") and filed with the SEC its Form 10-K ("2015 10-K") for the fiscal year ended June 30, 2015, reiterating DeVry's previously reported financial results reported in the Company's August 18, 2015 press release. The 2015 10-K was signed by Defendants Hamburger, Wiggins, and Unzicker. The Company reported a decrease of 0.7% in revenues ($1,909,943,000 for 2015 compared to $1,923,371,000 in 2014), an increase of 4% in net income ($139,899,000 for 2015 compared to $134,032,000 for 20143) and an increase of 3% in earnings per share ($2.14 for 2015 compared to $2.07 for 2014).

169. In his Letter to Our Shareholders, Defendant Hamburger boasted the "foundation of [the Company's] success" stating that:

> Quality means delivering career-focused education with strong outcomes for students-ensuring that they are learning, graduating, gaining employment in their fields of study and paying back their loans. It gives us a competitive advantage, because students want to attend schools with proven high-quality outcomes.
>
> * * *
>
> Our success not only strengthen our position, but also differentiates DeVry Group institutions from others that are struggling- an important consideration for students who are being careful about where they make their investments in higher education. In our view, quality leads to growth; Investing in quality academic produces successful students, making our institutions more attractive to prospective students, enabling us to grow, and generating the resources to invest back into further quality and growth initiatives.

170. Noticeably absent from the Letter to Shareholders was any discussion of the employment and career statistics which appeared in each of the prior year's Letters.

171. The 2015 10-K noted, in addition to a decrease in revenue, and increases in both net income and earnings per share, under the heading "Enrollment Trends" for DeVry University, the Company reported a decrease in new student enrollment:

> New student undergraduate enrollment in the July 2015 session decreased 18.6% to 4,000 students as compared to the prior year. Total undergraduate enrollment in July 2015 was 31,293 students, a decrease of 15.9% compared to 37,210 in the previous summer. There were 10,045 total students for the July 2015 session in DeVry University's graduate programs, including its Keller Graduate School of Management, representing a decrease of 12.4% from the prior fiscal year. Management believes the decreases in undergraduate and graduate enrollment have been due to lower demand from DeVry University's target student segment driven by heightened competition from both public-sector and private-sector education providers, the availability of lower cost degrees, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students.

172. With respect to its marketing efforts, the 2015 10-K notes that:

> DeVry University advertises on various internet sites, on television and radio and utilizes a variety of methods to reach prospective students. DeVry University is updating its marketing programs in order to better communicate the quality of its degree programs and the value of a DeVry University education. DeVry University's highly integrated brand initiative focuses on DeVry University as an accredited, respected academic institution. Its campaigns are grounded in ongoing in-depth consumer marketplace research, and leverage multiple channels, including broadcast, print and internet advertising, public relations, content marketing and social media, as well as local marketing efforts. In order to position DeVry University for growth, local marketing and advertising will be increased significantly in targeted markets.

173. On September 2, 2015, the Company filed a Form 8-K with the SEC disclosing that it had received from the Multi-Regional and Foreign School Participation Division of the

Federal Student Aid office of the Department of Education a request for "documents and information regarding published employment outcomes and earnings of DeVry University graduates." According to the Company, that request was intended "to permit [the DoE] to assess DeVry University's compliance with applicable regulations under Title IV[.]" The Company stated that it would cooperate with the request, but could not predict the outcome of the investigation. That 8-K was signed by Defendant Unzicker.

174. On September 10, 2015, Defendant Hamburger participated in and presented at the BMO Capital Markets Back to School Education Conference where, in response to a question about DeVry University's outcomes, he stated:

> Outcomes, we've done a lot. The big outcomes that we look at are (inaudible) learning, are they persisting graduating? Are they gaining employment in their field? Are they repaying their loans? Those are all the kinds of outcomes, that I think are important, and I think all colleges should be held accountable to.

175. On October 22, 2015, the Company issued a press release announcing financial results for 1Q 2016, ended September 30, 2016. In that press release, the Company announced quarterly revenues of $441.4 million (a 4.5% decrease from the prior year quarter) and earnings per share of $0.08 (a 74.2% decrease from the prior year quarter). In regard to undergraduate student enrollment for the DeVry University September 2015 session, the press release announced 4,006 new students (a 24% decrease from the prior year) and 31,843 total students (a 20.1% decrease from the prior year). That press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

176. On November 4, 2015, the Company filed its Form 10-Q with the SEC for the 1Q 2016 for the quarter ended September 30, 2015 ("1Q 2016 Form 10-Q"), which was signed by Defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results in

the Company's October 22, 2015 press release, stating "[t]otal consolidated revenues for the first quarter of fiscal year 2016 of $441.4 million decreased $30.6 million, or 4.5%, as compared to the year-ago quarter."

177. With regards to student enrollment, the 1Q 2016 Form 10-Q emphasized that:

> Management believes the decreases in undergraduate and graduate enrollment have been due to lower demand from DeVry University's target student segment driven by heightened competition from both public-sector and private-sector education providers, the availability of lower cost degrees, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. Management believes heightened competition at the local level has increased, as local colleges have started targeting adult students to a much greater extent, also local public-sector and independent colleges are taking share from national competitors. Pricing pressure is increasing, and while students appear willing to pay a high price for private independent colleges, DeVry University is more expensive than many of its public and private-sector competitors.
>
> To address the issue of declining enrollment, DeVry University is focused on implementing management's transformation strategy which includes both near-term actions to stabilize enrollments and sustain positive economics and loner-term investments to increase competitiveness and differentiation.

**2. Defendants' Use of Misleading Academic Annual Reports**

178. The Company's use of Academic Annual Reports further contributed to Defendants' scheme to defraud investors and students. Thus, in a calculated move to assuage both investors' and prospective students' concerns about the success of the Company and its ability to attract students and thus generate revenues and earnings per share, Defendants released Academic Annual Reports during the Class Period which touted the success of DeVry University students in obtaining employment upon graduation.

179. On June 13, 2012, DeVry University released its 2010-2011 Academic Annual Report, representing that 89% of all 2010 DeVry University graduates who earned a bachelor's degree were employed in their fields of study within six months of graduating. In this regard, the Company noted that:

| **2010 Career Services Results by degree program** Combined statistics for students who graduated from the February 2010, June 2010 and October 2010 classes. | Graduates who actively pursued and obtained employment and those already employed in education-related careers within 180 days of graduation | Average reported annual compensation[3] | Graduates | Graduates eligible for career assistance[4] | Graduates who actively pursued employment for up to 180 days and those who were already employed[5] | Graduates employed in education-related positions within 180 days of graduation |
|---|---|---|---|---|---|---|
| ASSOCIATE DEGREE PROGRAM | | | | | | |
| Accounting | 75% | $33,066 | 90 | 70 | 56 | 42 |
| Electroneurodiagnostic Technology | 100% | $47,840 | 2 | 2 | 2 | 2 |
| Electronics & Computer Technology | 87% | $33,381 | 331 | 254 | 210 | 182 |
| Health Information Technology | 76% | $31,561 | 489 | 356 | 283 | 215 |
| Network Systems Administration | 84% | $38,263 | 540 | 329 | 248 | 209 |
| Web Graphic Design | 50% | $30,827 | 273 | 131 | 60 | 30 |
| TOTAL | 79% | 534,145 | 1,725 | 1,142 | 859 | 680 |
| BACHELOR'S DEGREE PROGRAM | | | | | | |
| Biomedical Engineering Technology[2] | 80% | $42,480 | 76 | 70 | 64 | 51 |
| Business Administration | 90% | $39,220 | 1,550 | 1,314 | 1,237 | 1,115 |
| Clinical Laboratory Science | 100% | $49,640 | 7 | 7 | 6 | 6 |
| Computer Engineering Technology | 80% | $37,369 | 134 | 119 | 105 | 84 |
| Computer Information Systems | 84% | $43,849 | 718 | 628 | 530 | 443 |
| Electronics Engineering Technology | 88% | $41,297 | 256 | 238 | 215 | 190 |
| Game & Simulation Programming | 63% | $38,847 | 374 | 334 | 226 | 143 |
| Multimedia Design & Development | 0% | N/A | 1 | 1 | 1 | 0 |
| Network & Communications Management | 90% | $44,287 | 511 | 462 | 411 | 369 |
| Technical Management | 92% | $46,649 | 3,608 | 3,052 | 2,827 | 2,594 |
| TOTAL | 89% | 543,953 | 7,235 | 6,225 | 5,622 | 4,995 |

180. Similarly, on February 4, 2013, DeVry University released its 2011-2012 Academic Report, indicating the following:

| **2011 Career Services Results by degree program**<br>Combined statistics for students who graduated from the February 2011, June 2011 and October 2011 classes. | Graduates who actively pursued and obtained employment and those already employed in educational-related careers within 180 days of graduation | Average reported annual compensation[2] | Graduates | Graduates eligible for career assistance[3] | Graduates who actively pursued employment for up to 180 days and those who were already employed[4] | Graduates employed in education-related positions within 180 days of graduation |
|---|---|---|---|---|---|---|
| ASSOCIATE DEGREE PROGRAM | | | | | | |
| Accounting | 74% | $33,287 | 159 | 97 | 88 | 65 |
| Electroneurodiagnostic Technology *(renamed Neurodiagnostic Technology November 9, 2012)* | 100% | $35,391 | 9 | 8 | 8 | 8 |
| Electronics & Computer Technology | 82% | $37,043 | 336 | 218 | 201 | 165 |
| Health Information Technology | 69% | $33,321 | 849 | 523 | 460 | 318 |
| Network Systems Administration | 81% | $37,502 | 696 | 407 | 373 | 303 |
| Web Graphic Design | 52% | $31,739 | 412 | 140 | 110 | 57 |
| **ASSOCIATE TOTAL** | 74% | $35,327 | 2,461 | 1,393 | 1,240 | 916 |
| BACHELOR'S DEGREE PROGRAM | | | | | | |
| Biomedical Engineering Technology[1] | 81% | $43,568 | 113 | 101 | 94 | 76 |
| Business Administration | 91% | $38,180 | 1,703 | 1,334 | 1,269 | 1,150 |
| Clinical Laboratory Science | 100% | $44,075 | 15 | 14 | 14 | 14 |
| Computer Engineering Technology | 86% | $40,834 | 122 | 97 | 91 | 78 |
| Computer Information Systems | 85% | $44,178 | 806 | 613 | 570 | 484 |
| Electronics Engineering Technology | 91% | $44,386 | 285 | 240 | 232 | 211 |
| Game & Simulation Programming | 61% | $36,096 | 439 | 298 | 246 | 149 |
| Management | 100% | $29,062 | 9 | 5 | 5 | 5 |
| Multimedia Design & Development | 82% | $29,208 | 66 | 65 | 40 | 33 |
| Network & Communications Management | 90% | $43,838 | 543 | 433 | 407 | 366 |
| Technical Management | 90% | $47,001 | 4,099 | 3,176 | 3,033 | 2,726 |
| **BACHELOR'S TOTAL** | 88% | $43,849 | 8,200 | 6,356 | 6,001 | 5,292 |

**Graduate Employment Rates**

Even in today's challenging economic environment, a large percentage of 2011 DeVry University graduates in the active job market were either employed in their fields before graduating or found jobs within six months of graduation. For those who earned associate degrees, the employment rate was 74 percent; the rate was 88 percent for those who earned bachelor's degrees[5].

181. DeVry University's 2012-2013 Academic Annual Report again boasted that "[n]inety percent of DeVry University's 2012 graduates who were actively seeking employment had careers in their field within six months of graduation, at an average salary of $43,538." To that point, the Company provided the following chart:

| **2012 Career Services Results by degree program**<br>Combined statistics for students who graduated from the February 2012, June 2012, October 2012 and December 2012 classes | Graduates who actively pursued and obtained employment and those already employed in education-related careers within 180 days of graduation | Average reported annual compensation[1] | Graduates | Graduates eligible for career assistance[2] | Graduates who actively pursued employment for up to 180 days and those who were already employed[3] | Graduates employed in education-related positions within 180 days of graduation |
|---|---|---|---|---|---|---|
| ASSOCIATE DEGREE PROGRAM | | | | | | |
| Accounting | 90% | $33,892 | 234 | 144 | 124 | 112 |
| Electronics & Computer Technology | 91% | $37,395 | 378 | 246 | 215 | 195 |
| Health Information Technology | 79% | $31,847 | 1,018 | 619 | 522 | 411 |
| Network Systems Administration | 87% | $39,937 | 797 | 437 | 377 | 329 |
| Neurodiagnostic Technology | 100% | $37,960 | 7 | 7 | 7 | 7 |
| Web Graphic Design | 64% | $33,327 | 403 | 145 | 88 | 56 |
| **ASSOCIATE TOTAL** | **83%** | **$35,436** | **2,837** | **1,598** | **1,333** | **1,110** |
| BACHELOR'S DEGREE PROGRAM | | | | | | |
| Biomedical Engineering Technology | 90% | $45,281 | 110 | 98 | 88 | 79 |
| Business Administration | 92% | $38,558 | 1,911 | 1,536 | 1,430 | 1,318 |
| Clinical Laboratory Science | 100% | $46,176 | 26 | 23 | 21 | 21 |
| Computer Engineering Technology | 87% | $44,421 | 119 | 102 | 93 | 81 |
| Computer Information Systems | 89% | $44,651 | 901 | 697 | 633 | 562 |
| Electronics Engineering Technology | 93% | $48,208 | 318 | 282 | 269 | 249 |
| Game & Simulation Programming | 69% | $38,688 | 362 | 248 | 194 | 133 |
| Justice Administration | 100% | $26,000 | 4 | 3 | 2 | 2 |
| Management | 96% | $42,353 | 74 | 52 | 48 | 46 |
| Multimedia Design & Development | 84% | $32,251 | 196 | 127 | 92 | 77 |
| Network & Communications Management | 93% | $44,891 | 660 | 525 | 494 | 461 |
| Technical Management | 94% | $48,101 | 4,620 | 3,614 | 3,413 | 3,196 |
| **BACHELOR'S TOTAL** | **92%** | **$45,031** | **9,301** | **7,307** | **6,777** | **6,225** |

