**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PENSION TRUST FUND FOR | ) | |
| OPERATING ENGINEERS, individually | ) | |
| and on behalf of all others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 C 5198 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| DEVRY EDUCATION GROUP, INC., | ) | |
| DANIEL HAMBURGER, RICHARD M. | ) | |
| GUNST, PATRICK J. UNZICKER, AND | ) | |
| TIMOTHY J. WIGGINS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Lead plaintiff, the Utah Retirement Systems[1] ("plaintiff"), has filed a Second Amended

Class Action Complaint For Violations of the Federal Securities Laws, asserting violations of

sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 of the Securities

Exchange Commission. Defendants, DeVry Education Group, Inc. ("DeVry"), Daniel

Hamburger, Richard M. Gunst, Patrick J. Unzicker, and Timothy J. Wiggins, move to dismiss

the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim

under Rule 8, Rule 9(b), and the heightened pleading requirements of the Private Securities

Litigation Reform Act of 1995 ("PSLRA"). For the following reasons, the motion is granted.

---

[1] This suit was initially brought by a different institutional investor, the above-captioned Pension Trust Fund for Operating Engineers, which moved for appointment as lead counsel. However, the Utah Retirement Systems filed a competing motion, and, recognizing that the Utah Retirement Systems had a larger financial interest in the litigation, the Pension Trust Fund for Operating Engineers did not oppose the competing motion. Accordingly, this Court appointed the Utah Retirement Systems as lead plaintiff. (Aug. 24, 2016 Minute Entry, ECF No. 36.)

# BACKGROUND

This lawsuit centers on defendants' public statements concerning the job placement statistics for graduates of a DeVry subsidiary, DeVry University. DeVry University ("DVU") is a for-profit post-secondary educational institution offering undergraduate and graduate degrees in programs including healthcare, business, technology, accounting, finance, and law. (2d Am. Compl. ¶ 2, ECF No. 51.) In recent years, DVU has accounted for between forty and fifty percent of DeVry's revenue. (*Id.*) For years, DVU has marketed itself to prospective students—and defendants have marketed it to investors—by claiming, in one form or another, that approximately 90% of DVU graduates obtain employment in their field of study within six months of graduation at average yearly salaries of approximately $40,000 or more ("the 90% Statement"). (*Id.* ¶ 3.) Not only did the 90% Statement appear in DVU advertising and marketing materials for years, but defendants repeatedly made some version of the 90% Statement in documents filed with the Securities and Exchange Commission ("SEC") and in public statements to investors and analysts, including press releases, quarterly earnings conference calls, and presentations at securities analyst conferences. (*See, e.g., id.* ¶¶ 42, 46, 55, 59, 74, 100.)

DeVry's use of the 90% Statement and other similar statements in its marketing and advertising attracted the notice of federal regulators. In January 2014, DeVry received a civil investigative demand ("CID") from the Federal Trade Commission ("FTC"), requesting information "relating to the advertising, marketing or sale of secondary or postsecondary educational products or services" in order to determine whether DeVry had violated Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," including false or

deceptive advertising.[2]  (Geraci Decl., Ex. E, Annual Report on SEC Form 10-K at 124, ECF No. 60-5; *see* 2d Am. Compl. ¶ 28.)

**The FTC Action**

On January 27, 2016, after a two-year investigation in which the FTC allegedly "reviewed well over 2 million pages of documents and responses from DeVry to approximately 64 comprehensive interrogatories, and voluminous materials from third parties" (2d Am. Compl. ¶ 205, *see id.* ¶ 215), the FTC filed a lawsuit against DeVry and DVU ("the DeVry entities") in the Central District of California.  The lawsuit alleged that their advertising contained "false and unsubstantiated" representations concerning the degree to which "obtaining a degree from DVU is highly likely to result in obtaining a desirable job soon after graduating—a well-paying, career-oriented job in the student's chosen field of study."  (Geraci Decl., Ex. A, FTC Compl., ¶¶ 16-17.)  Specifically, the FTC alleged that the DeVry entities made two types of misrepresentations in their marketing and advertising.  The first type consisted of various versions of the 90% Statement, or what the FTC called "the 90% claims," which consisted of misrepresentations to the effect that "as a result of obtaining a DVU degree, 90% of DVU graduates who were actively seeking employment landed or obtained new jobs in their field of study within six months of graduation":

> In some instances when Defendants make this representation, they claim this statistic applies to DVU graduates from a recent year, while in other instances, Defendants claim this statistic applies to all graduates since 1975, or "for more than 30 years."  In its advertising and in its presentations to prospective students, Defendants present this 90% "employment rate" as evidence of the likelihood that obtaining a DeVry degree leads to finding a job.  While Defendants'

---

[2] *See generally Kraft, Inc. v. FTC.*, 970 F.2d 311, 314 (7th Cir. 1992); *FTC. v. QT, Inc.*, 448 F. Supp. 2d 908, 957 (N.D. Ill. 2006).

advertisements and sales pitches most commonly express DVU's employment rate for recent graduates as exactly 90%, in some instances, during certain limited time periods, Defendants have stated a percentage that is slightly less or more than 90% (e.g., 87% or 92%). . . . [T]hese representations . . . are false and unsubstantiated.

(*Id.* ¶ 17.) The second type of misrepresentation was the DeVry entities' "higher-income claim." (*Id.* ¶ 18.) The FTC alleged that the DeVry entities misrepresented that DVU graduates "obtain jobs that pay significantly more than jobs that graduates of other colleges and universities obtain." (*Id.*) For example, according to the FTC, the DeVry entities falsely represented in their marketing and advertising materials that "one year after graduation, DVU graduates with bachelor's degrees earned 15% more than graduates with bachelor's degrees from all other colleges and universities." (*Id.*)

The FTC alleged that its investigation had shown that the DeVry entities were unable to substantiate these claims. To calculate the statistics it used in its advertising, DVU relied on files composed of mostly student-reported information maintained by its career services department, but, according to the FTC, DVU counted graduates as working in their field of study even if they were performing work most people "would not reasonably consider to be" in their field of study at all. (*Id.* ¶¶ 44-45.) For example, DVU allegedly classified as working "in field" such graduates as a rural mail carrier with a degree in technical management; a server at a Cheesecake Factory with a degree in business administration; a secretary at a prison with a degree in business administration; and salespeople and customer service representatives with various degrees. (*Id.*) Further, the DeVry entities counted graduates as having obtained employment in their field of study even if they had not obtained a new job as a result of earning a DVU degree, but had merely continued with the same job they had already had, which happened to be in their field of study. (*Id.*)