182. On March 20, 2015, DeVry University released its 2013-2014 Academic Annual Report stressing that "[o]ne critical measure of our success is the employment outcomes of DeVry University graduates." To that effect, the Company indicated that, "[i]n 2013, 90% of DeVry University graduates actively seeking employment had careers in their field of study within 6 months of graduation at an average salary of $44,295." These figures were reflected in the following chart:

| **2013 Career Services results by degree program** Combined statistics for students who graduated from the February 2013, April 2013, June 2013, August 2013, October 2013 and December 2013 classes.[2] | Graduates who were already employed, or actively sought employment, that had careers in fields related to their education within six months of graduation | Average reported annual compensation[3] | Graduates | Graduates who were already employed in fields related to their education or were available to actively seek employment[4] | Graduates who were already employed in fields related to their education or actively sought employment for up to six months after graduation[5] | Graduates who were already employed, or actively sought employment, that had careers in fields related to their education within six months of graduation |
|---|---|---|---|---|---|---|
| **ASSOCIATE DEGREE PROGRAMS:** | | | | | | |
| Accounting | 90% | $37,458 | 187 | 99 | 94 | 85 |
| Electronics & Computer Technology | 90% | $38,350 | 254 | 164 | 149 | 135 |
| Health Information Technology | 83% | $32,375 | 719 | 416 | 383 | 320 |
| Network Systems Administration | 87% | $37,691 | 681 | 389 | 359 | 315 |
| Neurodiagnostic Technology | 100% | $47,410 | 8 | 8 | 8 | 8 |
| Web Graphic Design | 71% | $30,375 | 310 | 101 | 78 | 56 |
| **ASSOCIATE DEGREE TOTAL[6]** | **85%** | **$35,555** | **2,159** | **1,177** | **1,071** | **919** |
| **BACHELOR'S DEGREE PROGRAMS:** | | | | | | |
| Accounting | 100% | $29,800 | 11 | 7 | 5 | 5 |
| Biomedical Engineering Technology | 86% | $42,238 | 95 | 79 | 75 | 65 |
| Business Administration | 92% | $40,322 | 1,833 | 1,440 | 1,373 | 1,271 |
| Clinical Laboratory Science | 85% | $46,905 | 26 | 21 | 20 | 17 |
| Communications | 100% | $44,171 | 7 | 6 | 5 | 5 |
| Computer Engineering Technology | 91% | $44,844 | 126 | 98 | 98 | 90 |
| Computer Information Systems | 86% | $46,856 | 881 | 686 | 648 | 563 |
| Electronics Engineering Technology | 92% | $49,551 | 356 | 300 | 289 | 267 |
| Game & Simulation Programming | 72% | $43,337 | 285 | 190 | 163 | 118 |
| Healthcare Administration | 66% | $50,000 | 4 | 3 | 3 | 2 |
| Justice Administration | 90% | $30,142 | 54 | 24 | 21 | 19 |
| Management | 97% | $40,623 | 106 | 83 | 79 | 77 |
| Multimedia Design & Development | 75% | $30,631 | 305 | 188 | 174 | 132 |
| Network & Communications Management | 93% | $46,733 | 673 | 558 | 533 | 498 |
| Technical Management | 94% | $48,863 | 3,596 | 2,867 | 2,788 | 2,631 |
| **BACHELOR'S DEGREE TOTAL[6]** | **91%** | **$45,747** | **8,358** | **6,550** | **6,274** | **5,760** |
| **ALL UNDERGRADUATE DEGREE TOTAL** | **90%** | **$44,295** | **10,517** | **7,727** | **7,345** | **6,679** |

### B. Securities Analysts Following DeVry Recognized the Significance of DeVry's Job Placement Rates and Higher Salary Claims and Its <u>Correlation to Revenue Generation and Growth Potential</u>

183. Securities analysts relied on Defendants' representations that nearly (and often more than) 90% of DeVry University's graduates were employed in their field of study within six months of graduation and at higher salaries than other colleges and universities, and absorbed them throughout the Class Period as an important data point in gauging the future financial success of DeVry.

184. After the Company revealed a sharp drop in DeVry University enrollments during 4Q 2011, on August 15, 2011, Barrington Research stated that "[d]espite a continued difficult operating environment, DeVry continues to weather the storm relatively well, driven by management's diversification strategy (among programs, degree levels, and mix of online and onground) and solid execution. Despite investors' concerns regarding enrollment trends (leads, conversion rates, etc.), we view our investment thesis as in tact – long-term demand continues to be favorable, especially for a highly reputable company like DeVry, limited regulatory risk and attractive valuation. . . ." Similarly, on August 12, 2011, keeping its Overweight rating, Barclays Capital noted that "Due to strong student outcomes and diversification, we expect DV to weather the current challenging environment better than its peers." Morgan Stanley also underscored that "the diverse nature of its programs, its focus on student outcomes, room for greater efficiency, and FCF buildup will drive earnings growth over the long-term." Finally, on August 11, 2011, UBS Investment Research stated that "[d]espite near-term challenges, we still think that among the mid-cap publicly traded postsecondary companies this is the one to own. We continue to believe that over the long haul students are likely to gravitate to career colleges that provide degrees that lead to jobs to improve their earnings power."

185. After DeVry reported its lackluster 1Q 2012 results, securities analysts still viewed the Company favorably due to, in part, its reputation for strong "student outcomes":

- DeVry remained a top pick for Deutsche Bank because "[d]ue to DV's history of better regulatory metrics and student outcomes, it has typically traded at a 30% premium to the avg. of the campus peers . . . and at a premium to Apollo []. . . ." (December 7, 2011);

- As part of its Investor Recommendation, on, Piper Jaffray stated that "DeVry enjoys a well-deserved reputation for providing quality programs with favorable student outcomes." (December 8, 2011).

186. Following DeVry's release of declining Fall 2011 enrollment results on December 12, 2011, at least one securities analysts continued to tout DeVry's upside:

- Morgan Stanley maintained its overweight rating on DeVry, "view[ing] today's slightly softer fall enrollment numbers as already priced in. We continue to believe that weak results are more a function of the timing of regulatory changes, rather than a fundamental problem with the company's underlying businesses." (December 12, 2011).

187. On January 27, 2012, the day after DeVry reported disappointing 2Q 2012 results, securities analysts still touted the Company's focus on student outcomes:

- Oppenheimer Equity Research emphasized that DeVry "is well diversified and ranks toward the favorable end of the industry's operational and regulatory measures, and has a long-standing track record of solid student outcomes."

- Morgan Stanley maintained an overweight rating for DeVry because "[a] well-rounded portfolio, ongoing focus on student outcomes, additional cost containment and easier comps in the back half of the year set the stage for improving results."

188. On April 25, 2012, a day after DeVry reported earnings in line with expectations, but disappointing enrollment numbers for 3Q 2012, securities analysts still maintained a positive—if not cautious—view of DeVry focusing on student outcomes as a positive indicator to attract students:

- BMO Capital Markets maintained a market perform rating, stating that DeVry is "still considered one of the quality providers in the space . . . ."

- In its Quarterly Update, Oppenheimer Equity Research maintained its outperform rating because "DV is well diversified and ranks toward the favorable end of the industry's operational, bad debt, and regulatory measures, and has a long-standing track record of solid student outcomes."

- Deutsche Bank Markets Research reiterated its Buy rating because its sum-of-the-parts analysis suggested, among other things, that because of "[] DV undergrad's long history of >$40K starting

> salaries, 90% placement rates, and relatively low regulatory issues – we think its significantly undervalued within DV overall." (June 6, 2012).

189. Following a preview of DeVry's 4Q 2012 financial results on July 23, 2012 that included a decline of 15% to 17% in new enrollments at DeVry University, securities analysts still clung to the Company because of its history as a high-quality institution as a result, in part, to its exceptional student outcomes. For example, Barrington Research kept its Market Perform rating, but cautioned that "while DeVry is a very high-quality company, with limited regulatory risk and a strong debt-free balance sheet. . . ."

190. On August 9, 2012, DeVry reported its financial results for 4Q and full-year 2012, identifying a decrease of just over 14% in DeVry University enrollment for its May 2012 session, but some securities analysts still emphasized the Company's job placement statistics as a meaningful data point in determining its ratings:

- Deutsche Bank Markets Research maintained its Buy rating and in its Investment Thesis stated that "[d]ue to DeVry's long history of better than peer job placement and starting salaries, and only about 25% exposure to online only enrollment, we expect DeVry new enrollment to return to growth by YE13E." (August 10, 2012);

- J.P. Morgan issued an Underweight rating because of lingering weak enrollment, but noted that it ". . . continue[d] to appreciate DV's diversification, balanced growth and high quality student outcomes. . . ." (August 13, 2012).

191. Securities analysts were cautiously optimistic after DeVry issued better-than-expected 1Q 2013 results on October 25, 2013, again focusing on student outcomes:

- Morningstar Equity Research stated that "[a]s the industry retrenches and focuses on improving the student experience, student outcomes (graduation rates and employment, for example), and brand-building, we view DeVry as well positioned for the long term."

- J.P. Morgan maintained its Underweight rating, recognizing DeVry's "diversification, balanced growth and high quality student outcomes. . . ."

192. Following better-than-expected earnings, but still weak new student enrollments at DeVry University for 2Q 2013, securities analysts still remained encouraged by DeVry because of its solid reputation due in part to its student outcomes:

- Wells Fargo Securities kept its Outperform rating because "[t]he company's strong quality and effective diversification as well as the potential for upside, continue to make DeVry an attractive investment in our opinion . . . ."

- J.P. Morgan stated that it "appreciate[d] DV's focus on balanced growth and high quality student outcomes, and upgrade[d] shares of DV to Neutral from Underweight.

193. On April 23, 2013, DeVry reported weak earnings and a reverse in its recovery for new enrollments at DeVry University. The negative trend surprised securities analysts, though they still viewed the Company favorably because of DeVry University's perceived competitive advantage due to its strong student outcomes, but with choppy results expected in the near term. For example, Wells Fargo Securities also was "maintaining our Outperform rating on shares of DeVry . . . we believe the investment case for DeVry remains a strong one." It noted that, in one of its keys to improve enrollment, DeVry planned to "alter[] its marketing message to reinforce its branding as a career-oriented institution. Of DeVry graduates, 86% are employed within their field of study within six months of graduation with an average salary of $43,000. . . ." Similarly, while Deutsche Bank Markets Research maintained its Hold rating, it concluded that one of the key factors from DeVry's results as "[g]iven DeVry's strong placement rates (86%) and high starting salaries ($43K), the company believes that better messaging will improve demand."

194. On August 6, 2013, in anticipation of DeVry financial results for 4Q and full year 2013 expected just two days later, William Blair maintained its Outperform rating, focusing on

student outcomes and recognizing that DeVry "recently announced that in-field job placement rates for 2012 DeVry University graduates stood at 90%, an all-time high for the school" leading William Blair to conclude that "this is clear evidence of a very strong value proposition and ultimately believe the company's strong brands and outcomes will lead to positive enrollment growth . . . ."

195. After DeVry announced its financial results for 4Q and full year 2013 that still demonstrated weakness in enrollments at DeVry University, but an increase in its job placement rates for 2012, some securities analysts remained bullish on the Company due, in part, to the Company's student outcomes. For example:

- Wells Fargo maintained its Outperform rating, recognizing, among other things, DeVry's "employment placement is at an industry-best 90%."

- Barrington Research continued its Market Perform rating because of management's plan to "sharpen[] the communication of DeVry University's value proposition, which is educational quality, career outcomes, and exceptional student support" to regain enrollment growth.

196. After the Company released its financial results for 1Q 2014 on October 24, 2013, with marginal improvement in DeVry University enrollment for the September 2013 session, securities analysts primarily remained in a holding pattern, but with some notable exceptions that underscored DeVry University graduates' job placement rates and management's plan to attract new students. For example, Wells Fargo Securities maintained its Outperform rating and concluded that "between firming employment and lower pricing, the positive turn is not so far off as management's conservative tone implies."

197. Securities analysts were similarly circumspect about DeVry University's decreased enrollment following the release of the Company's 2Q 2014 financial results on

February 4, 2014, but still viewed DeVry as a high-quality company and appreciated management's efforts to right the ship. For example, Wells Fargo, in maintaining its Outperform rating, emphasized, among other things, ". . . strengthening student placement provides the backdrop to believe this trend can continue."

198. Following release of the Company's 3Q 2014 results on August 7, 2014, securities analysts noted DeVry management's plan to, among other things, emphasize its "strong student value proposition" to turnaround DeVry University:

- Barrington Research maintained its Market Perform rating, but "view[ed] management's actions favorably but these initiatives will take time to manifest themselves in the form of sustainable growth." (April 25, 2014);

- William Blair recognized that because of, among other factors, DeVry's ". . . solid regulatory profile highlighted by low student loan default and high job placement rates . . . DeVry warrants a significant premium to the majority of its private sector postsecondary peers, and reiterate our Outperform rating." (April 24, 2014).

199. Following DeVry's announcement of its 4Q and full-year 2014 financial results, securities analysts still reacted positively to the Company's job placement rates:

- William Blair maintained its Outperform rating while recognizing as on one of its Key Points that "[w]hile postsecondary education remains a regulated industry, DeVry's student outcomes are best in class and we view DeVry as a good steward of government-funded student tuition payments." (August 4, 2014, prior to DeVry's announcement);

- William Blair again noted that "we believe that puts the stock in a very good place in light . . . a top-tier regulatory profile highlighted by low student loan default and high job placement rates. . . ." (August 7, 2014);

- Wells Fargo Securities continued its Outperform rating and noted that while DeVry is in a competitive position, "[ ] with job placement rates consistently approaching 95% and a reasonable ROI case, there is more for the company to do in sharpening its

> brand focus and making its case to prospective students." (September 18, 2014).

200. Unfortunately for investors, DeVry's supposedly robust student outcome statistics—and the Individual Defendants' similar sanguine statements—were materially false and misleading when issued. In reality, contrary to these public statements, Defendants manipulated DeVry University graduates' employment and compensation statistics to inflate their results, concealing the truth which ultimately led to the FTC and DoE actions and the realization that the advertising campaign scheme to tout the success of its graduates was a scam.

## V. <u>THE TRUTH EMERGES</u>

201. On January 27, 2016, the FTC and DoE shocked the market with separate announcements that they had taken action against the Company in response to its issuance of false or unsubstantiated graduate employment and salary statistics.

202. First, the FTC filed a lawsuit against DeVry for engaging in deceptive marketing practices by purposefully misrepresenting the benefits of obtaining a degree from DeVry University. According to the FTC, DeVry falsely touted that: (1) 90% of DeVry University students from a specific year (*e.g.*, graduates from 2011-2016) who were actively seeking employment did not in fact land or obtain new jobs in their field of study within six months of graduation; (2) 90% of DeVry University students since 1975 who were actively seeking employment did not in fact land or obtain new jobs in their field of study within six months of graduation; and (3) one year after graduation, the average or median salary of DeVry University graduates with bachelor's degrees was not in fact 15% higher than the average or median salary of graduates with bachelor's degrees from all other colleges and universities. In truth, the actual number of DeVry University graduates who found employment in their field of study within six months of graduating was "significantly smaller than 90%." Similarly, the FTC stressed that

DeVry University's own files belied Defendants' assertion that DeVry University's graduates earn significantly higher salaries than graduates from other colleges or universities.

203. Second, the DoE publicly issued to DeVry a Notice of Intent to Limit, which explained the DoE's intention to impose limitations on DeVry's participation in programs authorized under Title IV and prevent the Company from making certain statements in advertising its schools. The DoE specifically stated that the Company was unable to substantiate its repeated advertisement that since 1975, 90% of DeVry graduates were employed in their field of study within six months of graduation because the Company did not maintain the necessary graduate-by-graduate records to substantiate that claim. Instead, as explained by the DoE, the Company used summary reports for certain years containing employment results of each graduating class. The DoE found, however, that those reports did not substantiate DeVry's advertisements because the reports themselves could not be verified without graduate-specific data. The DoE therefore concluded that DeVry was unable substantiate its claim that since 1975, 90% of DeVry graduates were employed in their field of study within six months of graduation.