Additionally, the FTC alleged that DVU "exclude[d] certain students from the calculation who were actively seeking employment," but had not succeeded within six months of graduation. For example, they classified as inactive a 2012 graduate who had

> viewed 177 jobs leads in DVU's jobs database; had at least six job interviews in the previous two months (including two interviews eleven days before DVU classified him as inactive); sent an email to DVU's Career Services department, two weeks before being classified as inactive, in which he stated that he "wanted to let you know I've been getting more response now that I am much more actively applying to positions," and that he "had two face to face interviews a while back and now 2 Skype interviews"; attended a DVU "Career Fair" the following day; and then sent the Career Services department an email informing them that, after attending the career fair, he sent three thank you notes to companies whose representatives he had spoken to at the fair.

(*Id.* ¶ 46.) Ultimately, the FTC alleged, "the actual percentage of DVU graduates who, at or near the time they graduated, found jobs that could reasonably be considered 'in their field' is significantly smaller than 90%." (*Id.* ¶ 47.)

As for the higher-income claim, the FTC alleged that the DeVry entities relied on a third-party report that DVU had reason to believe was unreliable because it was based on a flawed sampling and surveying methodology. (*Id.* ¶¶ 48-49.) According to the FTC, DVU personnel internally expressed misgivings about whether the data genuinely supported DVU's higher-income claim. (*Id.* ¶ 49.) In fact, the third party's statistics differed from data in DVU's own files and in the public record. (*Id.* ¶¶ 49-50.)

On December 15, 2016, the FTC issued a press release announcing that it had settled the case with the DeVry entities. (2d Am. Compl. ¶ 233.) Under the terms of the settlement, DeVry was to set up a $49.4 fund million to distribute to qualifying students who were harmed by the deceptive ads, as well as $50.6 million in debt relief. (*Id.* ¶ 234.) Additionally, DeVry was to discontinue the challenged advertising, implement certain reforms to allow it to keep track of data to support any representations it might make about graduate employment outcomes, and

confirm its compliance with those reforms for a period of ten years, among other conditions.  (*Id.* ¶¶ 234-41.)

**The DOE Action**

On the same day that the FTC filed its complaint, January 27, 2016, the Department of Education ("DOE") publicly issued to DVU a Notice of Intent to impose limitations on DVU's participation in programs authorized pursuant to Title IV of the Higher Education Act, 20 U.S.C. § 1070 *et seq.*  (2d Am. Compl. ¶ 217.)  According to the DOE's Notice of Intent, the DOE had sent DVU an August 28, 2015 letter, seeking information about DVU's representations in marketing and promotional materials that approximately 90% of DVU graduates *since 1975* held positions in their fields of study within six months of graduation.  (Geraci Decl., Ex. H, Notice of Intent, at 2, ECF No. 60-8.)  During the ensuing investigation, DVU was "unable to locate" student-by-student career services data for the period between 1975 and 1980, and it was able to locate only "certain student-by-student" records for the period between 1980 and 1990.  (*Id.* at 3.)  Although DVU was able to produce certain historical summary reports and data from legacy databases, the DOE concluded that, nevertheless, DVU did not have sufficient data to substantiate its "since 1975" representation.  (*Id.* at 7-9.)  Based on the findings of its investigation, the DOE decided to impose[3] certain conditions on DVU's receipt of Title IV funds, including, among other things, requiring DVU to cease making any representations based

---

[3] The DOE gave DVU approximately three weeks to request a hearing or submit "written material indicating why the limitation should not be imposed."  (Notice of Intent at 12.)  DVU chose to contest the Notice of Intent in an administrative proceeding, and the parties ultimately settled the matter on October 13, 2016, with DVU agreeing to cease making the "since 1975" representation, to maintain graduate-specific data to substantiate any graduate employment statistics it advertised or publicly communicated, and to post on its website a notice that it had agreed to cease making the "since 1975" representation because it lacked sufficient records from the years 1975-1983 to substantiate the representation.  (2d Am. Compl. ¶¶ 224-26.)

on graduate employment statistics, particularly the "since 1975" representation, unless and until it is able to substantiate them with graduate-specific information. (*Id*. at 9-12.)

**<u>Confidential Witnesses</u>**

Plaintiff alleges that it has received confidential statements from at least seven former employees of the DeVry entities, who describe how DVU compiled, used, or communicated graduate employment statistics. (2d Am. Compl. ¶ 242.) A number of these "Confidential Witnesses" suspected, sometimes based on complaints they heard from recent graduates, that the graduate employment statistics—and specific marketing language touting them—that they were required to use in advertising and recruiting efforts were false, misleading, or provided an incomplete picture of graduates' typical employment prospects. (*Id*. ¶¶ 243-59.) Although they do not claim to have discussed graduate employment statistics and related marketing efforts with the individual defendants themselves, some of these witnesses believe that the requirement that they use the approved statistics and language came from the upper levels of the corporate leadership. (*See, e.g., id.* ¶¶ 247, 256, 258.)

One Confidential Witness, identified as "CW3," served as Associate Director of Career Services at DVU's Fresno and Bakersfield, California campuses from January 2013 to January 2014, and, because his job required him to assist graduates in obtaining jobs, he was familiar with DVU's process for determining which students were sufficiently actively job-seeking to be included in its graduate employment statistics. (*Id*. ¶ 248.) In order to receive the assistance of the Career Services department, graduates had to participate in a burdensome process that required them to make certain job-search efforts outlined by the Career Services staff and to stay in regular contact with the staff. (*Id*. ¶¶ 249-50.) If graduates did not timely perform the job-search tasks prescribed by Career Services or respond to calls and emails from the Career

Services staff, then DVU could consider them to have waived Career Services' support and classify them as "non-job-seeking," which meant that they were not counted in DVU's graduate employment statistics. (*Id.* ¶ 249.) But the list of tasks graduates were required to perform and calls or emails they were required to return was extensive, and DVU's determination of whether a student was sufficiently complying with his or her job-search obligations was "subjective," although it required the approval of the campus president. (*Id.*) Additionally, many graduates were so overwhelmed by the barrage of phone calls and emails from DVU's Career Services staff and the burdensome obligations the Career Services department placed on them in return for its support that they opted to sign a form expressly waiving Career Services' support, rather than comply with its onerous job-search requirements, and those graduates were also excluded from DVU's graduate employment statistics. (*Id.* ¶ 250.)