204. These actions by the FTC and DoE prompted the Company to issue a press release on January 27, 2016 denying the allegations. The FTC and DoE actions are described in further detail below.

**A. The FTC Lawsuit**

205. The FTC Complaint, filed on January 27, 2016, revealed that DeVry has falsely been "advertis[ing] and promot[ing] [DeVry University's] degree programs through television commercials, [DeVry University's] website, YouTube advertisements, radio spots, print advertisements, Facebook, Twitter, sales pitches with prospective students, and other advertising and promotional materials" year after year since at least 2008. Specifically, the FTC, after it reviewed well over 2 million pages of documents and responses from DeVry to approximately 64

comprehensive interrogatories, and voluminous materials from third parties, concluded that there was enough evidence to file a lawsuit against DeVry and DeVry University based on its deceptive job placement statistics and higher income claims.

206. Following its comprehensive investigation, the FTC revealed that Defendants had created the student outcome statistics by manipulating information, selecting certain information, and omitting other pertinent information and data. By doing this, the FTC stated, Defendants were able to push the narrative that, "as a result of obtaining a DVU degree, 90% of DVU graduates who were actively seeking employment landed or obtained new jobs in their field of study within six months of graduation." The FTC explained that:

> [i]n some instances when Defendants make this representation, they claim this statistic applies to DVU graduates from a recent year, while in other instances, Defendants claim this statistic applies to all graduates since 1975, or "for more than 30 years." In its advertising and in its presentations to prospective students, Defendants present this 90% "employment rate" as evidence of the likelihood that obtaining a DeVry degree leads to finding a job. While Defendants' advertisements and sales pitches most commonly express DVU's employment rate for recent graduates as exactly 90%, in some instances, during certain limited time periods, Defendants have stated a percentage that is slightly less or more than 90% (e.g., 87% or 92%). ***As explained below, these representations (Defendants' "90% claims") are false and unsubstantiated.***

207. The FTC Complaint noted that DeVry has been advertising its 90% employment and higher income claims on various webpages on the DVU website (www.devry.edu) since at least 2008. Some examples include:

> **Excellent employment results**
>
> Nobody wants to go to college and just be a number…unless they're numbers like these. Each year, thousands of our grads find themselves right where they want to be – employed in their fields of study.




**An education that pays**

Not only can a degree from DeVry University prepare you for a lifetime of career success, it can also increase your earnings potential right from the start.




208. The FTC charged that, in order to substantiate its 90% claim, DeVry improperly relied upon student records maintained by DeVry University's Career Services department. These student records contained information about students' majors, graduation dates, employment history, and DeVry University's classification of their employment status. According to the FTC, "[t]hese student records, however, do not provide a reasonable basis that substantiates Defendants' 90% claims" because:

> Among other reasons, when calculating the 90% claims, Defendants count a substantial number of DVU graduates who should not be counted and similarly exclude a substantial number of DVU graduates who should not be excluded. For example, Defendants count graduates who did not obtain a job as a result of obtaining a degree from DVU. In fact, Defendants include the substantial percentage of DVU graduates who, after graduation, continued with the same job they had when they enrolled in DVU. Defendants also count graduates who did not obtain jobs in their field of study. ***A significant percentage of the jobs that Defendants count as being in the graduate's field of study include jobs that employers, industry experts, graduates, and consumers would not reasonably consider to be in the graduate's field of study***.

209. The FTC complaint also detailed several examples of DeVry University students from the graduating class of 2012 who were incorrectly classified as working "in field" including, but not limited to:

> a) graduates with degrees in technical management who were working as: a rural mail carrier (human resources specialization); a yard salesman at a nursery (business information systems specialization); a sales associate at Macy's (general technical specialization); a driver delivering rain gutters for a construction services company; a data entry specialist for a radio station (human resources specialization); and unpaid volunteers at medical centers (human resources management and health services management specializations);
>
> b) a graduate with a degree in business administration (health services management specialization) working as a server at the Cheesecake Factory);
>
> c) a graduate with a degree in business administration (health care management specialization) working as a car salesman;
>
> d) a graduate with a degree in business administration (accounting specialization) working as a secretary at a prison; and
>
> e) graduates with various degrees working as customer service representatives.

210. The FTC also alleged, based on its investigation, that Defendants excluded certain students from the calculation who were actively seeking employment:

> For example, in June 2013, Defendants excluded one 2012 graduate who, prior to being classified as inactive: viewed 177 jobs leads in DVU's jobs database; had at least six job interviews in the previous two months (including two interviews eleven days before DVU classified him as inactive); sent an email to DVU's Career Services department, two weeks before being classified as inactive, in which he stated that he "wanted to let you know I've been getting more response now that I am much more actively applying to positions," and that he "had two face to face interviews a while back and now 2 Skype interviews"; attended a DVU "Career Fair" the following day; and then sent the Career Services department an email informing them that, after attending the career fair, he sent three thank you notes to companies whose representatives he had spoken to at the fair.

211. Due to the manner in which DeVry manipulated this information, the FTC concluded that ***"[t]he actual percentage of DVU graduates who, at or near the time they graduated, found jobs that could reasonably be considered 'in their field' is significantly smaller than 90%."***

212. Additionally, the FTC asserted that Defendants relied on an income report prepared by a third-party to substantiate their claims that DeVry University graduates obtained higher incomes than graduates of other for-profit and traditional colleges and universities. However, according to the FTC, this income report lacked a reasonable basis to substantiate Defendants' claim, as "[t]he sampling methods and methodology of the survey that underlay the income report all gave or should have given Defendants reason to question the reliability of the conclusions and information contained in the report." Notably, the FTC added that DeVry University personnel had voiced their concerns over whether the date contained in the income report sufficiently supported the higher-income claim. The FTC further emphasized that:

> Among other problems, the comparison of the incomes of DVU graduates with incomes of graduates from other schools did not

> account or adjust for significant salary drivers such as age, experience, and degree field. In addition, ***statistics that DVU had directly collected from thousands of its graduates each year about their incomes differed significantly from the third party's statistics***, which consisted of information from only several hundred individuals per graduation year.

213. Furthermore, according to the FTC complaint, Defendants had access to publicly available statistics regarding the incomes of graduates from other colleges and universities throughout the United States, by school and by field. "***Comparing the information in [DeVry's] own files with publicly available income data shows that DVU graduates a year after graduating do not in fact earn significantly more than graduates from all other schools combined, casting doubt on Defendants' higher-income claim***."

214. On May 9, 2016, Judge Fitzgerald rejected DeVry's request to dismiss the FTC's lawsuit against the Company finding that the FTC stated a plausible claim for express misrepresentations.[9] In his order, Judge Fitzgerald stated that the "allegations show that the FTC's claims have factual basis and provide Defendants with adequate notice as to the FTC's reason for believing that the employment statistic is unsubstantiated and materially false." With respect to DeVry's higher-income representations, Judge Fitzgerald recognized that "[i]t takes no special knowledge of statistics to realize that comparing, for example, the incomes of a thirty-five-year old DeVry University graduate with ten years of experience and an average twenty-one-year-old college graduate with no experience could lead to misleading results…these allegations are plausible and particular enough to put Defendants on notice of the FTC's basis for its claim."

---

[9] *FTC v. DeVry Education Group, Inc., et al.,* Case No. 2:16-cv-00579 (C.D. Cal. May 9, 2016), "Order Denying Defendants' Motion to Dismiss Complaint" (ECF No. 38).

215. In the following month, on June 7, 2016, the parties in the FTC action submitted their Joint Rule 26(f) Report with Errata.[10] In the "Discovery Plan" section of the Joint Rule 26(f) Report, the FTC revealed the "evidence on which [it] relies on to support its allegations that [DeVry's and DeVry University's] 90% claim was false and unsubstantiated consists of student files, summaries of graduate placement information, and other documents that [DeVry and DeVry University] produced during [the FTC's] investigation in response to a request for the documents on which Defendants relied to support their claims, as well as other documents [DeVry and DeVry University] produced, such as internal emails and presentations. The FTC confirmed that its "allegation that the 90% claim was false and unsubstantiated consists of an analysis of these documents that [the FTC's] own personnel conducted in preparation for possible litigation." Further, in Section D.3 (Key Documents), the FTC identified the following as key documents:

- Defendants' advertisements, including television and radio commercials, websites, brochures, recruitment and enrollment presentations, social media, and brochures promoting DVU, as well as dissemination information;

- DVU student and graduate records used to substantiate [DeVry and DeVry University's] claims, including but not limited to Graduate Registration Forms or eforms, graduate observation logs, and summary spreadsheets;

- Training manuals, and policies and procedures, used by DVU's career services department and DVU admissions department;

- Audit reports, internal communications about student or graduate employment or about DVU's classification or proposed classification of student or graduate employment, and records concerning contact between students and graduates with DVU's Career Services Department;

[10] *FTC v. DeVry Education Group Inc., et al.*, Case No. 16-CV-579-MWF-SS (C.D. Cal. June 7, 2016), "Joint Rule 26(f) Report with Errata" (ECF No. 50).

- Complaints, and documents generated by [DeVry and DeVry University] in response to complaints, concerning employment issues and representations alleged in the Complaint, as well as consumer injury and mentality;

- [DeVry's and DeVry University's] internal documents discussing recruitment, advertising and marketing, employment statistics (including but not limited to who was or should be counted band who was not or should not be counted), other policies of DVU's career services department, graduate incomes, and the claims at issue in the Complaint, including such documents as emails, memos, spreadsheets, and PowerPoint presentations;

- Documents from third parties such as PayScale that [DeVry and DeVry University] relied on as the bases for the higher income claim;

- Documents from third parties such as the National Association of Colleges and Employers relating to average or median incomes of college graduates;

- Internal communications and communications with third parties such as CompliancePoint or Deloitte & Touche discussing the results of efforts to audit or verify DVU's employment statistics or to obtain information from graduates concerning their employment and income;

- Communications with third parties such as advertising agencies discussing or relating to messages conveyed by, or intended to be conveyed by, advertisements that referred to DVU's employment statistics or income earned by DVU graduates;

- [DeVry's and DeVry University's] financial information, including revenue figures;

- [DeVry's and DeVry University's] internal copy tests, alumni surveys, and other data related to the 90% and higher-income claims; and

- Third-party copy tests, marketing surveys or reviews and internal communications concerning these copy tests and marketing surveys or reviews.

216. In sum, as the FTC action revealed, based on its extensive pre-filing investigation, beginning in at least 2008, DeVry and DeVry University conducted a deceptive marketing campaign with inflated job placement and salary numbers in order to lure prospective students or retain those already enrolled at DeVry University, and at the same time assure investors and securities analysts that the Company can remain competitive in its industry even during an economic downturn. The bottom-line message of this marketing drive was that if you chose to attend or stay at DeVry University over other for-profit schools, community colleges, and public and private post-secondary institutions, you are more likely to get a job in your field of study within six months of graduation at a higher salary. The FTC, however, after conducting an extensive, two-year investigation, filed a lawsuit that charged DeVry's employment statistics as false and unsubstantiated because, among other reasons, DeVry and DeVry University counted a substantial number of DeVry University graduates who should not have been counted, and excluded a substantial number of graduates who should not have been excluded. Moreover, the FTC asserted that Defendants improperly relied on a third-party income report to substantiate their higher income claim, but this report lacked a reasonable basis to support such a claim.

**B. The DoE Action**

217. Also on January 27, 2016, the DoE publicly issued to DeVry a Notice of Intent, informing DeVry University of the DoE's intention to impose certain limitations on the participation of DeVry University in programs authorized pursuant to Title IV. The proposed limitations specifically relate to DeVry's representations in advertising and marketing regarding the post-graduation employment outcomes of DeVry University students since 1975.[11]

---

[11] On August 28, 2015, the Multi-Regional and Foreign School Participation Division of the Federal Student Aid Office of the DoE had previously served on DeVry a request for documents and information

218. According to the DoE, starting in at least 2008 and continuing throughout at least August 2015, DeVry's marketing and promotional materials represented that:

> Since 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation.

219. As noted by the DoE in its Notice of Intent, federal law mandates that educational institutions participating in programs authorized pursuant to Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070 *et seq.*, must be able to provide "the most recent available data concerning employment statistics and . . . any other information necessary to substantiate the truth of the advertisements." *See* 20 U.S.C. § 1094(a)(8); 34 C.F.R. § 668.14(b)(10). After attempting to garner information from DeVry regarding the Since 1975 Representation through its August 28, 2015 letter and again on at least one occasion thereafter, the DoE concluded that DeVry could not substantiate its Since 1975 Representation.

220. With regard to DeVry's representations, the DoE's Notice of Intent stated:

> [S]tarting in at least 2008 and continuing until at least August 2015, DeVry made representations to students and prospective students regarding the post-graduation employment outcomes of students who graduated from DeVry over a cumulative period stretching more than 30 years. The specific representation that forms the basis of this action was highlighted in DeVry's *We Major in Careers* campaign, a 2008 "career-focused brand marketing campaign" that sought to position DeVry as an institution that helped its graduates achieve career success. That campaign, which reflected more than a year's worth of in-depth consumer, marketplace, and brand research by DeVry, represented a conscious decision by DeVry to make certain representations to students and prospective students for marketing and recruitment purposes. Yet with respect to certain representations that were made by DeVry as part of that campaign and which continued to be

regarding published employment outcomes and relative earnings information of DeVry University graduates. The purpose of the request was to verify certain of DeVry's public statements and, in turn, permit the DoE to assess DeVry University's compliance with applicable regulations under Title IV.

> made until at least August 2015, ***DeVry is unable to substantiate the truthfulness of those representations***, as is required by federal law.

221. The DoE explained that "DeVry does not have, or cannot locate, the graduate-by-graduate records necessary to substantiate the veracity of [the Since 1975 Representation]." Instead, DeVry was able to produce only "By-Campus Rollup Reports" that were purportedly contemporaneously created and which summarized the employment results of each graduating class. The DoE found that such reports did not substantiate the Since 1975 Representation because, *inter alia*, DeVry could not furnish evidence demonstrating that the reports were accurate and conducted in a methodologically sound manner. The DoE concluded that that assurance could only be provided by the underlying student-by-student data which was, for certain years, unavailable.