CW3 estimated that if DVU had included in its graduate employment statistics all of the students who had waived Career Services' support, either by submitting the waiver form or failing to participate in the job-search process sufficiently actively, the job placement rate at his campuses would have been 60% to 70%. (*Id.* ¶ 252.) Further, in CW3's experience, graduates were unlikely to make more than $30,000 in their first year after graduation—a fact, he discovered, that was often upsetting and disappointing to graduates who expected, based on DVU's marketing, to make more than $40,000. (*Id.* ¶ 255.) According to CW3, "a few highly paid graduates and graduates working in cities with higher wages could skew the averages higher," but in his area, wages remained relatively low. (*Id.*)

**DeVry's Stock Price Drops**

On January 27, 2016, the day the FTC filed its lawsuit against the DeVry entities and the DOE disclosed that it had notified DVU of its intent to impose limitations, the market price of

DeVry's publicly traded common stock dropped $3.65 per share on extraordinarily high trading volume. (*Id.* ¶ 338.) The price dropped a further $0.72 per share the following day, an 18% decline from the January 26, 2016 closing price. Plaintiff alleges that defendants' false and misleading representations to investors concerning graduate employment statistics over several years between August 2011 and January 2016 artificially inflated DeVry's stock price, and the news of the FTC lawsuit and DOE action on January 27, 2016, caused the stock value to fall, to the detriment of plaintiff and other investors, and in violation of the Securities Exchange Act and Rule 10b-5 of the SEC. Additionally, plaintiff claims that the individual defendants are liable as "controlling persons" of DeVry under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t. Defendants have moved to dismiss for failure to state a claim under Federal Rule of Procedure 12(b)(6).

## ANALYSIS

Section 10(b) of the Securities Exchange Act prohibits the use "in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j. Under SEC Rule 10b-5, it is unlawful for any person:

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Thus, under § 10(b) and Rule 10b-5, "a plaintiff can obtain damages if she can prove (1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff

justifiably relied and (6) that the false statement proximately caused the plaintiff damages." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*"), *vacated and remanded on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). The required scienter is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).

"A motion [to dismiss] under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (ellipsis omitted)).

Under federal notice-pleading standards, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need[ ] not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Alam v. Miller*

*Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

Additionally, any claims of or including acts of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires the pleading party to "state with particularity the circumstances constituting fraud." *U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 775 (7th Cir. 2016). Although fraudulent or deceptive intent "may be alleged generally," Rule 9(b) requires a plaintiff to describe the "circumstances" of the alleged fraudulent activity with "particularity" by including such information as "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated," *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008), or, to put it differently, by providing the "who, what, where, when and how" of the alleged fraudulent conduct. *See Bank of Am., Nat'l Ass'n, v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).

The Private Securities Litigation Reform Act ("PSLRA") imposes heightened pleading requirements on private, class action claims of securities fraud under § 10(b) and Rule 10b-5:

> **(b) Requirements for securities fraud actions**
> **(1) Misleading statements and omissions**
> In any private action arising under this chapter in which the plaintiff alleges that the defendant—
>> **(A)** made an untrue statement of a material fact; or
>> **(B)** omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> *the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.*
> **(2) Required state of mind**
>> **(A) In general**
>> Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof

11

> that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind*.

15 U.S.C. § 78u-4 (italicized emphasis added).  Thus, under the PSLRA, private securities fraud plaintiffs not only must plead with particularity the factual circumstances constituting fraud, including by specifying the alleged misrepresentations and the basis for any allegations made on information and belief, but they must also plead with particularity sufficient facts to give rise to a "strong inference" that the defendant acted with scienter.  *See Tellabs I*, 437 F.3d at 594 ("[T]he PSLRA essentially returns the class of cases it covers [*i.e.*, private securities fraud class actions] to a very specific version of fact pleading—one that exceeds even the particularity requirement of . . . Rule . . . 9(b).").  A "strong inference," the United States Supreme Court has explained, is an inference that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.

In support of their motion to dismiss, defendants principally argue[4] that (1) plaintiff does not meet its burden to plead falsity and (2) plaintiff's complaint fails to raise a strong inference of scienter.

## I.    MATERIAL FALSITY

Under the PSLRA, a complaint containing a Rule 10b-5 claim must "specify each statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief."  *Tellabs I*, 437 F.3d at 595 (citing

---

[4] Defendants make additional arguments in their opening brief concerning such issues as loss causation and control person liability under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), but they appear to have abandoned them by failing to press them in their reply brief, so the Court does not address them. *See Blair v. Graham Corr. Ctr.*, 4 F.3d 996 (7th Cir. 1993) (unpublished table decision), *Carter-Kuehner v. Astrue*, No. CIV. 1:08-CV-291-TS, 2009 WL 5031338, at *13 n.5 (N.D. Ind. Dec. 15, 2009). In addition, the Court need not reach those issues because it agrees with defendants that plaintiff's allegations are not sufficient to create a strong inference of scienter, which is a sufficient basis to grant defendants' motion.

15 U.S.C. § 78u–4(b)(1)). That does not mean that a complaint "automatically survives" if it states all the known facts that might support an inference of falsity, nor that it fails if it "leaves out a redundant detail." *Tellabs I*, 437 F.3d at 595. "[T]he relevant question is 'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'" *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000)). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet" the standard set by the PSLRA. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

Plaintiff lists all the materially false and misleading statements and omissions defendants are alleged to have made in a thirty-seven-page, fifty-seven-paragraph section of its Second Amended Complaint. (2d Am. Compl. ¶¶ 278-335; *see also id.* ¶¶ 46-182.) Plaintiff argues that, in these numerous statements made to investors between 2011 and 2016, defendants made some version of the 90% Statement, touting job placement and/or salary statistics that were materially false or misleading, as shown by the allegations of the FTC, the DOE and the statements of the Confidential Witnesses who previously worked for DeVry or DVU. (Resp. Br. at 11-18, ECF No. 61.) Defendants argue that plaintiff has failed to plead with the requisite particularity why these statements were materially false because the allegations of falsity rest only on the unproven allegations of government regulators and the statements of anonymous confidential witnesses.