222. As a result of DeVry's failure to substantiate the Since 1975 Representation, the DoE imposed numerous conditions on DeVry in order to continue receiving Title IV funds. To that effect, the DoE stated:

> [A]s a condition of its continued participation in the Title IV programs and consistent with existing statutory and regulatory requirements, the Department is hereby notifying DeVry that neither it nor its agents or employees may make any representations, in advertisements or otherwise, that include statistics consisting of or based upon the post-graduation employment outcomes of students who graduated during the time that DeVry has conceded it does not possess graduate-specific information, *i.e.*, the type of information that is necessary to substantiate the truthfulness of any post-graduation employment claims. Nor may DeVry make any representations that include or are based upon post-graduation employment statistics regarding other time periods that cannot be substantiated with graduate-specific information. Moreover, for a period of five years following the effective date of this action, DeVry must subject all such representations to review by an independent auditor prior to the utterance (*i.e.*, oral, written, or otherwise) of such representations. The Department is also requiring DeVry to contact

> third parties who are repeating or re-publishing DeVry's unsubstantiated representations and demand that those entities cease doing so, to retain records used to develop and substantiate certain advertisements, to notify the Department of any legal claims, investigations, subpoenas or other inquiries regarding its post-graduation employment representations, and to notify its students of this limitation. DeVry's failure to comply with these limitations could subject DeVry to further actions pursuant to 34 C.F.R. Part 668, Subpart G, up to and including termination from its participation in Title IV programs.

223. DeVry contested the Notice of Limitation on February 12, 2016, causing the matter to be the subject of a Federal Student Aid proceeding entitled *In the Matter of DeVry University*, Docket No. 16-07-O.

224. On October 13, 2016, the DoE announced that it had entered into a settlement "resolving the Department's charge that [DeVry] used unsubstantiated job placement claims in recruitment and advertising materials." In the DoE's press release issued that day, the DoE explained that the settlement "enhances the Department's oversight of DeVry and builds upon the Obama Administration's commitment to protecting students, safeguarding taxpayer dollars and increasing accountability among postsecondary institutions." U.S. Secretary of Education John B. King, Jr., also stated in the press release that "[s]tudents deserve accurate information about where to invest their time and money, and the law is simple and clear: recruitment claims must be backed up by hard data." DoE Chief Enforcement Officer Robert Kaye thanked the FTC for its support in its investigation, stating that the DoE and FTC had "put an end to the use of an unsubstantiated claim by this institution." The press release added that the DoE is "working closely" with the FTC in connection with the FTC's lawsuit against DeVry, and that the DoE would "continue to support the FTC's ongoing lawsuit against DeVry, while also continuing its own investigations of the institution."

225. The DoE Settlement provides that DeVry will participate in Title IV programs under a provisional certification, and requires DeVry to take a number of measures, including:

> (a) "immediately cease publishing or otherwise using the Since 1975 Representation";
>
> (b) cease making "any representations to a student, prospective student, accrediting agency, state agency, the Secretary, or any member of the public that are based, in whole or in part, on the post-graduation employment outcomes of any student who graduated from [DeVry University] between 1975 and October 1980";
>
> (c) maintain graduate-specific data to substantiate "any representations to any student, prospective student, accrediting agency, state agency, the Secretary, or member of the public that are based, in whole or in part, on graduate employment rates";
>
> (d) "maintain information sufficient to establish the methodology it used to formulate any representations regarding post-graduation employment outcomes of [DeVry University] students"; and
>
> (e) for six years, engage a qualified, independent third party to review the required records and information relating to DeVry University graduates, so that that independent third party may issue a report on an annual basis stating whether DeVry university has satisfied its responsibilities to maintain graduate-specific employment records and has maintained information sufficient to establish its methodology used to make representations about employment outcomes of DeVry University graduates.

226. The DoE Settlement also requires DeVry to post the following statement for two years on the home page of DeVry University's website:

> DeVry University previously advertised that "Since 1975, 90% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation." The U.S. Department of Education has asserted that the records maintained by DeVry University for the period 1975-1983 were not sufficient to substantiate the Since 1975 Representation, and thus that DeVry University could not substantiate this representation to the extent required by law. Accordingly, the University agreed to cease making the Since 1975 Representation and post this notification on its website.

Moreover, the DoE Settlement requires the same statement to be included for six years in all agreements memorializing the enrollment of students at DeVry University.

227. The DoE Settlement further requires DeVry University to post a letter of credit for the benefit of the DoE in the amount of $68,435,908—approximately 10% of the Title IV aid revenue to DeVry University for the 2014-15 award year. For a period of five years, DeVry will be required to maintain the letter of credit and adjust it annually to remain at a level equal to 10% of the Title IV aid revenue it received in the previous fiscal year. As explained in the DoE Settlement, that letter of credit is designed to allow the DoE to provide refunds to students in the event that DeVry University closes.

**C. The Devastating Results On DeVry's Stock from these Disclosures**

228. As a result of these shocking disclosures by the FTC and DoE, which revealed that the Company's long-touted graduate employment and salary statistics were false or unsubstantiated, DeVry's common stock price dropped 15%, or $3.65 per share, from $23.68 per share on January 26, 2016 to $20.09 per share closing on January 27, 2016—wiping out over $230 million in the Company's market capitalization in one day, on unusually heavy trading volume.

229. Over the next several trading days, DeVry's stock price continued to trade lower, closing at $18.08 on February 2, 2016. In total, from January 27, 2016 to February 2, 2016, DeVry's stock price share price dropped $5.66 per share, or 24%, wiping out approximately $360 million of the Company's market capitalization.

230. In an article entitled "DeVry Education Teaches Tough Investment Lesson," investor website *TheStreet.com* recommended against owning shares of DeVry in light of the recent revelations. The article stated the following:

> To offset its declining student population at its various campuses, DeVry has ratcheted its promotional activities and marketing campaigns, claiming that 90% of its graduates who actively sought employment found new jobs in their majors within six months of graduation. Plus, DeVry claims that within a year of graduation, its former students earned 15% more pay compared to other graduates. But these claims are at best deceptive, according to the FTC. . . . With DeVry's earnings and revenue in retreat and with little prospect of higher enrollment, we recommend avoiding DeVry shares. And at around $18 per share, DeVry could see its stock reach single digits as the weight of the government investigation grows more heavy.

231. In reaction to these troubling disclosures, DeVry's price target was downgraded by numerous investment research firms.

| Firm | Old Target Price | New Target Price | % Difference |
|---|---|---|---|
| BMO Capital Markets | $30.00 | $21.00 | -30% |
| Compass Point | $28.00 | $18.00 | -36% |
| Deutsche Bank | $28.00 | $22.00 | -21% |
| Morgan Stanley | $33.00 | $27.00 | -18% |
| Robert Baird | $29.00 | $20.00 | -31% |
| Barrington Research | $35.00 | $25.00 | -29% |

232. The Company has also suffered other consequences in the fallout of the public's discovery that DeVry University graduates are not as successful as the Company had advertised. For instance, on March 14, 2016, the U.S. Department of Veterans Affairs cautioned GI Bill participants about DeVry on account of the FTC's lawsuit and the Department of Education's Notice of Intent. In a letter sent to DeVry University, Curtis Coy, the VA Deputy Undersecretary of Economic Opportunity, said: "Effective the date of this letter, VA is suspending DeVry University's status as a [Principles of Excellence] institution at least until the conclusion of the

FTC lawsuit," and highlighted that "[t]he FTC findings, [Department of Education] conclusions, and GI Feedback System complaints indicate that DeVry University has not acted in accordance with … Principles of Excellence guidelines."

### D. After the Class Period, DeVry Settles the FTC Lawsuit for $100 Million and Reforms to Prevent the Company from Further Touting Misleading Student Outcome Data

233. On December 15, 2016, DeVry and the FTC announced that DeVry and DeVry University had agreed to settle the FTC Lawsuit. According to the FTC's press release issued that day, the settlement requires DeVry to refund a total of $100 million to harmed students and graduates in the form of cash and debt relief, and "also includes provisions designed to prevent DeVry from misleading consumers in the future." As stated by FTC Chairwoman Edith Ramirez in the press release, "[w]hen people are making important decisions about their education and their future, they should not be misled by deceptive employment and earnings claims. . . . The FTC has secured compensation for the many students who were harmed, and I am pleased that DeVry is changing its practices."

234. Under the terms of the settlement, DeVry will pay $49.4 million in cash to be distributed to qualifying students who were harmed by the deceptive ads that boasted inflated job placement rates and income levels upon graduation, as well as $50.6 million in debt relief. The debt relief includes the full balance owed on all private unpaid student loans that DeVry provided to its undergraduate students between September 2008 and September 2015 (totaling $30.35 million), and $20.25 million in student debts for items including tuition, books, and certain course-related fees.

235. Equally as important, the FTC settlement also requires DeVry to discontinue its use of deceptive job placement rates and salary information moving forward and, for a period of ten years, to confirm that it is in compliance with imposed policy reforms.

236. First, DeVry and any of its "officers, agents, employees, and attorneys and all other persons in active concert or participation with any of them" are "permanently restrained and enjoined from:"

- Misrepresenting, expressly or by implication, the success that students or graduates have realized or are likely to realize in starting or obtaining careers, jobs or employment. This prohibition includes, but is not limited to, misrepresenting:
  - the extent to which—whether expressed by a number, a percentage or otherwise—graduates or any subset of graduates have obtained jobs or careers:
    - in their field of study;
    - in any specified field or type of employment;
    - with any given category or type of employer;
    - with any particular employer; or
    - within a given time frame;
  - the extent to which any employment statistic, or any other statement that refers to the employment success or status of students or graduates, reflects the success of students or graduates who were actively seeking employment;
  - the extent to which any employment statistic, or any other statement that refers to the employment success or status of students or graduates, either includes or does not include any subset of students or graduates; or
  - that any individual obtained a job or career, in his or her field of study or otherwise, as a result of attending DeVry.
- Misrepresenting, expressly or by implication, the compensation or compensation range that students or graduates of DeVry have received, or can be expected to receive, including but not limited to, misrepresenting that the compensation of any group of students or graduates is or was (a) equal to or greater than a specific amount, average or median, or (b) equal to or greater than the compensation received by any other group of students or graduates;
- Misrepresenting, expressly or by implication, any other fact material to consumers concerning any such product or service;
- Making any representation, expressly or by implication:

- o that any employment statistic reflects the success of graduates in obtaining employment near or after graduation when the statistic includes employment that graduates obtained (a) before purchasing the product or service, or (b) at any time more than six months prior to graduating; provided, however, that nothing in this [subsection] shall be construed to prohibit DeVry from making a representation to a state or federal authority or programmatic or institutional accreditor on a reporting form required by such entity, provided further that DeVry clearly and conspicuously disclose on such form, either as the primary number or in a footnote in 14-point font, the percentage of students who obtained their jobs upon or after graduating; or

- o that any employment statistic reflects the employment status or employment success of graduates who were actively seeking employment if graduates were classified as not actively seeking employment based on (a) having waived career-services assistance, in whole or in part, or (b) the extent to which the graduates used career services.

- Making any representation, expressly or by implication, about the benefit of any educational product or service, or the success or likely success of any student or graduate, unless the representation is non-misleading, and, at the time such representation is made, DeVry possesses and relies upon Competent and Reliable Evidence[12] that is sufficient to substantiate that the representation is true.

237. Second, DeVry is required to "preserve all Competent and Reliable Evidence relied upon to substantiate any representation" concerning, among other things, student outcomes for DeVry University graduates. Thus, if DeVry makes such a representation that relates to any class of current or former students or graduates, DeVry must preserve, among other things: (i) all student files relating to the students or graduates; (ii) all communications relating to complaints received from any student or graduate concerning the person's job search experience, compensation or compensation range of jobs, assistance or lack of assistance from DeVry in attempting to find employment, or any advertising or marketing that referred to obtaining employment or to compensation received by past graduates; (iii) all forms completed that relate

[12] The FTC Settlement Stipulation and Order defines "Competent and Reliable Evidence" as "tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area that have been conducted and evaluated in an objective manner by qualified persons, using procedures generally accepted in the profession to yield accurate and reliable results."

to a student's or graduate's employment status, job search or use of or attempted use of DeVry's career-related services; (iv) all documents and information relating to any student's or graduate's employment status or income at any point before or after graduation; (v) all documents relating to any audit, review, survey or analysis underlying or supporting any rate or statistic used in any representation . . . including the employment status or compensation of students or graduates; and (vi) all documents used by DeVry to determine any calculation, rate or statistic used in any representation, including how to classify the employment status of any student or graduate, and any factor utilized in determining the number of students or graduates placed in the numerator or the denominator of any such calculation, rate or statistic.

238. Third, DeVry is also required to establish a "training program for all principals, officers, directors, managers, employees, agents, and representatives who direct or engage in the promotion or sale of any educational product or service." This training program is to remain in place for 20 years and DeVry must "[e]nsure . . . that the training program addresses the trainee's duty not to use or make any representation prohibited under [the Settlement Stipulation]."

239. Fourth, one year after approval of the settlement, DeVry and DeVry University submit a compliance report to the FTC describing, among other things, "whether and how that Defendant is in compliance with each Section of [the Settlement Stipulation] including, but not limited to, describing in detail the way that Defendant calculates, documents and substantiates any claim covered by [the Settlement Stipulation.]" For 10 years, DeVry and DeVry University must submit a compliance notice to the FTC, within 60 days of any change in, among other things, "any process or procedure for calculating, documenting or substantiating any claim covered by [the Settlement Stipulation.]"

240. Fifth, DeVry and DeVry University are required to create certain records for 15 years, including, among others, accounting records showing the revenues from all goods or services sold, certain personnel records, and records of all consumer complaints relating to advertisements, person's experience in attempting to obtain a job or employment, compensation or compensation range of jobs, DeVry's job placement rates or employment statistics, and any assistance the person received or failed to receive from DeVry in attempting to find employment. DeVry and DeVry University are also required to create and maintain "records necessary to demonstrate full compliance with each provision of [the Settlement Stipulation], including all submissions to the Commission[.]"

241. Finally, to allow the FTC to monitor DeVry's compliance with the terms in the FTC Settlement Stipulation, within 30 days after a written request from the FTC, DeVry must submit additional compliance reports or other requested information, appear for depositions, produce documents, or respond to any other discovery request by the FTC that is prescribed in the Federal Rules of Civil Procedure. DeVry must also permit the FTC to interview any employee or other person affiliated with any DeVry entity who has agreed to be interviewed. The FTC may also employ any "other lawful means, including posing . . . as consumers, suppliers, or other individuals or entities, to DeVry or any individual or entity affiliated with DeVry, without the necessity of identification or prior notice."

## VI. <u>CONFIDENTIAL WITNESSES FURTHER EXPLAIN HOW DEVRY MISLED THE PUBLIC</u>

242. Multiple former DeVry employees have provided confidential statements describing how, during their tenure, the Company gamed the misleading DeVry University graduate job placement and salary statistics. As certain of these former employees explain, the Company used a system of waivers and opt-outs to select only certain students for inclusion in

the student outcomes statistics, and also counted certain students as being employed in their chosen field of study even though those students' jobs were unrelated to their studies. Based on their experience working at the Company, certain Confidential Witnesses expressed doubts that the Company's advertised employment and salary statistics could be true. These Confidential Witness statements thus corroborate the allegations, as made in this Second Amended Complaint and by the FTC and DoE, that DeVry University's job placement and higher income claims were false and misleading.