There is considerable force in defendants' argument. Plaintiff relies most heavily on the FTC's allegations in its January 27, 2016 complaint against the DeVry entities (hereinafter, "the FTC Complaint"). The FTC, in turn, relied on information it had allegedly discovered in DVU's Career Services files indicating that DVU had misclassified certain employed graduates as working in their fields of study, when in fact they were not, and certain unemployed graduates as

not proactively seeking a job, when in fact they were. (Geraci Decl., Ex. A, FTC Compl., ¶¶ 44-47.)[5] But the FTC did not specifically identify the information that it allegedly discovered other than to give a few examples of graduates who were misclassified. The Court agrees with defendants that the fact that even a dozen or so DVU graduates were misclassified as either working in their field of study or non-job-seeking does not strongly indicate by way of "specific facts," *Metzler*, 540 F.3d at 1070, that the 90% Statement, which purports to be based on the employment history of thousands of graduates, is false. *See, e.g.*, *Karam v. Corinthian Colleges, Inc.*, No. 10-CV-6523, 2012 WL 8499135, at *10 (C.D. Cal. Aug. 20, 2012) ("Plaintiffs have failed to allege particularized facts to show how many students and faculty members were involved in these alleged practices. Thus, we are unable to determine whether the alleged problems were of a sufficient magnitude to render misleading Defendants' statements."); *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 581 (S.D.N.Y. 2012) ("Plaintiff must particularly and specifically establish widespread problems of noncompliance throughout ESI's many campuses and programs. Plaintiff's allegations of specific instances of unethical or fraudulent practices do not render Defendants' broad statements regarding compliance misleading."); *In re Career Educ. Corp.*, No. 03 C 8884, 2007 WL 1029092, at *6 (N.D. Ill. Mar. 29, 2007), *vacated pursuant to settlement* 2008 WL 8666579 (allegations that some graduates were improperly included in job placement statistics, although

---

[5] Plaintiff also argues in its response brief that the third-party report described in the FTC Complaint supports its allegations that the more-than-$40,000 element of the 90% Statement is false. (*See* Resp. Br. at 15-17; Geraci Decl., Ex. A, FTC Compl., ¶¶ 48-50.) But this argument is meritless. Based on the facts plaintiff has pleaded, there is no apparent connection between the third-party report and any element of the 90% Statement, nor did the FTC allege otherwise in the FTC Complaint; it cited the third-party report merely in connection with its claim that DVU's *higher-income claim*, *i.e.*, its claims that its graduates obtain jobs paying higher salaries than graduates of other institutions, was false. (Geraci Decl., Ex. A, FTC Compl., ¶¶ 48-50.) Defendants did not make that claim in their disclosures to their investors; rather, the statements they made to investors that plaintiff challenges in this lawsuit were all versions of the 90% Statement, and plaintiff appears to concede as much (Resp. Br. at 17-18).

their jobs were not related to their course of study, "do not explain why this made reported placement percentages false," and allegations that placement rate was lower than advertised at some campuses, but not nationwide, did not demonstrate "that any contemporaneous statement to the market was thereby rendered false"); *In re Career Educ. Corp. Sec. Litig.*, No. 03 C 8884, 2006 WL 999988, at *8 (N.D. Ill. Mar. 28, 2006) (allegations concerning six schools, when defendant operated "seventy-eight campuses world-wide," did not "raise an inference of fraud on a nation-wide level such that [defendant's] statements and omissions regarding its starts, student population, and job placement numbers nationally were false or misleading").

The statements of the Confidential Witnesses do not cure this deficiency in plaintiff's allegations. Even taking them at face value,[6] only CW3 provides particularized details that meaningfully corroborate the FTC's allegations of misclassification problems with the graduate employment statistics. But his experience was limited to two campuses in central California, and his statement does little to broaden the scope of the complaint's allegations to support the inference that the misclassification problems were so widespread and pervasive as to affect the accuracy of nationwide graduate employment statistics. Indeed, according to the complaint, CW3 recognizes that results at other campuses with which he is unfamiliar might "skew the averages higher." (2d Am. Compl. ¶ 255.)

But, while the Court must ensure that "the grounds for the plaintiff's suspicions . . . make the allegations plausible," it must also "remain sensitive to information asymmetries that may

---

[6] The value of allegations based on information from anonymous sources must be "discounted," *Higginbotham*, 495 F.3d at 757, but it need not be discounted to zero, particularly if the accounts of the confidential witnesses are set forth in "convincing detail" and the witnesses provide enough information about their jobs to demonstrate that they "were in a position to know at first hand the facts to which they are prepared to testify." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711-12 (7th Cir. 2008) ("*Tellabs II*") *on remand from Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). Generally, the Confidential Witnesses' accounts, particularly CW3's, are rendered in sufficient detail to afford them a degree of reliability.

prevent [plaintiff] from offering more detail" based only on its pre-complaint inquiry, which it conducts without the benefit of discovery. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011). Plaintiff's claim is based to some degree on the suggestion in the FTC Complaint and in other materials filed in the FTC case in the Central District of California, such as the parties' Joint Rule 26(f) Report, that DeVry has internal information that contradicts the 90% Statement. (*See, e.g.,* 2d Am. Compl. ¶ 215.)