243. CW1, an Admissions Advisor for DeVry University's online programs from August 2011 to November 2012 in Chicago, Illinois, stated that he was highly suspicious of DeVry's claims about a 90% job placement rate. CW1 recalled being instructed to tell prospective students that "they would have a job after six months," but he could not recall the specific language he was instructed to use. CW1 doubted the accuracy of those job placement claims because he thought it was "impossible" that 90% of students would have jobs within six months. In fact, CW1 eventually refused to make such claims to prospective students because he felt guilty about saying it, and also eventually declined to tell prospective students that they would earn more than graduates of other schools. CW1 believed that the suspicious job placement and higher income claims were powerful statements in recruiting students.

244. CW1 stated that DeVry recorded its Admissions Advisors' calls with prospective students, and that the Company would issue warnings and dock the pay of employees who did not provide "the exact rates and exact percentages they would give us." In fact, CW1 recalled being reprimanded for failing to provide the required job placement and salary statistics to prospective students. CW1 believed that other Admissions Advisors also suspected that the job placement and salary statistics were misleading at best, but felt pressure to make the claims to

protect their jobs. Admissions Advisors also had quotas which they were required to meet if they wanted to keep their jobs, and were under significant pressure to enroll students.

245. CW2, a Regional Marketing Director of DeVry's Northeast region from September 2008 to August 2013, was in charge of marketing efforts in that area, which included New York City. CW2 worked on physical advertisement campaigns as well as social media efforts. CW2 recalled that DeVry provided him with information about a 90% job placement rate that the school wanted him and his colleagues to use in marketing efforts. He said that the specific language about job placement rates that he was required to use had been reviewed and approved by DeVry's legal and compliance department, and that the Company kept a repository of approved language for use by the marketing department.

246. CW2 said that he was aware that the advertised job placement rates "might not be 100 percent accurate" due to a "grey area" in whether graduates were obtaining jobs in their field of study or in other industries, and he suspected that certain graduates were employed in jobs that most people would not define as being in the graduates' field of study. CW2, who asserted that he was "very close" to the Company's social media efforts, revealed that DeVry's job placement claims had come under online scrutiny "either by disgruntled students or the media," and that such scrutiny further led him to suspect that the Company's asserted job placement rates were not accurate. He said that the "whole marketing department" had similar concerns that the jobs used in the placement statistics were not in graduates' field of study.

247. CW2 explained that a typical student complaint on social media was to say that the 90% job placement rate was false, with statements such as "I haven't been able to find a job or anyone to hire" or "I've been working with career services, and I'm unable to get a job, [and] career service hasn't really helped me." CW2 stated that DeVry would actively monitor social

media through its Social Media Team to stay apprised of what students were saying about their experience and ability to obtain jobs, which monitoring was an "important aspect" of the business. CW2 believed that the criticism of the 90% job placement claim was likely reported to Dave Pauldine, who was DeVry's Executive Vice President of Marketing and the President of DeVry University. Pauldine reported to Defendant Hamburger.

248. CW3, an Associate Director of Career Services at DeVry University's Fresno and Bakersfield, California Campuses from January 2013 to January 2014, worked directly with graduates to aid them in obtaining jobs. CW3 was familiar with how many graduates from his campus obtained jobs as well as the types of jobs they obtained. CW3 was also familiar with the school's process for determining job placement rates and its policies that determined which students would be counted in those statistics. CW3 stated that DeVry only counted in its job placement statistics the graduates it defined as actively seeking jobs, and omitted graduates who DeVry had determined were "non-job seeking." Since the accrediting agencies of higher-learning institutions did not have specific requirements for how schools calculated job placement statistics, DeVry had its own internal rules for which graduates were counted in those statistics and which were not. Furthermore, CW3 added that each DeVry University campus had its own process for deciding if and when a graduate was "non-job seeking."

249. CW3 described how that process worked at his campuses. Following graduation from DeVry University, if the prospective graduates agreed to receive help from the career services department in finding a job, they would receive a "canned" email from the school each week setting forth their responsibilities in that job search effort. These efforts would include writing and submitting a resume to the school, applying for jobs suggested by the school, communicating with school staff, and so on. If students did not perform these tasks or did not

respond to emails or calls from the school, the career services advisors and directors could classify the student as "non-job seeking," which would waive the student from inclusion in job placement statistics. CW3 stated that it could be weeks or even months before an unresponsive student would be labeled as non-job seeking, and that that determination was subjective. His department often waited until nearly six months after graduation before waiving a student. A final classification as non-job seeking required the approval of the campus president, that is, CW7, who first reviewed each student's file showing the graduation date and notes from the career services advisor about the student's job seeking efforts.

250. CW3 explained that DeVry graduates were often waived from inclusion in job placement statistics because they would become frustrated with burdensome requirements from the school's career services department. CW3 stated that the list of all responsibilities and requirements placed on graduates if they wanted to obtain help from the career services department in finding a job was extensive and meant that the career services department was "going to be up in their business." CW3 added that "they don't want that kind of attention, and after three weeks of phone calls and emails from us, they're like, 'Send me the form [to opt-out].'" DeVry had a form specifically for students to sign indicating they wanted to opt-out of the career services job placement assistance. When students signed this form, they could be waived from inclusion in the job placement statistics, and in fact DeVry wanted its graduates to opt out so that they did not have to be counted in the job placement statistics. He believed the opt-outs and waivers were a "choice selection" by the school used for the purpose of boosting the appearance of its job placement statistics. CW3 said that at least five to six graduates of every 30-person cohort would typically opt out, in addition to approximately two who would be waived for being unresponsive.

251. CW3 stated that one of the reasons he left DeVry after one year was because he did not like how the school cared only about its placement numbers and statistics, and did not seem to sincerely care about finding jobs for students. The other reason was due to the waivers. The idea that the school could waive a graduate as non-job seeking because that graduate had not submitted a resume to the school or had not responded to some emails bothered him. He said that it made his "skin crawl."

252. CW3 said that DeVry expected its career services department to meet a 95% to 100% job placement rate for graduates within six months of their graduation. CW3 noted that that rate was only possible due to the number of waivers that were obtained for students who were non-job seeking either voluntarily through opt-outs or as decided by the school. "That's why DeVry was always at 95 percent placement," he said. "If they are not exhibiting job-seeking behavior, they were waived. That really disturbed me." Without waivers, CW3 estimated that the true job placement rate at his campus was at most 60% to 70%. CW3 said he was fully aware of the actual job placement rate, and that everyone in career services and the campus president (*i.e.*, CW7) were also aware.

253. CW3 provided reports to CW7 on a regular basis about the progress of job placement for graduates. Each month he submitted information about each student, including details about who was placed in jobs and who was waived as non-job seeking. "He would ask, 'What's the status? What's the situation?'" for each of the students CW3 was working to place in jobs, CW3 said of CW7. According to CW3, CW7 reviewed the job status and situation of all graduates throughout the six months after graduation, and he personally spoke with him about the graduates. He believed CW7 fully understood the true percentage of job placement for the graduating cohorts. "He knew intimately everything that went on with every [graduate] file."

254. CW3 was also required to input all job placement information about each graduate into the school's career services database system, called "HireDeVry." He said that the information and documents input into the system included each graduate's graduation date, field of study, resume, job, income for that job, and any notes the career advisor took about the graduate's job search activities. As described by CW3, if the graduate had been waived as non-job seeking, that information was input into the system as well. He said that the HireDeVry system could be used to determine job placement percentages, but those percentages excluded all non-job seeking graduates who had been waived. CW3 said, however, that DeVry had another computer software system that could be used to determine job placement rates for all graduates including those who were otherwise waived from the school's official job placement claims. He said if he wanted to run a report showing the actual job placement rate, he would have to go into HireDeVry, save the dataset he wanted to use to run the numbers, then input that into the separate system and run the report. Once the report was run, he said, there was no way to save it in this separate system. He noted, however, that this system provided the school with the capability of running reports showing the actual job placement rate for graduates including students who had been waived in its official statistics.

255. CW3 also recalled DeVry's advertising campaign that claimed its graduates earned 15 percent higher incomes than graduates of other bachelor's degree programs. CW3 said that those claims were "bogus" and "a lie." From his experience helping graduates find jobs, the jobs were almost always entry-level positions with salaries between $25,000 and $30,000. CW3 said that "there's no way there was any difference" between what DeVry graduates earned and what graduates from other schools earned in these same types of entry-level positions. He recalled that graduates would get angry with him when he explained what their job options

would be and what they could expect to earn. CW3 said that many graduates believed they would be earning $40,000 due to marketing and other materials they saw before enrolling. CW3 said a few highly paid graduates and graduates working in cities with higher wages could skew the averages higher, but that in most areas of the country, the wages remained low for new graduates.

256. CW4, a National Admissions Advisor for DeVry University's online programs from 2007 to 2011 in Chicago, Illinois, confirmed that DeVry supplied him with statistics about its students as well as other marketing material that he was expected to use when recruiting students. CW4 stated that advisors were encouraged to use the claim that 90% of DeVry University's graduates are employed in their field of study within six months of graduation. CW 4 stated that the encouragement to use the claim "came down from the top," noting that "[o]ur managers told us, but their managers told them." According to CW4, he reported to a recruiting manager who, in turn, reported to the recruiting director. CW4 stated that DeVry's Career Services department was responsible for determining the job placement rate. He indicated that he and other admissions advisors were aware that the 90% job placement claim did not include all students, but they were not required, nor expected to inform prospective students of that fact. CW4 believed that DeVry University's job placement rates did not include students that transferred in or did not finish the program.

257. CW5, an online Graduate Career Advisor for DeVry's Keller School of Management from January 2011 to December 2012 based in Naperville, Illinois, stated that he did not keep track of his placement rates because it was done automatically by the Company's computer system, HireDeVry. CW5 explained that he did not run reports about job placement rates on his own, but recalled waiving a significant number of graduates for various reasons

based on DeVry's policies. CW5 understood that these waived graduates were not counted in job placement statistics. For example, CW5 estimated that roughly 15% of graduates he dealt with were waived because they advised him that they were not seeking employment and that another 25% were waived because they already had jobs prior to graduation and were not seeking new employment.

258. CW6 was an Associate Dean at DeVry University's College of Engineering and Information Services in Irving, Texas, from July 2009 to July 2015. In July 2014, CW6's job title changed to Faculty Program Chair but his responsibilities remained the same. CW6 stated that campus-specific job placement rates of DeVry University graduates were reported up the chain of command within the Company. CW6 added that DeVry's corporate policy prohibited employees from releasing campus-specific job placement rates to the public.

259. CW7, Campus Director and then President of DeVry University's Fresno and Bakersfield, California campuses from January 2009 to May 2016, said that DeVry had a written national policy that described the process and rules for which students were included or excluded in the job placement statistics of DeVry University graduates. CW7 confirmed that certain students were waived from inclusion in those statistics, and as Campus Director and them Campus President, he signed off on those waivers. He said that the waiver decisions and graduates' files were also occasionally reviewed for accuracy by higher-level employees. CW7 separately explained that DeVry kept records on how many graduates were not counted in the job placement statistics, and that that data was kept in the HireDeVry computer system.

## VII. SCIENTER ALLEGATIONS

260. Numerous facts demonstrate that Defendants knew, or were severely reckless in not knowing, that DeVry's statements with respect to the graduate employment statistics were false and misleading when issued.

261. First, the FTC's determination that the Company lacked any reasonable basis for the false and misleading DeVry University graduate employment and salary statistics indicates that Defendants Hamburger, Wiggins, Unzicker, and Gunst were at least reckless in disregarding the substantial risk that those statistics were false. In that vein, there were obvious red flags that cast doubt on the advertised statistics, and Defendants' egregious failure to investigate the basis of those statistics reflects a gross indifference to the truthfulness of their Class Period statements.

262. As to the much-publicized DeVry University graduate employment statistics, the FTC determined that the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%." Indeed, the advertisements described in the FTC Complaint, which are substantially the same as Defendants' statements in the Company's SEC filings, press releases, and during conference calls with securities analysists, asserting that 90% of DeVry University graduates are employed in their field within six months of graduation, the FTC determined that such statements "are false and unsubstantiated."

263. The FTC explained that DeVry calculates the 90% figure using information obtained from DeVry University students and graduates, related information obtained by DeVry University's Career Services department, and analysis conducted by DeVry University staff. Those student records, however "do not provide a reasonable basis that substantiates Defendants' 90% claims." Among other things, the 90% figure "count[s] a substantial number of [DeVry University] graduates who should not be counted and similarly exclude[s] a substantial number of [DeVry University] graduates who should not be excluded." For instance, the 90% figure "count[s] graduates who did not obtain a job as a result of obtaining a degree from [DeVry University]," including the "substantial percentage of DVU graduates who, after graduation,

continued with the same job they had when they enrolled in [DeVry University]." The 90% figure also counts graduates who did not obtain jobs in their field of study, and indeed a "significant percentage of the jobs that Defendants count as being in the graduate's field of study include jobs that employers, industry experts, graduates, and consumers would not reasonably consider to be in the graduate's field of study." Notable examples of such improper inclusion described in the FTC Complaint include:

- graduates with degrees in technical management who were working as: a rural mail carrier (human resources specialization); a yard salesman at a nursery (business information systems specialization); a sales associate at Macy's (general technical specialization); a driver delivering rain gutters for a construction services company; a data entry specialist for a radio station (human resources specialization); and unpaid volunteers at medical centers (human resources management and health services management specializations);
- a graduate with a degree in business administration (health services management specialization) working as a server at the Cheesecake Factory;
- a graduate with a degree in business administration (health care management specialization) working as a car salesman; and
- a graduate with a degree in business administration (accounting specialization) working as a secretary at a prison.

264. The 90% figure also excluded certain students who were actively seeking employment. The FTC describes one egregious instance in its complaint:

> For example, in June 2013, Defendants excluded one 2012 graduate who, prior to being classified as inactive: viewed 177 jobs leads in DVU's jobs database; had at least six job interviews in the previous two months (including two interviews eleven days before DVU classified him as inactive); sent an email to DVU's Career Services department, two weeks before being classified as inactive, in which he stated that he "wanted to let you know I've been getting more response now that I am much more actively applying to positions," and that he "had two face to face interviews a while back and now 2 Skype interviews"; attended a DVU "Career Fair" the following day; and then sent the Career Services department an

> email informing them that, after attending the career fair, he sent three thank you notes to companies whose representatives he had spoken to at the fair.

265. Thus, lacking any reasonable basis for asserting that 90% of DeVry University graduates are employed in their field within six months of graduation, Defendants were at least severely reckless in making such statements.