Whether plaintiff identifies this information with sufficient particularity to survive defendants' motion to dismiss is a close question. *See Yourish v. Cal. Amplifier*, 191 F.3d 983, 995-96 (9th Cir. 1999) ("When one of the circumstances indicating falseness is the alleged existence of contemporaneous information inconsistent with a particular statement that was allegedly known only to the defendants, some detail about the alleged information, other than that its substance contradicted the substance of the identified statement, must be provided.") (citing *Arazie v. Mullane*, 2 F.3d 1456, 1466-67 (7th Cir. 1993)). The Joint Rule 26(f) Report identifies the evidence that the FTC intends to rely on only in broad categories of documents described only in vague terms, without any particulars about what information the documents contain other than that these documents support the FTC's allegation that the 90% Statement is false. (2d Am. Compl. ¶ 215.) But considering that the report appears to describe documents containing information that the DeVry entities alone possess and that the FTC was only able to obtain based on its Civil Investigative Demand, the Court "does not see how [plaintiff] would have been able to plead more facts pertaining" to the graduate employment statistics. *See Presser*, 836 F.3d at 778. Plaintiff has an articulable reason (namely, the allegations in the FTC Complaint combined with the disclosures made in the Joint Rule 26(f) Report in the FTC action) to suspect that the information showing the falsity of the 90% Statement exists in readily

available form, but unlike the FTC, plaintiff did not have any pre-complaint means of acquiring it. *See In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at *7 n.3 (N.D. Ill. Nov. 4, 1998) ("The fact that Plaintiffs do not have all of the specific documents to support their claims at this time is not fatal to their complaint [because] '[t]he actual contents of the books and records . . . are peculiarly within the Movants' knowledge and control'") (quoting *STI Classic Fund v. Bollinger Indus., Inc.,* No. 96-cv-823, 1996 WL 885802, at *2 (N.D. Tex. 1996)).

In the FTC action in the Central District of California, the DeVry entities moved to dismiss, and the court denied the motion. Although that was a significantly different legal and factual context, the following aspect of that court's reasoning is nevertheless persuasive in this case:

> It is true that the FTC was able to conduct substantial pre-filing discovery and is likely able to include additional factual information in the Complaint. But no authority requires the FTC to provide more specificity than is necessary under Rule 9(b). . . . By alleging why the actual employment rate is "significantly smaller than 90%" (Complaint ¶¶ 45-46), the FTC has done all that Rule 9(b) requires: it enabled Defendants to defend this action. Defendants can now go back to their records and recalculate the employment rate by (1) excluding graduates who continued with the jobs they had prior to attending DeVry University; (2) excluding graduates who were not employed in their field of study; and (3) including graduates who at least arguably were actively seeking post-graduation employment. If the calculation produces a number that is only marginally smaller than 90 percent, then Defendants could promptly move for summary judgment.

*FTC v. DeVry Educ. Grp., Inc.,* No. CV-16-00579, 2016 WL 6821112, at *6 (C.D. Cal. May 9, 2016); *Bankers Tr. Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992) (under Rule 9(b), plaintiff need not "plead facts showing that the representation is indeed false"). Similarly, this Court concludes that plaintiff has done just enough, by making the most diligent pre-complaint inquiry within its power and stating enough facts to "raise a reasonable expectation that discovery will reveal" additional evidence of falsity, *see Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 556 (2007), or alternatively, to permit defendants to quickly marshal evidence disproving plaintiff's allegations, to survive defendants' motion to dismiss for failure to allege material falsity.[7] *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1102 (10th Cir. 2003) ("The level of factual specificity required to meet [the PSLRA pleading] standard may put defendants on notice of precisely what they are alleged to have done wrong and permit them to defend against the charge."); *id.* at 1105 ("Although based on information and belief, [the complaint] alleges sufficient 'facts on which that belief is formed' to satisfy the pleading requirement of § 78u–4(b)(1) [because it] adequately puts the defendants on notice of the substance of the plaintiffs' claims, and the range, sources, and level of detail of the facts alleged demonstrate that this complaint is not frivolous or conclusory and deserves to proceed to the next stage of litigation."); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002) ("[T]he rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence[, and] Defendants' argument that even more detail be required, before there is any discovery, . . . amounts to requiring plaintiffs to plead evidence.").

## II.  SCIENTER

Plaintiff does not make allegations of direct evidence demonstrating that defendants actually knew that the 90% Statement was false, or knew of a substantial risk that it was false, at

---

[7] This Court recognizes that the California court's decision to deny the motion to dismiss the FTC Complaint—like several other decisions this Court has cited in Part I of this Opinion, including *Pirelli*, *Presser*, and *Arazie*—was based on the Rule 9(b) pleading standard, not the heightened PSLRA standard. However, both standards require pleading factual circumstances with "particularity" in order to permit a reasonable inference of fraud or deception.  *Compare* Rule 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.") *and U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014) ("The requirement of pleading fraud with particularity includes pleading facts that make the allegation of fraud plausible.") *with* 15 U.S.C. § 78u-4(b)(1)(B) ("[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.") *and Tellabs I*, 437 F.3d at 595 ("[T]he relevant question is whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." (internal quotation marks omitted)).  The standards are similar enough for cases decided under Rule 9(b) to be persuasive in determining whether plaintiff has sufficiently alleged the falsity of the challenged statements in this case.

the time they were making it to investors. Rather, plaintiff alleges that various facts circumstantially demonstrate that defendants must have either known that the 90% Statement was false, or recklessly disregarded a substantial risk that it was false.

Plaintiff divides its scienter allegations into four categories, which can be summarized as follows: (1) based on the results of the FTC investigation as the FTC described them in the complaint it filed in the Central District of California, there were "obvious red flags" (2d Am. Compl. ¶ 261) warning of a substantial risk that the 90% Statement was false, which defendants were at least reckless in disregarding during the class period (*id.* ¶¶ 261-67); (2) the statements of the Confidential Witnesses support a strong inference that defendants recklessly disregarded a substantial risk that the 90% Statement was false or misleading (*id.* ¶¶ 268-74); (3) the magnitude and duration of defendants' repetition of the 90% Statement support an inference of scienter because the Statement concerned a matter of critical importance to DVU's commercial viability, and defendants' use of the Statement resulted in a massive $100 million settlement with the FTC that required defendants to change their marketing tactics (*id.* ¶¶ 275-76); and (4) the initiation of the FTC's investigation approximately two years before the filing of the FTC Complaint supports an inference that defendants should have known of a substantial risk that the 90% Statement was false, at least after the investigation began (*id.* ¶ 277).