266. In regard to DeVry's claims as to DeVry University graduates' purported earning power, the FTC Complaint makes clear that the "sampling methods and methodology" underlying a third-party survey used to substantiate those claims "***all gave or should have given [DeVry] reason to question the reliability of the conclusions and information***" of that survey, and "[i]n fact, ***[DeVry University] personnel expressed concerns over whether the data sufficiently supported the higher-income claim***." Notably, "statistics that [DeVry University] had directly collected from thousands of its graduates each year about their incomes differed significantly from the third party's statistics, which consisted of information from only several hundred individuals per graduation year." Moreover, DeVry had "extensive information in [its] own files about the income of [DeVry University] graduates" in addition to "publicly available data reflecting the incomes of graduates of schools throughout the United States, by school and by field." As the FTC explained, a comparison of DeVry's internal statistics with publicly available graduate income data "shows that [DeVry University] graduates a year after graduating do not in fact earn significantly more than graduates from all other schools combined," and so DeVry's "reliance on the third-party data for its higher-income claim was therefore unreasonable."

267. Additionally, in a joint Rule 26(f) report filed by the parties on June 7, 2016 in the FTC's action against DeVry, DeVry included both Defendant Gunst and David Pauldine, who reported directly to Defendant Hamburger, in a list of percipient witnesses likely to have

discoverable information. The inclusion of Gunst and Pauldine in the list of percipient witnesses in that litigation indicates that these individuals were knowledgeable regarding how the Company generated the DeVry University graduate employment and salary statistics, and therefore were aware or recklessly disregarding the substantial risk that the job placement and salary statistics touted by Defendants during the Class Period were false.

268. Second, Confidential Witnesses have provided additional information supporting a strong inference that Defendants recklessly disregarded the likelihood that the DeVry University graduate and employment statistics were false or misleading. For instance, CW1 explained that Admissions Advisors faced pressure from the Company to repeat the job placement and salary statistics to prospective students in an effort to get those students to enroll at DeVry University, and the Company even recorded the Admissions Advisors' calls with prospective students to ensure that the Admissions Advisors told students about the job placement and salary statistics. Advisors who failed to tout the job placement and salary statistics were reprimanded. The Company also imposed enrollment quotas on these Admissions Advisors, which they had to meet in order to keep their jobs.

269. CW2 also confirmed that DeVry required Company employees to tout the job placement statistics to prospective students. Specifically, CW2 explained that the required language had been reviewed and approved by DeVry's legal and compliance department, and that the Company kept a repository of approved language for use by marketing employees. CW4 corroborated that assertion, stating that encouragement to use the job placement statistics "came down from the top," noting that "[o]ur managers told us, but their managers told them." CW2 came to doubt the accuracy of the advertised job placement statistics in part because there was a "grey area" in whether graduates actually obtained jobs in their field of study. In fact, CW2

believed that graduates were employed in jobs that most people would not define as being in their field of study.

270. CW2 similarly described how DeVry actively monitored social media for complaints by DeVry University graduates who were struggling to find jobs. CW2 stated that such complaints caused him and the "whole marketing department" to suspect that the job placement rates advertised by the Company were not accurate. CW2 believed that such criticism was likely reported to Pauldine. CW2 added that Pauldine reported to Defendant Hamburger.

271. As explained in more detail above, CW3 revealed that career services advisors and directors could classify graduates as "non-job seeking," which would exclude them from DeVry University's job placement statistics. That classification was applied to students who either did not respond to the numerous calls and emails from DeVry's career services department following graduation, or specifically asked not to be contacted any more. CW3 noted that the final classification of a student as non-job seeking required the approval of the campus president (in CW3's case, CW7). That campus president reviewed each student's file, regularly received reports about graduates' job placements, and, according to CW3, "knew intimately everything that went on with every [graduate] file." CW3 believed the Company's system of opt-outs and waivers was put in place by DeVry as a means of "choice selection" for the purpose of improving its job placement statistics.

272. CW7, for his part, confirmed that DeVry had a written national policy that set forth the rules for which students would be included or excluded in the job placement statistics. CW7 separately explained that DeVry kept records on how many graduates were not counted in the job placement statistics, and that that data was kept in the HireDeVry computer system.

273. CW3 stated that he was required to input all job placement information about each graduate into HireDeVry, including graduation date, field of study, job, income, and any additional notes. That system provided the school with the capability of running reports showing the actual job placement rate for graduates including students who had been waived in its official statistics. According to CW6, campus-specific job placement rates of DeVry University graduates were reported up the chain of command within the Company.

274. This obvious ability to manipulate the student outcomes data, as described by the Confidential Witnesses, indicates that the Individual Defendants were at least reckless in disregarding the substantial risk that the employment and salary statistics were false, or failing to investigate the doubtful validity of the student outcome statistics to satisfy themselves that the statistics were accurate. Indeed, Defendant Hamburger's discussion on September 13, 2012 regarding training of the Company's admissions advisors, and specifically the advisors' concerns regarding what they were permitted to say and what points they should focus on when speaking with prospective students, indicates that Hamburger had intimate knowledge of the Company's own scrutiny of its marketing practices. As such, Defendant Hamburger was in a position to detect the errors in the Company's advertised employment and salary statistics, but his apparent failure to do so demonstrates his recklessness.

275. Third, the magnitude and duration of Defendants' misstatements was extraordinary. During the Class Period, Defendants Hamburger, Wiggins, Unzicker, and Gunst each made repeated false statements regarding DeVry University's graduate employment statistics and/or signed SEC filings containing such statements, certifying the statements' accuracy. Similarly, as described in the FTC Complaint, DeVry engaged in a massive advertising campaign touting the false employment statistics through "television commercials,

[DeVry University]'s website, YouTube advertisements, radio spots, brochures, print advertisements, Facebook, Twitter, sales pitches with prospective students, and other advertising and promotional materials" since at least 2008. The extraordinary magnitude and duration of the misstatements at issue in this case, which constituted a critical and core feature of the Company's primary marketing campaigns since at least 2008, demonstrates that the Individual Defendants recklessly failed to ensure that their Class Period statements concerning the DeVry University graduate employment and salary statistics were accurate. Moreover, even putting aside the Individual Defendants' scienter, the dramatic scope of the Company's advertising campaign highlighting the false employment and salary statistics supports an inference that the similarly false statements in the Company's SEC filings, press releases, and analyst presentations were reviewed and approved by corporate officers sufficiently knowledgeable about the Company to know that the statements were false.

276. The magnitude and duration of Defendants' misconduct is further underscored by DeVry's $100 million settlement of the FTC lawsuit and the breadth of the corporate reforms that DeVry has agreed to put in place. For example, DeVry must pay over $49 million directly to the FTC for distribution to students and provide over $50 million in debt relief to its undergraduates, much of which is specifically set aside for students who received loans issued by DeVry between September 2008 and September 2015—a more than seven year period. Separately, DeVry and, among others, its officers, agents, employees, and attorneys are permanently restrained and enjoined from "[m]isrepresenting, expressly or by implication, the success that students or graduates have realized or are likely to realize in starting or obtaining careers, jobs or employment." In addition, for 20 years after the settlement, DeVry must "establish and implement a training program for all principals, officers, directors, managers, employees, agents,

and representatives who direct or engage in the promotion or sale of any educational product or service[.]" DeVry is also required to submit a compliance report one year after the order is entered and, for 10 years, each DeVry entity must submit a compliance notice for any change in, among other things, "any process or procedure for calculating, documenting or substantiating any claim covered" by the settlement.

277. Fourth, the initiation of an investigation by the FTC approximately two years before it filed its complaint supports an inference that Defendants knew, or should have known, that the advertised employment and salary statistics were false. In other words, after two years of investigating DeVry's post-graduation employment and salary claims, receiving more than 2.3 million pages of documents, and receiving responses to approximately 64 comprehensive interrogatories from DeVry, the FTC determined that there was a sufficient basis to file its Complaint. Even assuming that Defendants were not already acting with scienter in making their false statements concerning DeVry University graduates' employment and salary prospects (an assumption readily refuted by the allegations in the FTC Complaint, the DoE's Action, and the CWs' statements) at the time of the FTC's January 28, 2014 request for documents, the FTC's investigation should have put Defendants on notice that they needed to conduct their own investigation into the truth of such statements. Only three inferences can reasonably be drawn: (1) Defendants were already aware or recklessly disregarding the risk that their statements were false by the time DeVry received the FTC's request on January 28, 2014; (2) Defendants thereafter investigated the falsity of their statements in tandem with the FTC's investigation and learned that the statements were false, but continued to make the statements in spite of that knowledge; or (3) despite receiving the FTC's request on January 28, 2014, Defendants failed to investigate the truth of their statements and recklessly continued to tout the employment and

salary prospects of DeVry University graduates. Indeed, following the Company's January 28, 2014 receipt of the FTC's CID, Defendants highlighted the false and misleading student outcome statistics with declining frequency—strongly suggesting that Defendants finally began to appreciate the likely consequences of making such false statements. Under any of these three alternatives, Defendants acted with scienter in falsely promoting DeVry by pointing to the misleading DeVry University graduate employment and salary statistics.

## VIII. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

278. Throughout the Class Period, Defendants made numerous materially false and misleading statements concerning the job placement rates and compensation of DeVry University graduates, as set forth herein.

### A. Materially False and Misleading Statements and Omissions in the 2011 AR and 2011 10-K

279. On August 26, 2011, DeVry released its 2011 AR and 2011 10-K, which was signed by Defendants Hamburger and Gunst. Throughout the 2011 AR and the 2011 10-K, the Company discussed the Company's financial performance and the success of its programs resulting in a high percentage of employed graduates in their field of study. Specifically, the 2011 AR noted the following:

> We measure DeVry University's achievement towards that goal with our "90/40" standard: within six months of graduation, we want 90 percent of our graduates employed in their fields of study at an average salary of $40,000 or more. ***Even in this year's challenging job market, 89 percent of our graduates had jobs in their fields with an average salary of more than $43,000***.

280. The 2011 10-K also emphasized the success of DeVry University's graduates in obtaining employment in their field of study within six months of graduation and its impact on DeVry's financial results:

> DeVry University believes that the employment of its graduates is essential to the achievement of its mission and the ability to attract and retain students.
>
> * * *
>
> One measure of success is the employment outcomes of DeVry University graduates. ***Eighty-nine percent of DeVry University's June 2009, October 2009 and February 2010 graduates in the active job market were employed in fields of their study within six months of graduation at an average of $43,035***.

281. These statements in the 2011 AR and the 2011 10-K were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6

months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

**B. <u>Materially False and Misleading Statements and Omissions in the 1Q 2012 Press Release and Earnings Conference Call</u>**

282. On October 25, 2011, DeVry issued a press release entitled "DeVry Inc. Announces First-Quarter 2012 Results" ("1Q 2012 Press Release"). That same day, the Company held its 1Q 2012 Earnings Conference Call with securities analysts. With regard to undergraduate student enrollment, the 1Q 2012 Press Release noted that despite a tough job market, "87% of DeVry University June 2010, October 2010 and February 2011 graduates in the active job market were employed in their fields of study within six months of graduation at an average salary of $43,645." By way of a materially incomplete explanation of those statistics, the Company misleadingly stated in the press release that the employment figures "[e]xclude[] graduates continuing their education, foreign graduates ineligible to work in the United States/Canada and those unable to accept career advising because of extreme circumstances," and further "[e]xclude[] graduates who actively pursued employment for less than 180 days and did not become employed."

283. During the 1Q 2012 Earnings Conference call with securities analysts, Defendant Hamburger emphasized in his opening presentation the value of a DeVry University education and the correlation to employment following graduation:

> [O]ur graduates are receiving a significant return on their educational investment. ***As another indicator of the value proposition that we offer students, even in this tough job market, our graduate employment rate for DeVry University students in the active job market employed in their field of study within six months of graduation is 87%.***

284. These statements from the October 25, 2011 press release and conference call were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of

study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### C. <u>Materially False and Misleading Statements and Omissions in the 3Q 2012 Earnings Conference Call</u>

285. On April 24, 2012, the Company held a conference call with securities analysts to discuss DeVry's 2012 third quarter results (the "3Q 2012 Earnings Conference Call"). On that call, Defendant Hamburger told analysts: "graduate employment statistics for DeVry University are also holding up pretty strong, still 80%." Defendant Hamburger added, "We're not meeting our 90% goal, but [it's] still holding up very well," and that "the good news that help us spread the word is the graduates of our institutions are doing quite well."

286. The statements from the 3Q 2012 Earnings Conference Call with respect to graduate employment statistics set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a

DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; and (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation."

### D. Materially False and Misleading Statements and Omissions in the 2012 AR and 10-K

287. On August 28, 2012, DeVry released its 2012 AR and 2012 10-K, which was signed by Defendants Hamburger, Wiggins, and Unzicker. Throughout the 2012 10-K and 2012 AR, the Company discussed the Company's financial performance and the success of its programs resulting in a high percentage of employed graduates in their field of study.

288. In addition, the 2012 AR noted the following:

> One measure of success is the employment outcomes of DeVry University graduates. Each year, thousands of DeVry University graduates started careers in their chosen fields within 6 months or less of their graduation. ***Eighty-six percent of DeVry University's February 2011, June 2011 and October 2011 graduates in the active job market were employed in their fields of study within six months of graduation at an average salary of $42,626***. These statistics include graduates of associate and bachelor's degree programs and those who were already employed in their field of study.

289. The statements in the 2012 10-K and the 2012 AR set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the

FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### E. <u>Materially False and Misleading Statements and Omissions in the 1Q 2013 Press Release and Earnings Conference Call</u>

290. On October 25, 2012, DeVry issued a press release entitled "DeVry Inc. Announces First Quarter 2013 Results" ("1Q 2013 Press Release"). In the press release, the Company underscored employment of its graduates stating:

> As an example of the strong value proposition of our career-focused programs, graduate employment at DeVry University was 85.7 percent in the most recent annual reporting period. This average includes graduates of associate and bachelor's degree programs for the twelve-month period ending February 2012.

291. A chart which appears in the October 25, 2012 press release notes that in addition to 85.7% of DeVry University graduates being employed, the average salary was $42,623 and that the "[i]formation presented is based on graduate-provided data." In reaching the 85.7% number, the Company misleadingly explained that the "[d]enominator excludes graduates continuing their education, foreign graduates ineligible to work in the United States/Canada and those unable to accept career advising assistance because of extreme circumstances, such as military service or critical illness," and the "[n]umerator excludes graduates who actively pursued employment for less than 180 days and did not become employed."

292. Also on October 25, 2012, the Company held a conference call with securities analysts to discuss its 1Q 2013 results (the "1Q 2013 Earnings Conference Call"). In his opening presentation, Defendant Hamburger stated:

> The new DeVry University employment statistic we announced today shows that ***86% of DeVry University graduates who are active in the job market were employed in their field of study within 6 months of graduation. Average salary? $42,626***. Now that's remarkable in this economy. It demonstrates the quality of our academic offerings and the return on investment for our students.