As a threshold matter, defendants argue that plaintiff has engaged in improper "group pleading" by failing to distinguish among the various defendants in its allegations of scienter, as if its allegations need only create a strong inference of scienter against any one of the defendants. As defendants argue, the Seventh Circuit has rejected the "group pleading doctrine, which is a judicial presumption that statements in group-published documents including annual reports and press releases are attributable to officers and directors who have day-to-day control or

involvement in regular company operations," *Tellabs II*, 513 F.3d at 710 (internal alterations omitted). Thus, plaintiff "must create a strong inference of scienter with respect to each individual defendant." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). Plaintiff responds that, while it is true that the Seventh Circuit has rejected group pleading, its allegations nevertheless create a strong inference of defendants' scienter based not only on their job titles but also on their particular "positions, experience, and knowledge about DVU's employment statistics," which were central to DVU's commercial viability and therefore a matter with which DVU executives were likely to concern themselves. *See Tellabs II*, 513 F.3d at 711 (CEO must have been knowledgeable about demand for his company's two major products). The Court will assume that plaintiff is correct that executives of the individual defendants' level had reason to make themselves at least generally knowledgeable about graduate employment statistics, and consider whether plaintiff's allegations of (a) the FTC investigation and matters described in the resulting FTC Complaint, (b) the issues described by the Confidential Witnesses, and (c) the magnitude and duration of defendants' alleged misrepresentations, taken together, are sufficient to support a strong inference that defendants knew of a substantial risk that the 90% Statement was false and recklessly disregarded it with intent to deceive. *See Higginbotham*, 495 F.3d at 756.

### A. "Obvious Red Flags" in FTC Complaint and FTC Investigation

Plaintiff alleges that, based on the allegations of the FTC Complaint, there were "obvious red flags that cast doubt on the advertised statistics," and the individual defendants' failure to investigate "reflects a gross indifference to the truthfulness" of the 90% Statement. (2d Am. Compl. ¶ 261.) Plaintiff reiterates the allegations of the FTC Complaint (*id.* ¶¶ 262-66), and alleges that, in the parties' Rule 26(f) report in the FTC action, defendant Gunst and David

Pauldine, who reported directly to defendant Hamburger (who made most of the challenged misrepresentations to investors personally), were listed as percipient witnesses (*id.* ¶ 267). Plaintiff alleges that defendants should have become aware of these red flags, at the latest, at some point during the FTC investigation, particularly considering that the magnitude of the substantial settlement underscores the seriousness of the matter. (*Id.* ¶ 277.)

First, the mere fact of the FTC investigation is not enough to put defendants on notice of the potential falsity of the 90% Statement. In *Pugh*, the Seventh Circuit took a dim view of the argument that a lawsuit and accompanying investigation provided defendants in a securities fraud case with sufficiently reliable notice of the likelihood that their statements were false or misleading:

> The plaintiffs . . . contend that, whatever the Tribune individual defendants knew prior to February 2004, the lawsuits filed . . . that month demonstrate actual knowledge of the fraud. This argument completely misses the boat. ***After the lawsuits were filed, the defendants had actual knowledge of accusations of fraud, not fraud itself. . . . As we explained in Higginbotham, "[t]aking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal."*** [495 F.3d] at 761. . . . [T]he complaint as a whole does not establish a strong inference of scienter as to the . . . individual defendants.

521 F.3d at 695 (emphasis added). At most, the FTC investigation put defendants on notice of "accusations" of falsity, not falsity itself, and the complaint contains no particularized allegations about when defendants learned of a substantial likelihood that the accusations were meritorious.[8]

As for the settlement, it came long after the class period had ended, so it provides no help to plaintiff with respect to notice of a risk of falsity that might support a strong inference of

---

[8] It is not even clear when defendants learned precisely what the accusations were. According to the complaint, DeVry disclosed on February 4, 2014, that it had recently received "a compulsory request from the FTC to provide documents and information relating to the advertising, marketing, or sale of secondary or postsecondary educational products" (2d Am. Compl. ¶ 129), but it is not clear whether defendants knew precisely what the FTC considered objectionable about its advertising or marketing practices, other than that they might be unfair or deceptive in violation of Section 5 of the FTC Act, or when they learned it.

scienter. Further, even if it had come before the end of the class period, the settlement did not contain an admission of wrongdoing, so even the settlement provides no insight into when or whether defendants learned enough to know that there was a serious risk that the 90% Statement was false. Indeed, although at this stage the Court assumes that the 90% Statement is false, there is little or no factual detail in the complaint weighing against an inference that, to this very day, defendants do not believe it. *Cf. Last Atlantis Capital LLC v. AGS Specialist Partners*, 533 F. Supp. 2d 828, 831-34 (N.D. Ill. 2008) (inference of scienter was at least as compelling and cogent as competing inferences against certain defendants who had settled regulatory matter by consenting to findings that they had violated certain SEC rules and related regulations, but *not* against other defendants against whom there were no consent orders or any other "specific regulatory findings" of wrongdoing). For all the particularized allegations of the complaint show, it is as likely that defendants settled the FTC action for "public relations" purposes as anything else.[9] *See Higginbotham*, 495 F.3d at 760 ("For all the complaint reveals, improving the financial controls . . . has been undertaken only as a public-relations measure, or to forestall future litigation, the cost of which easily can exceed the losses attributable to fraud."). Also, as the Seventh Circuit explained in *Higginbotham*, it is inappropriate to draw inferences against defendants based on "subsequent remedial measures" defendants may have taken, and the settlement with the FTC, with its conditions including reforming the way defendants keep track of data to support representations they might make about graduate employment outcomes, falls into that category. *See* 495 F.3d at 760 (citing Fed. R. Evid. 407); *see also Pugh*, 521 F.3d at 695 (citing *Higginbotham*).

---

[9] Alternatively, even assuming that defendants settled the FTC action because they had come to believe that the FTC's lawsuit was potentially meritorious, there were other issues involved in the FTC action besides the 90% Statement. For all the complaint shows, defendants could have decided to settle the FTC action because they worried about the potential falsity of DVU's higher-income claims, for example, rather than the 90% claims.