293. These statements made on October 25, 2012 set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University

graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### F. Materially False and Misleading Statements and Omissions in the 2Q 2013 Earnings Conference Call

294. On February 6, 2013, the Company held a conference call with securities analysts to discuss its 2Q 2013 results (the "2Q 2013 Earnings Conference Call"). On that call, Defendant Hamburger responded to a question how DeVry University can entice students to enroll, stating:

> We're really focusing on DeVry's long-time reputation for being the career university. . . . We've been at this for decades, and we've got a long track record of a data, third-party review data back to 1975. And since that time our graduates in the active job market have been employed within their field of study within 6 months of graduation. So that's the kind of message that we think is important to tell[.]

295. These statements made on February 6, 2013 set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as

job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

## G. Materially False and Misleading Statements and Omissions at the Robert W. Baird and Co. Business Solutions Conference

296. On February 26, 2013, Defendant Wiggins participated in and presented at the Robert W. Baird and Co. Business Solutions Conference wherein he discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> ***As Daniel Hamburger said recently and I thought very aptly, he said, when the students think about advancing their education, one thing that is guaranteed is the debt. And I think in their minds they are not sure that the career at the end is there. Even though at DeVry University, we have very good statistics, some 88% of students that persist and graduate, if you look at those that are actively looking within six months, will find a position in their field of study, and the average pay is $43,000.***

* * *

> And one of the things that is encouraging when we look at DeVry University, one, is that we have these good employment statistics; two, we know that we do well in supporting students to get through this process.

297. These February 26, 2013 statements set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order,

DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### H. Materially False and Misleading Statements and Omissions at the Credit Suisse 15th Annual Global Services Conference

298. On March 13, 2013, Defendant Hamburger participated in and presented at the Credit Suisse 15th Annual Global Services Conference wherein he discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> Well, the other measures of quality is successful student outcomes. . . . At DeVry University, ***nearly 86% of our graduates in the active job market were employed in their field of study within 6 months of graduation. And these graduates earned an average salary of over $43,000***. So that's a marker of academic quality.
>
> * * *
>
> One question that we've been asked is, how do we compete? How does DeVry compete? What is it that attracts students to our institutions in this competitive environment that's out there in higher education? We referred to it as HIRE education. That's spelled a little bit differently, HIRE. . . . [T]he E, ***incredible employment outcomes, like the 86% employed [at] $43,000*** that I referenced earlier [at] DeVry University.

299. These March 13, 2013 statements set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain

employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

## I. <u>Materially False and Misleading Statements and Omissions in the 3Q 2013 Press Release and Earnings Conference Call</u>

300. On April 23, 2013, the Company issued a press release announcing financial results for 3Q 2013, ended March 31, 2013. In that press release, the Company stated that while "[e]nrollment results continue to be impacted by lower cyclical demand among the university's target segment of students," the Company's "plan to improve enrollment results includes

enhancing communications to students about DeVry University's excellent graduate employment results[.]"

301. Also on April 23, 2013, the Company held a conference call with securities analysts to discuss its 3Q 2013 results (the "3Q 2013 Earnings Conference Call"). On that call, Defendant Hamburger discussed the steps the Company was taking to increase enrollment growth at DeVry University which included becoming aggressive in its message that that a degree from DeVry University translates into quick employment at a very good salary. Defendant Hamburger stated that:

> [L]et's focus on the steps that we're taking to address these challenges and regain . . . enrollment growth at DeVry University. Our strategy is centered on the fact that DeVry University offers a very strong return on investment, and we need to do more to demonstrate this inherent value proposition to prospective students. So first, we're changing our message to be more hard hitting on DeVry University as the career university. You know, ***86% of graduates active in the job market are employed in their field of study within 6 months of graduation, and that's with an average salary over $43,000. And the percent is trending up as we're going through this fiscal year***. So we're going to do a better job communicating these impressive results to prospective students.

302. These April 23, 2013 statements set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not

in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### J. Materially False and Misleading Statements and Omissions at the William Blair Growth Stock Conference

303. On June 13, 2013, Defendant Hamburger participated in and presented at the William Blair Growth Stock Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> So in addition to academic quality investments, the other measure that I would give you of academic quality is successful student outcomes. . . . ***At DeVry University, nearly 86% of our graduates in the active job market were employed in their field of study within six months of graduation. And these graduates earned an average salary of $43,000[.]***

* * *

> Okay, so, two-part question. How would the Department of Education, which has increased scrutiny on higher education generally, as well as in the private sector specifically, view our outcomes? ***And then how about that -- those employment results, of the 86% I mentioned? By the way, that's our goal, is that 9 out of 10 DeVry University graduates in their -- in the after-job market should be employed in their field of study, not just any job, in their field of study within six months. Not 12 months, not 100 years. It's got to be within six months.***
>
> ***Third party reviewed statistics that we have disclosed publicly with third-party review since 1975.*** So there is a lot of talk now about more disclosure. We should have tough rules and make everybody disclose it. We have been disclosing it for a long time. . . . I don't know of too many universities that even talk about what their current statistics are, let alone have third-party review. And despite those on their website and hand that to every prospective student who interviews. I think the Department of Education would also acknowledge, and has many times, that there are good actors and bad actors in the public sector and the private sector. There is no monopoly on one or the other. We need to make sure we have strong rules of the road for all.

304. These June 13, 2013 statements set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were

only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### K. Materially False and Misleading Statements and Omissions in the 4Q 2013 Press Release and Earnings Conference Call

305. On August 8, 2013, the Company issued a press release ("4Q 2013 Press Release") stating that "[t]he percentage of DeVry University graduates who were actively seeking employment and had careers in their field within 6 months of graduation increased to 90 percent in calendar 2012," with an average salary of $43,539. As a purported caveat to these figures, the Company misleadingly stated that the employment and salary statistics are "based on 2012 graduates' self-reported data to DeVry University Career Service Center who were employed at graduation or who were actively seeking employment after graduation and found

employment in tier field within six months." The Company further misleadingly noted that the figures "[do] not include graduates who were not actively seeking employment, as determined by DeVry University Career Services, or who did not report data on employment status to DeVry University Career Services."

306. Also on August 8, 2013, the Company held a conference call with securities analysts to discuss its 4Q 2013 results (the "4Q 2013 Earnings Conference Call"). On that call, Defendant Hamburger stated:

> A recent Gallup poll found that the factor adult American say is most important in selecting a college is the percent of graduates who find a good job. This is what DeVry University does. ***The latest numbers are in, and DeVry University's employment statistics increased to more than 90%. 90% of our graduates in the active job market are employed in their field of study within six months of graduation. And they're earning an average of over $43,500***. That's higher than the median family household income of our students before they enrolled at DeVry University.

307. These August 8, 2013 statements set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as

further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### L. Materially False and Misleading Statements and Omissions in the 2013 AR and 10-K

308. On August 29, 2013, DeVry issued its 2013 10-K—which was signed by Defendants Hamburger, Wiggins, and Unzicker—and its 2013 AR. Throughout the 2013 Form 10-K and the 2013 AR, the Company discussed the Company's financial performance and the success of its programs resulting in a high percentage of employed graduates in their field of study. Specifically, the 2013 10-K stated:

> One measure of success is the employment outcomes of DeVry University graduates. Each year, thousands of DeVry University graduates have started careers in their chosen fields within 6 months or less of their graduation. ***Ninety percent of DeVry University's calendar 2012 graduates in the active job market were employed in their fields of study within six months of***

> ***graduation at an average salary of $43,539***. These statistics include graduates of associate and bachelor's degree programs and those who were already employed in their field of study.

309. Additionally, Defendant Hamburger stated in the 2013 AR:

> The best measure of our quality is the successful outcomes that our students achieve. ***Notably, 90 percent of DeVry University's 2012 graduates active in the job market were employed in their fields of study within six months of graduation, earning an average of more than $43,500 annually***.

310. These statements in the 2013 10-K and the 2013 AR set forth above were materially

false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry

graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### M. <u>Materially False and Misleading Statements and Omissions at the Robert W. Baird & Co. Inc. Growth Stock Conference</u>

311. On May 6, 2014, in response to an analyst's questions about academic outcomes at the Robert W. Baird & Co. Inc. Growth Stock Conference Defendant Wiggins stated:

> ***Our graduation rate's in the 30% range. We'd like to see that higher and we're working hard. But the students that persist, our graduate employment data is that over 90% of students actively seeking jobs have them within six months and the average pay of those folks is $44,000, give or take.***

312. These May 6, 2014 statements set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were

actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### N. Materially False and Misleading Statements and Omissions at the William Blair & Company LLC Growth Stock Conference

313. On June 11, 2014, Defendant Hamburger participated in and presented at the William Blair & Company LLC Growth Stock Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> So that's who we are. And what's the investment thesis on DeVry Group? It's a clear and powerful formula: quality plus diversification plus long-term thinking, long-term approach. That

> is what drives long-term growth. And when we talk about quality, the key measure is successful student academic outcomes.
>
> Let me share three recent examples of quality across our institutions. ***At DeVry University, more than 90% of our graduates in the active job market were employed in their field of study within six months of graduation, and these graduates earned average salary of $44,000. So that's that [90% $44,000] statistic. In strong and weak job markets, employers value DeVry University graduates.***

314. These June 11, 2014 statements set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC

Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### O. Materially False and Misleading Statements and Omissions in the 4Q 2014 Press Release and Earnings Conference Call

315. On August 7, 2014, the Company issued a press release announcing financial results for the 4Q and full-year 2014, stating that 90.9 percent of DeVry University graduates were employed in their field of study within 6 months of graduation, earning an average of $44,295. As in previous announcements of DeVry University graduate employment statistics, the Company misleadingly noted that the figures were based on graduates' "self-reported data to DeVry University Career Services who were employed at graduation or who were actively seeking employment after graduation and found employment in their field within six months." In addition, the Company misleadingly stated that the figures did "not include graduates who were not actively seeking employment, as determined by DeVry University Career Services, or who did not report data on employment status to DeVry University Career Services."

316. On the same day, the Company held its 4Q 2014 Earnings Conference Call. In his opening presentation, Defendant Hamburger touted DeVry University graduate employment statistics, emphasizing that:

> One of our strongest messages is the value employers attach to a DeVry University education, as they consistently hire our graduates to fill their jobs and send their existing employees to us for continuing education. We announced the latest graduate

> employment results in today's release and they remained above our goal of 90%. ***Actually 90.9% of our graduates in the active job market were employed in their field of study within 6 months of graduation. And they're earning an average of about $44,300 annually***.

317. Notwithstanding Defendants' misleading explanation of how they reached the false job placement and salary statistics, these August 7, 2014 statements set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their

higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

**P. <u>Materially False and Misleading Statements and Omissions in the 2014 AR and 10-K</u>**

318. On August 27, 2014, DeVry released its 2014 10-K—which was signed by Defendants Hamburger, Wiggins, and Unzicker—and its 2014 AR. Throughout the 2014 10-K and the 2014 AR, the Company discussed its financial performance and the success of its programs resulting in a high percentage of employed graduates in their field of study.

319. The Company recognized that its financial success and those of their graduates, depend on the employment of its graduates. Thus, the 2014 10-K states with respect to DeVry University:

> ***In 2013, 90.9% of graduate of DeVry University's associate and bachelor's degree programs who were actively seeking employment had careers in their chosen fields within six months of graduation at an average salary of $44,295***. To a large extent, these figures are based upon self-reported data from graduates. They reflect graduates who were employed in positions relating to their field of study within 180 days of graduation from among those graduates who were eligible for career assistance and who actively pursued employment relating to their field of study.

320. Additionally, Defendant Hamburger stated in the 2014 AR:

> ***In 2013, 90% of DeVry University graduates actively seeking employment obtained careers in their fields of study within six months of graduation or were already employed in their field when they graduated. These graduates earned an average salary of nearly $44,295***. In strong job markets and weaker one alike, employers value DeVry University graduates.

321. Within the discussion of "The Vital Role of Private-Sector Education" in the 2014 AR, the Company noted the following with respect to the success of its graduates:

> Increasingly, students and taxpayer are expecting colleges to prepare student for employment and careers. ***In 2013, 90 percent of DeVry University graduates actively seeking employment had careers in their fields within six months of graduation, at an average compensation of $44,000***. In addition, a study conducted by the Cicero Group found that graduates of DeVry Group institutions experienced significant growth in their earnings.

322. These statements in the 2014 10-K and the 2014 AR set forth above were materially

false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry

graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### Q. <u>Materially False and Misleading Statements and Omissions at the BMO Back to School Education Conference</u>

323. On September 18, 2014, Defendant Hamburger participated in and presented at the BMO Back to School Education Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics. For example, in response to questions from a securities analyst about the value proposition of higher education, he stated:

> And in terms of value proposition and brand, DeVry University has a very strong brand. That's one of the anchors on which we are basing our turnaround and transformation process.
>
> And a very strong value proposition. And that value proposition at DeVry University centers around two concepts: careers and care. So careers and care. Careers, that's one of our strongest messages. ***We just announced the latest graduate employment statistics, as we do every August, and we remained above 90%. Actually, it was 90.9% of our graduates actively seeking employment were employed in their field of study within six months of graduation.*** And those figures include students with careers prior to graduation. So, careers.

* * *

> So the value proposition of DeVry University is very clear, it's very strong and it's around careers and care.
>
> *   *   *
>
> And we've published the results of those career statistics long before it was cool, long before the administration thought it was a good idea. And we think it's a good idea, too. ***That's why for 30 or 40 years we have published our statistics very consistently, transparency; by program, by market. You as a prospective student or a family can get that information and see what those outcomes are.***

324. These September 18, 2014 statements were false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as

described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000

### R. <u>Materially False and Misleading Statements and Omissions at the J.P. Morgan Ultimate Services Investor Conference</u>

325. On November 12, 2014, Defendant Wiggins participated in and presented at the J.P. Morgan Ultimate Services Investor Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> Let me talk about quality. One of the key measures of quality is successful student outcomes and I'd like to recite or give you three examples. ***At DeVry University, more than 90% of graduates active in the job market were employed in their field of study within six months of graduation. And the average compensation of these graduates was nearly $44,000. In strong and weak job markets, employers value DeVry University grads.***
>
> * * *
>
> ***And that's why we feel good about our statistic of over 90% of our students that persist find work in their field of study.*** So I think what we find is many students are -- don't have money. They're concerned about going into debt. They read the stories -- and maybe there's some generational things going on as well.

326. These November 12, 2014 statements set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be

reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

**S. <u>Materially False and Misleading Statements and Omissions at the Robert W. Baird & Co. Inc.'s Growth Stock Conference</u>**

327. On May 5, 2015 Defendant Hamburger participated in and presented at the Robert W. Baird & Co. Inc.'s Growth Stock Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> So the employment statistics of the graduates at DeVry University -- I'm assuming you're talking about DeVry University because you can speak to the other institutions as well -- and they all have good employment results. ***DeVry University's employment results are actually trending up. That's one of the reasons that we're very confident in the ability, among many other reasons, in the ability that we have to improve our results and to turn it around, is the fundamental value proposition which is, I think, what your question gets at, for the student is very strong, in fact strengthening. Employment results are up. Salaries are up as well for the graduates. So the percentage who are employed in fields of study within six months of graduation or in the active job market is up, and their salaries are going up.*** The employers are very happy with our graduates, and so the Cisco's and the IBMs and the GEs and the Accentures, you know, they're coming back again and again for our graduates.