As for the substance of the investigation based on the allegations of the FTC Complaint, the Court fails to see which allegations revealed that that there were "obvious red flags" defendants should have noticed. What the FTC alleged, in relevant part,[10] was that, although defendants advertised that approximately 90% of graduates actively seeking employment obtained jobs in their fields of study within six months of graduation at a salary of approximately $40,000 or more, specific examples of misclassification showed that DVU was manipulating those statistics by (a) including graduates who should have been excluded because they were working outside their fields of study and (b) excluding graduates for not actively seeking employment, when in fact those graduates were diligently (if unsuccessfully) job-seeking. At most, the FTC alleged a few specific examples of misclassified graduates and suggested that it would later be able to prove there were enough other such graduates to render the 90% Statement false or misleading.

While these allegations were enough to survive the defendants' motion to dismiss the FTC Complaint in the Central District of California, they are not enough to "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). The FTC Complaint did not make any attempt to quantify the number of graduates who were misclassified. *See supra* at 14-15. Without any allegations of the precise or even approximate scope of the misclassification problems, the Court cannot infer that there must have been "obvious red flags" in DVU's process for tracking graduate employment data and calculating statistics that would have warned of nationwide problems, which distinguishes this case from

_____

[10] Again, plaintiff relies in part on the FTC allegations concerning the unreliable third-party report on how DVU graduates' incomes compared to those of other institutions, but as the Court explained above in note 5, plaintiff has not alleged facts connecting the third-party report to the 90% Statement and suggesting that defendants knew it was false; the FTC itself only alleged that the third-party report showed the falsity of DVU's higher-income claims, which, unlike the 90% claims, plaintiff does not allege defendants to have repeated to investors.

some of the cases plaintiff cites in support of its position. *Cf., e.g., Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) (inferring that defendants' false statements about company's 1995 financial results were made with scienter in part because the company's restated 1995 earnings were *91%* lower than originally reported). Nor did the FTC Complaint contain any allegations of specific facts indicating that knowledge of any likelihood of widespread manipulation of the employment statistics had filtered up to the individual defendants or spread throughout the company. This was no defect in the FTC Complaint because Rule 9(b) permits intent to be alleged generally—but under the heightened PSLRA pleading standard, scienter must be alleged with particularity.

The Supreme Court has directed courts evaluating whether a PSLRA plaintiff's allegations "give rise to a strong inference of scienter" to "take into account plausible opposing inferences" because "[t]he strength of an inference cannot be decided in a vacuum," and "[t]he inquiry is inherently comparative." *Tellabs*, 551 U.S. at 323 (internal quotation marks omitted); *see Tellabs II*, 513 F.3d at 711 ("The plausibility of an explanation depends on the plausibility of the alternative explanations."). In this case, the allegations of the FTC Complaint do not support a "strong" inference that defendants had scienter when they made the alleged misrepresentations to investors because, unlike in *Tellabs*, it is not "very hard to credit" the competing inference that defendants made the misrepresentations without intent to deceive or knowledge of a substantial risk of their falsity. *See Tellabs II*, 513 F.3d at 709; *see also id.* at 706-07 (summarizing facts of *Tellabs*). There are no particularized allegations shedding light on when, if ever, defendants should have known that the 90% Statement was or might be false, nor do the circumstances make the inference that defendants never drew that conclusion particularly implausible. The specific misconduct alleged (the misclassification of graduates as either employed-in-field or

24

non-job-seeking) is "diffuse," and while job placement may be a "vital" component of defendants' business, that is not sufficient to "create a strong inference that the defendants knew whether or how often its [Career Services employees] crossed the line" in misclassifying graduates. *See Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, No. 10 C 7031, 2012 WL 1030474, at *10 (N.D. Ill. Mar. 27, 2012) (internal quotation marks omitted) (declining to infer that DeVry's executives knew that its recruiters were being overly "aggressive" and sometimes "resort[ing] to deception" in order to meet management's enrollment expectations).

This case is like *Boca Raton*, not *Tellabs*, in which the plaintiff alleged that the company's biggest customer had significantly reduced its orders prior to the start of the class period and it was "exceedingly unlikely" that news of that potentially catastrophic development had not reached the CEO of the company. *See Tellabs II*, 513 F.3d at 709. The Court fails to see why it is particularly unlikely, in this case, that defendants never received information demonstrating how widespread the misclassification problems were, and therefore never knew that the 90% Statement was false. The Second Amended Complaint does not identify specific facts that should have put defendants on notice of misclassification problems so dire as to affect nationwide statistics. At most, the complaint gestures in vague terms at internal information to that effect, without describing it in sufficient detail to permit the Court to determine whether it supports a strong inference that defendants would have been able to put the puzzle pieces together. Based on such vague allegations, the Court cannot conclude that it is particularly unlikely that, despite the FTC's accusations to the contrary, defendants believed that the 90% Statement was true in reliance on the work of subordinates, without any knowledge of a substantial risk that the subordinates who collected the data or calculated the statistics were

doing their work improperly.  *Cf. id*; *see Boca Raton*, 2012 WL 1030474, at \*10 (distinguishing *Tellabs II* on similar grounds).

None of this is to say that the inference that defendants knew of a substantial risk that the 90% Statement is false is implausible or unreasonable—but the PSLRA requires more than plausibility or reasonableness.  *See Tellabs*, 551 U.S. at 323-24 ("[A] court must consider plausible, nonculpable explanations for the defendant's conduct . . . [and] the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations.").  In *Tellabs II*, the Seventh Circuit offered the following hypothetical to explain its reasoning:

> ***Suppose a person woke up one morning with a sharp pain in his abdomen. He thought it was due to a recent operation to remove his gall bladder, but realized it could equally well have been due to any number of other things. The inference that it was due to the operation could not be thought cogent.*** But suppose he went to a doctor who performed tests that ruled out any cause other than the operation or a duodenal ulcer and told the patient that he was 99 percent certain that it was the operation. . . .  Because in our abdominal-pain example all other inferences had been ruled out except the 1 percent one, the inference that the pain was due to the operation would be cogent. This case is similar. Because the alternative hypotheses—either a cascade of innocent mistakes, or acts of subordinate employees, either or both resulting in a series of false statements—are far less likely than the hypothesis of scienter at the corporate level at which the statements were approved, the latter hypothesis must be considered cogent.