328. Indeed, these statements were made less than two months after DeVry University released its 2013-2014 Academic Annual Report, on March 20, 2015, stating that "[i]n 2013, 90% of DeVry University graduates actively seeking employment had careers in their field of study within 6 months of graduation at an average salary of $44,295."

329. These May 5, 2015 statements set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain

employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

## T. <u>Materially False and Misleading Statements and Omissions in the 2015 AR and 10-K</u>

330. On August 27, 2015, DeVry released its 2015 Annual Report ("2015 AR") and filed with the SEC its Form 10-K ("2015 10-K") for the fiscal year ended June 30, 2015, reiterating DeVry's previously reported financial results reported in the Company's August 18, 2015 press release.

331. In his Letter to Our Shareholders in the 2015 AR, Defendant Hamburger boasted the "foundation of [the Company's] success" stating that:

> Quality means ***delivering career-focused education with strong outcomes for students-ensuring that they are learning, graduating, gaining employment in their fields of study and paying back their loans***. It gives us a competitive advantage, because students want to attend schools with proven high-quality outcomes.
>
> * * *
>
> Our success not only strengthen our position, but also differentiates DeVry Group institutions from others that are struggling- an important consideration for students who are being careful about where they make their investments in higher education. In our view, quality leads to growth; Investing in quality academic produces successful students, making our institutions more attractive to prospective students, enabling us to grow, and generating the resources to invest back into further quality and growth initiatives.

332. These statements were false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment

statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### U. <u>Defendants' False and Misleading SOX Certifications</u>

333. Included in DeVry's 2011 10-K were SOX certifications signed by Defendants Hamburger and Gunst. Those certifications falsely stated:

> I, [Daniel M. Hamburger/Richard M. Gunst], certify that:
>
> 1. I have reviewed this annual report on Form 10-K of DeVry Inc. for the fiscal year ending June 30, 2011;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> * * *
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and

> internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > * * *
> >
> > c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report and based on such evaluation[.]

334. Defendants Hamburger, Gunst, and Wiggins made substantially similar false statements in SOX certifications attached to DeVry's regulatory filings throughout the Class Period, including in Forms 10-Q for the periods 1Q 2012, 2Q 2012, 3Q 2012, 1Q 2013, 2Q 2013, 3Q 2013, 1Q 2014, 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, and 1Q 2016, and Forms 10-K for the 2012, 2013, 2014, and 2015 fiscal years.

335. Defendants' SOX Certifications were materially false and misleading. Contrary to the representations that those 10-Ks and 10-Qs did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," they materially misstated the DeVry University graduates employment and salary statistics and/or failed to disclose that the DeVry University graduates employment and salary statistics touted during the Class Period were false. Such employment and salary statistics were false because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 1, 2, 3, and 5, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably

considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and CWs 2, 3, and 5, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

## IX. LOSS CAUSATION

336. The market price of DeVry's publicly traded common stock was artificially inflated by the material misstatements and omissions complained of herein, including the

misstatements and omissions about the employment and compensation statistics of DeVry University graduates.

337. The artificial inflation in DeVry's stock price was removed when the facts, conditions, and risks misstated and omitted by Defendants were revealed to the market. The information was disseminated on January 27, 2016, when it was disclosed that the FTC and DoE had both taken action against the Company in response to its pervasive use of false DeVry University graduate employment and salary statistics. Those disclosures corrected, *inter alia*, Defendants' prior materially misleading statements and omissions concerning DeVry University graduates' job placement and salary statistics, and reduced the amount of inflation in the price of DeVry's publicly traded stock that had been caused by Defendants' false statements, causing economic injury to Lead Plaintiff and other members of the Class.

338. In response to the January 27, 2016 corrective disclosures, DeVry's stock price declined from $23.74 per share on January 26, 2016 to close at $20.09 per share on January 27, 2016, declining $3.65 per share, or approximately 15%, on extraordinarily high volume. The Company's stock price continued its slide the next day, falling an additional $0.72 per share to $19.37 per share on January 28, 2016—an 18% decline from the January 26, 2016 closing price.

339. Accordingly, the decline in DeVry's stock price was a direct and proximate result of Defendants' scheme being revealed to investors and to the market. The timing and magnitude of DeVry's stock price decline negates any inference that the economic losses and damages suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Company-specific facts unrelated to the Defendants' fraudulent conduct.

## X. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

340. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Second Amended Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

341. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by a corporate officer of DeVry who knew that the statement was materially false or misleading when made.

## XI. THE PRESUMPTION OF RELIANCE

342. Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact that there was a duty to disclose.

343. Lead Plaintiff is also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a) DeVry's common stock was actively traded in an efficient market on the NYSE;

(b) DeVry's common stock traded at high weekly volumes;

(c) As a regulated issuer, DeVry filed periodic public reports with the SEC;

(d) DeVry was eligible to file registration statements with the SEC on Form S-3;

(e) DeVry regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(f) The market reacted promptly to public information disseminated by DeVry;

(g) DeVry securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

(h) The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of DeVry securities; and

(i) Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased or acquired DeVry securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

344. Accordingly, Lead Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for DeVry's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XII. CLASS ACTION ALLEGATIONS

345. Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired securities issued by DeVry during the period from August 26, 2011 through and January 27, 2016, inclusive, and who were damaged thereby.

Excluded from the Class are Defendants; DeVry's affiliates and subsidiaries; the officers and directors of DeVry and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.

346. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, DeVry common shares were actively traded on the NYSE. As of January 29, 2016, DeVry had approximately 63.117 million shares of common stock issued and outstanding. Although the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes that there are at least thousands of members of the proposed Class. Members of the Class can be identified from records maintained by DeVry or its transfer agent(s), and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

347. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

348. Common questions of law and fact exist to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of fact and law common to the Class are:

(a) whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

(b) whether Defendants' misrepresentations and omissions as alleged herein misrepresented material facts about the truthfulness of the employment and compensation statistics of DeVry graduates during the Class Period;

(c) whether SEC filings, documents, press releases and other statements disseminated to the investing public and statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of DeVry;

(d) whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e) whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

(f) whether the members of the Class have sustained damages, and the proper measure of damages.

349. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiff has no interest that conflicts with the interests of the Class.

350. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

351. The names and addresses of those persons and entities that purchased or acquired DeVry's common stock during the Class Period are available from DeVry's transfer agent(s). Notice may be provided to such purchasers and record owners *via* first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## XIII. CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER (Against Defendant DeVry And The Individual Defendants)

352. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

353. During the Class Period, Defendants DeVry, Hamburger, Unzicker, Wiggins and Gunst carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (i) deceive the investing public regarding DeVry's business, operations, management and the intrinsic value of DeVry securities; (ii) enabled Defendants to artificially inflate the price of DeVry securities; and (iii) caused Lead Plaintiff and other members of the Class to purchase DeVry securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants jointly and individually (and each of them) took the actions set forth herein.

354. The Defendants named in this count: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of DeVry's securities during the Class Period in an effort to maintain artificially high market prices for DeVry securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. The Defendants named in this count are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons as alleged below.

355. These Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of DeVry as specified herein.

356. These Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of DeVry's value and performance and continued substantial growth, which included the making of, and the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about DeVry and its business operations and future prospects in light of the circumstances in which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of DeVry securities during the Class Period.

357. These Defendants are liable for the following materially false and misleading statements and omissions made during the Class Period as alleged above in Section VIII:

(a) Defendant DeVry: Defendant DeVry is liable for the false and misleading statements and omissions made by any Defendant, which are set forth above in Section VIII.

(b) Defendant Hamburger: Defendant Hamburger is liable for the false and misleading statements and omissions made in the Company's Forms 10-Q dated February 4, 2011, May 5, 2011, November 4, 2011, and February 6, 2012; Forms 10-K dated August 26, 2011, August 28, 2012, August 29, 2013, August 27, 2014, and August 27, 2015; the SOX Certifications attached as exhibits to the Forms 10-Q and 10-K filed with the SEC on August 26, 2011, November 4, 2011, February 6, 2012, May 3, 2012, August 28, 2012, November 5, 2012, February 7, 2013, May 3, 2013, August 29, 2013, November 5, 2013, February 4, 2014, May 5, 2014, August 27, 2014, November 5, 2014, February 5, 2015, May 8, 2015,

August 27, 2015, and November 4, 2015; Annual Reports issued on August 29, 2013, August 27, 2014, and August 27, 2015; and conference calls and analyst presentations conducted on October 25, 2011, April 24, 2012, October 25, 2012, February 6, 2013, March 13, 2013, April 23, 2013, June 13, 2013, August 8, 2013, June 11, 2014, August 7, 2014, September 18, 2014, and May 5, 2015;

(c) Defendant Unzicker: Defendant Unzicker is liable for the false and misleading statements and omissions made in the Company's Forms 10-Q dated May 3, 2012, November 5, 2012, February 7, 2013, May 3, 2013, November 5, 2013, February 4, 2014, May 5, 2014, November 5, 2014, February 5, 2015, May 8, 2015 and November 4, 2015; Forms 10-K dated August 28, 2012, August 29, 2013, August 27, 2014, and August 27, 2015; and Forms 8-K dated April 25, 2012, July 23, 2012, August 9, 2012, October 25, 2012, February 6, 2013, March 6, 2013, April 23, 2013, August 8, 2013, October 24, 2013, February 4, 2014, April 25, 2014, August 7, 2014, October 23, 2014, February 5, 2015, April 23, 2015, August 18, 2015, September 2, 2015, and October 22, 2015;

(d) Defendant Wiggins: Defendant Wiggins is liable for the false and misleading statements and omissions made in the Company's Forms 10-Q dated February 6, 2012, May 3, 2012, November 5, 2012, February 7, 2013, May 3, 2013, November 5, 2013, February 4, 2014, May 5, 2014, November 5, 2014, February 5, 2015, May 8, 2015, and November 4, 2015; Forms 10-K dated August 28, 2012, August 29, 2013, August 27,

2014, and August 27, 2015; the Form 8-K dated January 26, 2012; the SOX Certifications attached as exhibits to the Forms 10-Q and 10-K filed with the SEC on February 6, 2012, May 3, 2012, August 28, 2012, November 5, 2012, February 7, 2013, May 3, 2013, August 29, 2013, November 5, 2013, February 4, 2014, May 5, 2014, August 27, 2014, November 5, 2014, February 5, 2015, May 8, 2015, August 27, 2015, and November 4, 2015; and analyst presentations conducted on February 26, 2013, May 6, 2014, and November 12, 2014;

(e) Defendant Gunst: Defendant Gunst is liable for the false and misleading statements and omissions made in the Company's Forms 10-Q dated February 4, 2011, May 5, 2011, and November 4, 2011; Form 10-K dated August 26, 2011; the Forms 8-K dated April 26, 2011, August 12, 2011, October 25, 2011, and December 12, 2011; and the SOX Certifications attached as exhibits to the Forms 10-Q and 10-K dated August 26, 2011 and November 4, 2011.

358. Defendants Hamburger, Unzicker, Wiggins, and Gunst, as the most senior officers of DeVry, are liable as direct participants in the wrongs complained of herein. Through their high-ranking positions of control and authority as the most senior executive officers of the Company, each of these Defendants was able to control, and did directly control, the content of the public statements disseminated by DeVry. Defendants Hamburger, Unzicker, Wiggins, and Gunst had direct involvement in the daily business of the Company and participated in the preparation and dissemination of DeVry's materially false and misleading statements set forth above.

359. The allegations in this Second Amended Complaint establish a strong inference that Defendants DeVry, Hamburger, Unzicker, Wiggins, and Gunst acted with scienter throughout the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts. As demonstrated by Defendants' material misstatements and omissions throughout the Class Period, if Defendants did not have actual knowledge of the misrepresentations and omissions alleged herein, they were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether their statements were false or misleading, even though such facts were available to them. Specifically, Defendants knew or recklessly disregarded that the student outcome statistics concerning graduates of DeVry University were misleading, inflated, and deceptive which caused the FTC and DoE to take action against the Company, as described more fully above.

360. Moreover, the dramatic scope of the Company's advertising campaign highlighting the false employment and salary statistics supports an inference that the similarly false Class Period statements in the Company's SEC filings, press releases, and analyst presentations were reviewed and approved by corporate officers sufficiently knowledgeable about the Company to know that the statements were false.

361. Lead Plaintiff and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market in which the securities trade and/or the material false and misleading statements and omissions made by Defendants, they paid artificially inflated prices for DeVry common stock, which inflation was removed from the stock when the true facts became known. Lead Plaintiff and the other members of the Class would not have

purchased DeVry common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

362. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

363. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of DeVry securities during the Class Period.

## COUNT II

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT (Against Defendants Hamburger, Unzicker, Wiggins, and Gunst)

364. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

365. Defendants Hamburger, Unzicker, Wiggins, and Gunst acted as controlling persons of DeVry within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

366. By reason of their high-level positions of control and authority as the Company's most senior officers, the Individual Defendants had the power and authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause DeVry to engage in the wrongful conduct complained of herein. The Individual Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the public statements made by DeVry during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein. The Individual Defendants were provided with or had unlimited access to copies of the Company's press releases, public filings, and other statements alleged by

Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

367. In their capacities as DeVry's most senior corporate officers, and as more fully described above, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein. Defendants Hamburger, Unzicker, Wiggins, and Gunst signed DeVry's SEC filings and Sarbanes-Oxley certifications, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by DeVry during the Class Period.

368. Each of the Individual Defendants culpably participated in some meaningful sense in the fraud alleged herein. Defendants Hamburger, Wiggins, and Gunst each acted with scienter, as set forth more fully in Section VII.

369. By virtue of their positions as controlling persons of DeVry and as a result of their own aforementioned conduct, Defendants Hamburger, Unzicker, Wiggins, and Gunst together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a) Declaring that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.

## XV. JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED: December 23, 2016

**WEXLER WALLACE LLP**

By: /s/ Mark R. Miller
Kenneth A. Wexler
Mark R. Miller
55 West Monroe St.
Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
Email: kaw@wexlerwallace.com
mrm@wexlerwallace.com

*Liaison Counsel*

**SPECTOR ROSEMAN KODROFF & WILLIS, P.C.**

Mark S. Willis
1101 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004
Tel: (202) 756-3600
Fax: (202) 756-3602
Email: mwillis@srkw-law.com

Robert M. Roseman
Daniel J. Mirarchi
Andrew N. Dodemaide
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Email: rroseman@srkw-law.com
dmirarchi@srkw-law.com
adodemaide@srkw-law.com

*Attorneys for Lead Plaintiff, Utah Retirement Systems*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that on December 23, 2016, he caused true copies of the foregoing Second Amended Class Action Complaint for Violations of the Federal Securities Laws to be served upon all counsel of record using the Court's CM/ECF system.

*/s/ Mark R. Miller*
Mark R. Miller