513 F.3d at 710-11 (emphasis added).  This case is closer to the Seventh Circuit's hypothetical than to the circumstances of *Tellabs*.  An inference that defendants made misrepresentations to investors knowingly or recklessly might be plausible, but because plaintiff makes no specific factual allegations that provide a basis for concluding that that particular characterization of their misrepresentations is more or less likely to be correct than an innocent one, inferring that defendants made the misrepresentations with scienter requires a degree of speculation that the

PSLRA does not tolerate. Under these particular circumstances, the inference cannot "be thought cogent," rather than merely plausible. *See id.*

### B. Confidential Witness Allegations

Plaintiff argues that its allegations based on the statements of the Confidential Witnesses strengthen the inference of scienter by corroborating the allegations based on the FTC Complaint. But even taking the Confidential Witnesses' allegations at face value,[11] they do not support a strong inference of scienter. Some of the Confidential Witnesses vaguely allege that they had the sense that the practice of using graduate employment statistics in marketing and recruitment came from high levels of management (2d Am. Compl. ¶ 269), or that campus-specific job placement rates were "reported up the chain of command" (*id.* ¶ 273), or that graduate job placement data was available to defendants via internal databases such as "HireDeVry" (*id.*), but none of these allegations qualifies as "stat[ing] with *particularity* facts giving rise to a *strong inference* that the defendant acted" with knowledge of a substantial risk that the statistics were false. 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). The Confidential Witnesses may have "believed" that defendants were aware of certain data, or that they "had to be monitoring [the data] because the numbers were so important" to them and to the business, but an inference of scienter based on such allegations is "weak" at best, *see Boca Raton*, 2012 WL 1030474, at *10-11, at least where, as here, there are no circumstances making a competing inference "exceedingly unlikely," *Tellabs II*, 513 F.3d at 709. Additionally, "there is a big difference between knowing about the [statistics] and knowing that the [statistics] are false." *See Higginbotham*, 495 F.3d at 758; *Pugh*, 521 F.3d at 694 (citing *Higginbotham*); *Boca Raton*, 2012 WL 1030474, at *11 ("As for the . . . figures themselves, there is no indication in the complaint

---

[11] *See supra* n.6.

that they would raise a red flag about how they were generated.") (citing *Pugh* and *Higginbotham*).

No Confidential Witness makes particularized factual allegations supporting an inference that evidence of widespread misclassifications of graduates either as employed-in-field or non-job-seeking rose so far up the corporate chain of command as to reach defendants. Nor do the Confidential Witnesses' particularized, rather than merely vague or generalized, factual allegations add up to a sufficient basis for a strong inference that the misclassification problem was so pervasive and widespread, and that such a high volume of graduates were being misclassified, that defendants, as corporate executives, must have had knowledge of at least a substantial risk that the 90% Statement was false or misleading. A reasonable competing inference is that any complaints, data, or other information defendants received that might suggest that the employment statistics were misleading was too "diffuse" or, alternatively, too isolated to particular campuses (only CW3 provides specific allegations of misclassification), for any of the alleged problems to be apparent at the corporate level. *See Boca Raton*, 2012 WL 1030474, at *10-11. Even combining the allegations of the Confidential Witnesses with the allegations of the FTC Complaint, the inference that defendants knew of a substantial risk that the 90% Statement was false is not "cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324.

### C. Magnitude and Duration of Misrepresentations

Plaintiff argues that given the magnitude and duration of defendants' repetition of the 90% Statement, which was a central feature of their marketing going to the core of their operations, and which defendants repeated to investors dozens of times during the class period, it is highly unlikely that they were unaware of its falsity or at least a substantial risk of its falsity.

Plaintiff emphasizes both that the FTC alleged in its lawsuit that the number of employed graduates working in their field of study was "significantly," not slightly, "smaller than 90%," and the size of the settlement (over $100 million, with numerous other conditions attached) supports that allegation. "The more serious the error," plaintiff argues, "the less believable are defendants['] protests that they were completely unaware [that their statements were false] and the stronger is the inference that defendants must have known about the discrepancy." *See Rehm*, 954 F. Supp. at 1256.

But as the Court has already explained above in Part II.A, unlike in *Rehm* and like cases, the allegations of the Second Amended Complaint do not establish the magnitude of defendants' misrepresentations with any degree of specificity. Although the FTC Complaint vaguely alleged that the number of graduates working in their field of study was "significantly" smaller than the approximately 90% that defendants claimed, there were no particularized allegations there or here to shed any light on how large the discrepancy actually was—unlike in *Rehm*, when the defendant company restated its financial results to the tune of a 91% drop in earnings. Plaintiff's best case in this regard is *Ross v. Career Education Corp.*, No. 12 C 276, 2012 WL 5363431, at *8-9 (N.D. Ill. Oct. 30, 2012), but the Court agrees with defendants that *Ross*, "by comparison, underscores the weakness of plaintiff's own scienter allegations." (Reply Br. at 6, ECF No. 64.) *Ross* is broadly factually analogous, as it involved allegations of misrepresentations with respect to a for-profit educational institution's job placement rates, but there were stronger allegations of genuinely "widespread and pervasive" inflation of job placement rates, which were not only common knowledge throughout the company but had reached the notice of the CEO, who was even alleged to have complimented employees on it. *See id.* Additionally, in *Ross*, the company's "history of non-compliance" with respect to job placement reporting requirements,

the CEO's hiring specifically to remedy the problem, and his resignation just as results of an investigation into job placement statistics were to be announced all provided additional support for the inference of scienter that this case lacks. *See id.* at *9-11. Plaintiff's argument that its allegations create a strong inference of scienter based on the magnitude of the alleged misrepresentations is unpersuasive.

As for duration, the fact that defendants made the 90% Statement many times over a period of several years provides no support for any inference of scienter if they never had reason to suspect that it was false, and as the Court has explained above, the allegations do not support a strong inference that defendants must have known of a substantial risk that the 90% Statement was false.

<u>**CONCLUSION**</u>

For the reasons set forth above, the Court grants defendant's motion to dismiss [58]. The complaint is dismissed without prejudice. Plaintiff may file an amended complaint by January 15, 2018.

**SO ORDERED.**                                      **ENTERED:** December 6, 2017

_____
**HON. JORGE L. ALONSO**
**United States District Judge**