# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **PENSION TRUST FUND FOR OPERATING ENGINEERS, Individually and on Behalf of All Others Similarly Situated,** | **Case No. 1:16-CV-05198** <br> **Hon. Jorge L. Alonso** |
| **Plaintiff,** | |
| **v.** | **JURY TRIAL DEMANDED** |
| **DEVRY EDUCATION GROUP, INC., DANIEL HAMBURGER, RICHARD M. GUNST, PATRICK J. UNZICKER, AND TIMOTHY J. WIGGINS,** | **ECF CASE** |
| **Defendants.** | |

# THIRD AMENDED CLASS ACTION COMPLAINT
# FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I. BRIEF SUMMARY ........................................................................................... 1

II. BRIEF SUMMARY OF PLAINTIFFS' INVESTIGATION ............................................. 4

III. THE NATURE OF THE ACTION...................................................................... 11

    A. DeVry's 90% Representation Was False and Misleading .................................... 19

    B. DeVry's Executives Either Knew the 90% Representation was False or
    Made the Representation with Reckless Disregard for the Truth ......................... 21

        1. Investigations and Settlements with Government Entities ...................... 21

        2. Internal Documents Produced by the Government Show
        Defendants Had Knowledge the Statistics Were False, or Were
        Severely Reckless ................................................................... 24

        3. Defendants' Public Statements Show They Were Knowledgeable
        About Regulators' Allegations ................................................. 26

        4. Information Provided by Confidential Witnesses Creates a Strong
        Inference of Knowledge or Severe Recklessness ..................................... 27

    C. Post-Class Period Events Provide Even Further Evidence that Defendants'
    Fraudulent Practices Pervaded the Company ....................................... 35

IV. JURISDICTION AND VENUE ........................................................................ 36

V. THE PARTIES ........................................................................................... 36

    A. Lead Plaintiff ................................................................................... 36

    B. Defendants ...................................................................................... 37

VI. THE FRAUD PERPETRATED BY DEFENDANTS.................................................. 41

    A. Defendants Hamburger, Wiggins, Unzicker, and Gunst Misrepresented
    and Concealed the Actual DeVry University Student Outcome Statistics ........... 41

        1. DeVry's Misleading SEC Filings and Public Announcements Tout
        the Success of Graduates to Attract Students and Grow Revenue
        and Earnings Per Share ........................................................... 44

        2. Defendants' Use of Misleading Academic Annual Reports ..................... 98

B.      Securities Analysts Following DeVry Recognized the Significance of DeVry's Job Placement Rates and Higher Salary Claims and Its Correlation to Revenue Generation and Growth Potential ................................. 102

VII.    THE TRUTH EMERGES ........................................................................ 108

A.      The FTC Lawsuit ........................................................................ 110

B.      The DoE Action ........................................................................ 120

C.      The Devastating Results On DeVry's Stock from these Disclosures ................. 127

D.      After the Class Period, DeVry Settles the FTC Lawsuit for $100 Million and Reforms to Prevent the Company from Further Touting Misleading Student Outcome Data ........................................................................ 129

E.      Additional Revelations Following Investigations and Settlements with New York and Massachusetts Provides Additional Evidence that the Fraudulent Conduct was Pervasive Across the Company ................................. 134

VIII.   CONFIDENTIAL WITNESSES FURTHER EXPLAIN HOW DEVRY MISLED THE PUBLIC ........................................................................ 136

IX.     SCIENTER ALLEGATIONS ........................................................................ 163

X.      MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........................................................................ 178

A.      Materially False and Misleading Statements and Omissions in the 2011 AR and 2011 10-K ........................................................................ 179

B.      Materially False and Misleading Statements and Omissions in the 1Q 2012 Press Release and Earnings Conference Call ........................................ 181

C.      Materially False and Misleading Statements and Omissions in the 3Q 2012 Earnings Conference Call ........................................................................ 183

D.      Materially False and Misleading Statements and Omissions in the 2012 AR and 10-K ........................................................................ 184

E.      Materially False and Misleading Statements and Omissions in the 1Q 2013 Press Release and Earnings Conference Call ........................................ 185

F.      Materially False and Misleading Statements and Omissions in the 2Q 2013 Earnings Conference Call ........................................................................ 187

G.      Materially False and Misleading Statements and Omissions at the Robert W. Baird and Co. Business Solutions Conference ................................. 189

ii

H.      Materially False and Misleading Statements and Omissions at the Credit Suisse 15th Annual Global Services Conference .................................................. 190

I.      Materially False and Misleading Statements and Omissions in the 3Q 2013 Press Release and Earnings Conference Call ........................................................ 192

J.      Materially False and Misleading Statements and Omissions at the William Blair Growth Stock Conference .......................................................................... 194

K.      Materially False and Misleading Statements and Omissions in the 4Q 2013 Press Release and Earnings Conference Call ........................................................ 196

L.      Materially False and Misleading Statements and Omissions in the 2013 AR and 10-K .......................................................................................................... 198

M.      Materially False and Misleading Statements and Omissions at the Robert W. Baird & Co. Inc. Growth Stock Conference .................................................. 199

N.      Materially False and Misleading Statements and Omissions at the William Blair & Company LLC Growth Stock Conference ............................................. 201

O.      Materially False and Misleading Statements and Omissions in the 4Q 2014 Press Release and Earnings Conference Call ........................................................ 202

P.      Materially False and Misleading Statements and Omissions in the 2014 AR and 10-K .......................................................................................................... 204

Q.      Materially False and Misleading Statements and Omissions at the BMO Capital Markets Back to School Education Conference ..................................... 207

R.      Materially False and Misleading Statements and Omissions at the J.P. Morgan Ultimate Services Investor Conference .................................................. 209

S.      Materially False and Misleading Statements and Omissions at the Robert W. Baird & Co. Inc.'s Growth Stock Conference ............................................... 210

T.      Materially False and Misleading Statements and Omissions in the 2015 AR and 10-K .......................................................................................................... 212

U.      Defendants' False and Misleading SOX Certifications ..................................... 214

XI.      LOSS CAUSATION ................................................................................................ 216

XII.      THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .......................... 217

XIII.      THE PRESUMPTION OF RELIANCE .................................................................. 218

XIV.      CLASS ACTION ALLEGATIONS ......................................................................... 219

XV.     CAUSES OF ACTION ................................................................................................ 222

        COUNT I

        VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE
        10b-5 PROMULGATED THEREUNDER
        (Against Defendant DeVry And The Individual Defendants) ........................................ 222

        COUNT II

        FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
        (Against Defendants Hamburger, Unzicker, Wiggins, and Gunst) ................................ 227

XVI.    PRAYER FOR RELIEF ............................................................................................... 228

XVII.   JURY DEMAND ......................................................................................................... 229

Court-appointed Lead Plaintiff Utah Retirement Systems ("Lead Plaintiff"), individually and on behalf of all persons or entities similarly situated, alleges the following based on personal knowledge as to itself and its own acts, and information and belief as to all other matters.

## I.     BRIEF SUMMARY

Lead Plaintiff in this class action securities fraud dispute alleges that DeVry Education Group Inc. ("DeVry" or the "Company") Daniel Hamburger, Richard M. Gunst, Patrick J. Unzicker, and Timothy Wiggins (the "Individual Defendants," and together, the "Defendants") made false statements to investors about the job placement and salary outcomes achieved by its students after graduation.  Specifically, Lead Plaintiff alleges that over a five year period—from August 26, 2011 and January 27, 2016—the Defendants repeatedly claimed that 90% of their students obtained jobs in their field of study within six months of graduation making salaries of around $40,000.  These metrics were critical to DeVry's investors who viewed superior outcomes as a sign of DeVry's financial health and stability.

But as four separate government agencies have concluded—and as numerous former employees of DeVry corroborate—these employment outcomes were false.  They were false because DeVry maintained a corporate policy of both artificially excluding (or "waiving") students from the statistic who should have been counted, and artificially including students in the statistic who should not have been counted.

Notably, the four government agencies that investigated DeVry— (1) the Federal Trade Commission ("FTC"), (2) Department of Education ("DoE"); (3) New York Attorney General's Office ("NY AG"), and (4) the Massachusetts Attorney General's Office ("Massachusetts AG")—*all* conducted extensive discovery, and *based on DeVry's own internal documents*, arrived at the same conclusion: that DeVry misled the public about its employment outcomes. For example, the Massachusetts AG publicly announced that it found certain DeVry programs

had job placement rates as low as 52 percent, well below the 90% the Company publicly touted. Each agency also entered into settlements with DeVry concerning the 90% misrepresentation, with the FTC settlement totaling $100 million.

Through its investigation, Lead Plaintiff has also uncovered significant evidence corroborating the results of these government investigations—namely, that the statements made to investors and the public concerning employment outcomes were false, and that the Individual Defendants either knew these statements were false, or acted with reckless disregard for the truth. Lead Plaintiff's investigation included (1) interviews with numerous former employees of DeVry (twenty of whose accounts are included in the Third Amended Complaint), and (2) a review of documents produced by the FTC and DOE regarding their investigations into DeVry, pursuant to Lead Plaintiff's Freedom of Information Act ("FOIA") requests. This evidence is briefly summarized below.

First, twenty different Confidential Witnesses ("CWs") from across the Country provided information showing that DeVry's career services practices were uniform across its organization, and in fact originated *from DeVry's corporate office*. For example, one Confidential Witness explained that DeVry's corporate office directed him[1] and his staff to alter starting wage information for graduates who had obtained jobs. A number of these Confidential Witnesses also specifically placed Daniel Hamburger and other Individual Defendants in meetings during the Class Period[2] during which they discussed DeVry's employment statistics, the FTC investigation, and the DoE investigation. *Most damning to DeVry, and in particular to Defendant Hamburger,* a high-level Confidential Witness reported that in 2014 (during the Class Period) he discovered that DeVry University did not have the data to back up the 90%

---

[1] All CWs will be described in the masculine to protect their identities.

[2] The term "Class Period" is defined in Section III herein.

representation, and that he reported this fact to an in-house attorney who worked in DeVry's corporate compliance department. During this meeting, the witness informed the in-house attorney that there was no data to substantiate DeVry's job placement rates and the 90% representation. The Confidential Witness was promptly fired as result of this meeting and was also told by his boss that CEO Daniel Hamburger had been told of his actions.

Second, the documents obtained pursuant to Lead Plaintiff's FOIA requests corroborate what former employees conveyed to Lead Plaintiffs. Documents obtained from the DoE reveal the agency's conclusion, supported by evidence, that DeVry acted in bad faith with respect to the 90% misrepresentation. After receiving thousands of documents from DeVry, the DoE concluded that: ***"this was not an isolated instance, but part of a pattern whereby DeVry either intentionally or through wanton negligence avoided clear statutory and regulatory requirements."[3]*** (internal citations omitted)[4]. The DoE's pleadings cite specific evidence in support:

- **"DeVry continued to make the Representation in advertisements even *after* DeVry staff and others raised questions about DeVry's ability to substantiate the claim. For example, an internal presentation in 2008 on the efficacy of the *Careers* campaign posed questions about the sources of the Representation in seeking to establish the 'truth behind' the claim and whether it could 'substantiate' the 90 percent figure"** (emphasis in original).

- "[I]n February 2009, DeVry President David Pauldine posited, in an email sent on his behalf, whether DeVry should 'be looking at *alternative* messaging such that it brings the ultimate *credibility* to our employment claims.'"

- **"And in November 2009, staff at an advertisement agency used by DeVry, Leo Burnett USA, questioned certain details of the Representation. In response, DeVry's 'Senior Consumer Insights Specialist' dismissed the concerns by affirming a response that DeVry had 'dug into these numbers 8 ways to Sunday, and there is no other clear, compelling, and compliant story.'"**

---

[3] *See* Opening Brief of Federal Student Aid, *In re DeVry University*, Federal Student Aid Proceeding Docket No. 16-07-O (produced to Lead Plaintiff by the DoE pursuant to the FOIA Request)

[4] All emphases herein are added unless noted otherwise.

- "DeVry made statements in response to the Substantiation Request that lacked credibility. Specifically, although DeVry claimed to have ceased making the Representation no later than January 2014, this was not true. DeVry's failure to act with candor during the investigation violated its fiduciary duty to the Department." (internal citations omitted).

The fact that the DoE found that DeVry acted in bad faith with respect to the 90% representation contributes substantially to the inference that Defendants knew or show have known that the 90% representation was false.

Additionally, internal charts produced by the FTC to Lead Plaintiff through a FOIA request show that the "executive officers" of DeVry—defined to include DeVry's "Chief Executive Officer," "Chairman," and "Chief Financial Officer," among others—were designated as custodians who agreed produce documents to the FTC on a range of topics including: "emails. . . which relate to completion rates, job placement rates, [and] students' pre-graduation or post-graduation income amounts"; documents concerning "minimum placement rates" reported to government agencies; and "issues raised by consumer complaints." These internal records coupled with the FTC's ultimate allegations create an inference that documentary evidence exists showing that the Individual Defendants knew about the fraud.

Thus, there is significant evidence establishing that (i) the statements made to investors regarding employment outcomes were false, and (ii) there is a strong inference that the Individual Defendants were either aware the statistics they were touting were false, or recklessly disregarded fraudulent practices that pervaded the Company.

## II. BRIEF SUMMARY OF PLAINTIFFS' INVESTIGATION

Lead Plaintiffs' allegations that are unrelated to Lead Plaintiffs' own acts are based upon an investigation conducted by and through Lead Plaintiff's attorneys. The investigation included a review of, among other things: (i) DeVry's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) research reports by securities and financial analysts; (iii)

4

transcripts of DeVry's earnings conference calls; (iv) publicly available presentations by DeVry; (v) DeVry's press releases and media reports; (vi) economic analyses of the movement and pricing data associated with DeVry's common stock; (vii) consultations with relevant consultants and experts; (viii) information obtained from former DeVry employees throughout the course of counsel's investigation; and, (ix) other publicly available material and data identified herein.

Lead Plaintiff's allegations are also based on the investigation and resolution of the lawsuit filed by the FTC in which DeVry and DeVry University agreed to pay $100 million and implement several remedial measures to resolve allegations concerning the false representation of employment statistics in DeVry's advertising and marketing materials. The FTC launched its probe on January 28, 2014, when it issued a Civil Investigative Demand ("CID") to DeVry seeking documents and information concerning DeVry's advertising, marketing, or sale of secondary or postsecondary education products or services, or education accreditation products or services. After a two-year investigation which yielded more than 2.3 million pages of documents and responses to approximately 64 comprehensive interrogatories from DeVry, and an additional trove of documents and information from third parties, the FTC filed a lawsuit against DeVry charging that DeVry University's much-touted graduate employment and salary statistics were either false or unsubstantiated.[5] Lead Plaintiff's allegations concerning the FTC's actions are also based, on documents that Plaintiff's counsel received from the FTC, pursuant to a FOIA request, concerning the scope of discovery gathered by the agency.

On December 15, 2016, the FTC and DeVry announced that DeVry and DeVry University had agreed to a $100 million settlement to resolve the FTC lawsuit. Also on that day, the FTC and DeVry filed a Stipulation as to Entry of Order for Permanent Injunction and

---

[5] *See FTC v. DeVry Educ. Grp. Inc., et al.*, No. 16-CV-579-MWF-SS (C.D. Cal.).

Monetary Judgment and proposed order, which was signed by Judge Michael W. Fitzgerald of the Central District of California on December 19, 2016 (collectively, the "FTC Settlement Stipulation and Order"). As described in more detail below, under the terms of the settlement, DeVry agreed to pay $49.4 million to be distributed to qualifying students and $50.6 million in loan forgiveness for unpaid student loans and other student debt for certain former students. According to the FTC, the settlement also includes, among other things, "provisions designed to prevent DeVry from misleading consumers in the future."

Lead Plaintiff's allegations are similarly based upon information gleaned from the investigation and resolution of claims by the DoE and internal documents produced by the DoE to Lead Plaintiff concerning its dispute with DeVry. On August 28, 2015, the Multi-Regional and Foreign School Participation Division of the Federal Student Aid Office of the DoE served on DeVry a request for documents and information regarding published employment outcomes and relative earnings information of DeVry University graduates. Much like the FTC, on January 27, 2016, the DoE publicly issued to DeVry a Notice of Intent to Limit (the "Notice of Intent"), informing DeVry University of the DoE's intention to impose certain limitations on the participation of DeVry University in programs authorized pursuant to Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070, *et seq.* ("Title IV") as a result of the school's failure to substantiate certain of its advertised graduate employment and salary statistics. Later that year, on October 13, 2016, the DoE announced that it had entered into a settlement (the "DoE Settlement") resolving the dispute. Under the terms of the settlement, which Lead Plaintiff obtained pursuant to a FOIA request to the DoE, DeVry agreed to, among other things, (1) "immediately cease" making the claim that "since 1975, 90% (or some close variation thereof) of [DeVry] graduates system-wide in the active job market were employed in career-related

6

positions within six months of graduation"; (2) "possess and maintain graduate-specific data to substantiate such representations and will make such graduate specific data available to the [DoE] upon request"; (3) "engage a qualified, independent third-party … to review the records and information related to [DeVry] graduates from January 2017 and beyond …."; (4) post a notice on its website explaining that DeVry cannot substantiate the representation that "since 1975, 90% of DeVry graduates system-wide in the active job market held positions in their fields of study within six months of graduation."; and (5) post a letter of credit for the benefit of the DoE in the amount of $68,435,908.

Lead Plaintiff's allegations are further based on interviews with Confidential Witnesses—former employees of DeVry or DeVry University from across the country—who have knowledge of the relevant aspects of the Company's operations, including:

- CW1, an Admissions Advisor for DeVry University's online programs from August 2011 to November 2012 in Chicago, Illinois, who was responsible for recruiting students throughout the United States. CW1 recalled that he was given a script that he was required to read to prospective students. The script required him to tell prospective students that "they would have a job after six months," and included claims about the 90% job placement rate.

- CW2, a Regional Marketing Director of DeVry's Northeast region from September 2008 to August 2013, who was in charge of marketing efforts in that region, which included New York City. CW2 worked on physical advertisement campaigns as well as social media efforts. He reported to the National Marketing Director. CW2 said that the specific language about job placement rates that he was required to use had been reviewed and approved by DeVry's legal and compliance department, and that the Company kept a repository of approved language for use by the marketing department.

- CW3, an Associate Director of Career Services at DeVry University's Fresno and Bakersfield, California Campuses from January 2013 to January 2014, who worked directly with graduates to assist them in job placement. Because of this, CW3 was familiar with how many graduates obtained jobs as well as the types of jobs they obtained. CW3 was also familiar with the school's process for determining job placement rates and its policies that determined which students would be counted in those statistics. When asked if other DeVry campuses had a similar process for deeming students non-job seeking and not including them in the job placement statistics, CW3 said that the process was the "same" for every DeVry campus; the only difference was when a campus chose to implement the process. CW3 added that the "directive" on how to designate a student as non-job seeking came directly from DeVry's corporate office

7

- CW4, a National Admissions Advisor for DeVry University's online programs from 2007 to 2011 in Chicago, Illinois, who was responsible for speaking directly to prospective students and encouraging them to attend DeVry. He reported to the Assistant Director of Admissions. CW4 indicated that he and other admissions advisors were aware that the 90% job placement claim did not include all students. CW 4 stated that the encouragement to use the 90% claim "came down from the top," noting that "[o]ur managers told us, but their managers told them."

- CW5, an online Graduate Career Advisor for DeVry's Keller School of Management from January 2011 to December 2012, based in Naperville, Illinois, who was responsible for making calls to graduates who were within six months of graduation in order to obtain and review their resumes and cover letters and provide feedback. CW5 recalled waiving a significant number of graduates for various reasons based on DeVry's policies.

- CW6, who was an Associate Dean at DeVry University's College of Engineering and Information Services in Irving, Texas, from July 2009 to July 2015. In July 2014, CW6's job title changed to Faculty Program Chair but his responsibilities remained the same. When he was named Faculty Program Chair in 2014, he began reporting to the Assistant Dean of Academic Affairs. CW6 stated that campus-specific job placement rates of DeVry University graduates were reported up the chain of command within the Company, but added that DeVry's corporate policy prohibited DeVry employees from releasing campus-specific job placement rates to the public.

- CW7, the Campus Director and then President of DeVry University's Fresno and Bakersfield, California campuses from January 2009 to May 2016. He last reported to the Northwest Group President and, prior to that, reported to the Group Vice President. CW7 confirmed that DeVry had a written national policy that described the process and rules for which students were included in or excluded from DeVry University's job placement statistics.

- CW8, a Senior Director of Academic Effectiveness for DeVry from September 2013 to March 2014. He was based in Downers Grove, IL and reported to a Vice President at DeVry's Chamberlain College of Nursing, who reported to Susan Groenwald, the President of the Chamberlain College of Nursing, who reported to CEO Daniel Hamburger. CW8 was able to confirm that the numbers DeVry was producing and generating for the SEC reports were not accurate. He also reported this information to an in-house attorney at DeVry; was fired as a result; and was informed that Hamburger was made aware of his meeting with the in-house attorney.

- CW9, the Director of the Office of Institutional Effectiveness at DeVry's headquarters in Downers Grove, Illinois from March 2014 to August 2015. CW9 reported to CW8, who, according to CW9, was dismissed unexpectedly shortly after CW9's arrival. DeVry's Office of Institutional Effectiveness was created with the goal of creating a system to evaluate the effectiveness of curriculum at all the Chamberlain College of Nursing campuses. CW9 reported that DeVry didn't have the data available to calculate the 90% employment statistic.

- CW10, a Graduate Career Services Advisor at DeVry's Naperville, IL, online center from 2010 to March 2016. He reported to Manager of DeVry Natalie Pavon, and later to Assistant Dean Jillian Owens. As a Graduate Career Services Advisor and Recruiter for DeVry, CW10 helped recent graduates search for jobs. CW10 further discussed how, in response to regulatory scrutiny in 2010, DeVry began working to discover which students were actually finding work in their chosen fields.

- CW11, an Admissions Representative at DeVry's Naperville, Illinois online center and later Associate Director of Admissions for DeVry's Online Division in Chicago, Illinois. During his tenure, DeVry's Online Division had offices in Chicago, Phoenix and Orlando. CW11 worked for DeVry as an Admissions Representative at DeVry's Naperville, Illinois online center from April 2007 to January 2009. He was promoted to Associate Director of Admissions in April 2009 where he remained until leaving the Company in September 2015. CW11 reported to the Director of Online Admissions in Chicago, Elise Awwad, and managed a team of about 15 Admissions Representatives. He discussed how his subordinates could be fired for not reciting the 90% statistic to prospective students.

- CW12, the Director of Career Services for DeVry's Carrington College in Boise from August 2013 to February 2017. CW12 reported to a woman named Sheryl, and later to a man named Scott. As Director of Career Services, CW12 was responsible for tracking career metrics including placement rates and salaries at Carrington. According to CW12, prior to the FTC investigation, the company was very loose about the way it calculated and tracked post-graduation metrics.

- CW13, the Associate Director of DeVry University in Elk Grove, California from 2009 to 2013. He also worked for DeVry's Carrington College in Boise, Idaho from 2013 to 2014. While in Elk Grove, CW13 reported to the Campus President Marcellus Inglesias, then to Mary Cole. According to CW13, DeVry's claim that 90% of DeVry graduates were employed in their field within six months of graduation only reflected graduates who were eligible for work. In other words, DeVry allowed students to be written off if they were not actively looking for employment or moved out of state, among other reasons.

- CW14, who worked to open the career services offices at two new campuses in the Tampa, Florida area and was the Associate Director of Career Services in Tampa from March 2010 to July 2012. He then moved to Washington D.C., where he worked as Senior Career Services Liaison for DeVry from July 2012 to May 2016. CW14 confirmed that there were codes within the HireDevry system which allowed students to be designated "non-job seeking" and thus waived from inclusion in DeVry's employment statistics.

- CW15, who was employed by DeVry and Carrington College from February 2009 to January 2017. He first worked as DeVry's Metro President in the Phoenix market from 2009 to 2014, then as Senior Director of Operations for Carrington College from 2014 to 2017. CW15 had direct contact with Daniel Hamburger. CW15 believed Hamburger likely approved that advertising 90% advertising because it was very provocative advertising.

- CW16, who worked at DeVry as an Executive Assistant for almost seven years. He first worked in the Student Affairs Department; then for Career Services executives; and in

November 2013, moved to DeVry's Becker Professional Education business unit, where he remained until the end of his tenure. While working for DeVry's Career Services Department, CW16 was an Executive Assistant for Madeleine Slutsky, DeVry's Vice President of Career and Student Services. He recalled that in 2013, he was instructed by Slutsky to find every marketing document that quoted the 90% rate. It was CW16's understanding that Slutsky was working with Pat Duncan, the Director of Regulatory Compliance, to identify every single document which had 90% verbiage.

- CW17, who worked in the Career Services Office at DeVry's Phoenix, Arizona Campus from 2014 to 2017. CW17 was responsible for advising and helping DeVry graduates find jobs. CW17 reported to the Director of Career Services, Deena Handler. CW17 explained that every student at DeVry was automatically opted-in for career services following their graduation from DeVry, however, CW17 explained that graduates could opt-out of career services assistance and that DeVry had "waive" codes in HireDevry (so their statistics would not be included in the placement rate). CW17 also recounted that the "this is how we code" directives came from DeVry's corporate office.

- CW18, who worked as Senior Director of Admissions at DeVry University from 1993 to 2012. Based in Chicago, Illinois, he was responsible for the Chicago, Addison, and Tinley Park campuses. He reported to Chicago Metro-area Dean of Enrollment Management Christine Hierl and later to Vice President of Admissions Virginia Mechnig. CW18 attended meeting with Hamburger where the 90% enrollment rate was discussed.

- CW19, who was employed by DeVry as Vice President of Business Services/Operations from August 2009 to July 2016. He worked out of both the Oak Brook and Downers Grove (corporate headquarters) locations in Illinois. CW19 reported directly to the Chief Information Officer Chris Nash, who reported to CEO Daniel Hamburger. According to CW19, DeVry student graduate employment metrics was a topic of discussion in meetings he attended. These meetings included Quarterly Leadership Meetings, in which graduate employment metrics were discussed. CW19 also reported that CEO Daniel Hamburger, CFO Daniel Wiggins, CFO Richard Gunst (Wiggins's predecessor), and CAO Patrick Unzicker all participated regularly in Quarterly Leadership Meetings.

- CW20, who served as Vice President of Academic Affairs and Chief Academic Officer for Chamberlain College of Nursing from July 2011 to June 2017. CW20 was primarily based in Downers Grove, Illinois, at DeVry Education Group's headquarters. He reported to Chamberlain College President Susan Groenwald, who reported to DeVry Education Group CEO Daniel Hamburger. During his tenure as the Vice President of Academic Affairs and Chief Academic Officer, CW20 oversaw the academic curriculum for the nursing programs. He spent most of his time in meetings with people at corporate related to various academic matters. CW20 participated in meetings with Hamburger during which issues related to job placement and accreditation at DeVry were discussed.

Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth in this Third Amended Complaint after a reasonable opportunity for discovery.

## III.    THE NATURE OF THE ACTION

1.    Lead Plaintiff brings this federal securities class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j and 78t(a), on behalf a Class consisting of all persons and entities who purchased or otherwise acquired DeVry publicly traded common stock during the period from August 26, 2011 through January 27, 2016, inclusive, (the "Class Period") and who were damaged thereby.  Excluded from the Class are: Defendants; DeVry's affiliates and subsidiaries, including DeVry's employee retirement and/or benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); the officers and directors of DeVry and its subsidiaries and affiliates during the Class Period; members of the immediate family of any excluded person; any entity in which any excluded person or entity has or had a controlling interest; and the heirs, successors, and assigns of any excluded person or entity.

2.    Lead Plaintiff alleges that Defendants—DeVry and certain of its officer and Directors—executed a scheme whereby they disseminated materially false and misleading information and omitted other material information that artificially inflated DeVry's stock price, causing damage to Lead Plaintiff and the Class.

3.    DeVry provides educational services globally through a number of subsidiaries, including DeVry University—one of the largest postsecondary educational institutions in the United States with undergraduate and graduate degrees offered on campus and online.  Through its five colleges, DeVry University offers programs in healthcare, business, technology, accounting, and finance.

11

4.     There is no question that DeVry University was a core DeVry asset during the Class Period, accounting for more than half of the Company's revenues through fiscal year 2013. Indeed, even when enrollment at DeVry University was flagging during the latter portion of the Class Period, it still accounted for over $900 million in revenue (or more than 48% of DeVry's total revenues) in fiscal year 2014 and nearly $800 million in revenue (or more than 41% of total revenues) in fiscal year 2015.

5.     DeVry's chief source of revenue is the tuition it collects from students enrolled in its schools.  Thus, generally speaking, since tuition makes up the bulk of DeVry's revenues, DeVry grows its revenues by increasing and maintaining student enrollments at its schools. However, many of its schools, including DeVry University, operate in highly fragmented markets and are subject to fierce competition with not only other for-profit postsecondary schools, but also state institutions, community colleges, and independent universities, among others.  DeVry has thus historically needed a way to differentiate DeVry University, and in turn lure new students and retain currently enrolled students, in order to boost revenues and profits.

6.     As such, to compete in this environment and drive student growth at DeVry University, Defendants conducted a sustained marketing scheme through television, radio, print, and internet channels pushing the message that roughly 90% of DeVry University's graduates obtain employment in their field of study within six months of graduation at average salaries somewhere in the low-to-mid-$40,000 range.  This marketing scheme was highly effective and eventually caught the attention of the FTC and DoE.  As CW1 suggested, the job placement and higher income claims were powerful statements in recruiting students.  Defendants also used DeVry University's job placement and salary statistics (also referred to as "student outcomes") to portray DeVry to securities analysts and investors as a high-quality company with the potential to

grow revenues and earnings. Securities analysts and investors looked to these student outcomes as a critical component in evaluating DeVry's earnings potential.

7. However, unbeknownst to securities analysts, investors, and students (but as confirmed by numerous former DeVry employees who are confidential witnesses herein) the job placement and salary statistics were fiction. Indeed, CW8, a high level former employee at DeVry—just 2 reporting levels from CEO Hamburger—stated that, "the numbers DeVry was producing and generating for the SEC reports were just not accurate."

8. Among the many examples of Defendants' publicly disseminated false statements concerning student outcomes, on August 26, 2011, DeVry released its 2011 Annual Report, which boasted that **"*[e]ven in this year's challenging job market, 89 percent of our graduates had jobs in their fields with an average salary of more than $43,000*."** Similarly, on October 25, 2012, DeVry issued a press release for its 1Q 2013 financial results that contained misrepresentations about DeVry University's student outcome statistics as well as a chart which represented that for the 85.7% of DeVry University graduates who were employed, the average salary was $42,623. Yet again, on March 13, 2013, Defendant Daniel Hamburger participated in and presented at the Credit Suisse 15th Annual Global Services Conference wherein he emphasized:

> Well, ***the other measure of quality is successful student outcomes***. . . . At DeVry University, ***nearly 86% of our graduates in the active job market were employed in their field of study within 6 months of graduation. And these graduates earned an average salary of over $43,000***. So that's a marker of academic quality.
>
> \* \* \*
>
> One question that we've asked is how do we compete? How does DeVry compete? What is it that attracts students to our institutions in this competitive environment that's out there in higher education? We refer to it as HIRE Education. It's spelled a little

> bit differently, H-I-R-E. . . . [T]he E, incredible employment
> outcomes like the ***86% employed [at] $43,000*** that I referenced
> earlier [at] DeVry University.

9. Even when Defendants acknowledged that certain business segments, particularly DeVry University, faced difficulties and economic headwinds, they did so inadequately and propped up the fiction that DeVry's financial position would improve because of its marketing of student employment outcomes. For instance, in his "Fellow Owners, Students, Colleagues and Friends Letter" in the Company's 2012 Annual Report, Defendant Hamburger stated that even though DeVry's 'financial outcomes in 2012 were not what we wanted, our student outcomes were—and our investments in quality and capacity mean that we are poised to transition to recovery and growth in our enrollments and financial results." Likewise, on April 23, 2013, the Company issued a press release announcing its 3Q 2013 financial results, emphasizing that the Company's "plan to improve enrollment results includes enhancing communications to students about DeVry University's excellent graduate employment results[.]" In a conference call with securities analysts later that day, Defendant Hamburger again attempted to assuage analysts and investors by touting DeVry's strategy to combat weakening enrollment at its flagship DeVry University by, among other things, stressing the strength and success of DeVry University student outcomes:

> Our strategy is centered on the fact that DeVry University offers a very strong return on investment, and we need to do more to demonstrate this inherent value proposition to prospective students. So first we're changing our messaging to be more hard hitting on DeVry University as the career university. You know, ***86% of graduates active in the job market are employed in their field of study within six months of graduation. And that's with an average salary over $43,000. . . . So we're going to do a better job of communicating these impressive results to prospective students.***

10.     Defendants continued to push this story especially with securities analysts and investors, recognizing the importance this information carried with securities analysts when they issued their ratings and recommendations of the Company.  For instance, on August 8, 2013, in a conference call with securities analysts to discuss DeVry's 4Q 2013 results, Defendant Hamburger emphasized that "90% of our graduates in the active job market are employed in their field of study within six months of graduation.  And they're earning an average of over $43,500.  That's higher than the median family household income of our students before they enrolled at DeVry University."  Likewise, on August 7, 2014, the Company issued a press release for its 4Q 2013 financial results, which stated that 90.9 percent of DeVry University graduates were employed in their field of study within 6 months of graduation, earning an average of $44,295.

11.     Analysts took note of DeVry's seemingly strong growth potential because of the purportedly strong student outcomes, parroting DeVry's positive—but false—graduate success story and issuing positive ratings.  For example, after the Company revealed a sharp drop in DeVry University enrollments during 4Q 2011, on August 12, 2011 Barclays Capital maintained its "Overweight" rating, underscoring that "[d]ue to strong student outcomes and diversification, we expect DV to weather the current challenging environment better than its peers."  Morgan Stanley also highlighted that "the diverse nature of its programs, its focus on student outcomes, room for greater efficiency, and FCF buildup will drive earnings growth over the long-term."  Similarly, on January 27, 2012, the day after DeVry reported disappointing 2Q 2012 results, Oppenheimer Equity Research emphasized that DeVry "is well diversified and ranks toward the favorable end of the industry's operational and regulatory measures, and has a long-standing track record of solid student outcomes."  Following better-than-expected earnings but still weak new student enrollment at DeVry University for 2Q 2013, J.P. Morgan stated that it

"appreciate[d] DV's focus on balanced growth and high quality student outcomes," and upgraded its rating of DeVry shares.

12.     However, DeVry's history of duping students and investors was about to catch up to it.  On January 27, 2016, after a two-year investigation that began on January 28, 2014, which yielded more than 2.3 million pages of documents and responses to approximately 64 comprehensive interrogatories from DeVry, and an additional trove of documents and information from third parties, the FTC shocked the market when it filed a lawsuit against DeVry charging that DeVry University's much-touted graduate employment and salary statistics were either made up or unsubstantiated.[6]  According to the FTC, the actual number of DeVry University graduates who found employment in their field of study within six months of graduating was "significantly smaller than 90%" as DeVry had claimed year after year.  Similarly, the FTC stressed that DeVry University's own files belied Defendants' assertion that DeVry University's graduates earned significantly higher salaries than graduates from other colleges or universities.

13.     Indeed, the FTC explained in its complaint, which was filed on January 27, 2016, that "when calculating the 90% claims, *Defendants count a substantial number of DVU graduates who should not be counted and similarly exclude a substantial number of DVU graduates who should not be excluded*" (emphasis added).  For instance, "Defendants count graduates who did not obtain a job as a result of obtaining a degree from DVU," including the "substantial percentage of DVU graduates who, after graduation, continued with the same job they had when they enrolled in DVU."  The FTC noted, in addition, that "Defendants also count graduates who did not obtain jobs in their field of study," and indeed "*[a] significant percentage*

---

[6] Complaint at 24, *FTC v. DeVry Educ. Group, Inc.,* No. 16-cv-579 (C.D. Cal. Jan. 27, 2016).

*of the jobs that Defendants count as being in the graduate's field of study include jobs that employers, industry experts, graduates, and consumers would not reasonably consider to be in the graduate's field of study*" (emphasis added).  Similarly, the FTC observed that "Defendants also exclude certain students from the calculation who in fact were actively seeking employment," and provided as an example one student who was counted as non-job-seeking even though the student had viewed 177 job leads in DeVry University's jobs database, had at least six job interviews in the prior two months, attended a DeVry University "Career Fair," and had been in contact with DeVry University's Career Services department on multiple occasions to provide updates on his search for a job.  As such, the FTC concluded that DeVry lacked any "reasonable basis" to substantiate the 90% employment claims.

14.    Moreover, the FTC criticized Defendants' reliance on an income report prepared by a third-party to substantiate their claims that DeVry University graduates obtained higher incomes than graduates of other for-profit and traditional colleges and universities.  According to the FTC, "[t]he sampling methods and methodology of the survey that underlay the income report all gave or should have given Defendants reason to question the reliability of the conclusions and information contained in the report," and in fact "DVU personnel expressed concerns over whether the data sufficiently supported the higher-income claim."  Remarkably, DeVry University's own data that it had internally collected from thousands of its graduates each year (in contrast to the several hundred per year used in the third-party report) "differed significantly" from the statistics in the third party's report.  The FTC's conclusion was stunning: "Comparing the information in Defendants' own files with publicly available income data shows that *DVU graduates a year after graduating do not in fact earn significantly more than graduates from all other schools combined*" (emphasis added).

17

15.     On January 27, 2016, the DoE similarly issued to DeVry a Notice of Intent, informing DeVry University of the DoE's intention to impose certain limitations on the participation of DeVry University in programs authorized pursuant to Title IV.  The proposed limitations specifically related to DeVry's representations in advertising and marketing that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation" (the "Since 1975 Representation").  With regard to those representations, the DoE's Notice of Intent stated that "starting in at least 2008 and continuing until at least August 2015, DeVry made representations to students and prospective students regarding the post-graduation employment outcomes of students who graduated from DeVry over a cumulative period stretching more than 30 years. . . . Yet with respect to certain representations that were made by DeVry as part of that campaign and which continued to be made until at least August 2015, ***DeVry is unable to substantiate the truthfulness of those representations***, as is required by federal law"[7] (emphasis added).

16.     As a result of these shocking disclosures, DeVry's common stock price dropped 15%, or $3.65 per share, from $23.74 per share on January 26, 2016, to $20.09 per share closing on January 27, 2016—wiping more than $230 million from the Company's market capitalization value in one day, on unusually heavy trading volume.

17.     Over the next several trading days, DeVry's stock price continued to slide lower, closing at $18.08 on February 2, 2016.  In total, from January 26, 2016 to February 2, 2016,

---

[7] On October 13, 2016, the DoE announced that it had entered into a settlement "resolving the Department's charge that ***[DeVry] used unsubstantiated job placement claims in recruitment and advertising materials.***"  In the DoE's press release issued that day, the DoE emphasized that the settlement "enhances the Department's oversight of DeVry and builds upon the Obama Administration's commitment to protecting students, safeguarding taxpayer dollars and increasing accountability among postsecondary institutions."

DeVry's stock price dropped $5.66 per share, or 24%, eliminating approximately $357 million from the Company's market capitalization value.

18.     About a year later, on December 15, 2016, the FTC and DeVry announced that DeVry agreed to a pay $100 million settlement and to take among remedial measures to resolve the FTC's claims.  FTC Chairwoman Edith Ramirez accurately summed up the settlement, emphasizing that "[w]hen people are making important decisions about their education and their future, they should not be misled by deceptive employment and earnings claims. . . .  The FTC has secured compensation for the many students who were harmed, and I am pleased that DeVry is changing its practices."  According to the FTC press release, "DeVry [paid] $49.4 million in cash to be distributed to qualifying students who were harmed by deceptive ads, as well as $50.6 million in debt relief."  But DeVry's settlement with the FTC goes beyond financial redress and tackles the same types of deceptive job placement and salary statistics peddled to Lead Plaintiff and the Class here.  According to the FTC, the settlement "include[d] provisions designed to prevent DeVry from misleading consumers in the future," and, among other things, "prohibits DeVry from misrepresenting the likelihood that graduates will get a job as a result of their degree," and "specifically prohibits DeVry from including jobs students obtained more than six months before graduating whenever DeVry advertises its graduates' success in finding jobs near graduation."  In addition, the settlement precluded DeVry from "misrepresenting the compensation or compensation ranges that students or graduates have received or can be expected to receive."

### A.     DeVry's 90% Representation Was False and Misleading

19.     Twenty former DeVry employees from around the country provided information regarding the scheme to manipulate student outcome statistics that corroborates the facts revealed by the FTC and DoE.  For instance, according to CW3, DeVry was only able to justify

the job placement numbers by "cherry picking" the graduates that were included. CW3 explained that during his employment, DeVry omitted from the number of DeVry University graduates the Company had determined were "non-job seeking" from its student outcomes. CW3 specifically stated that DeVry University's career services department instituted a policy whereby students were required to complete onerous weekly assignments—such as submitting resumes to the school, and applying to jobs recommended by the school, and completing long forms—in order for the graduates to be deemed as "job-seeking." As a result, certain students who may have in fact been actively seeking jobs were nevertheless deemed "non-job seeking" when they did not respond to career services representatives. CW3 reported that students would also opt-out of the school's career services because they were frustrated with the burdensome requirements. These students were similarly treated as "non-job seeking" and were omitted from DeVry's employment statistics. As CW3 confirmed, the waivers and opt-outs were a "choice selection" used for the purposes of improving the student outcome statistics.

20.     Additional Confidential Witnesses from across the country corroborated CW3's revelations. For example, CW13 confirmed that DeVry allowed a certain number of students to be written off each year. He confirmed that students could be written off if they were not actively looking for employment or moved out of state, among other reasons. CW13 explained that there were 7 to 8 "inactive codes" in DeVry's computer system that were used. In addition, CW13 was allowed to write off graduates from the statistic whom he was unable to contact. These students would be coded as "inactive." Thus, according to CW13, DeVry's claim that 90% of DeVry graduates were employed in their field within six months of graduation only reflected graduates who were deemed eligible for work.

21.     Similarly, CW8 explained that the "the 90 percent statistic that DeVry provided its shareholders was highly inflated."  According to CW8, DeVry obfuscated the numbers to the school's benefit—"they start with a number to produce and find a way to calculate it," said CW8.

22.     CW14 confirmed there were codes within HireDevry which allowed students to be designated "non-job seeking" and waived from inclusion in DeVry's employment statistics.

23.     CW15 also confirmed that the 90% job placement rate excluded students who were waived from the statistics because they were non-job-seeking, but that DeVry also ran a hard number to see how many students they actually placed.  CW15 estimated that if they had included the waived students, the percentage would have been less than 90%.  CW15 also reported that whenever someone was placed at the campus level, that placement was verified at the corporate level.

24.     CW17 explained that every student at DeVry was automatically opted-in for career services following their graduation from DeVry, however, CW17 said graduates could opt-out of career services assistance and that DeVry had "waive" codes in HireDevry.  CW17 also recounted that the "this is how we code" directives came from DeVry's corporate office.

**B.      DeVry's Executives Either Knew the 90% Representation was False or Made the Representation with Reckless Disregard for the Truth**

25.     Numerous facts demonstrate that Defendants Hamburger, Wiggins, Unzicker, and Gunst knew, or were at least severely reckless in not knowing, that DeVry's statements with respect to the graduate employment statistics were false and misleading when made.

**1.      Investigations and Settlements with Government Entities**

26.     First, the fact that four separate government entities independently found DeVry's 90% representation to be false (based on DeVry's own internal documents) and extracted significant penalties from DeVry provides an inference that DeVry's practices were so pervasive

that DeVry's executives must have either (1) known about them, or (2) acted recklessly by failing to confirm the numbers they were touting in light of what was actually happening within the organization.

27. Notably, the Massachusetts AG publicly revealed, following its investigation, that certain DeVry University programs had job placement rates "*as low as 52 percent*." The sheer magnitude of the difference between the 90% figure that the Individual Defendants touted and the actual percentage in certain schools adds to the inference that Defendants were at least reckless about the practices within their organization.

28. The FTC similarly determined that DeVry University's true job placement numbers were "significantly" smaller than the 90% DeVry had fed to the public and that the Company lacked any reasonable basis for its advertised statistics. The FTC complaint stated that the 90% figure "count[s] a substantial number of [DeVry University] graduates who should not be counted and similarly exclude[s] a substantial number of [DeVry University] graduates who should not be excluded." The 90% figure also counts graduates who did not obtain jobs in their field of study, and indeed a "significant percentage of the jobs that Defendants count as being in the graduate's field of study include jobs that employers, industry experts, graduates, and consumers would not reasonably consider to be in the graduate's field of study." Thus, lacking any reasonable basis for asserting that 90% of DeVry University graduates are employed in their field within six months of graduation, Defendants were at least severely reckless in making such statements.

29. With respect to DeVry's claims as to DeVry University graduates' purported earning power, the FTC complaint makes clear that the "sampling methods and methodology" underlying a third-party survey used to substantiate those claims "*all gave or should have given*

*[DeVry] reason to question the reliability of the conclusions and information*" of that survey, and "[i]n fact, *[DeVry University] personnel expressed concerns over whether the data sufficiently supported the higher-income claim*." Notably, "statistics that [DeVry University] had directly collected from thousands of its graduates each year about their incomes differed significantly from the third party's statistics, which consisted of information from only several hundred individuals per graduation year." Moreover, DeVry had "extensive information in [its] own files about the income of [DeVry University] graduates" in addition to "publicly available data reflecting the incomes of graduates of schools throughout the United States, by school and by field." As the FTC explained, a comparison of DeVry's internal statistics with publicly available graduate income data "shows that [DeVry University] graduates a year after graduating do not in fact earn significantly more than graduates from all other schools combined," and so DeVry's "reliance on the third-party data for its higher-income claim was therefore unreasonable." Moreover, CW3 provided information (described herein) showing that DeVry was manipulating its starting salary statistics, and that the directive to do this came from corporate.

30.     In addition, in a joint Rule 26(f) report filed by the parties in the FTC's action on June 7, 2016, DeVry included both Defendant Gunst and David Pauldine, who was DeVry's Executive Vice President of Marketing and the President of DeVry University and reported directly to Defendant Hamburger, in a list of percipient witnesses likely to have discoverable information. The inclusion of Gunst and Pauldine in the list of percipient witnesses in that litigation indicates that these individuals were knowledgeable regarding how the Company generated the DeVry University graduate employment and salary statistics, and therefore were

aware or recklessly disregarded the substantial risk that the job placement and salary statistics touted by Defendants during the Class Period were false.

### 2. Internal Documents Produced by the Government Show Defendants Had Knowledge the Statistics Were False, or Were Severely Reckless

31. Internal documents produced by the FTC in response to a FOIA request show that the government's investigation specifically sought to uncover what DeVry's corporate executives knew about DeVry's 90% and salary misrepresentations. These internal documents included charts reflecting the scope of discovery that DeVry's attorneys agreed to produce to the FTC. Critically, the charts show that the "executive officers" of DeVry—defined to include DeVry's "Chief Executive Officer," "Chairman," and "Chief Financial Officer," among others— were designated as custodians who agreed produce documents on a range of topics including: "emails… which relate to completion rates, job placement rates, [and] students' pre-graduation or post-graduation income amounts"; documents concerning "minimum placement rates" reported to government agencies; and "issues raised by consumer complaints." These internal records coupled with the FTC's allegations and conclusions create an inference that documentary evidence exists showing that the Individual Defendants knew, or recklessly regarded that fact that there was no basis for DeVry's stated employment statistics.

32. Internal documents produced by the FTC also show that the FTC's investigation was focused, not only on DeVry's advertising material, but also on the same false statements contained within the Company's SEC filings that are the subject of this lawsuit. These internal records provide even more evidence that the numerous statements Defendants made to investors concerning the 90% statistic and graduating salary information were false and misleading.

33. Internal documents produced by the FTC in response to a FOIA request also provide an inference that DeVry's practices were pervasive across the organization. These

documents show that the FTC's investigation of DeVry's manipulation was wide-ranging and encompassed all of DeVry's campuses and schools. A table produced by the FTC listing negotiated modifications to discovery requests is 52 pages long, lists 64 separate discovery requests and modifications, encompasses requests touching upon all of DeVry's colleges, and even allows for certain requests to be fulfilled through document "sample[s] of campus presidents" at specific locations.

34.     Internal documents produced to Lead Plaintiff by the DoE through a FOIA request also show that the Individual Defendants either had knowledge of the fraud or were reckless. The documents specifically show that DeVry and its executives acted in bad faith and were in fact put on notice that DeVry University's job placement statistics were inaccurate. For example, an internal brief submitted by the DoE to the Office of Hearings and Appeals describes high-level evidence showing that DeVry's executives were either put on notice or were reckless with respect to the job placement statistics they were touting. As explained in an internal brief filed by the DoE:

- "[T]he violation at issue was neither unplanned nor isolated. Rather the Representation was developed as part of a multi-year, national advertising campaign that reached millions of prospective students … and that commenced only after extensive consumer and brand research. Relying on this research, DeVry made an initial decision to use, and repeated decisions to keep using, the Representation even after it certified to the Department its knowledge of, and compliance with, the substantiation requirement. Indeed, **"this was not an isolated instance, but part of a pattern whereby DeVry either intentionally or through wanton negligence" avoided clear statutory and regulatory requirements."** (emphasis added, internal citations omitted).

- *"DeVry continued to make the Representation in advertisements even *after* DeVry staff and others raised questions about DeVry's ability to substantiate the claim. For example, an internal presentation in 2008 on the efficacy of the *Careers* campaign posed questions about the sources of the Representation in seeking to establish the 'truth behind' the claim and whether it could 'substantiate' the 90 percent figure. Moreover, in February 2009, DeVry President David Pauldine posited, in an email sent on his behalf, whether DeVry should 'be looking at *alternative* messaging such that it brings the ultimate *credibility* to our employment claims.' "*

- **"And in November 2009, staff at an advertisement agency used by DeVry, Leo Burnett USA, questioned certain details of the Representation.  In response, DeVry's 'Senior Consumer Insights Specialist' dismissed the concerns by affirming a response that DeVry had 'dug into these numbers 8 ways to Sunday, and there is no other clear, compelling, and compliant story.'  Nevertheless, aware of both legal requirements and expressed questions and concerns about the Representation, DeVry continued to use the Representation in advertisements until after the Department asked DeVry for substantiation." (internal citations omitted).

- "DeVry made statements in response to the Substantiation Request that lacked credibility. Specifically, although DeVry claimed to have ceased making the Representation no later than January 2014, this was not true.  DeVry's failure to act with candor during the investigation violated its fiduciary duty to the Department." (internal citations omitted).

35.    The fact that the DoE described specific evidence it possessed showing that DeVry acted in bad faith with respect to the misrepresentations at issue raises the inference that DeVry's senior executives either knew or recklessly disregarded the truthfulness of the 90% representation.  As the DoE explained, (1) DeVry engaged in a pattern of making misrepresentations; (2) DeVry's senior executives were making presentations and sending emails about the 90% representation at a high level as early as about the issue 2008; and (3) continued making misrepresentations after they were put on notice by both a consultant and the DoE during the Class Period about the falsity of the 90% representation.  These internal documents, and others described below, contribute substantially to the inference that the Defendants acted with scienter.

### 3.    Defendants' Public Statements Show They Were Knowledgeable About Regulators' Allegations

36.    Defendants' public statements about the FTC's investigation and lawsuit make clear that they were knowledgeable about how DeVry's employment statistics were calculated, or were at the very least put on notice of irregularities by the FTC's investigation.  For example, Defendant Hamburger discussed the FTC's Civil Investigative Demand just days after it was filed during the DeVry's Q2 2014 earning call.  Similarly, during a Q3 2015 earnings call,

Defendant Hamburger stated that "[w]e're certainly fully cooperating with the folks over there and having dialogues with the staff." And after the FTC filed suit, Defendant Hamburger provided detailed thoughts to investors in response to the FTC's allegations, evidencing his knowledge about how DeVry calculated it statistics, stating:

> [T]here's not now nor has there ever been a national standard for calculating employment statistics. We've advocated for there to be one for all of higher education. In the absence of regulation, DeVry University designed a methodology for calculating the employment outcomes of its graduates over 40 years ago. 40 years ago. We believe it's a very sound way of doing it.

37. Thus, Defendants' public statements provide further evidence that Defendants knew the Company's employment statistics were not accurate.

### 4. Information Provided by Confidential Witnesses Creates a Strong Inference of Knowledge or Severe Recklessness

38. Confidential Witnesses have provided additional information supporting a strong inference that Defendants knew or recklessly disregarded the likelihood that the DeVry University's student outcome statistics were false or misleading.

#### (a) The Individual Defendants Were Told About and Discussed the Fraudulent Outcomes

39. For instance, CW8 reported that "the numbers DeVry was producing and generating for the SEC reports were just not accurate." According to CW8, the actual numbers were different from what DeVry reported to investors. CW8 reported that he discovered that DeVry did not have the data to back up the claim that 90% of its graduates got jobs in their field of study within six months of graduation and, in approximately April 2014, reported this to an in-house attorney who worked in DeVry's corporate compliance department. He said that he specifically told the in-house attorney that there was no data to substantiate DeVry's job placement rates and the 90% representation. He told the attorney "you don't have the data to

calculate this." When asked if Hamburger knew about his findings, CW8 responded that he definitely did. He knew this because Groenwald, his boss, told him in a meeting that she discussed CW8's findings with Hamburger. CW8 added that Groenwald and Hamburger met all the time. CW8 was fired a month after meeting with DeVry's in-house attorney and said that his meeting with the compliance department and the attorney led to his termination.

40. CW8 also stated that Defendant Hamburger wanted to speak with him after CW8 authored a report about factors critical to the success of a for-profit college. CW8 understood that Hamburger had seen his report and wanted to meet with him about it. CW8 was later fired after he warned DeVry that the Company was generating numbers for SEC reports that were not accurate.

41. CW18 said he attended a meeting with CEO Daniel Hamburger during which the 90% enrollment rate was discussed. Similarly, CW15 had direct contact with Daniel Hamburger. CW15 stated that Daniel Hamburger likely approved that 90% advertising because it was very provocative.

42. CW15 also described Hamburger's hands-on management style, recounting how he would get emails from "Daniel [Hamburger] where he would say that he was reviewing 'your statistics' or 'Hey, I was listening to an enrollment call.'" Hamburger would tell CW15 what he thought of a particular statistic or how to instruct his employees to handle enrollment calls in the future. CW15 recalled that Hamburger came to his campus at least five times during his tenure as Metro President.

43. CW19 described himself as a "senior leader of the Company," and participated in many meetings involving senior leadership. According to CW19, DeVry student graduate employment metrics was a topic of discussion in meetings he attended. These meetings included

28

Quarterly Leadership Meetings, in which graduate employment metrics were discussed. CW19 said that CEO Daniel Hamburger, CFO Daniel Wiggins, CFO Richard Gunst (Wiggins's predecessor), and CAO Patrick Unzicker all participated regularly in Quarterly Leadership Meetings. CW19 also recalled that Madeleine Slutsky, the Vice President of Career and Student Services attended the Quarterly Leadership Meetings. Notably, Slutsky was repeatedly listed as a document custodian concerning topics related to job placement rates in internal discovery documents Lead Plaintiff received from the FTC.

44.     In addition, CW20, the former Vice President of Academic Affairs and Chief Academic Officer for Chamberlain College, participated in meetings with Hamburger during which issues related to job placement and accreditation at DeVry were discussed. CW20 recalled that DeVry had an ongoing issue related to job placement and accreditation. CW20 also specifically recalled that DeVry University was not aggregating data on institutional effectiveness across its different programs, and this lack of data was an issue discussed during meetings led by Hamburger in 2012, 2013, and 2014.

> (b)     *DeVry Maintained a Corporate Policy that Artificially Inflated Its Job Numbers*

45.     CW16 was an Executive Assistant for Madeleine Slutsky, DeVry's Vice President of Career and Student Services. He recalled that in 2013, he was instructed by Slutsky to find every marketing document that quoted the 90% rate. It was CW16's understanding that Slutsky was working with Pat Duncan, the Director of Regulatory Compliance, to identify every single document which had 90% verbiage and which DeVry could no longer use. According to CW16, Slutsky received reports on job placement statistics on a regular basis, including reports from HireDeVry.

46.     CW3 explained that the "directive" on how to designate a student as non-job seeking came from DeVry's corporate office.  According to CW3, in order to designate a graduate as non-job seeking the file required a signature from the campus president, as well as approval from DeVry's Vice President of Career Services, Shelly Dubois.

47.     CW3 also explained that the process was the "same" for every DeVry campus; the only difference was when a campus chose to implement the process.  He explained that the larger DeVry campuses would deem students non-job seeking more quickly because they had more students and this affected their overall job placement percentages.  According to CW3, some campuses (typically the larger ones) would institute the policy within four weeks, whereas other campuses might do it within 90 days, or several months.  He reiterated that the protocol for deeming student non-job seeking (waived) to not include them in the job placement statistics was "identical across the board" within the DeVry organization, but the length of time to make that designation was at each campus's discretion.

48.     CW3 also reported that her campus had to meet a target placement rate of 95-100%; that that the 95-100% job placement rate came from DeVry's corporate office; and this target was discussed at regular meetings he attended with representatives of DeVry's corporate office, which included DeVry's Corporate Director of Career Services.

49.     CW18 recalled that for the duration of his tenure at DeVry University his team used a mandatory script to guide their recruitment conversations which was developed and then honed by upper management.  The script touted the university's claim that within six months of graduation 90% of DeVry graduates landed jobs in their fields of study.  According to CW18, the script was approved by DeVry University's President David Pauldine, Vice President of New Student Recruitment John Holbrook, and Vice President Robert Whitney.

50.     CW2 explained that the job placement and salary statistics given to prospective students had been reviewed and approved by DeVry's legal and compliance department, and that the Company kept a repository of approved language for use by marketing employees. CW4 corroborated that assertion, stating that encouragement to use the job placement statistics "came down from the top," noting that "[o]ur managers told us, but their managers told them." CW2 came to doubt the accuracy of the advertised job placement statistics in part because there was a "grey area" in whether graduates actually obtained jobs in their field of study. In fact, CW2 suspected that certain graduates were employed in jobs that most people would not define as being in their field of study.

51.     As described above, CW3 stated that career services advisors and directors could classify graduates as "non-job seeking," which would exclude them from DeVry University's job placement statistics. CW3 noted that the final classification of a student as non-job seeking required the approval of the campus president (in CW3's case, CW7). According to CW3, that campus president reviewed each student's file, regularly received reports about graduates' job placements, and "knew intimately everything that went on with every [graduate's] file."

52.     CW7, for his part, confirmed that DeVry had a written national policy that set forth the rules for which students would be included or excluded in the job placement statistics. CW7 separately explained that DeVry kept records on how many graduates were not counted in the job placement statistics, and that that data was kept in the HireDeVry computer system.

53.     CW3 also stated that he was required to input all job placement information about each graduate into HireDeVry, which provided DeVry with the capability of running reports showing the actual job placement rate for graduates including students who had been waived in

31

its official statistics. According to CW6, campus-specific job placement rates of DeVry University graduates were reported up the chain of command within the Company.

54. CW10 further discussed how, in response to regulatory scrutiny in 2010, DeVry began working to discover which students were actually finding work in their chosen fields. CW10 recalled being assigned to a project where he was to document recent DeVry graduates' employment status. CW10 was given a list of questions to ask students to verify whether they were employed in their field of study. He recalled that most of the students he tried to contact couldn't be reached, and those who were reached were often out of work or employed in a field that had nothing to do with their degree.

55. The obvious and pervasive manipulation of DeVry's employment statistics across DeVry's numerous campuses, as described by the Confidential Witnesses, indicates that Defendants Hamburger, Wiggins, Unzicker, and Gunst were at least reckless in disregarding the substantial risk that the employment and salary statistics were false.

> (c)  *The Magnitude and Duration of Defendants' Misstatements was Extraordinary.*

56. Over a nearly five-year Class Period—and according to the FTC and DoE much longer—the Individual Defendants repeatedly touted the same false fact regarding DeVry University's student outcomes. The extraordinary magnitude and duration of the misstatements at issue in this case, which constituted a critical and core feature of the Company's primary marketing campaigns since at least 2008, demonstrates that Defendants Hamburger, Wiggins, Unzicker, and Gunst recklessly failed to ensure that their Class Period statements concerning DeVry University's graduate employment and salary statistics were accurate. Moreover, the dramatic scope of the Company's advertising campaign highlighting the false employment and salary statistics supports an inference that the similarly false statements in the Company's SEC

filings, press releases, and analyst presentations were reviewed and approved by corporate

officers sufficiently knowledgeable about the Company to know that the statements were false.

> (d) *Defendants Were Put On Notice of the Fraud by the FTC's Investigation*

57. As described in further detail below, the foregoing is further underscored by

DeVry's $100 million settlement of the FTC lawsuit and the breadth of corporate reforms that

DeVry has agreed to put in place. For example, DeVry must pay over $49 million directly to the

FTC and provide over $50 million in debt relief to its undergraduates—for over a seven year

period—between September 2008 and September 2015. In addition, DeVry and, among others,

its officers, agents, employees, and attorneys are permanently restrained and enjoined from

"[m]isrepresenting, expressly or by implication, the success that students or graduates have

realized or are likely to realize in starting or obtaining careers, jobs or employment." Moreover,

for 20 years after the order is entered, DeVry must "establish and implement a training program

for all principals, officers, directors, managers, employees, agents, and representatives who direct

or engage in the promotion or sale of any educational product or service[.]" DeVry is also

required to submit a compliance report one year after the order is entered and, for 10 years after

the entry of the order, each DeVry entity must submit a compliance notice for any change in,

among other things, "any process or procedure for calculating, documenting or substantiating

any claim covered" by the order.

58. In addition, the initiation of an investigation by the FTC approximately two years

before it filed its complaint supports an inference that Defendants knew, or should have known,

that the advertised employment and salary statistics were false. Even assuming that Defendants

were not already acting with scienter in making their false statements concerning DeVry

University graduates' employment and salary prospects (an assumption readily refuted by the

allegations in the FTC's complaint, the DoE's action, and the CWs' statements), at the time of the FTC's January 28, 2014 request for documents, the FTC's investigation should have put Defendants on notice that they needed to conduct their own investigation into the truth of such statements. Only three inferences can reasonably be drawn: (1) Defendants were already aware or recklessly disregarding the risk that their statements were false by the time DeVry received the FTC's request on January 28, 2014; (2) Defendants thereafter investigated the falsity of their statements in tandem with the FTC's investigation and learned that the statements were false, but continued to make the statements in spite of that knowledge; or (3) despite receiving the FTC's request on January 28, 2014, Defendants failed to investigate the truth of their statements and recklessly continued to tout the employment and salary prospects of DeVry University graduates. Indeed, following the Company's January 28, 2014 receipt of the FTC's CID, Defendants highlighted the false and misleading student outcome statistics with declining frequency— strongly suggesting that Defendants finally began to appreciate the likely consequences of making such false statements. Under any of these three alternatives, Defendants acted with scienter in falsely promoting DeVry by pointing to the misleading DeVry University graduate employment and salary statistics.

59. Confidential Witness allegations confirm that the FTC investigation had an impact on DeVry's corporate policy regarding its job placement statistics. For example, CW12 was familiar with the FTC investigation and the settlement it reached with DeVry. He said that prior to the FTC investigation, the company was very loose about the way it calculated and tracked post-graduation metrics. CW12 said that, for example, a student who graduated with a medical assistant degree would have been considered to be employed in his field if he found a job as a

babysitter, or any kind of caregiver. He added that after the FTC came in, DeVry became "a lot more tight."

60. As of the filing of this Third Amended Complaint, the restrictions on DeVry's ability to promote certain job placement statistics remain in place and DeVry is also now required to affirmatively maintain graduate-specific data to substantiate any representations to, among others, any student or prospective student on graduate employment rates and "maintain information sufficient to establish the methodology it used to formulate any representations regarding post-graduation employment outcomes of [DeVry University] students."

### C. Post-Class Period Events Provide Even Further Evidence that Defendants' Fraudulent Practices Pervaded the Company

61. Following its settlements with the FTC and DoE, DeVry also entered into settlement agreements with both the NY AG and the Massachusetts AG to resolve similar claims that DeVry inflated its employment statistics. Both offices announced they had conducted investigations which shed light on DeVry's practices of inflating its employment statistics which was pervasive across the organization. The NY AG publicly announced that its investigation showed that "DeVry . . . mischaracterized certain unsuccessful job-seekers as 'inactive,' despite evidence that the graduates had in fact carried out an active, though unsuccessful, job search." Similarly, an investigation conducted by the Massachusetts AG revealed that "DeVry programs had job placement rates as low as **52 percent**." (emphasis added)

62. Only four months after DeVry settled with the FTC and DoE, the Company announced that it would change the name of its parent company to Adtalem Global Education in May 2017. Although the Company's stated purpose for the name change was to highlight its broadened, "education offerings and geographic reach," media outlets connected the name change to the Company's alleged manipulation of its job statistics given the proximity in time to

DeVry's settlement with the FTC regarding allegations that the Company misled tens of thousands of students about their post-graduation job and income prospects.[8]

## IV.    JURISDICTION AND VENUE

63.    This Third Amended Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

64.    This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

65.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions that constitute the alleged violations of law, including the preparation and dissemination to the public of untrue statements of material facts, occurred in this District.

66.    In connection with the acts alleged in this Third Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## V.    THE PARTIES

### A.    Lead Plaintiff

67.    Plaintiff Utah Retirement Systems ("URS") is a public pension system that has been providing retirement benefits to Utah's public school and education employees since 1963. As of December 31, 2015, URS managed approximately $26.7 billion in assets for the benefit of its members. URS purchased DeVry common stock during the Class Period and suffered

---

[8] *See, e.g.*, http://www.chicagotribune.com/business/ct-devry-name-change-adtalem-20170524-story.html; https://www.bizjournals.com/chicago/news/2017/05/24/devry-university-parent-company-changing-its-name.html

damages as a result of the violations alleged herein.  On August 24, 2016, this Court appointed

URS as Lead Plaintiff in this litigation.

###### B.    Defendants

68.    Defendant DeVry Education Group, Inc. is incorporated in the State of Delaware.

Its principal executive offices are located at 3005 Highland Parkway, Downers Grove, Illinois,

60515.  DeVry, founded in 1973, provides educational services worldwide through three

segments: Business, Technology and Management; Medical and Healthcare; and International

and Professional Education.  DeVry University is a subsidiary of DeVry and one of the largest

degree-granting higher education systems in North America.  DeVry University was founded in

1931 and offers onsite and online undergraduate and graduate degree programs covering 34

different career fields within its five colleges of study: The College of Business & Management,

which includes Keller Graduate School of Management; The College of Engineering &

Information Sciences; The College of Health Sciences; The College of Liberal Arts & Sciences;

and The College of Media, Arts & Technology.  DeVry's common stock traded on the NYSE

under the ticker symbol "DV" during the Class Period.

69.    Defendant Daniel Hamburger ("Hamburger") served at all relevant times as

DeVry's President and Chief Executive Officer, ultimately leaving those roles on May 24, 2016.

During the Class Period, Defendant Hamburger reviewed, approved, and signed DeVry's false

and misleading SEC filings and certifications pursuant to Section 302 of the Sarbanes-Oxley Act

of 2002 therein ("SOX Certifications").  Specifically, Defendant Hamburger signed: (1) the

Forms 10-Q that the Company filed with the SEC on February 4, 2011, May 5, 2011, November

4, 2011, and February 6, 2012; (2) the Forms 10-K filed with the SEC on August 26, 2011,

August 28, 2012, August 29, 2013, August 27, 2014, and August 27, 2015; and (3) the SOX

Certifications attached as exhibits to the Forms 10-Q and 10-K filed with the SEC on February 4,

2011, May 5, 2011, August 26, 2011, November 4, 2011, February 6, 2012, May 3, 2012, August 28, 2012, November 5, 2012, February 7, 2013, May 3, 2013, August 29, 2013, November 5, 2013, February 4, 2014, May 5, 2014, August 27, 2014, November 5, 2014, February 5, 2015, May 8, 2015, August 27, 2015, and November 4, 2015. Defendant Hamburger also made false and misleading statements in the Company's Annual Reports issued on August 29, 2013, August 27, 2014, and August 27, 2015. Moreover, Defendant Hamburger participated in conference calls with securities analysts, during which DeVry's false and misleading SEC filings and press releases were presented and discussed. Specifically, Defendant Hamburger made false and misleading statements at analyst conferences and on DeVry's earnings conference calls set forth below, held on October 25, 2011, April 24, 2012, October 25, 2012, February 6, 2013, March 13, 2013, April 23, 2013, June 13, 2013, August 8, 2013, June 11, 2014, August 7, 2014, September 18, 2014, and May 5, 2015.

70. Defendant Daniel J. Wiggins ("Wiggins") served as DeVry's Senior Vice President and Chief Financial Officer from January 3, 2012 to May 31, 2016. Wiggins also served as Treasurer from January 3, 2012 until early 2015. During the Class Period, Defendant Wiggins reviewed, approved, and signed DeVry's false and misleading SEC filings and SOX Certifications. Defendant Wiggins also reviewed, approved, and signed false and misleading press releases and Forms 8-K issued during the Class Period. Specifically, he signed: (1) the Form 8-K that DeVry filed with the SEC on January 26, 2012; (2) Forms 10-Q that DeVry filed with the SEC on February 6, 2012, May 3, 2012, November 5, 2012, February 7, 2013, May 3, 2013, November 5, 2013, February 4, 2014, May 5, 2014, November 5, 2014, February 5, 2015, May 8, 2015, and November 4, 2015; (3) the Forms 10-K filed with the SEC on August 28, 2012, August 29, 2013, August 27, 2014, and August 27, 2015; and (4) the SOX Certifications

attached as exhibits to the Forms 10-Q and 10-K filed with the SEC on February 6, 2012, May 3, 2012, August 28, 2012, November 5, 2012, February 7, 2013, May 3, 2013, August 29, 2013, November 5, 2013, February 4, 2014, May 5, 2014, August 27, 2014, November 5, 2014, February 5, 2015, May 8, 2015, August 27, 2015, and November 4, 2015. Defendant Wiggins also frequently participated in conference calls with securities analysts, during which DeVry's false and misleading SEC filings and press releases were presented and discussed. Specifically, Defendant Wiggins made false and misleading statements at an analyst conferences held on February 26, 2013, May 6, 2014, and November 12, 2014.

71. Defendant Patrick J. Unzicker ("Unzicker") served as DeVry's Vice President, Finance and Chief Accounting Officer from March 1, 2012 to May 31, 2016. In March 2015, Unzicker assumed the role of Treasurer and since May 31, 2016 has also served as the Company's Senior Vice President and Chief Financial Officer. During the Class Period, Defendant Unzicker reviewed, approved, and signed DeVry's false and misleading SEC filings and SOX Certifications. Defendant Unzicker also reviewed, approved, and signed false and misleading press releases and Forms 8-K issued during the Class Period. Specifically, he signed: (1) the Forms 8-K that DeVry filed with the SEC on April 25, 2012, July 23, 2012, August 9, 2012, October 25, 2012, February 6, 2013, March 6, 2013, April 23, 2013, August 8, 2013, October 24, 2013, February 4, 2014, April 25, 2014, August 7, 2014, October 23, 2014, February 5, 2015, April 23, 2015, August 18, 2015, September 2, 2015, and October 22, 2015; (2) Forms 10-Q that DeVry filed with the SEC on May 3, 2012, November 5, 2012, February 7, 2013, May 3, 2013, November 5, 2013, February 4, 2014, May 5, 2014, November 5, 2014, February 5, 2015, May 8, 2015 and November 4, 2015; and (3) the Forms 10-K filed with the SEC on August 28, 2012, August 29, 2013, August 27, 2014, and August 27, 2015. Defendant Unzicker also

frequently participated in conference calls with securities analysts, during which DeVry's false and misleading SEC filings and press releases were presented and discussed.

72.     Defendant Richard M. Gunst ("Gunst") served as Chief Financial Officer of DeVry from 2006 until January 2, 2012.  He also served as a Director during the Class Period. Defendant Gunst reviewed, approved, and signed DeVry's false and misleading SEC filings and SOX Certifications during the Class Period.  Defendant Gunst also reviewed, approved, and signed false and misleading press releases and Forms 8-K issued during the Class Period. Specifically, he signed: (1) the Forms 8-K that DeVry filed with the SEC on April 26, 2011, August 12, 2011, October 25, 2011, and December 12, 2011; (2) Forms 10-Q that DeVry filed with the SEC on February 4, 2011, May 5, 2011, and November 4, 2011; (3) the Form 10-K filed with the SEC on August 26, 2011; and (4) the SOX Certifications attached as exhibits to the Forms 10-Q and 10-K filed with the SEC on August 26, 2011 and November 4, 2011.  Defendant Wiggins also frequently participated in conference calls with securities analysts, during which DeVry's false and misleading SEC filings and press releases were presented and discussed.

73.     Defendants Hamburger, Wiggins, Unzicker, and Gunst are collectively referred to as the "Individual Defendants."  The Individual Defendants, because of their high-ranking positions and direct involvement in the everyday business of DeVry, directly participated in the management of DeVry's operations, including its public reporting functions, had the ability to, and did control, DeVry's conduct, and were privy to confidential information concerning DeVry and its business, operations and financial statements, as alleged herein.  The Individual Defendants were directly involved in controlling the content of, and in drafting, reviewing, publishing and/or disseminating the false and misleading statements and information alleged herein.  Moreover, the Individual Defendants were aware of, or recklessly disregarded, the false

and misleading statements and omissions, and approved or ratified these misstatements and omissions in violation of the federal securities laws.

74.     DeVry and the Individual Defendants are collectively referred to herein as "Defendants."

## VI.     THE FRAUD PERPETRATED BY DEFENDANTS

### A.     Defendants Hamburger, Wiggins, Unzicker, and Gunst Misrepresented and Concealed the Actual DeVry University Student Outcome Statistics

75.     DeVry provides educational services worldwide through a number of subsidiaries, including DeVry University—one of the largest degree-granting higher education systems in the United States.  Through its five colleges, DeVry University offers programs in healthcare, business, technology, accounting, finance, and law.  DeVry directly competes with traditional, not-for-profit colleges and other for-profit schools in attracting students to enroll in its numerous programs.  Because DeVry is a publicly traded business, Defendants' primary focus is generating revenues, earnings per share, and increasing shareholder value, which is primarily achieved by increasing enrollment at its campuses.  In other words, DeVry has to distinguish DeVry University from formidable competition coming from both other for-profit schools as well as traditional non-profit institutions of higher learning to attract the students necessary to drive revenue and profit growth quarter after quarter.  To do this, Defendants devised a scheme— beginning in 2008 at the latest—to target students, who would spend tens of thousands of dollars to obtain a degree at DeVry University, with deceptive advertisements and marketing materials emphasizing positive student outcomes and specifically claiming that 90% of DeVry University's graduates obtain employment in their field of study within six months of graduation and obtain salaries 15% higher than the average salaries of graduates with bachelor's degrees from other colleges and universities.

41

76.     This scheme, the subject of an FTC lawsuit that was filed after an exhaustive two-year investigation and ultimately settled on December 15, 2016, not only misled students, but falsely assured investors and securities analysts covering DeVry that the job placement rates and higher salaries would lead to continued financial growth and would mitigate the negative effects of a weakened economy on new enrollments and student retention. Securities analysts, for their part, understood that students' employment outcomes were a key benchmark in assessing the Company's potential to grow revenues and earnings, and consistently viewed DeVry as a high-quality institution that could attract new students or retain current ones based in part on the highly-publicized—but fictitious—graduate employment and salary statistics. For example:

- "DeVry enjoys a well-deserved reputation for providing quality programs with favorable student outcomes. A strong record of regulatory compliance adds to the stock's appeal in the current environment of heightened regulatory scrutiny." (Piper Jaffray, December 8, 2011);

- "While an investment in DV requires patience, and results are likely to deteriorate before they get better, we expect management's focus on improving the business will pay off. A well-rounded portfolio, ongoing focus on student outcomes, additional cost containment and easier comps in the back half of the year set the stage for improving results." (Morgan Stanley Research North America, January 27, 2012);

- "Due to DV undergrad's long history of >$40K starting salaries, 90% placement rates, and relatively low regulatory issues - we think it[']s significantly undervalued within DV overall." (Deutsche Bank Markets Research, June 6, 2012).

77.     Indeed, even when flagging enrollment at DeVry's flagship DeVry University—primarily attributed to a sluggish economy and high unemployment that was deterring prospective students from taking on new debt—adversely affected the Company's revenues, analysts still remained bullish on DeVry. This was because they believed that even in a downturn in the economy and in the face of strong competition from other institutions, DeVry was able to remain competitive and attract new students due to, among other things, Defendants' statements that 90% of DeVry University's students found jobs in their field of study within six months of graduation with higher salaries than their counterparts at other schools:

42

- "Even as questions surrounding program costs, recruiting tactics, and questionable student outcomes—among other issues—remain, DeVry management has been outspoken, reaffirming its message of, 'doing well by doing good.' The fact remains that . . . we continue to see select higher-quality, for-profit education providers such as DeVry included in a position to take incremental share from traditional schools, in aggregate, even if budgets shrink." (Morningstar Equity Research, June 27, 2012);

- "Due to DeVry's long history of better than peer job placement and starting salaries, and only about 25% exposure to online only enrollment, we expect DeVry new enrollment to return to growth by YE13E." (Deutsche Bank Markets Research, August 10, 2012);

- "We continue to believe that DeVry's shares offer an attractive long-term opportunity in light of the company's strong brands, minimal regulatory exposure, and consistent management focus on educational quality and outcomes, and maintain our Outperform rating." (William Blair, August 6, 2013);

- "Though we have not seen large new student growth across the group, we believe the demonstrated strength in employment (about 90% placement) and easier comparisons make the scenario of gradually improving starts plausible, if not assured." (Wells Fargo Securities LLC Equity Research, September 11, 2013);

- "In light of the . . . the solid regulatory profile highlighted by low student loan default and high job placement rates . . . we think DeVry warrants a significant premium to the majority of its private sector postsecondary peers, and reiterate our Outperform rating." (William Blair, April 24, 2014)

- "While postsecondary education remains a regulated industry, DeVry's student outcomes are best in class and we view DeVry as a good steward of government-funded student tuition payments. . . . DeVry remains a good actor, in our view, and we like its current and future policy profile and therefore its ability to operate its business with an eye on shareholder returns rather than potential regulatory interference." (William Blair, August 4, 2014);

- "At the same time, it sees evidence of improving labor market outcomes for its graduates, which ultimately should be the driver of a recovery in demand." (Wells Fargo Securities LLC Equity Research, February 6, 2015).

78.     Thus, Defendants embarked on their fraudulent scheme to boost student enrollment (and thus, revenues) since at least 2008, by advertising that 90% of DeVry University graduates actively seeking employment had careers in their fields of study within six months of graduation.  Similarly, Defendants also represented that DeVry University graduates obtained jobs with significantly higher incomes than graduates of other colleges or universities.  This

43

deceptive information was not only disseminated in advertisements but, most importantly for shareholders, in the Company's SEC filings and other investor-oriented Company publications.

      1.      **DeVry's Misleading SEC Filings and Public Announcements Tout the Success of Graduates to Attract Students and Grow Revenue and Earnings Per Share**

79.     Throughout the Class Period, Defendants touted the student outcomes at DeVry University in DeVry's SEC filings and other public announcements, specifically emphasizing the correlation between high graduate employment and salary statistics and the potential to grow revenues and earnings, increase enrollments, and successfully compete with other schools.

80.     On August 11, 2011, prior to the beginning of the Class Period, DeVry issued a press release announcing financial results for 4Q and full-year 2011, ended June 30, 2011. In that press release, the Company announced quarterly revenues of $546.7 million (an 8% increase from the prior year quarter) and earnings per share of $1.08 (a 9% increase from the prior year quarter). For the entirety of Fiscal 2011, the Company also announced revenues of $2,182 million (a 14% increase from the prior year) and earnings per share of $4.68 (a 21% increase from the prior year). In regard to undergraduate student enrollment for the DeVry University Summer 2011 session, the press release announced 15,566 new students (a 25.6% decrease from the prior year) and 64,317 total students (a 5.8% decrease from the prior year).

81.     Defendant Hamburger stated in the August 11, 2011 press release, "[w]e were not satisfied with our short-term enrollment performance this quarter . . . but we believe in our long-term opportunities for growth. Recently we have been experiencing a challenging external environment characterized by a prolonged tough economy and new regulatory changes. We believe that by remaining focused on our strategy of quality and diversification, we will return to

a long-term growth trend." The August 11, 2011 press release was attached as an exhibit to a

Form 8-K filed with the SEC on the following day. That 8-K was signed by Defendant Gunst.[9]

82.  At the beginning of the Class Period on August 26, 2011, DeVry released its 2011

Annual Report ("2011 AR") and filed with the SEC its Form 10-K ("2011 10-K") for the fiscal

year ended June 30, 2011. The 2011 10-K, which was signed by Defendants Hamburger and

Gunst, reiterated DeVry's previously reported financial results in its August 11, 2011 press

release. The 2011 AR emphasized both the Company's strong financial performance and the

success of its programs resulting in 89% of DeVry University's recent graduates obtaining jobs

in their fields of study. The Company reported an increase of 14% in revenues ($2,182,371,000

in 2011 compared to $1,915,181,000 in 2010), an 18% increase in net income ($330,403,000 in

2011 compared to $279,909,000 in 2010) and an increase of 20.9% in earnings per common

share ($4.68 in 2011 compared to $3.87 in 2010).

83.  In his Fellow Shareholders, Students, Coworkers, and Friends Letter, Defendant

Hamburger specifically tied the Company's financial success with its students and career

success:

> Achieving that vision [of preparing students for careers that would
> improve the quality of life for themselves] requires strong financial
> results – and in 2011, DeVry delivered. In fiscal 2011, our
> revenues totaled $2.2 billion, a 14 percent increase over 2010, and
> net income grew by 18 percent to $330 million. These results
> enabled us to make significant investments to support the
> execution of our "Achieve-Grown-Build" strategy.
>
> * * *
>
> We are committed to investing in the services, programs, and
> infrastructure that enable us to provide excellent service to our
> 119,000 students. We know that these investments are the key to

---

[9] On June 9, 2011, DeVry announced that Defendant Gunst had informed the Company of his intent
to retire from his position as Chief Financial Officer, but that he would stay in that position while the
Company searched for his replacement.

our students' academic and career success. ***We also know that their success builds our schools' reputation and drives DeVry's growth.***

84.     The 2011 AR boasted the success of the Company's graduates with the success of

its "90/40" standard:

> Our goal is simple: we want to give our students the education, services, and support they need to succeed, both while they are our students and after they graduate.
>
> We measure DeVry University's achievement towards that goal with our "90/40" standard: within six months of graduation, we want 90 percent of our graduates employed in their fields of study at an average salary of $40,000 or more. ***Even in this year's challenging job market, 89 percent of our graduates had jobs in their fields with an average salary of more than $43,000***.

85.     In the Company's 2011 10-K, the Company discussed enrollment trends for both

its DeVry University undergraduate and graduate programs:

> New student undergraduate enrollment in summer 2011 decreased 25.6% to 15,566 students as compared to the prior year. Total undergraduate enrollment in summer 2011 was 64,317 students, a decrease of 5.8% compared to 68,290 in the previous summer. There were 21,576 coursetakers for the July 2011 session in DeVry University's graduate programs, including its Keller Graduate School of Management, representing an increase of 1.9% over the prior year. Coursetaker enrollment in DeVry University online program offerings in summer 2011 was 69,617, a decrease of 0.7% over the prior year.

86.     As the 2011 10-K noted, a "strong motivation for students considering a

postsecondary education is the prospective income premium." At the same time, the Company

noted the competitive nature of the postsecondary education market which is "highly fragmented

and competitive; no single institution has a significant market share." Thus, the Company stated

that:

> In every market in which DeVry University operates, there are numerous state institutions, community colleges, and independent universities. In particular, there is growing competitive pressure

46

from community colleges, traditional universities, and technical colleges . . . .  In addition, there is growing competition from online programs (by private-sector, publically-funded and independent institutions) and site-based private-sector school programs.

87.    The 2011 10-K also discussed the Company's marketing and outreach, noting that:

DeVry University currently advertises on various Internet sites, on television and radio, in magazines and newspapers, and utilizes telemarketing and direct mail to reach prospective students.  DeVry University frequently updates its marketing programs in order to better communicate the quality of its degree programs and the value of a DeVry University education.  DeVry University's highly integrated brand initiative focuses on the university's graduate employment success, while emphasizing DeVry University as an accredited, highly-respected academic institution.  The brand campaign is grounded in ongoing in-depth consumer, marketplace and brand research, and leverages a number of channels, including broadcast, print and Internet advertising, public relations, and social media, as well as local marketing efforts.

88.    In addition, the Company recognized that its financial success—and that of its graduates—depends on the employment of its graduates.  Thus, the 2011 10-K stated with respect to DeVry University:

DeVry University believes that the employment of its graduates is essential to the achievement of its mission and the ability to attract and retain students.

\* \* \*

DeVry University attempts to gather accurate data to determine how many of its undergraduates, both at the associate and bachelor's degree levels, are employed in positions related to their program of study within six months following graduation.  To a large extent, the reliability of such data depends on the quality of information that graduates self-report.

One measure of success is the employment outcomes of DeVry University graduates.  ***Eighty-nine percent of DeVry University's June 2009, October 2009 and February 2010 graduates in the***

47

*active job market were employed in fields of their study within six
months of graduation at an average salary of $43,035.*

89.     Finally, the 2011 10-K contained certifications signed by Defendants Hamburger

and Gunst pursuant to §302 of the Sarbanes-Oxley Act of 2002 ("SOX"), which falsely stated:

I, [Daniel M. Hamburger/Richard M. Gunst], certify that:

1.  I have reviewed this annual report on Form 10-K of DeVry Inc.
for the fiscal year ending June 30, 2011;

2.  Based on my knowledge, this report does not contain any untrue
statement of a material fact or omit to state a material fact
necessary to make the statements made, in light of the
circumstances under which such statements were made, not
misleading with respect to the period covered by this report;

* * *

4.  The registrant's other certifying officer and I are responsible for
establishing and maintaining disclosure controls and procedures
(as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and
internal control over financial reporting (as defined in Exchange
Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or
caused such disclosure controls and procedures to be
designed under our supervision, to ensure that material
information relating to the registrant, including its
consolidated subsidiaries, is made known to us by others
within those entities, particularly during the period in
which this report is being prepared;

* * *

c)  Evaluated the effectiveness of the registrant's disclosure
controls and procedures and presented in this report our
conclusions about the effectiveness of the disclosure
controls and procedures, as of the end of the period covered
by this report and based on such evaluation[.]

90.     Defendants Hamburger, Gunst, and Wiggins made substantially similar false

statements in SOX certifications attached to DeVry's regulatory filings throughout the Class

Period, including in Forms 10-Q for the periods 1Q 2012, 2Q 2012, 3Q 2012, 1Q 2013, 2Q 2013,

3Q 2013, 1Q 2014, 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, and 1Q 2016, and Forms

10-K for the 2012, 2013, 2014, and 2015 fiscal years.[10]

91.     On October 6, 2011, the Company issued a press release titled "Graduates from

DeVry Inc. Schools Earn up to 65 Percent More with Degrees, According to New Research"

which touted the value of a degree from DeVry University:

> DeVry Inc. . . . a leading global provider of higher education,
> released a research study today showing that graduates increase
> their annual wages significantly when they earn a degree from
> DeVry University, Chamberlain College of Nursing or Carrington
> College California.
>
> The independent economic-impact analysis, conducted by The
> Cicero Group for DeVry Inc., tracked wage growth from 2003 to
> 2010 for graduates from three DeVry Inc. schools in seven states,
> as well as a control group of individuals who expressed interest in
> DeVry University, Chamberlain College of Nursing or Carrington
> College of California, but ultimately did not pursue a college
> degree.  Both groups had statistically similar starting salaries of
> $25,000-$27,000 in 2003. But by the end of the seven-year period,
> graduates form the three DeVry Inc. schools out-earned those in
> the control group by significant margins in all degree categories.
>
> Specifically, graduates who earned a bachelor's degree from a
> DeVry Inc. school increased their earnings by 65 percent to an
> average $44,262 at the end of the seven year period, compared to
> the control group's average final earnings of 18 percent, or
> $29,224.  Associate degree earners saw wage growth of 42 percent
> to an average $39,478; and certificate holders increased their
> wages 22 percent to an average $31,782.
>
> *   *   *
>
> **Economic Impact Beyond Graduate Wages**
>
> Beyond increases in graduate earnings, the study also analyzed the
> overall economic impact DeVry Inc. schools have on seven state
> and local economies.  In California, Florida, Illinois, New Jersey,

---

[10] All quarterly and annual reports filed with the SEC between the start of the Class Period and January 3, 2012 contained SOX certifications by Defendants Hamburger and Gunst.  Beginning on January 3, 2012 and continuing through the end of the Class Period, all quarterly and annual reports filed with the SEC contained SOX certifications signed by Defendants Hamburger and Wiggins.

New York, Ohio and Texas, DeVry Inc. schools had a total
economic impact of $822 million in FY2010, including $324
million in direct spending, which led to an additional $497 million
in indirect and induced spending. This overall impact is an
increase of $135 million from the previous fiscal year.

\* \* \*

"This research is yet one more example of DeVry's commitment to
transparency and accountability. We want students, prospective
students and taxpayers to have objective information to evaluate
the impact of a DeVry education," Hamburger said. "By
quantifying the ways in which our schools positively impact the
careers of our students, as well as contribute to local and state
economies, I hope people gain a better understanding of DeVry's
overall value and our role in higher education in America."

92.     On October 25, 2011, the Company issued a press release announcing financial

results for 1Q 2012, ended September 30, 2011. In that press release, the Company announced

quarterly revenues of $519 million (a 0.5% decrease from the prior year quarter) and earnings

per share of $0.83 (a 19.4% decrease from the prior year quarter). With respect to DeVry

University graduates' employment statistics following graduation, the Company noted that:

Despite the continued tough job market, ***87.3 percent of DeVry
University's June 2010, October 2010 and February 2011
graduates in the active job market were employed in their fields
of study within six months of graduation at an average salary of
$42,645***. These statistics include graduates of associate and
bachelor's degree programs and those who were already employed
in their field of study.

The Company sought to hedge these numbers by qualifying that the employment figures

"[e]xclude[] graduates continuing their education, foreign graduates ineligible to work in the

United States/Canada and those unable to accept career advising because of extreme

circumstances," and further "[e]xclude[] graduates who actively pursued employment for less

than 180 days and did not become employed."

50

93.     Defendant Hamburger stated in the October 25, 2011 press release, "[w]e are confident that what we are seeing now is a near-term discontinuity in the long-term growth trend. Our confidence is bolstered by the fundamental need for career-focused education both in the United States and in emerging markets, and by the strong value proposition we offer our students." The October 25, 2011 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Gunst.

94.     On the same day the Company issued its press release announcing 1Q results, it held its 1Q 2012 Earnings Conference Call. Participating on the call were Defendants Hamburger, Unzicker, and Gunst. In his opening presentation, Defendant Hamburger discussed the value of a DeVry University education with respect to employment following graduation. Defendant Hamburger noted that:

> [O]ur confidence is bolstered by this fundamental need for career focused education. And by the strong value proposition that we offer our students. Recently we released a study we had commissioned by the Cicero Group which tracked wage growth from 2003 to 2010 for graduates from three of our institutions in seven states alongside a control group of individuals who expressed interest in one of these colleges but ultimately didn't pursue a degree. By the end of the seven-year period, the Bachelor's Degree graduates from the DeVry institutions increased their earnings on average by 65%; compared to that control group, the average was 18%. And similarly for Associate Degree graduates, wages increased on average 42% compared to 22% for the control group. This study demonstrates that our graduates are receiving a significant return on their educational investment.
>
> **As another indicator of the value proposition that we offer students, even in this tough job market, our graduate employment rate for DeVry University students in the active job market employed in their field of study within six months of graduation is 87%.** Now the goal we hold ourselves accountable to had always been 9 out of 10. So to hold ourselves accountable, we're investing more resources to help our students like our new partnership with CareerBuilder.

95.     On November 4, 2011, the Company filed its Form 10-Q with the SEC for the 1Q

2012 ended September 30, 2011 ("1Q 2012 Form 10-Q"), which was signed by Defendants

Hamburger and Gunst.  The 1Q 2012 Form 10-Q reiterated DeVry's previously reported

financial results in its October 25, 2011 press release, stating "[t]otal consolidated revenues for

the first quarter of fiscal year 2012 of $519.0 million decreased $2.4 million, or 0.5%, as

compared to the year-ago quarter."

96.     With regards to student enrollment, the 1Q 2012 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were driven
> mainly by the negative impact on student decision making of the
> prolonged economic downturn and economic conditions generally,
> resulting in a reduction of interest from potential students.  In
> addition, management believes a near-term distraction of DeVry
> University employees associated with the implementation of new
> regulations also contributed to the decreases in DeVry University
> undergraduate enrollments.  To address these issues, DeVry
> University is adding new programs and locations, and making
> investments to enhance the strength of its brand, improve customer
> service and increase awareness among potential students through
> new and innovative advertising campaigns.

97.     On December 12, 2011, the Company issued a press release announcing Fall 2011

enrollment results for DeVry schools.  In regard to undergraduate student enrollment for DeVry

University, the press release announced 13,558 new students (a 24.6% decrease from the prior

year) and 64,112 total students (a 12.8% decrease from the prior year).  The Company stated in

the press release that "weak economic conditions and persistent unemployment continued to

impact consumer confidence and enrollment results, coupled with adjustments associated with

new regulations.  DeVry University continues to mitigate the effects of this challenging

environment by prudently controlling costs, and by increasing employee training to improve the

student admissions experience."

52

98.     Defendant Hamburger stated in the December 12, 2011 press release that "[w]hile we experienced lower enrollment at some of our institutions during this period, there's no change in the fundamental long-term demand for career-oriented education. . . .  We are focused on turning around our performance in the near-term, and remain confident in our ability to grow over the long-term."  The December 12, 2011 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Gunst.

99.     On December 14, 2011, the Company announced that Defendant Wiggins would replace Defendant Gunst as DeVry's Senior Vice President, Chief Financial Officer, and Treasurer, effective January 3, 2012.

100.     On January 26, 2012, the Company issued a press release announcing financial results for 2Q 2012, ended December 31, 2011.  In that press release, the Company announced quarterly revenues of $524 million (a 5% decrease from the prior year quarter) and earnings per share of $0.13 (an 89.6% decrease from the prior year quarter).  For the six-month period ended December 31, 2011, the Company also announced revenues of $1,043 million (a 2.8% decrease from the prior year period) and earnings per share of $0.97 (a 57.5% decrease from the prior year period).

101.     Defendant Hamburger stated in the January 26, 2012 press release that the Company was "disappointed with these results," but that it was nevertheless "focused on improving [its] performance by implementing initiatives that will drive revenue growth, while controlling costs."  As set forth in the press release, such initiatives included "[e]nhancing awareness to drive student interest in DeVry's career-oriented educational programs."  The January 26, 2012 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Wiggins.

53

102.    On February 6, 2012, the Company filed its Form 10-Q with the SEC for the 2Q

2012 for the quarter ended December 31, 2011 ("2Q 2012 Form 10-Q"), which was signed by

Defendants Hamburger and Wiggins, reiterating DeVry's previously reported financial results in

the January 26, 2012 press release, stating:

> Total consolidated revenues for the second quarter of fiscal year
> 2012 of $524.0 million decreased $27.4 million, or 5%, as
> compared to the year-ago quarter.  For the first six months of fiscal
> year 2012, total consolidated revenues decreased $29.8 million, or
> 2.8%, to $1,043.1 million.

103.    With regards to student enrollment, the 2Q 2012 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were driven
> primarily by the negative impact on student decision making of the
> prolonged economic downturn and economic conditions generally,
> resulting in a reduction of interest from potential students.  In
> addition, management believes a short-term distraction of DeVry
> University employees associated with the implementation of new
> regulations also contributed to the decreases in DeVry University
> undergraduate enrollments.  To address these issues, DeVry
> University is adding new programs and locations.  It is also making
> investments to enhance the strength of its brand, improve customer
> service and increase awareness among potential students through
> new and innovative advertising campaigns.

104.    On March 1, 2012, DeVry announced that Defendant Unzicker had been named as

the Company's Vice President, Finance and Chief Accounting Officer.  Unzicker had previously

been the Company's Vice President and Controller since 2008.

105.    On April 24, 2012, the Company issued a press release announcing financial

results for 3Q 2012, ended March 31, 2012.  In that press release, the Company announced

quarterly revenues of $540.8 million (a 4% decrease from the prior year quarter) and earnings

per share of $1.00 (a 24% decrease from the prior year quarter).  For the nine-month period

ended March 31, 2012, the Company also announced revenues of $1,584 million (a 3% decrease

from the prior year period) and earnings per share of $1.96 (a 45.6% decrease from the prior year

period).  In regard to undergraduate student enrollment for the DeVry University Spring 2012

session, the press release announced 12,025 new students (a 19.7% decrease from the prior year)

and 60,196 total students (a 15.1% decrease from the prior year).  The Company stated in the

press release that these enrollment results "were impacted by a focus on adjusting to new

regulations and prolonged unemployment, which continued to affect consumer confidence."

106.    Defendant Hamburger stated in the April 24, 2012 press release that the Company

"continued to execute on [its] five-point performance improvement plan."  The April 24, 2012

press release was attached as an exhibit to a Form 8-K filed with the SEC on the following day,

which was signed by Defendant Unzicker.

107.    Also on April 24, 2012, the Company held its 3Q 2012 Earnings Conference Call.

Participating on the call were Defendants Hamburger, Unzicker, and Wiggins.  In response to a

question posed by a securities analysts with respect to graduate employment statistics at the

Chamberlain school, Defendant Hamburger noted the following with respect to DeVry

University:

> … and also ***the graduate employment statistics for DeVry
> University are also holding up pretty strong, still 80%.  We're not
> meeting our 90% goal, but still holding up very well***.  It's more a
> factor of prospective students.  We've just seen that among their
> environment or their neighbors or their friends, in the popular press
> just causing that hesitation on the front end.  But the good news
> that help us spread the word is the graduates of our institutions are
> doing quite well.

108.    On May 3, 2012, the Company filed its Form 10-Q with the SEC for the 3Q 2012

for the quarter ended March 31, 2012 ("3Q 2012 Form 10-Q"), which was signed by Defendants

Wiggins and Unzicker, reiterating DeVry's previously reported financial results in its April 24,

2012 press release, stating:

> Total consolidated revenues for the third quarter of fiscal year 2012
> of $540.8 million decreased $21.9 million, or 3.9%, as compared

to the year-ago quarter. For the first nine months of fiscal year 2012, total consolidated revenues decreased $51.7 million, or 3.2%, to $1,583.9 million.

109. With regards to student enrollment, the 3Q 2012 Form 10-Q emphasized that:

Management believes the decreases in enrollments were driven primarily by the negative impact on student decision making of the prolonged economic downturn and persistent unemployment, resulting in a reduction of interest from potential students. In addition, management believes a short-term distraction of DeVry University employees associated with the implementation of new regulations in July 2011, along with the heightened competition, also contributed to the decreases in DeVry University undergraduate enrollments. To address these issues, DeVry University is enhancing the effectiveness of its recruiting efforts. During the third quarter, DeVry University provided additional training to its admissions advisors on revisions that were made to their performance management system stemming from the implementation of new regulations in July 2011. It is also making investments to enhance the strength of its brand, improve customer service and increase awareness among potential students through new and innovative advertising campaigns.

110. Less than a week later, on May 9, 2012, at the Robert W. Baird & Co. Inc. Growth Stock Conference, in response to an analyst's question, Defendant Hamburger recognized that career-oriented education is critical for DeVry University's competitive position:

[B]ut the key is what's our competitive position. What's our value proposition, how are we going to enhance that to compete. And there, what's really important is enhancing that focus on career oriented education [still] enhancing for example our career services. And we have taken that up over the last couple of years to 200 career services professionals just at DeVry University. So that is a way to compete with any other universities that have a little office, or career services that don't offer that.

111. On June 12, 2012, Defendant Hamburger participated in and presented at the William Blair & Company LLC Stock Growth Conference wherein he discussed the success of DeVry and in particular DeVry University student outcome statistics:

So we have a diverse family of educational institutions, and they all share a common operating philosophy. That is that quality leads

56

to growth. Our focus on academic quality drives strong student outcomes that strengthens our reputation and results in continued enrollment growth. And this growth ultimately leads to strong financial results as well.

\*     \*     \*

So let me turn now to our long-term strategy for driving growth and value. Ask anyone at DeVry what our strategy is and they will summarize it for you in three words. Achieve, grow, and build.

Achieve superior student outcomes. How do we do that? By providing high-quality career-oriented academics, service excellence and innovative educational technology. . . . Many students are attracted by our focus on career-oriented education. . . . That's career-oriented academics.

112.    During the Question and Answer session, in response to a question from an unidentified audience member, Defendant Hamburger confirmed that we "revolve around basically two pillars.  One, our metrics of outcomes and the other is standards of professional practice.  So metrics of outcomes would include, do the students learn? Do they graduate? Are they employed in their field of study? Are they repaying their loans?"

113.    On July 23, 2012, the Company issued a press release previewing financial results for 4Q 2012, ended June 30, 2012.  In that press release, the Company announced quarterly revenues of between $500 million and $510 million and earnings per share of between $0.43 and $0.46.  In regard to undergraduate student enrollment for the DeVry University Summer 2012 session, the Company stated that it expected to report a decline of 15% to 17% in new enrollments.

114.    Defendant Hamburger stated in the July 23, 2012 press release, "[w]hile we are disappointed with this quarter's results, we are optimistic about mid- and long- term growth in higher education."  The July 23, 2012 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

115.    On August 9, 2012, the Company issued a press release announcing financial results for 4Q and full-year 2012, ended June 30, 2012.  In that press release, the Company announced quarterly revenues of $505.9 million (a 7.5% decrease from the prior year quarter) and earnings per share of $0.12 (an 88.9% decrease from the prior year quarter).  For Fiscal 2012, the Company also announced revenues of $2,089 million (a 4.2% decrease from the prior year) and earnings per share of $2.09 (a 55.3% decrease from the prior year).  In regard to undergraduate student enrollment for the DeVry University May 2012 session, the press release announced 5,730 new students (a 14.3% decrease from the prior year) and 60,044 total students (a 14.7% decrease from the prior year).  For DeVry University's July 2012 undergraduate session, the press release announced 7,532 new students (a decrease of 16.6% from the prior year) and 50,503 total students (a decrease of 15.8% from the prior year).  The Company stated in the press release that "[e]nrollment results for DeVry University at both the undergrad and graduate levels continue to be negatively impacted by the prolonged economic downturn and low consumer confidence, trends being experienced across higher education."  The August 9, 2012 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

116.    On August 28, 2012, the Company issued its 2012 Annual Report ("2012 AR) and filed with the SEC its Form 10-K ("2012 10-K") for the fiscal year ended June 30, 2012.  The 2012 10-K was signed by Defendants Hamburger, Wiggins, and Unzicker.  In the 2012 AR, the Company reported a decrease of 4% in revenues ($2,089,781,000 for 2012 compared to $2,182,371,000 in 2011), a decrease of 57% in net income ($141,565,000 for 2012 compared to $330,403,000 for 2011) and a decrease of 55% in earnings per share ($2.09 for 2012 compared to $4.68 in 2011).

117.    In his Fellow Owners, Students, Colleagues and Friends Letter, Defendant

Hamburger stated:

> 2012 proved to be a challenging year not just for DeVry but also
> for the entire U.S. higher-education system. . . . While our
> financial outcomes in 2012 were not what we wanted, our student
> outcomes were—and our investments in quality and capacity mean
> that we are poised to transition to recovery and growth in our
> enrollments and financial results.  The years ahead hold
> tremendous promise for DeVry's institutions and our students.  We
> are confident that our hard work in 2012 will yield great
> opportunities in the years that follow.

118.    In the 2012 10-K, in addition to noting the decrease in revenue, net income and

earnings per share, reported the decrease in new student enrollment:

> New student undergraduate enrollment in July 2012 session
> decreased 16.6% to 7,532 students as compared to the prior year.
> Total undergraduate enrollment in July 2012 was 50,503 students,
> a decrease of 15.8% compared to 59,966 in the previous summer.
> There were 16,397 total students for the July 2012 session in
> DeVry University's graduate programs, including its Keller
> Graduate School of Management, representing a decrease of 9.7%
> from the prior year.

119.    With respect to marketing and outreach, the 2012 10-K notes the following:

> DeVry University currently advertises on various Internet sites, on
> television and radio, in magazines and newspapers, and utilizes
> telemarketing and direct mail to reach prospective students.  DeVry
> University frequently updates its marketing programs in order to
> better communicate the quality of its degree programs and the
> value of a DeVry University education.  DeVry University's highly
> integrated brand initiative focuses on the university's graduate
> employment success, while emphasizing DeVry University as an
> accredited, highly-respected academic institution.  The brand
> campaign is grounded in ongoing in-depth consumer, marketplace
> and brand research, and leverages a number of channels, including
> broadcast, print and Internet advertising, public relations, and
> social media, as well as local marketing efforts.

120.     In addition, the Company recognized that its financial success, and those of its graduates, depended on the employment of its graduates.  Thus, the 2012 10-K states with respect to DeVry University:

> As *THE* Career University, DeVry University believes that the employment of its graduates is essential to the achievement of its mission and the ability to attract and retain students.
>
> *   *   *
>
> DeVry University attempts to gather accurate data to determine how many of its undergraduates, both at the associate and bachelor's degree levels, are employed in positions related to their program of study within six months following graduation. To a large extent, the reliability of such data depends on the quality of information that graduates self-report.
>
> One measure of success is the employment outcomes of DeVry University graduates.  Each year, thousands of DeVry University graduates have started careers in their chosen fields within 6 months or less of their graduation. ***Eighty-six percent of DeVry University's February 2011, June 2011 and October 2011 graduates in the active job market were employed in their fields of study within six months of graduation at an average salary of $42,626.  These statistics include graduates of associate and bachelor's degree programs and those who were already employed in their field of study***.
>
> (Emphasis in first quoted paragraph in original).

121.     On September 13, 2012, Defendant Hamburger participated in and presented at the BMO Capital Markets Back to School Education Conference wherein he discussed the success of DeVry and in particular DeVry University graduates' employment statistics.  In response to an analyst's question about the thesis of investing in DeVry, he emphasized that "[e]verybody knows DeVry's reputation for quality and certainly students and families know DeVry. DeVry University equals careers, they know that reputation, employers, we've a great reputation with employers for those career outcomes."  In response to another question by the same analyst about DeVry's priorities, Defendant Hamburger stated:

The second area is regaining enrollment growth. That involves improving our marketing, recruiting and retention, all three of those count, retention counts every bit as much as recruiting a new student. Marketing is focused on both the sort of the media mix and the tactics as well as the message itself and the branding. So a lot of focus on social, digital, website optimization, search engine optimization. And we're adding to the dedicated group that we have doing that. The message, reinforcement of our brand.

> \*      \*      \*

And then, recruiting. We still had a dislocation or a disruption in our conversion rates, probably the best way to measure that, July of 2011, when we had new regulations and so changing the way to your performance review that, might change that might be distracting for you. And we've worked always through that. So we've done a lot of training. For a while there, I think our admissions advisors kind of froze up, our managers froze up, not sure what I am allowed to say, what am I not allowed to say, so we've done a lot of training that says, you know what, don't focus on that focus on the student in front of you. You were compliant, this is DeVry, you've never done a wrong thing, you're compliant now. But they needed to hear that because there was just sort of, hearing so much negative press and everything, wondering. I have done something wrong, no, you're not doing anything wrong. And over the course of the year, we worked our way through that and now I'd say that we are up a good 20%, 30% off the bottom terms of improving our conversion rate from where we were. And the result of all these efforts to improve our enrollments is actually starting to work.

122.     On October 25, 2012, the Company issued a press release announcing financial results for 1Q 2013, ended September 30, 2012. In that press release, the Company announced quarterly revenues of $482.7 million (a 7% decrease from the prior year quarter) and earnings per share of $0.49 (a 41% decrease from the prior year quarter). In regard to undergraduate student enrollment for the DeVry University September 2012 session, the press release announced 6,580 new students (an 8.6% decrease from the prior year) and 56,086 total students (a 14.9% decrease from the prior year). With respect to the launch of DeVry University's

marketing campaign underscoring employment for its graduates due to its "career-focused

programs," the Company noted:

> DeVry University recently launched a new advertising campaign
> that underscores the growing need for an educated workforce to fill
> tomorrow's jobs in high-demand sectors.
>
> As an example of the strong value proposition of our career-
> focused programs, *graduate employment at DeVry University was*
> *85.7 percent in the most recent annual reporting period*. This
> average includes graduates of associate and bachelor's degree
> programs for the twelve-month period ending February 2012.

123.    A chart which appears in the press release notes that in addition to 85.7% of

DeVry University graduates being employed, the average salary was $42,623 and that the

"[i]formation presented is based on graduate-provided data."  In reaching the 85.7% number, the

Company misleadingly explained that the "[d]enominator excludes graduates continuing their

education, foreign graduates ineligible to work in the United States/Canada and those unable to

accept career advising assistance because of extreme circumstances, such as military service or

critical illness," and the "[n]umerator excludes graduates who actively pursued employment for

less than 180 days and did not become employed."

124.    The October 25, 2012 press release was attached as an exhibit to a Form 8-K filed

with the SEC on the same day, which was signed by Defendant Unzicker.

125.    In the same day, the Company held its 1Q 2013 Earnings Conference Call.

Participating on the call were Defendants Hamburger, Unzicker, and Wiggins.  In his opening

presentation, Defendant Hamburger discussed career-oriented education in terms of its return on

investment (ROI) and return on educational investment (ROEI) and their relation to employment

statistics of DeVry University graduates.  Defendant Hamburger noted that:

> DeVry's programs across all our institutions are focused on these
> types of high ROI programs or high ROEI programs.  And this is
> why DeVry is so confident about the future.  The new DeVry

University employment statistic we announced today shows that *86% of DeVry University graduates who are active in the job market were employed in their field of study within six months of graduation. Average salary? $42,623*. Now that's remarkable in this economy. It demonstrates the quality of our academic offerings and the return on investment for our students.

126. On November 5, 2012, the Company filed its Form 10-Q with the SEC for the 1Q 2013 ended September 30, 2012 ("1Q 2013 Form 10-Q"), which was signed by Defendants Hamburger, Wiggins and Unzicker, reiterating DeVry's previously reported financial results in the Company's October 25, 2012 press release, stating "[t]otal consolidated revenues for the first quarter of fiscal year 2013 of $482.7 million decreased $36.3 million, or 7.0%, as compared to the year-ago quarter."

127. With regards to student enrollment, the 1Q 2013 Form 10-Q emphasized that:

Management believes the decreases in enrollments were driven by the negative impact on student decision making from the prolonged economic downturn and persistent unemployment, resulting in a reduction of interest from potential students. In addition, management believes heightened competition contributed to the decreases in DeVry University undergraduate and graduate enrollments. To regain enrollment growth at DeVry University, management's plan includes channel-focused initiatives, technology and brand awareness. . . . DeVry University's brand awareness campaigns are helping drive higher quality inquires and steadily improving conversion rates.

128. On February 6, 2013, the Company issued a press release announcing financial results for 2Q 2013, ended December 31, 2012. In that press release, the Company announced quarterly revenues of $505 million (a 3.6% decrease from the prior year quarter) and earnings per share of $0.78 (a 500% increase from the prior year quarter). For the six-month period ended December 31, 2012, the Company also announced revenues of $988 million (a 5.3% decrease from the prior year period) and earnings per share of $1.27 (a 30.9% increase from the prior year period). In regard to undergraduate student enrollment for the DeVry University November 2012

session, the press release announced 6,488 new students (a 15.5% decrease from the prior year) and 60,103 total students (a 17.6% decrease from the prior year). For DeVry University's January 2013 undergraduate session, the press release announced 5,593 new students (a 4.7% decrease from the prior year) and 62,435 total students (a 14.9% decrease from the prior year).

129.    Defendant Hamburger stated in the February 6, 2013 press release that "DeVry's focus on quality and diversification is helping us as we work through the cyclical weakness." The February 6, 2013 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

130.    Also on February 6, 2013, the Company held its 2Q 2013 Earnings Conference Call. Participating on the call were Defendants Hamburger, Unzicker, and Wiggins. In response to a question concerning how DeVry University is enticing students to enroll in the university, Defendant Hamburger pointed to the statistic that graduates are employed in their field of study within 6 months of graduation as a fact for attracting students:

> [Question:] You both alluded to the fact that the issue with DeVry University seems to be inquiry that the top of the channel being challenging. I'm just curious how you're changing your message to students, prospective students, to make it less challenging to entice them to enroll. . . .
>
> [Hamburger:] Sure. We're really focusing on DeVry's long-time reputation for being the career university. . . . We've been at this for decades and we've got a long track record of a data, third-party review data back to 1975. ***And since that time our graduates in the active job market have been employed within their field of study within six months of graduation. So that's the kind of message that we think is important to tell[.]***

131.    On February 7, 2013, the Company filed its Form 10-Q with the SEC for the 2Q 2013 for the quarter ended December 31, 2012 ("2Q 2013 Form 10-Q"), which was signed by Defendants Hamburger, Wiggins and Unzicker, reiterating DeVry's previously reported financial results in its February 6, 2013 press release, stating "[t]otal consolidated revenues for the second

quarter of fiscal year 2013 of $505.2 million decreased $18.8 million, or 3.6%, as compared to the year-ago quarter. For the first six months of fiscal year 2013, total consolidated revenues decreased $55.1 million or 5.3% to $988.0 million."

132. With regards to student enrollment, the 2Q 2013 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were driven by the negative impact on student decision making from the prolonged economic downturn and persistent unemployment, resulting in a reduction in interest from potential students. In addition, management believes heightened and innovative competition from both public and private sector education providers contributed to the decreases in DeVry University undergraduate and graduate enrollments. To regain enrollment growth at DeVry University, management's plan includes channel-focused initiatives, technology and brand awareness. . . . DeVry University's brand awareness campaigns are helping drive higher quality inquires and steadily improving conversion rates.

133. On February 26, 2013, Defendant Wiggins participated in and presented at the Robert W. Baird and Co. Inc. Business Solutions Conference wherein he discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> As Daniel Hamburger said recently, and I thought very aptly, he said, when the students think about advancing their education, one thing that's guaranteed is the debt. And I think in their minds, they're not sure that the career at the end is there. ***Even though at DeVry University, we have very good statistics, some 88% of students persist and graduate. If you look at those that are actively looking within six months, will find a position in their field of study and the average pay is $43,000.*** So that's a message I think we can do a better job articulating to the students and that's because we're very much career focused.
>
> *     *     *
>
> And one of the things that is encouraging when we look at DeVry University, one is that we have these good employment statistics. Two, we know that we do well in supporting students to get through this process.

65

134.   On March 6, 2013, the Company issued a press release announcing that DeVry University had received reaffirmation of its accreditation by the Institutional Actions Council of The Higher Learning Commission of the North Central Association of Colleges and Schools.  As explained in the press release, the Higher Learning Commission accredits degree-granting educational institutions such as DeVry University, and is recognized by the DoE.  The March 6, 2013 press release stated that more information regarding DeVry University's accreditation could be found at http://www.ncahlc.org.  That website provides information concerning the accreditation process and the criteria for accreditation of educational institutions.  Notably, such criteria include the requirement that an "institution evaluates the success of its graduates" including by "assur[ing] that the degree or certificate programs it represents as  preparation for advanced study or employment accomplish these purposes."  The criteria also require that an institution "looks to indicators it deems appropriate to its mission, such as employment rates[.]"  The March 6, 2013 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

135.   On March 13, 2013, Defendant Hamburger participated in and presented at the Credit Suisse 15th Annual Global Services Conference wherein he discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> Well, the other measures of quality is successful student outcomes. . . . ***At DeVry University, nearly 86% of our graduates in the active job market were employed in their field of study within six months of graduation.  And these graduates earned an average salary of over $43,000.  So that's a marker of academic quality***.
>
> \* \* \*
>
> One question that we've asked is how do we compete?  How does DeVry compete?  What is it that attracts students to our institutions in this competitive environment that's out there in higher education?  We refer to it as HIRE Education.  It's spelled a little bit differently, HIRE.  The H is for hands-on, small-class sizes,

individual attention, from professors who know you by name not a number. The I, in three years you can get a four year bachelor's degree. In other words that's speed to degree. The R is for the reputation that our institutions enjoy with students, with accreditors, and especially with employers. And that leads to the E, *incredible employment outcomes like the 86% employed [at] $43,000 that I referenced earlier [at] DeVry University*.

136.    On April 15, 2013, the Company announced that it had received a subpoena from the Office of the Attorney General of the State of Illinois and a Civil Investigative Demand issued by the Office of the Attorney General of the Commonwealth of Massachusetts. As stated by the Company, the Illinois subpoena "was issued pursuant to the Illinois False Claims Act in connection with an investigation concerning whether the compensation practices of DeVry and certain of its affiliates are in compliance with the Incentive Compensation Ban of the Higher Education Act." Moreover, the Massachusetts demand "was issued in connection with an investigation into whether DeVry caused false claims and/or false statements to be submitted to the Commonwealth of Massachusetts relating to student loans, guarantees, and grants provided to DeVry's Massachusetts students." The Company stated that it could not predict the outcome of the investigations at that time.

137.    On April 23, 2013, the Company issued a press release announcing financial results for 3Q 2013, ended March 31, 2013. In that press release, the Company announced quarterly revenues of $509 million (a 5.9% decrease from the prior year quarter) and earnings per share of $0.88 (a 12% decrease from the prior year quarter). For the nine-month period ended March 31, 2013, the Company also announced revenues of $1,497 million (a 5.5% decrease from the prior year period) and earnings per share of $2.15 (a 9.7% increase from the prior year period). In regard to undergraduate student enrollment for the DeVry University March 2013 session, the press release announced 6,533 new students (a 21.2% decrease from the prior year) and 56,958 total students (a 16.5% decrease from the prior year). The Company

stated that while "[e]nrollment results continue to be impacted by lower cyclical demand among the university's target segment of students," the Company's "plan to improve enrollment results includes enhancing communications to students about DeVry University's excellent graduate employment results[.]"  The April 23, 2013 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

138.    Also on April 23, 2013, the Company held its 3Q 2013 Earnings Conference Call. Participating on the call were Defendants Hamburger, Unzicker, and Wiggins.  In his opening presentation, Defendant Hamburger discussed the steps the Company was taking to increase enrollment growth at DeVry University which included becoming aggressive in its message that that a degree from DeVry University translates into quick employment at a very good salary. Defendant Hamburger stated:

> [L]et's focus on the steps that we're taking to address these challenges and regain . . . enrollment growth at DeVry University. Our strategy is centered on the fact that DeVry University offers a very strong return on investment, and we need to do more to demonstrate this inherent value proposition to prospective students. So first we're changing our messaging to be more hard hitting on DeVry University as the career university.  You know, *86% of graduates active in the job market are employed in their field of study within six months of graduation. And that's with an average salary over $43,000.  And the percent is trending up as we're going through this fiscal year*.  So we're going to do a better job communicating these impressive results to prospective students.

139.    On May 3, 2013, the Company filed its Form 10-Q with the SEC for the 3Q 2013 for the quarter ended March 31, 2013 ("3Q 2013 Form 10-Q"), which was signed by Defendants Hamburger, Wiggins, and Unzicker, reiterating DeVry's previously reported financial results reiterating in its February 6, 2013 press release, stating "[t]otal consolidated revenues for the third quarter of fiscal year 2013 of $508.8 million decreased $32.1 million, or 5.9%, as compared

to the year-ago quarter. For the first nine months of fiscal year 2013, total consolidated revenues

decreased $87.2 million or 5.5% to $1,497 million."

140. With regards to student enrollment, the 3Q 2013 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were due to
> lower cyclical demand from the University's target student
> segment driven by the prolonged economic downturn, persistent
> unemployment, negative perceptions of the value of a college
> degree and increased reluctance to take on debt, resulting in a
> reduction of interest from potential students. In addition,
> management believes heightened competition from both public-
> sector and private-sector education providers and issues with
> internal execution contributed to the decreases in DeVry University
> undergraduate and graduate enrollments. To regain enrollment
> growth at DeVry University, management's plan includes channel-
> focused initiatives, technology improvements and brand
> awareness.

141. On June 13, 2013, Defendant Hamburger participated in and presented at the

William Blair & Company LLC Growth Stock Conference wherein he again discussed the

success of DeVry and in particular DeVry University graduates' employment statistics:

> So in addition to academic quality investments, the other measure
> that I would give you of academic quality is successful student
> outcomes. . . . At DeVry University, ***nearly 86% of our graduates
> in the active job market were employed in their field of study
> within six months of graduation. And these graduates earned an
> average salary of $43,000[.]***
>
> \*       \*       \*
>
> And so we're confident in the growth opportunities over the long-
> term, and for private sector education specifically, but for DeVry in
> particular for three main reasons. And first, there is a growing
> need for career-oriented education. . . . . The second reason is a
> strong ROI from education, or as we like to refer to it, ROEI,
> Return On Educational Investment. The US Census Bureau
> recently released a report showing that the difference in lifetime
> earnings between a high school grad and a college grad is $1
> million. The difference is, of course, even greater in fields like
> engineering, computer science, and healthcare. And DeVry is
> focused on these types of high ROEI programs.

\*      \*      \*

And so we're confident in long-term growth, given this growing need for career-oriented education, the public sector is struggling to meet the demand, and the strong ROEI. And we think perspective students understand ROEI very well. But right now, many are waiting; they're just not sure if this is the right time to commit to college. And this leads us to believe that there may be some pent-up demand building, to be released as the economy improves.

142.    In response to a question from an unidentified audience member concerning the

Department of Education's scrutiny of employment statistics, Defendant Hamburger stated:

Okay. So two-part question.  How would the Department of Education, which has increased scrutiny on higher education generally as well as in the private sector specifically, view our outcomes?  And then how about that, those employment results, the 86% that I mentioned.  By the way, that's, our goal, is that nine out of 10 DeVry University graduates in the active job market should be employed in their field of study, not just any job, in their field of study within six months,  not 12 months, not 100 years, it's got to be within six months.

Third party reviewed statistics that we have disclosed publicly with third-party review since 1975,  so there is a lot of talk now about more disclosure.  We should have tough rules and make everybody disclose it.  We've been disclosing it for a long time. . . . I don't know of too many universities that even talk about what their current statistics are, let alone have third-party review and display those on their website, and hand that to every prospective student who interviews. I think the Department of Education would also acknowledge, and has many times, that there are good actors and bad actors in the public sector and the private sector. There's no monopoly on one or the other, we do need to make sure we have strong rules of the road for all.

\*      \*      \*

[A]nd that's our advocacy. DeVry is basically two pillars. Pillar one is outcomes metrics.  So, are the students learning, are they graduating,  are they repaying their loans, are they employed? And pillar two is professional standards conduct, strong disclosure. Professional standards, maybe even like a trial period where kind of like when you buy a car, you can return it in three days or something like that.

70

143.    On August 8, 2013, the Company issued a press release announcing financial results for 4Q and full year 2013, ended June 30, 2013.  In that press release, the Company announced quarterly revenues of $480 million (a 4.4% decrease from the prior year quarter) and a per share loss of $0.51 ($0.63 lower than the prior year quarter).  For the entirety of Fiscal 2013, the Company also announced revenues of $1,964 million (a 5.2% decrease from the prior year) and earnings per share of $1.65 (a 21.1% decrease from the prior year).  In regard to undergraduate student enrollment for the DeVry University May 2013 session, the press release announced 4,616 new students (a 19.4% decrease from the prior year) and 48,842 total students (an 18.7% decrease from the prior year).  For DeVry University's July 2013 session, the press release announced 5,674 new students (a 24.7% decrease from the prior year) and 42,374 total students (a 16.1% decrease from the prior year).  The Company stated in the press release that "DeVry University is focused on highlighting the university's strong value proposition to students."

144.    In the August 8, 2013 press release, the Company noted under the heading "Academic and operational accomplishments" that "*[t]he percentage of DeVry University graduates who were actively seeking employment and had careers in their field within 6 months of graduation increased to 90 percent in calendar 2012*," at an average salary of $43,539.  As a misleading caveat to these figures, the Company stated that the employment and salary statistics are "based on 2012 graduates' self-reported data to DeVry University Career Services who were employed at graduation or who were actively seeking employment after graduation and found employment in their field within six months."  The Company hedged, noting that these figures "[do] not include graduates who were not actively seeking employment,

as determined by DeVry University Career Services, or who did not report data on employment status to DeVry University Career Services."

145.    In addition, Defendant Hamburger stated in the August 8, 2013 press release that "[w]e are responding to a challenging environment by executing a turnaround plan at DeVry University and Carrington including aligning our cost structure, regaining enrollment growth and making targeted investments to drive future growth. Our formula of quality plus diversification equals growth is helping us as we work through the cyclical weakness and we remain confident in the opportunities for long-term growth in career-oriented education." The August 8, 2013 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

146.    On the same day, the Company held its 4Q 2013 Earnings Conference Call. Participating on the call were Defendants Hamburger, Unzicker, and Wiggins. In his opening presentation, Defendant Hamburger touted the improved DeVry University graduate employment statistics as a result of its marketing campaign emphasizing the value of a DeVry University degree after graduation. Defendant Hamburger noted that:

> A recent Gallup poll found that the factor adult Americans say is most important in selecting a college is the percent of graduates who find a good job. This is what DeVry University does. The latest numbers are in, and DeVry University employment statistics increased to more than 90%. ***90% of our graduates in the active job market are employed in their field of study within six months of graduation. And they're earning an average of over $43,500.*** That's higher than the median family household income of our students before they enrolled at DeVry University.
>
> Employers see value from DeVry University, as they repeatedly hire our graduates to fill their jobs. And they send their existing employees to us for continuing education as well. New students from our corporate and government partnerships have grown more than 20%. Today, we have more than 400 agreements in place. We work with corporations, including Walmart, Xerox, Allstate, and others.

72

> Three of our DeVry University campuses placed in the top 100 for return on investment in a ranking by PayScale, and they rated over 1,000 institutions. PayScale's report examined the return on investment given the cost of tuition and the payoff in lifetime earnings. And out of that, we had three in the top 100.

> \* \* \*

> Moving to regaining enrollment growth, the biggest factors depressing demand at DeVry University as well as the overall education market in the U.S. continue to include prospective students' lack of confidence in the job market and in the ROI of college. So the plan to increase enrollment starts with sharpening the communication of DeVry University's value proposition, which is educational quality, career outcomes, and exceptional student support. We'll more aggressively communicate this value proposition, including new, more focused advertising.

> Our plan includes investing $20 million more in media spend in fiscal 2014, increasing our weeks on air by about 50%. And we're funding this from other marketing areas, so our overall marketing spend will be flat.

147. On August 29, 2013, the Company issued its 2013 Annual Report ("2013 AR") and filed with the SEC its Form 10-K ("2013 10-K") for the fiscal year ended June 30, 2013. The 2013 10-K was signed by Defendants Hamburger, Wiggins, and Unzicker. The Company reported a decrease of 5% in revenues ($1,964,375,000 for 2013 compared to $2,071,783,000 in 2012), a decrease of 24% in net income ($106,786,000 for 2013 compared to $141,565,000 for 2012), and a decrease of 21% in earnings per share ($1.65 for 2013 compared to $2.09 for 2012).

148. In his Fellow Owners, Students, Colleagues and Friends Letter, Defendant Hamburger noted the "challenging time" and the "current economic environment" which impacted the Company's financial performance:

> We felt the impact in lower 2013 enrollments at DeVry, which represents half of our organization and therefore had a significant effect on our results: revenues decreased 5 percent to $1.96 billion, and net income declined 25 percent to $107 million.

149.    Defendant Hamburger, referencing the University's student outcome statistics, was upbeat about the future of the Company, expressing confidence in its "turnaround plan" "because DeVry University's value proposition is fundamentally strong."  Specifically, Defendant Hamburger noted that:

> The best measure of our quality is the successful outcomes that our students achieve.  ***Notably, 90 percent of DeVry University's 2012 graduates active in the job market were employed in their fields of study within six months of graduation, earning an average of more than $43,500 annually***.

150.    The 2013 10-K noted, in addition to the decrease in revenue, net income and earnings per share, the decrease in new student enrollment:

> New student undergraduate enrollment in July 2013 session decreased 24.7% to 5,674 students as compared to the prior year. Total undergraduate enrollment in July 2013 was 42,374 students, a decrease of 16.1 % compared to 50,503 in the previous summer. There were 13,281 total students for the July 2013 session in DeVry University's graduate programs, including its Keller Graduate School of Management, representing a decrease of 19.0 % from the prior year.

151.    With respect to its marketing, the 2013 10-K notes that:

> DeVry University currently advertises on various Internet sites, on television and radio, in magazines and newspapers, and utilizes telemarketing and direct mail to reach prospective students.  DeVry University frequently updates its marketing programs in order to better communicate the quality of its degree programs and the value of a DeVry University education.  DeVry University's highly integrated brand initiative focuses on the university's graduate employment success, while emphasizing DeVry University as an accredited, highly respected academic institution.  The brand campaign is grounded in ongoing in-depth consumer, marketplace and brand research, and leverages a number of channels, including broadcast, print and Internet advertising, public relations, and social media, as well as local marketing efforts.

152.     In addition, the Company recognized that its financial success—and that of its

graduates—depends on the employment of its graduates.  Thus, the 2013 10-K states with

respect to DeVry University:

> As The Career University, DeVry University believes that the
> employment of its graduates is essential to the achievement of its
> mission and the ability to attract and retain students.
>
> \*          \*          \*
>
> DeVry University attempts to gather accurate data to determine
> how many of its undergraduates, both at the associate and
> bachelor's degree levels, are employed in positions related to their
> program of study within six months following graduation.  To a
> large extent, the reliability of such data depends on the quality of
> information that graduates self-report.
>
> One measure of success is the employment outcomes of DeVry
> University graduates.  Each year, thousands of DeVry University
> graduates have started careers in their chosen fields within 6
> months or less of their graduation.  ***Ninety percent of DeVry
> University's calendar 2012 graduates in the active job market
> were employed in their fields of study within six months of
> graduation at an average salary of $43,539***.  These statistics
> include graduates of associate and bachelor's degree programs and
> those who were already employed in their field of study.

153.     On October 24, 2013, the Company issued a press release announcing financial

results for 1Q 2014, ended September 30, 2013.  In that press release, the Company announced

quarterly revenues of $450.9 million (a 6% decrease from the prior year quarter) and a loss per

share of $0.11 ($0.60 less than the prior year quarter).  In regard to undergraduate student

enrollment for the DeVry University September 2013 session, the press release announced 6,589

new students (a 0.1% increase from the prior year) and 46,966 total students (a 16.3% decrease

from the prior year).

154.     Defendant Hamburger stated in the October 24, 2013 press release that the

Company was executing on its "formula of quality plus diversification equals growth, which is

mitigating the cyclical weakness in certain segments of U.S. postsecondary education."
Hamburger added that the Company's "turnaround plans at DeVry University and Carrington
Colleges are producing early signs of operational improvement." The October 24, 2013 press
release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was
signed by Defendant Unzicker.

155.    On November 5, 2013, the Company filed its Form 10-Q with the SEC for the 1Q
2014 for the quarter ended September 30, 2013 ("1Q 2014 Form 10-Q"), which was signed by
Defendants Hamburger, Wiggins, and Unzicker, reiterating DeVry's previously reported financial
results in the Company's October 24, 2013 press release, stating "[t]otal consolidated revenues
for the first quarter of fiscal year 2014 of $450.9 million decreased $29.0 million, or 6.0%, as
compared to the year-ago quarter."

156.    With regards to student enrollment, the 1Q 2014 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were due to
> lower demand from DeVry University's target student segment
> driven by the prolonged low level of economic growth, persistent
> higher levels of unemployment, negative perceptions of the value
> of a college degree and increased reluctance to take on debt,
> resulting in a reduction in interest from potential students. In
> addition, management believes heightened competition from both
> public-sector and private-sector education providers contributed to
> the decreases in DeVry University undergraduate and graduate
> enrollments. To improve performance at DeVry University,
> management is focused on implementing a turnaround plan which
> includes these points:
>
> · Further improve academic quality;
> · Align the cost structure with enrollment levels;
> · Regain enrollment growth;
> · Make targeted investments with the intent to drive future growth;
> and
> · Manage the change, while developing the team.

* * *

76

> The plan to stabilize enrollments includes communication of
> DeVry University's value proposition, which is education quality,
> career prospects and high levels of student service.

157.    On November 6, 2013, the Company announced that it had changed its name
from DeVry Inc. to DeVry Education Group Inc.

158.    On February 4, 2014, the Company issued a press release announcing financial
results for 2Q 2014, ended December 31, 2013.  In that press release, the Company announced
quarterly revenues of $491.3 million (a 1.9% decrease from the prior year quarter) and earnings
per share of $0.74 (a 5.1% decrease from the prior year quarter).  For the six-month period ended
December 31, 2013, the Company also announced revenues of $942.2 million (a 3.9% decrease
from the prior year period) and earnings per share of $0.63 (a 50.4% decrease from the prior year
period).  In regard to undergraduate student enrollment for the DeVry University November 2013
session, the press release announced 4,824 new students (a 12% decrease from the prior year)
and 43,726 total students (an 11.7% decrease from the prior year).  For the January 2014 session
of DeVry University's undergraduate program, the press release announced 4,911 new students
(a 7.9% decrease from the prior year) and 45,097 total students (a 15.1% decrease from the prior
year).

159.    Defendant Hamburger stated in the February 4, 2014 press release that DeVry's
"formula of quality plus diversification equals growth is mitigating the current weakness in
certain segments of U.S. postsecondary education."  The February 4, 2014 press release was
attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by
Defendant Unzicker.

160.    On the same day, the Company filed its Form 10-Q with the SEC for the 2Q 2014
ended December 31, 2013 ("2Q 2014 Form 10-Q"), which was signed by Defendants
Hamburger, Wiggins, and Unzicker, reiterating DeVry's previously reported financial results in

the Company's February 4, 2014 press release, stating "[t]otal consolidated revenues for the

second quarter of fiscal year 2014 of $491.3 million decreased $9.4 million, or 1.9%, as

compared to the year-ago quarter.  For the first six months of fiscal 2014, total consolidated

revenues decreased $38.4 million or 3.9% to $942.2 million."

161.    With regards to student enrollment, the 2Q 2014 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were due to
> lower demand from DeVry University's target student segment
> driven by the prolonged low level of economic growth, persistent
> higher levels of unemployment, negative perceptions of the value
> of a college degree and increased reluctance to take on debt,
> resulting in a reduction in interest from potential students.  In
> addition, management believes heightened competition from both
> public-sector and private-sector education providers contributed to
> the decreases in DeVry University undergraduate and graduate
> enrollments.  To improve performance at DeVry University,
> management is executing a turnaround plan which includes:
>
> · Sharpening DeVry University's value proposition which is
> educational quality, career outcomes and exceptional student
> support;
> · Aligning the cost structure with enrollment levels; and
> · Strategic use of scholarships to attract new students and improve
> student persistence.
>
> * * *
>
> The plan to stabilize enrollments includes communication of
> DeVry University's value proposition, which is educational quality,
> career prospects and high levels of student service.

162.    Also on February 4, 2014, the Company disclosed that, on January 28, 2014, it

had received "a compulsory request from the FTC to provide documents and information relating

to the advertising, marketing, or sale of secondary or postsecondary educational products or

services or educational accreditation products or services by DeVry Group during the past five

years."  The Company explained that the "purpose of the request is to determine whether

unnamed persons and/or entities have violated or are violating Section 5 of the Federal Trade

Commission Act and, if so, to determine whether further FTC action would be in the public interest."

163.     Several securities analysts expressed limited concern about the FTC's "compulsory request" to DeVry to provide information relating to the advertising, marketing, or sale of educational products or services during the past five years.  Wells Fargo Securities remained upbeat suggesting that the "compulsory requests for marketing information from DeVry for the past five years from the FTC represents a rare regulatory blemish" and noted that the request was "likely part of an effort announced last September that has included a number of lead generation companies and involves coordinated efforts with the Department of Education, the [Consumer Financial Protection Bureau], the Department of Justice and various states."  In fact, Wells Fargo went as far as stating that "DeVry's marketing practices are among the most circumspect in the group, in our opinion, and much more comparable to typical not-for-profit school advertising than to that of its for-profit brethren and so we rate the prospect of a 'federal case' as unlikely."  Deutsche Bank considered the FTC inquiry as "odd" because it did not originate from a state attorney general, the SEC, or the Consumer Financial Protection Bureau. Deutsche Bank expressed its belief that "this is the first school specific FTC inquiry since the late 1990s so it is unclear if other schools will be receiving similar requests or if the FTC is only looking at DeVry."  Securities analysts' lack of concern about the FTC's investigation reflected that they had been misled by the years of flawed data that Defendants had spoon-fed them in pushing the narrative that approximately 90% of DeVry University graduates were placed in jobs in their field of study within six months at salaries that typically exceeded $43,000.

164.     On April 24, 2014, the Company issued a press release announcing financial results for 3Q 2014, ended March 31, 2014.  In that press release, the Company announced

quarterly revenues of $496.1 million (a 1.5% decrease from the prior year quarter) and earnings per share of $0.86 (a 2.3% decrease from the prior year quarter). For the nine-month period ended March 31, 2014, the Company also announced revenues of $1,438 million (a 3.1% decrease from the prior year period) and earnings per share of $1.49 (a 30.7% decrease from the prior year period). In regard to undergraduate student enrollment for the DeVry University March 2014 session, the press release announced 5,018 new students (a 2.5% decrease from the prior year) and 42,583 total students (a 10.4% decrease from the prior year).

165. Defendant Hamburger stated in the April 24, 2014 press release:

> During the quarter we made good progress on our plan to turn around and transform DeVry University, including narrowing the rate of decline in new student enrollment, improving student persistence, and accelerating our cost reduction initiatives. As we look ahead to fiscal 2015, we will continue to enhance our strong student value proposition and to grow and diversify in healthcare, international and professional education.

The April 24, 2014 press release was attached as an exhibit to a Form 8-K filed with the SEC on the following day, which was signed by Defendant Unzicker.

166. On May 5, 2014, the Company filed its Form 10-Q with the SEC for the 3Q 2014 for the quarter ended March 31, 2014 ("3Q 2014 Form 10-Q"), which was signed by Defendants Hamburger, Wiggins, and Unzicker, reiterating DeVry's previously reported financial results in the Company's April 24, 2014 press release, stating "[t]otal consolidated revenues for the third quarter of fiscal year 2014 of $496.1 million decreased $7.7 million, or 1.5%, as compared to the year-ago quarter. For the first nine months of fiscal 2014, total consolidated revenues decreased $46.1 million or 3.1% to $1,438.3 million."

167. With regards to student enrollment, the 3Q 2014 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were due to lower demand from DeVry University's target student segment driven by negative perceptions of the value of a college degree and

increased reluctance to take on debt, resulting in a reduction in interest from potential students. In addition, management believes heightened competition from both public-sector and private-sector education providers contributed to the decreases in DeVry University undergraduate and graduate enrollments. To improve performance at DeVry University, management continues to execute a turnaround plan which includes:

· Stabilizing enrollments and positioning the university for long-term growth;
· Reducing DeVry University's cost structure, while maintaining and enhancing our service to students;
· Regaining DeVry University's technology edge; and
· Developing and supporting the team to execute the strategy.

The plan to stabilize enrollments and position DeVry University for long-term growth includes communication of DeVry University's value proposition, which is educational quality, career prospects and high levels of student service.

168. On the following day, May 6, 2014, in response to an analyst's questions about academic outcomes at the Robert W. Baird & Co. Inc. Growth Stock Conference, Defendant Wiggins stated:

[S]o the profile of students at DeVry are what I call non-traditional students by and large. It's not everybody, but DeVry really excels at students that have had some academic challenge along the way, need additional service or support or care. We're proud of the students that persist and we'll talk a bit about that in a second.

Our graduation rate's in the 30% range, we'd like to see that higher and we're working hard. But the students that persist, our graduate employment data is that, over 90% of students actively seeking jobs have them within six months and the average pay of those folks is $44,000, give or take. So the students that come and persist, do well. We see good results inside the four walls of the schools. Our net promoter score is very high with our students. We like the graduate employment.

We'd like to see more of the students persist. So certainly the students that come, and many of our students are first time college goers, first in their family or in the generation. Our students tend to have less economic means, which means they borrow more. So it's important that students complete their program.

169.    On June 11, 2014, Defendant Hamburger participated in and presented at the William Blair & Company LLC Growth Stock Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> So that's who we are.  And what's the investment thesis on DeVry Group?  It's a clear and powerful formula, quality plus diversification plus long-term thinking, a long-term approach. That is what drives long-term growth.  And when we talk about quality, the key measure is successful student academic outcomes.
>
> Let me share three recent examples of quality across our institutions.  ***At DeVry University, more than 90% of our graduates in the active job market were employed in their field of study within six months of graduation, and these graduates earn an average salary of $44,000.  So that's a 90%, $44,000 statistic. In strong and weak job markets, employers value DeVry University graduates.***

170.    On July 18, 2014, the Company announced that it had received a letter from the Office of the NY AG on July 15, 2014, "requesting cooperation with the NY AG's inquiry into whether recent television advertisements and website marketing regarding DeVry University had violated federal and state laws prohibiting false advertising and deceptive practices.  The letter requested information from January 1, 2011 to the present."  The Company stated at the time that it intended to cooperate with the investigation, but that it could not predict its outcome.[11]

171.    On August 7, 2014, the Company issued a press release announcing financial results for 4Q and full-year 2014, ended June 30, 2014.  In that press release, the Company announced quarterly revenues of $485.1 million (a 1% increase from the prior year quarter) and earnings per share of $0.58 (a $1.09 increase from the prior year quarter).  For Fiscal 2014, the Company also announced revenues of $1,923 million (a 2.1% decrease from the prior year) and

---

[11] In its 2016 Form 10-K, DeVry stated that it "has produced, and continues to produce, responsive information in cooperation with the NY AG's inquiry, and presently is in discussions with the NY AG Staff to address certain concerns the [NY AG] has raised that could form the basis for potential claims by the NY AG if not addressed to [its] satisfaction."

earnings per share of $2.07 (a 25.5% increase from the prior year). In regard to undergraduate student enrollment for the DeVry University May 2014 session, the press release announced 4,388 new students (a 4.9% decrease from the prior year) and 41,977 total students (a 14.1% decrease from the prior year). For DeVry University's July 2014 undergraduate session, the Company announced 4,915 new students (a 13.4% decrease from the prior year) and 37,210 total students (a 12.2% decrease from the prior year).

172.    In a section titled "Graduate Employment Statistics," the Company noted in the August 7, 2014 press release that for DeVry University undergraduates, 90.9% were employed earning an average salary of $44,295. As in previous announcements of employment statistics, the Company qualified those statistics by noting that the figures were based on graduates' "self-reported data to DeVry University Career Services who were employed at graduation or who were actively seeking employment after graduation and found employment in their field within six months." In addition, the Company stated that the figures did "not include graduates who were not actively seeking employment, as determined by DeVry University Career Services, or who did not report data on employment status to DeVry University Career Services."

173.    The August 7, 2014 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

174.    On the same day, the Company held its 4Q 2014 Earnings Conference Call. Participating on the call were Defendants Hamburger, Unzicker, and Wiggins. In his opening presentation, Defendant Hamburger touted DeVry University graduate employment statistics, emphasizing the value of a DeVry University degree after graduation and the value employers attach to it. Defendant Hamburger, emphasizing the student outcome statistics, noted that:

> One of our strongest messages is the value employers attach to a
> DeVry University education, as they consistently hire our

> graduates to fill their jobs and send their existing employees to us
> for continuing education. We announced the latest graduate
> employment results in today's release, and it remained above our
> goal of 90%. ***Actually 90.9% of our graduates in the active job
> market were employed in their field of study within six months of
> graduation. And they're earning an average of about $44,300
> annually***.

175. On August 27, 2014, DeVry released its 2014 Annual Report ("2014 AR") and

filed with the SEC its Form 10-K ("2014 10-K") for the fiscal year ended June 30, 2014,

reiterating the previously reported financial results in the Company's August 7, 2014 press

release. The 2014 10-K was signed by Defendants Hamburger, Wiggins, and Unzicker. The

Company reported a decrease of 2% in revenues ($1,923,371,000 for 2014 compared to

$1,964,375,000 in 2013), an increase of 25% in net income ($134,032,000 for 2014 compared to

$106,786,000 for 2013) and an increase of 25% in earnings per share ($2.07 for 2014 compared

to $1.65 for 2013).

176. In his Fellow Owners, Students, Colleagues and Friends Letter, Defendant

Hamburger boasted:

> ***In 2013, 90% of DeVry University graduates actively seeking
> employment obtained careers in their field of study within six
> months of graduation or were already employed in their field
> when they graduated. These graduates earned an average salary
> of nearly $44,295***. In strong job markets and weaker one alike,
> employers value DeVry University graduates.

177. Within the discussion of "The Vital Role of Private-Sector Education" in the 2014

AR, the Company noted the following with respect to the success of its graduates:

> Increasingly, students and taxpayers are expecting colleges to
> prepare students for employment and careers. ***In 2013, 90 percent
> of DeVry University graduates actively seeking employment had
> careers in their fields within six months of graduation, at an
> average compensation of $44,000***. In addition, a study conducted
> by the Cicero Group found that graduates of DeVry Group
> institutions experienced significant growth in their earnings.

178.    The 2014 10-K noted, in addition to the decrease in revenue, net income and earnings per share, under the heading "Enrollment Trends" for DeVry University, the Company reported the decrease in new student enrollment:

> New student undergraduate enrollment in the July 2014 session decreased 13.4% to 4,915 students as compared to the prior year. Total undergraduate enrollment in July 2014 was 37,210 students, a decrease of 12.2% compared to 42,374 in the previous summer. There were 11,467 total students for the July 2014 session in DeVry University's graduate programs, including its Keller Graduate School of Management, representing a decrease of 13.7% from the prior year.  Management believes the decreases in enrollments are due to lower demand from DeVry University's target student segment.  This is driven by the prolonged low level of economic growth, persistent higher levels of unemployment, negative perceptions of the value of a college degree and increased reluctance to take on debt.  These factors have resulted in a reduction in interest from potential students. In addition, management believes heightened competition from both public-sector and private-sector education providers contributed to the decreases in DeVry University undergraduate and graduate enrollments.

179.    The Company recognized that its financial success, and those of its graduates, depended on the employment of its graduates.  Thus, the 2014 10-K states with respect to DeVry University:

> DeVry University believes that the employment of its graduates is essential to the achievement of its mission and its ability to attract and retain students.  Career Services professionals across the DeVry University system work diligently to partner with graduates to attain positions in their career fields.  Although DeVry University cannot guarantee employment, it is dedicated to helping guide and motivate its students and graduates through the career process.
>
> *            *            *
>
> ***In 2013, 90.9% of graduates of DeVry University's associate and bachelor's degree programs who were actively seeking employment had careers in their chosen fields within six months of graduation at an average salary of $44,295***.  To a large extent, these figures are based upon self-reported data from graduates.

> They reflect graduates who were employed in positions relating to their field of study within 180 days of graduation from among those graduates who were eligible for career assistance and who actively pursued employment relating to their field of study.

180.  With respect to its marketing, the 2014 10-K notes that:

> DeVry University advertises on various Internet sites, on television and radio and utilizes telemarketing and direct mail to reach prospective students. DeVry University is updating its marketing programs in order to better communicate the quality of its degree programs and the value of a DeVry University education. DeVry University's highly integrated brand initiative focuses on the university's graduate employment success, while emphasizing DeVry University as an accredited, highly-respected academic institution. Its campaigns are grounded in ongoing in-depth consumer marketplace research, and leverage multiple channels, including broadcast, print and Internet advertising, public relations, content marketing and social media, as well as local marketing efforts.

181.  In addition, the 2014 10-K again disclosed that on January 28, 2014, DeVry had received a CID for information from the FTC relating to advertising, marketing or sale of secondary or postsecondary education products or services, or education accreditation products or services. The 2014 10-K noted that "[t]he stated nature and scope of the CID was to determine whether unnamed persons and/or entities have violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended and, if so, whether further FTC action would be in the public interest."

182.  On September 18, 2014, Defendant Hamburger participated in and presented at the BMO Capital Markets Back to School Education Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics. For example, in response to questions from a securities analyst about the value proposition of higher education, he stated:

> And in terms of value proposition and brand, DeVry University has a very strong brand that's one of the anchors on which we're

basing our turnaround and transformation process and a very strong value proposition.  And that value proposition at DeVry University centers around two concepts, careers and care.  So careers and care, careers, that's one of our strongest messages.  *We just announced the latest graduate employment statistics, as we do every August, and we remained above 90%, actually, it was 90.9% of our graduates actively seeking employment were employed in their field of study within six months of graduation.*  And those figures include students with careers prior to graduation, so, careers.

*        *        *

So the value proposition of DeVry University is very clear, it's very strong and it's around careers and care.

*        *        *

[A]nd we've published the results of those career statistics long before the school, long before the administration thought it was a good idea,  and we think it's a good idea, too, *that's why for 30 years, 40 years we've published our statistics very consistently, transparency, by program, by market, you as a prospective student or a family can get that information and see, what those outcomes are.*

183.    On October 23, 2014, the Company issued a press release announcing financial results for 1Q 2015, ended September 30, 2014.  In that press release, the Company announced quarterly revenues of $462.0 million (a 2.5% increase from the prior year quarter) and earnings per share of $0.31.  In regard to undergraduate student enrollment for the DeVry University September 2014 session, the press release announced 5,268 new students (a 20% decrease from the prior year) and 39,857 total students (a 15.1% decrease from the prior year).

184.    Defendant Hamburger stated in the October 23, 2014 press release that "DeVry Education Group's strategy of quality plus diversification plus long-term focus continues to differentiate us and position us well for growth opportunities."  Moreover, the Company stated that DeVry University continued to execute its plan of "enhancing the institution's programmatic focus, optimizing its pricing structure, enhancing its marketing and recruiting efforts, and

reducing the cost structure of the organization." The October 23, 2014 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

185. On November 5, 2014, the Company filed its Form 10-Q with the SEC for 1Q 2015, ended September 30, 2014 ("1Q 2015 Form 10-Q"), which was signed by Defendants Hamburger, Wiggins, and Unzicker. The 1Q 2015 Form 10-Q reiterated DeVry's previously reported financial results in its April 23, 2014 press release, stating "[t]otal consolidated revenue for the first quarter of fiscal year 2015 of $462.0 million increased $11.1 million, or 2.5%, as compared to the year-ago quarter."

186. With regards to student enrollment, the 1Q 2015 Form 10-Q emphasized that:

> Management believes the decreases in enrollment have been due to lower demand from DeVry University's target student segment believed to be driven by heightened competition from both public-sector and private-sector education providers, the availability of lower cost degrees, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. To improve performance at DeVry University, management continues to execute a turnaround and transformation plan which includes:
>
> · Attracting the right students into strong programs;
> · Reducing DeVry University's cost structure, while striving to maintain and even enhance our service to students;
> · Regaining DeVry University's technology edge; and
> · Developing and supporting the team to drive execution.

187. On November 12, 2014, Defendant Wiggins participated in and presented at the J.P. Morgan Ultimate Services Investor Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> So that's kind of a quick review of who we are. What's the strategy for DeVry Group? Well, the good news is it's a clear and powerful formula. Quality, plus diversification, plus long-term focus equals growth.

Let me talk about quality. One of the key measures of quality is successful student outcomes and I'd like to recite or give you three examples. At DeVry University, more than 90% of graduates active in the job market were employed in their field of study within six months of graduation. And the average compensation of these graduates was nearly $44,000. In strong and weak job markets, employers value DeVry University grads.

188.     In response to an analyst's questions about the types of students enrolling at

DeVry University, Defendant Wiggins provided:

> **And that's why we feel good about our statistic of over 90% of our students that persist find work in their field of study.**  So I think what we find is many students are -- don't have money. They're concerned about going into debt.  They read the stories -- and maybe there's some generational things going on as well.
>
> *        *        *
>
> So when you're trying to attract students at a big institution like DeVry University, they run the gamut from people that are employed, want to seek a master's degree, getting help from their employer, so they have a job, they'll have a job when they're done, to people -- maybe a single mother that's currently unemployed and hasn't been to school in a number of years.  Those are profoundly different audiences and that's why I'm so confident that the programmatic focus gives us an opportunity.

189.     On February 5, 2015, the Company issued a press release announcing financial

results for 2Q 2015, ended December 31, 2014.  In that press release, the Company announced

quarterly revenues of $484.9 million (a 1.3% decrease from the prior year quarter) and earnings

per share of $0.65 (a 13.3% decrease from the prior year quarter).  For the six-month period

ended December 31, 2014, the Company also announced revenues of $946.9 million (a 0.5%

increase from the prior year period) and earnings per share of $0.96 (a 9.1% increase from the

prior year period).  In regard to undergraduate student enrollment for the DeVry University

November 2014 session, the press release announced 4,201 new students (a 12.9% decrease from

the prior year) and 38,235 total students (a 12.6% decrease from the prior year).  For DeVry

University's January 2015 undergraduate session, the Company announced 4,282 new students (a 12.8% decrease from the prior year) and 37,922 total students (a 15.9% decrease from the prior year). The Company repeated its claim that DeVry University continued to execute its plan of "enhancing the institution's programmatic focus, better communicating its value proposition to students and employers, and reducing its cost structure through workforce reductions and real estate consolidations." The February 5, 2015 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

190. On the same day, the Company filed its Form 10-Q with the SEC for the 2Q 2015 for the quarter ended December 31, 2014 ("2Q 2015 Form 10-Q"), which was signed by Defendants Hamburger, Wiggins, and Unzicker, reiterating DeVry's previously reported financial results reported in the Company's February 5, 2015 press release, stating "[t]otal consolidated revenues for the second quarter of fiscal year 2015 of $489.9 million decreased $6.4 million, or 1.3%, as compared to the year-ago quarter. For the first six months of fiscal year 2015, total consolidated revenues increased $4.7 million or 0.5% to $946.9 million, as compared to the year-ago period."

191. With regards to student enrollment, the 2Q 2015 Form 10-Q emphasized that:

> Management believes the decreases in enrollment have been due to lower demand from DeVry University's target student segment driven by heightened competition from both public-sector and private-sector education providers, the availability of lower cost degrees, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. To improve performance at DeVry University, management continues to execute a turnaround and transformation plan which includes:
>
> · Attracting the right students into strong programs;
> · Reducing DeVry University's cost structure, while striving to maintain and even enhance its service to students;
> · Regaining DeVry University's technology edge; and
> · Developing and supporting the team to drive execution.

192.    On April 23, 2015, the Company issued a press release announcing financial results for 3Q 2015, ended March 31, 2015.  In that press release, the Company announced quarterly revenues of $489.8 million (a 1.3% decrease from the prior year quarter) and earnings per share of $0.72 (a 16% decrease from the prior year quarter).  For the nine-month period ended March 31, 2015, the Company also announced revenues of $1,436.8 million (a 1.3% decrease from the prior year period) and earnings per share of $1.68 (a 12.8% increase from the prior year period).  In regard to undergraduate student enrollment for the DeVry University March 2015 session, the press release announced 4,156 new students (a 17.2% decrease from the prior year) and 36,188 total students (a 15% decrease from the prior year).

193.    Defendant Hamburger also introduced in the April 23, 2015 press release a marketing initiative that, despite being characterized as a new branding effort, was designed to continue attracting students in the face of formidable competition and a weakened economy with the same employment-outcome focus that the Company had previously been touting during and prior to the Class Period.  In other words, DeVry's new strategy to differentiate itself from its competitors was the same as its old one:

> Today we have announced the next phase of the significant transformation strategy underway at DeVry University to improve its competitive positioning and return the institution to growth.  We are confident that this strategy, together with the sustained expansion of our healthcare, professional and international institutions will drive positive student outcomes and DeVry Group's future growth.

Along those same lines, the Company stated:

> DeVry University announced the next phase of its strategy to return to growth and transform the institution through new, student-focused innovations.  Near-term, the university is taking action to differentially invest in its strongest markets and programs; reduce its cost structure; and establish a distinct voice for its brand.  In addition, DeVry University is implementing strategies to place it on a path for growth by enhancing the

> teaching and learning model, addressing affordability, and
> strengthening employer workforce solutions. Taken together, these
> actions are designed to maintain positive economics in fiscal 2016.
>
> DeVry University recently relaunched its brand to emphasize what
> it is best known for, careers and care. To view the campaign,
> which illustrates how DeVry University is "*Different. On Purpose*"
> please click on this web link: http://bit.ly/1EdBznH.

The April 23, 2015 press release was attached as Exhibit 99.1 to a Form 8-K filed with the SEC

on the following day, which was signed by Defendant Unzicker.

194.    On the same day, the Company announced that it had received from the Office of

the United States Attorney for the Northern District of Ohio compulsory requests for documents

and information from 2007 through April 1, 2015. The Company stated that the "requests

address allegations under the False Claims Act that DeVry University offered an associate

degree program in Health Information Technology without providing necessary information to

applicants regarding requirements for obtaining a degree and a job in the health information

technology field upon graduation." The Company further claimed that it could not predict the

outcome of that investigation.

195.    On April 23, 2015, the Company held its 3Q 2015 Earnings Conference Call.

Participating on the call were Defendants Hamburger, Unzicker, and Wiggins. In his opening

presentation, Defendant Hamburger discussed the relaunch of DeVry University's brand as part

of its strategy of quality, plus diversification, plus long-term focus to differentiate it from other

schools. With respect to its communication campaign emphasizing "career outcomes" and how

that is a contributing factor in attracting students to DeVry University which affects revenue of

the Company, Defendant Hamburger noted the following:

> And third, we relaunched the DeVry University brand. Our new
> communications campaign emphasizes how DeVry University is
> different on purpose. . . . We're emphasizing what DeVry
> University is known for, which is careers and care. Students give

us a great deal of credit for our ability to deliver strong career outcomes and for the care and support we provide them to help them achieve these outcomes. The new messaging is designed to clearly establish a distinct voice for the brand and to instill pride in the students we serve. Taken together, these and other near-term actions are designed to maintain positive economics in fiscal 2016.

196. On May 5, 2015 Defendant Hamburger participated in and presented at the Robert W. Baird & Co. Inc.'s Growth Stock Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

So the employment statistics of the graduates at DeVry University -- I'm assuming you're talking about DeVry University because you can speak to the other institutions as well -- and they all have good employment results. DeVry University's employment results are actually trending up. That's one of the reasons that we're very confident in the ability, among many other reasons, in the ability that we have to improve our results and to turn it around, is the fundamental value proposition which is, I think, what your question gets at, for the student is very strong, in fact strengthening. Employment results are up. Salaries are up as well for the graduates. So the percentage who are employed in fields of study within six months of graduation or in the active job market is up, and their salaries are going up. The employers are very happy with our graduates, and so the Cisco's and the IBMs and the GEs and the Accentures, you know, they're coming back again and again for our graduates.

The value proposition in terms of return on that educational investment that you asked about I think is also very good because the salaries are going up. . . .

197. On May 8, 2015, the Company filed its Form 10-Q with the SEC for the 3Q 2015 for the quarter ended March 31, 2015 ("3Q 2015 Form 10-Q"), which was signed by Defendants Hamburger, Wiggins, and Unzicker, reiterating DeVry's previously reported financial results reported in the Company's April 23, 2015 press release, stating "[t]otal consolidated revenue for the third quarter of fiscal year 2015 of $489.8 million decreased $6.3 million, or 1.3%, as compared to the year-ago quarter. For the first nine months of fiscal year 2015, total

consolidated revenues decreased $1.5 million or 0.1% to $1,436.8 million, as compared to the year-ago period."

198.    With regards to student enrollment, the 3Q 2015 Form 10-Q emphasized that:

> Management believes the decreases in enrollment have been due to lower demand from DeVry University's target student segment driven by heightened competition from both public-sector and private-sector education providers, the availability of lower cost degrees, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. To address the issue of declining enrollment, DeVry University is focused on implementing management's transformation strategy which includes both, near-term actions to improve enrollment, and longer-term investments to increase competitiveness and differentiation.

199.    On August 18, 2015, the Company issued a press release announcing financial results for 4Q and full-year 2015, ended June 30, 2015. In that press release, the Company announced quarterly revenues of $473.2 million (a 2.5% decrease from the prior year quarter) and earnings per share of $0.46 (a 20% decrease from the prior year quarter). For the entire 2015 fiscal year, the Company also announced revenues of $1,909.9 million (a 0.7% decrease from the prior year) and earnings per share of $2.14 (a 3% increase from the prior year). In regard to undergraduate student enrollment for the DeVry University May 2015 session, the press release announced 3,817 new students (a 13% decrease from the prior year) and 34,524 total students (a 17.8% decrease from the prior year). That press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

200.    On the same day, the Company held its 4Q 2015 Earnings Conference Call. Participating on the call were Defendants Hamburger, Unzicker, and Wiggins. In his opening presentation, Defendant Hamburger discussed the relaunch of DeVry University's brand which was already having a positive effect. With respect to its communication campaign emphasizing

"career outcomes" and how that is a contributing factor in attracting students to DeVry

University which affects revenue of the Company, Defendant Hamburger noted the following:

> And we've relaunched the DeVry University brand. Our new
> communications campaign emphasizes how DeVry is Different.
> On Purpose. We're emphasizing what DeVry University is known
> for, which is careers and care. Several of the investors I've spoken
> with have commented on our Different. On Purpose campaign.
> While it was just launched in July, we're seeing very early signs of
> success. For the last couple of years, we've seen brand awareness
> indicators flipping but with the launch of this campaign, we've
> now seen an uptick in both brand recognition and memorability.
> So, we're encouraged by the early results of the combination of our
> programmatic and local focus supported by our strong brand.

201. On August 27, 2015, DeVry released its 2015 Annual Report ("2015 AR") and

filed with the SEC its Form 10-K ("2015 10-K") for the fiscal year ended June 30, 2015,

reiterating DeVry's previously reported financial results reported in the Company's August 18,

2015 press release. The 2015 10-K was signed by Defendants Hamburger, Wiggins, and

Unzicker. The Company reported a decrease of 0.7% in revenues ($1,909,943,000 for 2015

compared to $1,923,371,000 in 2014), an increase of 4% in net income ($139,899,000 for 2015

compared to $134,032,000 for 2014) and an increase of 3% in earnings per share ($2.14 for 2015

compared to $2.07 for 2014).

202. In his Letter to Our Shareholders, Defendant Hamburger boasted the "foundation

of [the Company's] success" stating that:

> Quality means delivering career-focused education with strong
> outcomes for students-ensuring that they are learning, graduating,
> gaining employment in their fields of study and paying back their
> loans. It gives us a competitive advantage, because students want
> to attend schools with proven high-quality outcomes.
>
> \* \* \*
>
> Our success not only strengthen our position, but also differentiates
> DeVry Group institutions from others that are struggling- an
> important consideration for students who are being careful about

> where they make their investments in higher education.  In our
> view, quality leads to growth; Investing in quality academic
> produces successful students, making our institutions more
> attractive to prospective students, enabling us to grow, and
> generating the resources to invest back into further quality and
> growth initiatives.

203.    Noticeably absent from the Letter to Shareholders was any discussion of the

employment and career statistics which appeared in each of the prior year's Letters.

204.    The 2015 10-K noted, in addition to a decrease in revenue, and increases in both

net income and earnings per share, under the heading "Enrollment Trends" for DeVry University,

the Company reported a decrease in new student enrollment:

> New student undergraduate enrollment in the July 2015 session
> decreased 18.6% to 4,000 students as compared to the prior year.
> Total undergraduate enrollment in July 2015 was 31,293 students,
> a decrease of 15.9% compared to 37,210 in the previous summer.
> There were 10,045 total students for the July 2015 session in
> DeVry University's graduate programs, including its Keller
> Graduate School of Management, representing a decrease of 12.4%
> from the prior fiscal year.  Management believes the decreases in
> undergraduate and graduate enrollment have been due to lower
> demand from DeVry University's target student segment driven by
> heightened competition from both public-sector and private-sector
> education providers, the availability of lower cost degrees,
> negative perceptions of the value of a college degree and increased
> reluctance to take on debt, resulting in a reduction in interest from
> potential students.

205.    With respect to its marketing efforts, the 2015 10-K notes that:

> DeVry University advertises on various internet sites, on television
> and radio and utilizes a variety of methods to reach prospective
> students.  DeVry University is updating its marketing programs in
> order to better communicate the quality of its degree programs and
> the value of a DeVry University education.  DeVry University's
> highly integrated brand initiative focuses on DeVry University as
> an accredited, respected academic institution.  Its campaigns are
> grounded in ongoing in-depth consumer marketplace research, and
> leverage multiple channels, including broadcast, print and internet
> advertising, public relations, content marketing and social media,
> as well as local marketing efforts.  In order to position DeVry

University for growth, local marketing and advertising will be increased significantly in targeted markets.

206. On September 2, 2015, the Company filed a Form 8-K with the SEC disclosing that it had received from the Multi-Regional and Foreign School Participation Division of the Federal Student Aid office of the Department of Education a request for "documents and information regarding published employment outcomes and earnings of DeVry University graduates." According to the Company, that request was intended "to permit [the DoE] to assess DeVry University's compliance with applicable regulations under Title IV[.]" The Company stated that it would cooperate with the request, but could not predict the outcome of the investigation. That 8-K was signed by Defendant Unzicker.

207. On September 10, 2015, Defendant Hamburger participated in and presented at the BMO Capital Markets Back to School Education Conference where, in response to a question about DeVry University's outcomes, he stated:

> Outcomes, we've done a lot. The big outcomes that we look at are (inaudible) learning, are they persisting graduating? Are they gaining employment in their field? Are they repaying their loans? Those are all the kinds of outcomes, that I think are important, and I think all colleges should be held accountable to.

208. On October 22, 2015, the Company issued a press release announcing financial results for 1Q 2016, ended September 30, 2015. In that press release, the Company announced quarterly revenues of $441.4 million (a 4.5% decrease from the prior year quarter) and earnings per share of $0.08 (a 74.2% decrease from the prior year quarter). In regard to undergraduate student enrollment for the DeVry University September 2015 session, the press release announced 4,006 new students (a 24% decrease from the prior year) and 31,843 total students (a 20.1% decrease from the prior year). That press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by Defendant Unzicker.

209.    On November 4, 2015, the Company filed its Form 10-Q with the SEC for the 1Q

2016 for the quarter ended September 30, 2015 ("1Q 2016 Form 10-Q"), which was signed by

Defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results in

the Company's October 22, 2015 press release, stating "[t]otal consolidated revenues for the first

quarter of fiscal year 2016 of $441.4 million decreased $20.6 million, or 4.5%, as compared to

the year-ago quarter."

210.    With regards to student enrollment, the 1Q 2016 Form 10-Q emphasized that:

> Management believes the decreases in undergraduate and graduate
> enrollment have been due to lower demand from DeVry
> University's target student segment driven by heightened
> competition from both public-sector and private-sector education
> providers, the availability of lower cost degrees, negative
> perceptions of the value of a college degree and increased
> reluctance to take on debt, resulting in a reduction in interest from
> potential students.  Management believes heightened competition
> at the local level has increased, as local colleges have started
> targeting adult students to a much greater extent, also local public-
> sector and independent colleges are taking share from national
> competitors.  Pricing pressure is increasing, and while students
> appear willing to pay a high price for private independent colleges,
> DeVry University is more expensive than many of its public and
> private-sector competitors.
>
> To address the issue of declining enrollment, DeVry University is
> focused on implementing management's transformation strategy
> which includes both near-term actions to stabilize enrollments and
> sustain positive economics and loner-term investments to increase
> competitiveness and differentiation.

## 2.    Defendants' Use of Misleading Academic Annual Reports

211.    The Company's use of Academic Annual Reports further contributed to

Defendants' scheme to defraud investors and students.  Thus, in a calculated move to assuage

both investors' and prospective students' concerns about the success of the Company and its

ability to attract students and thus generate revenues and earnings per share, Defendants released

Academic Annual Reports during the Class Period which touted the success of DeVry University students in obtaining employment upon graduation.

212.    On June 13, 2012, DeVry University released its 2010-2011 Academic Annual Report, representing that 89% of all June 2009, October 2009, and February 2010 DeVry University graduates who earned a bachelor's degree were employed in their fields of study within six months of graduating.  In this regard, the Company noted that:

| **2010 Career Services Results by degree program** Combined statistics for students who graduated from the February 2010, June 2010 and October 2010 classes. | Graduates who actively pursued and obtained employment and those although employment pursued education-related careers within 180 days of graduation | Average reported annual compensation [3] | Graduates | Graduates eligible for career assistance [4] | Graduates who actively pursued employment for up to 180 days and those who were already employed [5] | Graduates employed in education-related positions within 180 days of graduation |
|---|---|---|---|---|---|---|
| **ASSOCIATE DEGREE PROGRAM** | | | | | | |
| Accounting | 75% | $33,066 | 90 | 70 | 56 | 42 |
| Electroneurodiagnostic Technology | 100% | $47,840 | 2 | 2 | 2 | 2 |
| Electronics & Computer Technology | 87% | $33,381 | 331 | 254 | 210 | 182 |
| Health Information Technology | 76% | $31,561 | 489 | 356 | 283 | 215 |
| Network Systems Administration | 84% | $38,263 | 540 | 329 | 248 | 209 |
| Web Graphic Design | 50% | $30,827 | 273 | 131 | 60 | 30 |
| **TOTAL** | 79% | $34,145 | 1,725 | 1,142 | 859 | 680 |
| **BACHELOR'S DEGREE PROGRAM** | | | | | | |
| Biomedical Engineering Technology[2] | 80% | $42,480 | 76 | 70 | 64 | 51 |
| Business Administration | 90% | $39,220 | 1,550 | 1,314 | 1,237 | 1,115 |
| Clinical Laboratory Science | 100% | $49,640 | 7 | 7 | 6 | 6 |
| Computer Engineering Technology | 80% | $37,369 | 134 | 119 | 105 | 84 |
| Computer Information Systems | 84% | $43,849 | 718 | 628 | 530 | 443 |
| Electronics Engineering Technology | 88% | $41,297 | 256 | 238 | 215 | 190 |
| Game & Simulation Programming | 63% | $38,847 | 374 | 334 | 226 | 143 |
| Multimedia Design & Development | 0% | N/A | 1 | 1 | 1 | 0 |
| Network & Communications Management | 90% | $44,287 | 511 | 462 | 411 | 369 |
| Technical Management | 92% | $46,649 | 3,608 | 3,052 | 2,827 | 2,594 |
| **TOTAL** | 89% | $43,953 | 7,235 | 6,225 | 5,622 | 4,995 |

213.    Similarly, on February 4, 2013, DeVry University released its 2011-2012 Academic Report, indicating the following:

99

| 2011 Career Services Results by degree program<br>Combined statistics for students who graduated from the February 2011, June 2011 and October 2011 classes. | Graduates who actively pursued and obtained employment and those already employed in an education-related career within 180 days of graduation | Average reported annual compensation[2] | Graduates | Graduates eligible for career assistance[3] | Graduates who actively pursued employment for up to 180 days and those who were already employed[4] | Graduates employed in education-related positions within 180 days of graduation |
|---|---|---|---|---|---|---|
| **ASSOCIATE DEGREE PROGRAM** | | | | | | |
| Accounting | 74% | $33,287 | 159 | 97 | 88 | 65 |
| Electroneurodiagnostic Technology<br>(renamed Neurodiagnostic Technology November 9, 2012) | 100% | $35,391 | 9 | 8 | 8 | 8 |
| Electronics & Computer Technology | 82% | $37,043 | 336 | 218 | 201 | 165 |
| Health Information Technology | 69% | $33,321 | 849 | 523 | 460 | 318 |
| Network Systems Administration | 81% | $37,502 | 696 | 407 | 373 | 303 |
| Web Graphic Design | 52% | $31,739 | 412 | 140 | 110 | 57 |
| **ASSOCIATE TOTAL** | **74%** | **$35,327** | **2,461** | **1,393** | **1,240** | **916** |
| **BACHELOR'S DEGREE PROGRAM** | | | | | | |
| Biomedical Engineering Technology[1] | 81% | $43,568 | 113 | 101 | 94 | 76 |
| Business Administration | 91% | $38,180 | 1,703 | 1,334 | 1,269 | 1,150 |
| Clinical Laboratory Science | 100% | $44,075 | 15 | 14 | 14 | 14 |
| Computer Engineering Technology | 86% | $40,834 | 122 | 97 | 91 | 78 |
| Computer Information Systems | 85% | $44,178 | 806 | 613 | 570 | 484 |
| Electronics Engineering Technology | 91% | $44,386 | 285 | 240 | 232 | 211 |
| Game & Simulation Programming | 61% | $36,096 | 439 | 298 | 246 | 149 |
| Management | 100% | $29,062 | 9 | 5 | 5 | 5 |
| Multimedia Design & Development | 82% | $29,208 | 66 | 65 | 40 | 33 |
| Network & Communications Management | 90% | $43,838 | 543 | 433 | 407 | 366 |
| Technical Management | 90% | $47,001 | 4,099 | 3,176 | 3,033 | 2,726 |
| **BACHELOR'S TOTAL** | **88%** | **$43,849** | **8,200** | **6,356** | **6,001** | **5,292** |

**Graduate Employment Rates**

Even in today's challenging economic environment, a large percentage of 2011 DeVry University graduates in the active job market were either employed in their fields before graduating or found jobs within six months of graduation. For those who earned associate degrees, the employment rate was 74 percent; the rate was 88 percent for those who earned bachelor's degrees[5].

214.    DeVry University's 2012-2013 Academic Annual Report again boasted that "[n]inety percent of DeVry University's 2012 graduates who were actively seeking employment had careers in their field within six months of graduation, at an average salary of $43,538." To that point, the Company provided the following chart:

| 2012 Career Services Results by degree program<br><br>Combined statistics for students who graduated from the February 2012, June 2012, October 2012 and December 2012 classes | Graduates who actively pursued and obtained employment and those already employed in education-related careers within 180 days of graduation | Average reported annual compensation [1] | Graduates | Graduates eligible for career assistance [2] | Graduates who actively pursued employment for up to 180 days and those who were already employed [3] | Graduates employed in education-related positions within 180 days of graduation |
|---|---|---|---|---|---|---|
| **ASSOCIATE DEGREE PROGRAM** | | | | | | |
| Accounting | 90% | $33,892 | 234 | 144 | 124 | 112 |
| Electronics & Computer Technology | 91% | $37,395 | 378 | 246 | 215 | 195 |
| Health Information Technology | 79% | $31,847 | 1,018 | 619 | 522 | 411 |
| Network Systems Administration | 87% | $39,937 | 797 | 437 | 377 | 329 |
| Neurodiagnostic Technology | 100% | $37,960 | 7 | 7 | 7 | 7 |
| Web Graphic Design | 64% | $33,327 | 403 | 145 | 88 | 56 |
| **ASSOCIATE TOTAL** | 83% | $35,436 | 2,837 | 1,598 | 1,333 | 1,110 |
| **BACHELOR'S DEGREE PROGRAM** | | | | | | |
| Biomedical Engineering Technology | 90% | $45,281 | 110 | 98 | 88 | 79 |
| Business Administration | 92% | $38,558 | 1,911 | 1,536 | 1,430 | 1,318 |
| Clinical Laboratory Science | 100% | $46,176 | 26 | 23 | 21 | 21 |
| Computer Engineering Technology | 87% | $44,421 | 119 | 102 | 93 | 81 |
| Computer Information Systems | 89% | $44,651 | 901 | 697 | 633 | 562 |
| Electronics Engineering Technology | 93% | $48,208 | 318 | 282 | 269 | 249 |
| Game & Simulation Programming | 69% | $38,688 | 362 | 248 | 194 | 133 |
| Justice Administration | 100% | $26,000 | 4 | 3 | 2 | 2 |
| Management | 96% | $42,353 | 74 | 52 | 48 | 46 |
| Multimedia Design & Development | 84% | $32,251 | 196 | 127 | 92 | 77 |
| Network & Communications Management | 93% | $44,891 | 660 | 525 | 494 | 461 |
| Technical Management | 94% | $48,101 | 4,620 | 3,614 | 3,413 | 3,196 |
| **BACHELOR'S TOTAL** | 92% | $45,031 | 9,301 | 7,307 | 6,777 | 6,225 |

215. On March 20, 2015, DeVry University released its 2013-14 Academic Annual Report stressing that "[o]ne critical measure of our success is the employment outcomes of DeVry University graduates." To that effect, the Company indicated that, "[i]n 2013, 90% of DeVry University graduates actively seeking employment had careers in their field of study within 6 months of graduation at an average salary of $44,295." These figures were reflected in the following chart:

101

| 2013 Career Services results by degree program — Combined statistics for students who graduated from the February 2013, April 2013, June 2013, August 2013, October 2013 and December 2013 classes.[2] | Graduates who were already employed, or actively sought employment, that had careers in fields related to their education within six months of graduation | Average reported annual compensation[3] | Graduates | Graduates who were already employed in fields related to their education or were available to or actively seek employment[4] | Graduates who were already employed in fields related to their education or who actively sought employment for up to six months after graduation[5] | Graduates who were already employed, or actively sought employment, that had careers in fields related to their education within six months of graduation |
|---|---|---|---|---|---|---|
| **ASSOCIATE DEGREE PROGRAMS:** | | | | | | |
| Accounting | 90% | $37,458 | 187 | 99 | 94 | 85 |
| Electronics & Computer Technology | 90% | $38,350 | 254 | 164 | 149 | 135 |
| Health Information Technology | 83% | $32,375 | 719 | 416 | 383 | 320 |
| Network Systems Administration | 87% | $37,691 | 681 | 389 | 359 | 315 |
| Neurodiagnostic Technology | 100% | $47,410 | 8 | 8 | 8 | 8 |
| Web Graphic Design | 71% | $30,375 | 310 | 101 | 78 | 56 |
| **ASSOCIATE DEGREE TOTAL[6]** | **85%** | **$35,555** | **2,159** | **1,177** | **1,071** | **919** |
| **BACHELOR'S DEGREE PROGRAMS:** | | | | | | |
| Accounting | 100% | $29,800 | 11 | 7 | 5 | 5 |
| Biomedical Engineering Technology | 86% | $42,238 | 95 | 79 | 75 | 65 |
| Business Administration | 92% | $40,322 | 1,833 | 1,440 | 1,373 | 1,271 |
| Clinical Laboratory Science | 85% | $46,905 | 26 | 21 | 20 | 17 |
| Communications | 100% | $44,171 | 7 | 6 | 5 | 5 |
| Computer Engineering Technology | 91% | $44,844 | 126 | 98 | 98 | 90 |
| Computer Information Systems | 86% | $46,856 | 881 | 686 | 648 | 563 |
| Electronics Engineering Technology | 92% | $49,551 | 356 | 300 | 289 | 267 |
| Game & Simulation Programming | 72% | $43,337 | 285 | 190 | 163 | 118 |
| Healthcare Administration | 66% | $50,000 | 4 | 3 | 3 | 2 |
| Justice Administration | 90% | $30,142 | 54 | 24 | 21 | 19 |
| Management | 97% | $40,623 | 106 | 83 | 79 | 77 |
| Multimedia Design & Development | 75% | $30,631 | 305 | 188 | 174 | 132 |
| Network & Communications Management | 93% | $46,733 | 673 | 558 | 533 | 498 |
| Technical Management | 94% | $48,863 | 3,596 | 2,867 | 2,788 | 2,631 |
| **BACHELOR'S DEGREE TOTAL[6]** | **91%** | **$45,747** | **8,358** | **6,550** | **6,274** | **5,760** |
| **ALL UNDERGRADUATE DEGREE TOTAL** | **90%** | **$44,295** | **10,517** | **7,727** | **7,345** | **6,679** |

**B.      Securities Analysts Following DeVry Recognized the Significance of DeVry's Job Placement Rates and Higher Salary Claims and Its Correlation to Revenue Generation and Growth Potential**

216.      Securities analysts relied on Defendants' representations that nearly (and often more than) 90% of DeVry University's graduates were employed in their field of study within six months of graduation and at higher salaries than other colleges and universities, and absorbed them throughout the Class Period as an important data point in gauging the future financial success of DeVry.

217.     After the Company revealed a sharp drop in DeVry University enrollments during 4Q 2011, on August 15, 2011, Barrington Research stated that "[d]espite a continued difficult operating environment, DeVry continues to weather the storm relatively well, driven by management's diversification strategy (among programs, degree levels, and mix of online and onground) and solid execution.  Despite investors' concerns regarding enrollment trends (leads, conversion rates, etc.), we view our investment thesis as [intact] – long-term demand continues to be favorable, especially for a highly reputable company like DeVry, limited regulatory risk and attractive valuation. . . ."  Similarly, on August 12, 2011, keeping its Overweight rating, Barclays Capital noted that "Due to strong student outcomes and diversification, we expect DV to weather the current challenging environment better than its peers."  Morgan Stanley also underscored that "the diverse nature of its programs, its focus on student outcomes, room for greater efficiency, and FCF buildup will drive earnings growth over the long-term."  Finally, on August 11, 2011, UBS Investment Research stated that "[d]espite near-term challenges, we still think that among the mid-cap publicly traded postsecondary companies this is the one to own. We continue to believe that over the long haul students are likely to gravitate to career colleges that provide degrees that lead to jobs to improve their earnings power."

218.     After DeVry reported its lackluster 1Q 2012 results, securities analysts still viewed the Company favorably due to, in part, its reputation for strong "student outcomes":

- DeVry remained a top pick for Deutsche Bank because "[d]ue to DV's history of better regulatory metrics and student outcomes, it has typically traded at a 30% premium to the avg. of the campus peers . . . and at a premium to Apollo []. . . ." (December 7, 2011);

- As part of its Investor Recommendation, on, on, Piper Jaffray stated that "DeVry enjoys a well-deserved reputation for providing quality programs with favorable student outcomes."  (December 8, 2011).

219.     Following DeVry's release of declining Fall 2011 enrollment results on December 12, 2011, at least one securities analysts continued to tout DeVry's upside:

- Morgan Stanley maintained its overweight rating on DeVry, "view[ing] today's slightly softer fall enrollment numbers as already priced in. We continue to believe that weak results are more a function of the timing of regulatory changes, rather than a fundamental problem with the company's underlying businesses." (December 12, 2011).

220.     On January 27, 2012, the day after DeVry reported disappointing 2Q 2012 results, securities analysts still touted the Company's focus on student outcomes:

- Oppenheimer Equity Research emphasized that DeVry "is well diversified and ranks toward the favorable end of the industry's operational and regulatory measures, and has a long-standing track record of solid student outcomes."

- Morgan Stanley maintained an overweight rating for DeVry because "[a] well-rounded portfolio, ongoing focus on student outcomes, additional cost containment and easier comps in the back half of the year set the stage for improving results."

221.     On April 25, 2012, a day after DeVry reported earnings in line with expectations, but disappointing enrollment numbers for 3Q 2012, securities analysts still maintained a positive—if not cautious—view of DeVry focusing on student outcomes as a positive indicator to attract students:

- BMO Capital Markets maintained a market perform rating, stating that DeVry is "still considered one of the quality providers in the space . . . ."

- In its Quarterly Update, Oppenheimer Equity Research maintained its outperform rating because "DV is well diversified and ranks toward the favorable end of the industry's operational, bad debt, and regulatory measures, and has a long-standing track record of solid student outcomes."

- Deutsche Bank Markets Research reiterated its Buy rating because its sum-of-the-parts analysis suggested, among other things, that because of "[] DV undergrad's long history of >$40K starting salaries, 90% placement rates, and relatively low regulatory issues – we think its significantly undervalued within DV overall." (June 6, 2012).

222.     Following a preview of DeVry's 4Q 2012 financial results on July 23, 2012 that included a decline of 15% to 17% in new enrollments at DeVry University, securities analysts

still clung to the Company because of its history as a high-quality institution as a result, in part, to its exceptional student outcomes. For example, Barrington Research kept its Market Perform rating, and stated that "DeVry is a very high-quality company, with limited regulatory risk and a strong debt-free balance sheet. . . ."

223. On August 9, 2012, DeVry reported its financial results for 4Q and full-year 2012, identifying a decrease of just over 14% in DeVry University enrollment for its May 2012 session, but some securities analysts still emphasized the Company's job placement statistics as a meaningful data point in determining its ratings:

- Deutsche Bank Markets Research maintained its Buy rating and in its Investment Thesis stated that "[d]ue to DeVry's long history of better than peer job placement and starting salaries, and only about 25% exposure to online only enrollment, we expect DeVry new enrollment to return to growth by YE13E." (August 10, 2012);

- J.P. Morgan issued an Underweight rating because of lingering weak enrollment, but noted that it ". . . continue[d] to appreciate DV's diversification, balanced growth and high quality student outcomes. . . ." (August 13, 2012).

224. Securities analysts were cautiously optimistic after DeVry issued better-than-expected 1Q 2013 results on October 25, 2013, again focusing on student outcomes:

- Morningstar Equity Research stated that "[a]s the industry retrenches and focuses on improving the student experience, student outcomes (graduation rates and employment, for example), and brand-building, we view DeVry as well positioned for the long term."

- J.P. Morgan maintained its Underweight rating, recognizing DeVry's "diversification, balanced growth and high quality student outcomes. . . ."

225. Following better-than-expected earnings, but still weak new student enrollments at DeVry University for 2Q 2013, securities analysts still remained encouraged by DeVry because of its solid reputation due in part to its student outcomes:

- Wells Fargo Securities kept its Outperform rating because "[t]he company's strong quality and effective diversification as well as the potential for upside, continue to make DeVry an attractive investment in our opinion . . . ."

- J.P. Morgan stated that it "appreciate[d] DV's focus on balanced growth and high quality student outcomes, and upgrade[d] shares of DV to Neutral from Underweight."

226. On April 23, 2013, DeVry reported weak earnings and a reverse in its recovery for new enrollments at DeVry University. The negative trend surprised securities analysts, though they still viewed the Company favorably because of DeVry University's perceived competitive advantage due to its strong student outcomes, but with choppy results expected in the near term. For example, Wells Fargo Securities also was "maintaining our Outperform rating on shares of DeVry . . . we believe the investment case for DeVry remains a strong one." It noted that, in one of its keys to improve enrollment, DeVry planned to "alter[] its marketing message to reinforce its branding as a career-oriented institution. Of DeVry graduates, 86% are employed within their field of study within six months of graduation with an average salary of $43,000. . . ." Similarly, while Deutsche Bank Markets Research maintained its Hold rating, it concluded that one of the key factors from DeVry's results as "[g]iven DeVry's strong placement rates (86%) and high starting salaries ($43K), the company believes that better messaging will improve demand."

227. On August 6, 2013, in anticipation of DeVry financial results for 4Q and full year 2013 expected just two days later, William Blair maintained its Outperform rating, focusing on student outcomes and recognizing that DeVry "recently announced that in-field job placement rates for 2012 DeVry University graduates stood at 90%, an all-time high for the school" leading William Blair to conclude that "this is clear evidence of a very strong value proposition and ultimately believe the company's strong brands and outcomes will lead to positive enrollment growth . . . ."

228. After DeVry announced its financial results for 4Q and full year 2013 that still demonstrated weakness in enrollments at DeVry University, but an increase in its job placement

rates for 2012, some securities analysts remained bullish on the Company due, in part, to the Company's student outcomes. For example:

- Wells Fargo maintained its Outperform rating, recognizing, among other things, DeVry's "employment placement is at an industry-best 90%."

- Barrington Research continued its Market Perform rating because of management's plan to "sharpen[] the communication of DeVry University's value proposition, which is educational quality, career outcomes, and exceptional student support" to regain enrollment growth.

229.    After the Company released its financial results for 1Q 2014 on October 24, 2013, with marginal improvement in DeVry University enrollment for the September 2013 session, securities analysts primarily remained in a holding pattern, but with some notable exceptions that underscored DeVry University graduates' job placement rates and management's plan to attract new students. For example, Wells Fargo Securities maintained its Outperform rating and concluded that "between firming employment and lower pricing, the positive turn is not so far off as management's conservative tone implies."

230.    Securities analysts were similarly circumspect about DeVry University's decreased enrollment following the release of the Company's 2Q 2014 financial results on February 4, 2014, but still viewed DeVry as a high-quality company and appreciated management's efforts to right the ship. For example, Wells Fargo, in maintaining its Outperform rating, emphasized, among other things, ". . . strengthening student placement provides the backdrop to believe this trend can continue."

231.    Following release of the Company's 3Q 2014 results on August 7, 2014, securities analysts noted DeVry management's plan to, among other things, emphasize its "strong student value proposition" to turnaround DeVry University:

- Barrington Research maintained its Market Perform rating, but "view[ed] management's actions favorably but these initiatives will take time to manifest themselves in the form of sustainable growth." (April 25, 2014);

- William Blair recognized that because of, among other factors, DeVry's ". . . solid regulatory profile highlighted by low student loan default and high job placement rates . . . DeVry warrants a significant premium to the majority of its private sector postsecondary peers, and reiterate our Outperform rating." (August 4, 2014).

232. Following DeVry's announcement of its 4Q and full-year 2014 financial results, securities analysts still reacted positively to the Company's job placement rates:

- William Blair maintained its Outperform rating while recognizing as on one of its Key Points that "[w]hile postsecondary education remains a regulated industry, DeVry's student outcomes are best in class and we view DeVry as a good steward of government-funded student tuition payments." (August 4, 2014, prior to DeVry's announcement);

- William Blair again noted that "we believe that puts the stock in a very good place in light . . . a top-tier regulatory profile highlighted by low student loan default and high job placement rates. . . ." (August 7, 2014);

- Wells Fargo Securities continued its Outperform rating and noted that while DeVry is in a competitive position, "[ ] with job placement rates consistently approaching 95% and a reasonable ROI case, there is more for the company to do in sharpening its brand focus and making its case to prospective students." (September 18, 2014).

233. Unfortunately for investors, DeVry's supposedly robust student outcome statistics—and the Individual Defendants' similar sanguine statements—were materially false and misleading when issued. In reality, contrary to these public statements, Defendants manipulated DeVry University graduates' employment and compensation statistics to inflate their results, concealing the truth which ultimately led to the FTC and DoE actions and the realization that the advertising campaign scheme to tout the success of its graduates was a scam.

## VII. THE TRUTH EMERGES

234. On January 27, 2016, the FTC and DoE shocked the market with separate announcements that they had taken action against the Company in response to its issuance of false or unsubstantiated graduate employment and salary statistics.

235. First, the FTC filed a lawsuit against DeVry for engaging in deceptive marketing practices by purposefully misrepresenting the benefits of obtaining a degree from DeVry

University.  According to the FTC, DeVry falsely touted that: (1) 90% of DeVry University students from a specific year (*e.g.*, graduates from 2011-2016) who were actively seeking employment did not in fact land or obtain new jobs in their field of study within six months of graduation; (2) 90% of DeVry University students since 1975 who were actively seeking employment did not in fact land or obtain new jobs in their field of study within six months of graduation; and (3) one year after graduation, the average or median salary of DeVry University graduates with bachelor's degrees was not in fact 15% higher than the average or median salary of graduates with bachelor's degrees from all other colleges and universities. In truth, the actual number of DeVry University graduates who found employment in their field of study within six months of graduating was "significantly smaller than 90%."  Similarly, the FTC stressed that DeVry University's own files belied Defendants' assertion that DeVry University's graduates earn significantly higher salaries than graduates from other colleges or universities.

236.    Second, the DoE publicly issued to DeVry a Notice of Intent to Limit, which explained the DoE's intention to impose limitations on DeVry's participation in programs authorized under Title IV and prevent the Company from making certain statements in advertising its schools.  The DoE specifically stated that the Company was unable to substantiate its repeated advertisement that since 1975, 90% of DeVry graduates were employed in their field of study within six months of graduation because the Company did not maintain the necessary graduate-by-graduate records to substantiate that claim.  Instead, as explained by the DoE, the Company used summary reports for certain years containing employment results of each graduating class.  The DoE found, however, that those reports did not substantiate DeVry's advertisements because the reports themselves could not be verified without graduate-specific data.  The DoE therefore concluded that DeVry was unable to substantiate its claim that since

1975, 90% of DeVry graduates were employed in their field of study within six months of graduation.

237.    These actions by the FTC and DoE prompted the Company to issue a press release on January 27, 2016 denying the allegations.  The FTC and DoE actions are described in further detail below.

### A.    The FTC Lawsuit

238.    The FTC Complaint, filed on January 27, 2016, revealed that DeVry has falsely been "advertis[ing] and promot[ing] [DeVry University's] degree programs through television commercials, [DeVry University's] website, YouTube advertisements, radio spots, print advertisements, Facebook, Twitter, sales pitches with prospective students, and other advertising and promotional materials" year after year since at least 2008.  Specifically, the FTC, after it reviewed well over 2 million pages of documents and responses from DeVry to approximately 64 comprehensive interrogatories and document requests, and voluminous materials from third parties, concluded that there was enough evidence to file a lawsuit against DeVry and DeVry University based on its deceptive job placement statistics and higher income claims.

239.    Internal documents produced to Lead Plaintiff by the FTC suggests that certain interrogatories and document requests were directed toward DeVry's "executive officers"— defined to include DeVry's "Chief Executive Officer," "Chairman," and "Chief Financial Officer."

240.    Following its comprehensive investigation, the FTC revealed that Defendants had created the student outcome statistics by manipulating information, selecting certain information, and omitting other pertinent information and data.  By doing this, the FTC stated, Defendants were able to push the narrative that, "as a result of obtaining a DVU degree, 90% of DVU

graduates who were actively seeking employment landed or obtained new jobs in their field of study within six months of graduation."  The FTC explained that:

> [i]n some instances when Defendants make this representation, they claim this statistic applies to DVU graduates from a recent year, while in other instances, Defendants claim this statistic applies to all graduates since 1975, or "for more than 30 years."  In its advertising and in its presentations to prospective students, Defendants present this 90% "employment rate" as evidence of the likelihood that obtaining a DeVry degree leads to finding a job. While Defendants' advertisements and sales pitches most commonly express DVU's employment rate for recent graduates as exactly 90%, in some instances, during certain limited time periods, Defendants have stated a percentage that is slightly less or more than 90% (e.g., 87% or 92%). ***As explained below, these representations (Defendants' "90% claims") are false and unsubstantiated.***

241.    The FTC Complaint noted that DeVry has been advertising its 90% employment and higher income claims on various webpages on the DVU website (www.devry.edu) since at least 2008.  Some examples include:

**Excellent employment results**

Nobody wants to go to college and just be a number…unless they're numbers like these.  Each year, thousands of our grads find themselves right where they want to be – employed in their fields of study.



**An education that pays**

Not only can a degree from DeVry University prepare you for a lifetime of career success, it can also increase your earnings potential right from the start.



242. The FTC charged that, in order to substantiate its 90% claim, DeVry improperly relied upon student records maintained by DeVry University's Career Services department. These student records contained information about students' majors, graduation dates, employment history, and DeVry University's classification of their employment status. According to the FTC, "[t]hese student records, however, do not provide a reasonable basis that substantiates Defendants' 90% claims" because:

> Among other reasons, when calculating the 90% claims, Defendants count a substantial number of DVU graduates who should not be counted and similarly exclude a substantial number of DVU graduates who should not be excluded. For example, Defendants count graduates who did not obtain a job as a result of obtaining a degree from DVU. In fact, Defendants include the substantial percentage of DVU graduates who, after graduation, continued with the same job they had when they enrolled in DVU. Defendants also count graduates who did not obtain jobs in their field of study. *A significant percentage of the jobs that Defendants count as being in the graduate's field of study include jobs that employers, industry experts, graduates, and consumers would not reasonably consider to be in the graduate's field of study*.

243.    The FTC complaint also detailed several examples of DeVry University students from the graduating class of 2012 who were incorrectly classified as working "in field" including, but not limited to:

> a) graduates with degrees in technical management who were working as: a rural mail carrier (human resources specialization); a yard salesman at a nursery (business information systems specialization); a sales associate at Macy's (general technical specialization); a driver delivering rain gutters for a construction services company; a data entry specialist for a radio station (human resources specialization); and unpaid volunteers at medical centers (human resources management and health services management specializations);

> b) a graduate with a degree in business administration (health services management specialization) working as a server at the Cheesecake Factory);

> c) a graduate with a degree in business administration (health care management specialization) working as a car salesman;

> d) a graduate with a degree in business administration (accounting specialization) working as a secretary at a prison; and

> e) graduates with various degrees working as customer service representatives.

244.    The FTC also alleged, based on its investigation, that Defendants excluded certain students from the calculation who were actively seeking employment:

> For example, in June 2013, Defendants excluded one 2012 graduate who, prior to being classified as inactive: viewed 177 jobs leads in DVU's jobs database; had at least six job interviews in the previous two months (including two interviews eleven days before DVU classified him as inactive); sent an email to DVU's Career Services department, two weeks before being classified as inactive, in which he stated that he "wanted to let you know I've been getting more response now that I am much more actively applying to positions," and that he "had two face to face interviews a while back and now 2 Skype interviews"; attended a DVU "Career Fair" the following day; and then sent the Career Services department an email informing them that, after attending the career fair, he sent three thank you notes to companies whose representatives he had spoken to at the fair.

245. Due to the manner in which DeVry manipulated this information, the FTC concluded that **"[t]he actual percentage of DVU graduates who, at or near the time they graduated, found jobs that could reasonably be considered 'in their field' is significantly smaller than 90%."**

246. Additionally, the FTC asserted that Defendants relied on an income report prepared by a third-party to substantiate their claims that DeVry University graduates obtained higher incomes than graduates of other for-profit and traditional colleges and universities. However, according to the FTC, this income report lacked a reasonable basis to substantiate Defendants' claim, as "[t]he sampling methods and methodology of the survey that underlay the income report all gave or should have given Defendants reason to question the reliability of the conclusions and information contained in the report."  Notably, the FTC added that DeVry University personnel had voiced their concerns over whether the data contained in the income report sufficiently supported the higher-income claim.  The FTC further emphasized that:

> Among other problems, the comparison of the incomes of DVU graduates with incomes of graduates from other schools did not account or adjust for significant salary drivers such as age, experience, and degree field.  In addition, *statistics that DVU had directly collected from thousands of its graduates each year about their incomes differed significantly from the third party's statistics*, which consisted of information from only several hundred individuals per graduation year.

247. Furthermore, according to the FTC complaint, Defendants had access to publicly available statistics regarding the incomes of graduates from other colleges and universities throughout the United States, by school and by field.  "***Comparing the information in [DeVry's] own files with publicly available income data shows that DVU graduates a year after graduating do not in fact earn significantly more than graduates from all other schools combined, casting doubt on Defendants' higher-income claim***."

248.     On May 9, 2016, Judge Fitzgerald rejected DeVry's request to dismiss the FTC's lawsuit against the Company finding that the FTC stated a plausible claim for express misrepresentations.[12]   In his order, Judge Fitzgerald stated that the "allegations show that the FTC's claims have factual basis and provide Defendants with adequate notice as to the FTC's reasons for believing that the employment statistic is unsubstantiated and materially false." With respect to DeVry's higher-income representations, Judge Fitzgerald recognized that "[i]t takes no special knowledge of statistics to realize that comparing, for example, the incomes of a thirty-five-year old DeVry University graduate with ten years of experience and an average twenty-one-year-old college graduate with no experience could lead to misleading results . . . these allegations are plausible and particular enough to put Defendants on notice of the FTC's basis for its claim."

249.     In the following month, on June 7, 2016, the parties in the FTC action submitted their Joint Rule 26(f) Report with Errata.[13]   In the "Discovery Plan" section of the Joint Rule 26(f) Report, the FTC revealed the "evidence on which [it] relies on to support its allegations that [DeVry's and DeVry University's] 90% claim was false and unsubstantiated consists of student files, summaries of graduate placement information, and other documents that [DeVry and DeVry University] produced during [the FTC's] investigation in response to a request for the documents on which Defendants relied to support their claims, as well as other documents [DeVry and DeVry University] produced, such as internal emails and presentations."  The FTC confirmed that its "allegation that the 90% claim was false and unsubstantiated consists of an analysis of these documents that [the FTC's] own personnel conducted in preparation for

---

[12] Order Denying Defs.' Mot. to Dismiss Compl. (ECF No. 38), *FTC v. DeVry Educ. Group, Inc., et al.,* Case No. 2:16-cv-00579 (C.D. Cal. May 9, 2016).

[13] Joint Rule 26(f) Report with Errata (ECF No. 50), *FTC v. DeVry Educ. Group Inc., et al.*, Case No. 16-cv-579-MWF-SS (C.D. Cal. June 7, 2016).

possible litigation." Further, in Section D.3 ("Key Documents"), the FTC identified the

following as key documents:

- Defendants' advertisements, including television and radio commercials, websites, brochures, recruitment and enrollment presentations, social media, and brochures promoting DVU, as well as dissemination information;

- DVU student and graduate records used to substantiate [DeVry and DeVry University's] claims, including but not limited to Graduate Registration Forms or eforms, graduate observation logs, and summary spreadsheets;

- Training manuals, and policies and procedures, used by DVU's career services department and DVU admissions department;

- Audit reports, internal communications about student or graduate employment or about DVU's classification or proposed classification of student or graduate employment, and records concerning contact between students and graduates with DVU's Career Services Department;

- Complaints, and documents generated by [DeVry and DeVry University] in response to complaints, concerning employment issues and representations alleged in the Complaint, as well as consumer injury and mentality;

- [DeVry's and DeVry University's] internal documents discussing recruitment, advertising and marketing, employment statistics (including but not limited to who was or should be counted who was not or should not be counted), other policies of DVU's career services department, graduate incomes, and the claims at issue in the Complaint, including such documents as emails, memos, spreadsheets, and PowerPoint presentations;

- Documents from third parties such as PayScale that [DeVry and DeVry University] relied on as the bases for the higher income claim;

- Documents from third parties such as the National Association of Colleges and Employers relating to average or median incomes of college graduates;

- Internal communications and communications with third parties such as CompliancePoint or Deloitte & Touche discussing the results of efforts to audit or verify DVU's employment statistics or to obtain information from graduates concerning their employment and income;

- Communications with third parties such as advertising agencies discussing or relating to messages conveyed by, or intended to be conveyed by, advertisements that referred to DVU's employment statistics or income earned by DVU graduates;

- [DeVry's and DeVry University's] financial information, including revenue figures;

- [DeVry's and DeVry University's] internal copy tests, alumni surveys, and other data related to the 90% and higher-income claims; and

- Third-party copy tests, marketing surveys or reviews and internal communications concerning these copy tests and marketing surveys or reviews.

250. In addition, internal documents produced by the FTC to Lead Plaintiff in response to a FOIA request show that the government's investigation specifically sought to uncover what DeVry's corporate executives knew about DeVry's 90% and salary misrepresentations. These internal documents create an inference that there is evidence that the Individual Defendants knew there was no basis for DeVry's stated employment statistics. Pursuant to a FOIA request, the FTC produced correspondence between the government and DeVry along with discovery requests that were sent and received during the course of the FTC's investigation. These documents included charts reflecting the scope of discovery that the FTC agreed to receive from DeVry. And internal FTC correspondence shows that the charts were in fact negotiated by DeVry's attorneys and attorneys representing the FTC. Critically, the charts show that the "executive officers" of DeVry—defined to include DeVry's "Chief Executive Officer," "Chairman," and "Chief Financial Officer" were designated as custodians who agreed to produce documents on a range of topics including: "emails . . . which relate to completion rates, job placement rates, [and] students pre-graduation or post-graduation income amounts"; documents concerning "minimum placement rates" reported to government agencies; and "issues raised by consumer complaints."

251. In addition, modifications to document requests produced to Plaintiffs' counsel by the FTC repeatedly name DeVry's corporate Vice President of Career Services, Madeleine

Slutsky and members of her staff, as document custodians for files concerning DeVry's alleged 90% and salary misrepresentations.[14]

252.    Internal documents produced by the FTC to Lead Plaintiff also show that the FTC's investigation was focused, not only on DeVry's advertising material, but also on the same false statements that are the subject of this lawsuit. This provides a further inference that documents exist showing that the numerous statements Defendants made to investors concerning the 90% statistic and graduating salary information were false and misleading. For example, a document request sent to DeVry during the course of the FTC's investigation on February 24, 2014 asked for documents supporting the following statements made in DeVry's SEC filings:

- "'Ninety percent of DeVry Universitys [sic] calendar 2012 graduates in the active job market were employed in their fields of study within six months of graduation at an average salary of $43,539.' (DeVry Inc. 2013 10-K, Career Services at 31)"

- "'Each year, thousands of DeVry University graduates have started careers in their chosen fields within six months or less of their graduation.' (DeVry Inc. 2012 10-K, Career Services at 29)"

253.    Internal documents produced by the FTC to Lead Plaintiff in response to a FOIA request also show that the FTC's investigation of DeVry's manipulation of the Company's employment statistics was wide-ranging and encompassed all of DeVry's campuses and schools. A table produced by the FTC listing negotiated modifications to discovery requests is 52 pages long, lists 64 separate discovery requests and modifications, encompasses requests touching upon all of DeVry's colleges, and even allows for certain requests to be fulfilled through document "sample[s] of campus presidents" at specific locations.

254.    In sum, as the FTC action revealed, based on its extensive pre-filing investigation, beginning in at least 2008, DeVry and DeVry University conducted a deceptive marketing

---

[14] A Confidential Witness, CW16, also discussed how Slutsky was knowledgeable about DeVry's employment statistics at the corporate level. For example, according to CW16, Slutsky received reports on job placement statistics on a regular basis, including reports from HireDeVry.

campaign with inflated job placement and salary numbers in order to lure prospective students or retain those already enrolled at DeVry University, and at the same time assure investors and securities analysts that the Company can remain competitive in its industry even during an economic downturn. The bottom-line message of this marketing drive was that if you chose to attend or stay at DeVry University over other for-profit schools, community colleges, and public and private post-secondary institutions, you are more likely to get a job in your field of study within six months of graduation at a higher salary. The FTC, however, after conducting an extensive, two-year investigation, filed a lawsuit that charged DeVry's employment statistics as false and unsubstantiated because, among other reasons, DeVry and DeVry University counted a substantial number of DeVry University graduates who should not have been counted, and excluded a substantial number of graduates who should not have been excluded. Moreover, the FTC asserted that Defendants improperly relied on a third-party income report to substantiate their higher income claim, but this report lacked a reasonable basis to support such a claim.

255. Defendants' public statements about the FTC's investigation and lawsuit make clear that (1) Defendants were put on notice of the FTC's allegations as soon as they were filed, and (2) the Individual Defendants maintained involvement in the investigation while it unfolded. For example, Defendant Hamburger, discussed the FTC's Civil Investigative Demand during the DeVry's Q2 2014 earning call, just days after it was received by the Company, telling a Morgan Stanley analyst, "we only just recently received the request within the last couple of days, so our intent here was to inform everybody and be as transparent as we can [, a]nd beyond that, we certainly intend to comply with their request for information." Defendants Hamburger and Unzicker again discussed the FTC's allegations during a Q3 2015 earnings call, with Defendant Hamburger stating that "[w]e're certainly fully cooperating with the folks over there and having

dialogues with the staff." Finally, after the FTC filed suit, Defendant Hamburger provided detailed thoughts to investors in response to the FTC's allegations, evidencing his knowledge about how DeVry calculated its statistics. As Hamburger explained in part in the Q2 2016 earnings call:

> [T]here's not now nor has there ever been a national standard for calculating employment statistics. We've advocated for there to be one for all of higher education. In the absence of regulation, DeVry University designed a methodology for calculating the employment outcomes of its graduates over 40 years ago. 40 years ago. We believe it's a very sound way of doing it.

256. Thus, Defendants' public statements about the FTC's investigation provide further evidence that they were either aware that there were problems with DeVry's employment statistics or were put on notice of potential irregularities during the course of the investigation.

## B. The DoE Action

257. Also on January 27, 2016, the DoE publicly issued to DeVry a Notice of Intent, informing DeVry University of the DoE's intention to impose certain limitations on the participation of DeVry University in programs authorized pursuant to Title IV. The proposed limitations specifically relate to DeVry's representations in advertising and marketing regarding the post-graduation employment outcomes of DeVry University students since 1975.[15]

258. According to the DoE, starting in at least 2008 and continuing throughout at least August 2015, DeVry's marketing and promotional materials represented that:

> Since 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation.

---

[15] On August 28, 2015, the Multi-Regional and Foreign School Participation Division of the Federal Student Aid Office of the DoE had previously served on DeVry a request for documents and information regarding published employment outcomes and relative earnings information of DeVry University graduates. The purpose of the request was to verify certain of DeVry's public statements and, in turn, permit the DoE to assess DeVry University's compliance with applicable regulations under Title IV.

259.     As noted by the DoE in its Notice of Intent, federal law mandates that educational institutions participating in programs authorized pursuant to Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070 *et seq.*, must be able to provide "the most recent available data concerning employment statistics and . . . any other information necessary to substantiate the truth of the advertisements."  *See* 20 U.S.C. § 1094(a)(8); 34 C.F.R. § 668.14(b)(10).  After attempting to garner information from DeVry regarding the Since 1975 Representation through its August 28, 2015 letter and again on at least one occasion thereafter, the DoE concluded that DeVry could not substantiate its Since 1975 Representation.

260.     With regard to DeVry's representations, the DoE's Notice of Intent stated:

> [S]tarting in at least 2008 and continuing until at least August 2015, DeVry made representations to students and prospective students regarding the post-graduation employment outcomes of students who graduated from DeVry over a cumulative period stretching more than 30 years.  The specific representation that forms the basis of this action was highlighted in DeVry's *We Major in Careers* campaign, a 2008 "career-focused brand marketing campaign" that sought to position DeVry as an institution that helped its graduates achieve career success.  That campaign, which reflected more than a year's worth of in-depth consumer, marketplace, and brand research by DeVry, ***represented a conscious decision by DeVry to make certain representations to students and prospective students for marketing and recruitment purposes.***  Yet with respect to certain representations that were made by DeVry as part of that campaign and which continued to be made until at least August 2015, ***DeVry is unable to substantiate the truthfulness of those representations***, as is required by federal law.

261.     The DoE explained that "DeVry does not have, or cannot locate, the graduate-by-graduate records necessary to substantiate the veracity of [the Since 1975 Representation]."  Instead, DeVry was able to produce only "By-Campus Rollup Reports" that were purportedly contemporaneously created and which summarized the employment results of each graduating class.  The DoE found that such reports did not substantiate the Since 1975 Representation

because, *inter alia*, DeVry could not furnish evidence demonstrating that the reports were accurate and conducted in a methodologically sound manner. The DoE concluded that that assurance could only be provided by the underlying student-by-student data which was, for certain years, unavailable.

262. As a result of DeVry's failure to substantiate the Since 1975 Representation, the DoE imposed numerous conditions on DeVry in order to continue receiving Title IV funds. To that effect, the DoE stated:

> [A]s a condition of its continued participation in the Title IV programs and consistent with existing statutory and regulatory requirements, the Department is hereby notifying DeVry that neither it nor its agents or employees may make any representations, in advertisements or otherwise, that include statistics consisting of or based upon the post-graduation employment outcomes of students who graduated during the time that DeVry has conceded it does not possess graduate-specific information, *i.e.*, the type of information that is necessary to substantiate the truthfulness of any post-graduation employment claims. Nor may DeVry make any representations that include or are based upon post-graduation employment statistics regarding other time periods that cannot be substantiated with graduate-specific information. Moreover, for a period of five years following the effective date of this action, DeVry must subject all such representations to review by an independent auditor prior to the utterance (*i.e.*, oral, written, or otherwise) of such representations. The Department is also requiring DeVry to contact third parties who are repeating or re-publishing DeVry's unsubstantiated representations and demand that those entities cease doing so, to retain records used to develop and substantiate certain advertisements, to notify the Department of any legal claims, investigations, subpoenas or other inquiries regarding its post-graduation employment representations, and to notify its students of this limitation. DeVry's failure to comply with these limitations could subject DeVry to further actions pursuant to 34 C.F.R. Part 668, Subpart G, up to and including termination from its participation in Title IV programs.

263.     DeVry contested the Notice of Limitation on February 12, 2016, causing the matter to be the subject of a Federal Student Aid proceeding entitled *In the Matter of DeVry University*, Docket No. 16-07-O.

264.     On October 13, 2016, the DoE announced that it had entered into a settlement "resolving the Department's charge that [DeVry] used unsubstantiated job placement claims in recruitment and advertising materials."  In the DoE's press release issued that day, the DoE explained that the settlement "enhances the Department's oversight of DeVry and builds upon the Obama Administration's commitment to protecting students, safeguarding taxpayer dollars and increasing accountability among postsecondary institutions."  U.S. Secretary of Education John B. King, Jr., also stated in the press release that "[s]tudents deserve accurate information about where to invest their time and money, and the law is simple and clear: recruitment claims must be backed up by hard data."  DoE Chief Enforcement Officer Robert Kaye thanked the FTC for its support in its investigation, stating that the DoE and FTC had "put an end to the use of an unsubstantiated claim by this institution."  The press release added that the DoE is "working closely" with the FTC in connection with the FTC's lawsuit against DeVry, and that the DoE would "continue to support the FTC's ongoing lawsuit against DeVry, while also continuing its own investigations of the institution."

265.     The DoE Settlement provides that DeVry will participate in Title IV programs under a provisional certification, and requires DeVry to take a number of measures, including:

(a)     "immediately cease publishing or otherwise using the Since 1975 Representation";

(b)     cease making "any representations to a student, prospective student, accrediting agency, state agency, the Secretary, or any member of the public that are based, in

whole or in part, on the post-graduation employment outcomes of any student who graduated from [DeVry University] between 1975 and October 1980";

(c)     maintain graduate-specific data to substantiate "any representations to any student, prospective student, accrediting agency, state agency, the Secretary, or member of the public that are based, in whole or in part, on graduate employment [rates]";

(d)     "maintain information sufficient to establish the methodology it used to formulate any representations regarding post-graduation employment outcomes of [DeVry University] students"; and

(e)     for six years, engage a qualified, independent third party to review the required records and information relating to DeVry University graduates, so that that independent third party may issue a report on an annual basis stating whether DeVry university has satisfied its responsibilities to maintain graduate-specific employment records and has maintained information sufficient to establish its methodology used to make representations about employment outcomes of DeVry University graduates.

266.    The DoE Settlement also requires DeVry to post the following statement for two years on the home page of DeVry University's website:

> DeVry University previously advertised that "Since 1975, 90% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation." The U.S. Department of Education has asserted that the records maintained by DeVry University for the period 1975-1983 were not sufficient to substantiate the Since 1975 Representation, and thus that DeVry University could not substantiate this representation to the extent required by law. Accordingly, the University agreed to cease making the Since 1975 Representation and post this notification on its website.

Moreover, the DoE Settlement requires the same statement to be included for six years in all agreements memorializing the enrollment of students at DeVry University.

124

267.    The DoE Settlement further requires DeVry University to post a letter of credit for the benefit of the DoE in the amount of $68,435,908—approximately 10% of the Title IV aid revenue to DeVry University for the 2014-15 award year.  For a period of five years, DeVry will be required to maintain the letter of credit and adjust it annually to remain at a level equal to 10% of the Title IV aid revenue it received in the previous fiscal year.  As explained in the DoE Settlement, that letter of credit is designed to allow the DoE to provide refunds to students in the event that DeVry University closes.

268.    Although much of the evidence obtained through the DoE's limitation act is not public, Lead Plaintiff obtained internal documents from the DoE through a document request made through the FOIA.  Evidence discussed in these internal documents create an inference that Defendants made false statements to investors regarding the 90% misrepresentation either knowingly, or recklessly.

269.    As disclosed in a January 27, 2016 letter from the DoE to Robert Paul, the President of DeVry University, the DoE primarily sought to require DeVry to cease making misrepresentations that "since 1975, 90%—or some close variation thereof . . . graduates actively seeking employment in their field of study were employed within six months of graduation."

270.    Importantly, the DoE brought a limitation action against DeVry regarding the 90% representation only after the benefit of document discovery.  An internal brief submitted by the DoE to the Office of Hearings and Appeals, dated May 9, 2016, specifically disclosed that the DoE received 113,486 bates stamped pages from DeVry in September 2015.

271.    After receiving and reviewing these files, however the DoE revealed its determination in its opening brief that DeVry could not substantiate the 90% representation.  Certain pieces of evidence described in the brief make it clear that DeVry's senior executives

125

either knew the employment statistics they were touting were false, or recklessly failed to investigate the issue. Specifically, the internal brief submitted by the DoE to the Office of Hearings and Appeals describes high-level evidence showing that DeVry's executives must have been aware of problems with the Company's job placement statistics. As explained in the DoE's pleading:

- "[T]he violation at issue was neither unplanned nor isolated. Rather the representation was developed as part of a multi-year, national advertising campaign that reached millions of prospective students … and that commenced only after extensive consumer and brand research. Relying on this research, DeVry made an initial decision to use, and repeated decisions to keep using, the Representation even after it certified to the Department its knowledge of, and compliance with, the substantiation requirement. Indeed, **"this was not an isolated instance but part of a pattern whereby DeVry either intentionally or through wanton negligence" avoided clear statutory and regulatory requirements."**

- **"**DeVry continued to make the representation in advertisements even *after* DeVry staff and others raised questions about DeVry's ability to substantiate the claim. For example, an internal presentation in 2008 on the efficacy of the *Careers* campaign posed questions about the sources of the Representation in seeking to establish the 'truth behind' the claim and whether it could 'substantiate' the 90 percent figure. Moreover, in February 2009, DeVry President David Pauldine posited, in an email sent on his behalf, whether DeVry should "be looking at *alternative* messaging such that it brings the ultimate *credibility* to our employment claims." And in November 2009, staff at an advertisement agency used by DeVry, Leo Burnett USA, questioned certain details of the Representation. In response, DeVry's "Senior Consumer Insights Specialist" dismissed the concerns by affirming a response that DeVry had "dug into these numbers 8 ways to Sunday, and there is no other clear, compelling, and compliant story." Nevertheless, aware of both legal requirements and express questions and concerns about the Representation, DeVry continued to use the Representation in advertisements until after the department asked DeVry for substantiation."

- "DeVry made statements in response to the Substantiation Request that lacked credibility. Specifically, although DeVry claimed to have ceased making the Representation no later than January 2014, this was not true. DeVry's failure to act with candor during the investigation violated its fiduciary duty to the Department."

272. Similarly, a non-public affidavit submitted by DeVry in the DoE action describes additional evidence showing that high-level DeVry executives must have known that the 90% misrepresentation was false:

- "DeVry produced to the Department a November 3, 2009 email from Drew Swinger, the "Senior Consumer Insights Specialist" for DeVry, Inc. . . . In that email chain, Lauren Rector, at Leo Burnett USA inquires of Mr. Swinger about wanting to "**dig a little deeper into the 90% employment rate claims**," specifically about the "since 1975" claims. Later in the chain, Mr. Swinger confirms Jay Pauer's statement that DeVry has "dug into these numbers 8 ways to Sunday, and there is no other clear, compelling, compliant story." Mr. Swinger also states that the 90% is not the "percent of graduates" who were employed, but rather the "percent of graduates who were in the active job market 6 months after graduation."

- "Since February 1983, DeVry graduates have been expected to fulfill certain obligations to be considered as 'actively pursuing employment.' Currently, 'actively pursuing employment' after graduation includes maintaining a close relationship with Career Counseling and Placement Office by making a visit, phone, or mail contact at least once every two weeks. Also, during the first 17 weeks after graduation, graduates are expected to make a personal visit or phone call to an average of three companies each working day."

273. The fact that the DoE described specific evidence that it possessed showing that DeVry acted intentionally in bad faith with respect to the misrepresentations at issue raises the inference that DeVry's senior executives either knew or recklessly disregarded the truthfulness of the 90% representations. As the DoE explained, (1) DeVry engaged in a pattern of making misrepresentations; (2) DeVry's senior executives were making presentations and sending emails about the 90% representation at a high level as early as about 2008; and (3) continued making misrepresentations after they were put on notice by both a consultant and the DoE during the Class Period about the falsity of the 90% representation. These internal documents contribute substantially to the inference that the Defendants acted with scienter.

## C. The Devastating Results On DeVry's Stock from these Disclosures

274. As a result of the shocking disclosures by the FTC and DoE, which revealed that the Company's long-touted graduate employment and salary statistics were false or unsubstantiated, DeVry's common stock price dropped 15%, or $3.65 per share, from $23.74 per share on January 26, 2016 to $20.09 per share closing on January 27, 2016—wiping out over

$230 million in the Company's market capitalization in one day, on unusually heavy trading volume.

275.     Over the next several trading days, DeVry's stock price continued to trade lower, closing at $18.08 on February 2, 2016. In total, from January 26, 2016 to February 2, 2016, DeVry's stock price share price dropped $5.66 per share, or 24%, wiping out approximately $357 million of the Company's market capitalization.

276.     In an article entitled "DeVry Education Teaches Tough Investment Lesson," investor website *TheStreet.com* recommended against owning shares of DeVry in light of the recent revelations. The article stated the following:

> To offset its declining student population at its various campuses, DeVry has ratcheted its promotional activities and marketing campaigns, claiming that 90% of its graduates who actively sought employment found new jobs in their majors within six months of graduation. Plus, DeVry claims that within a year of graduation, its former students earned 15% more pay compared to other graduates. But these claims are at best deceptive, according to the FTC. . . .  With DeVry's earnings and revenue in retreat and with little prospect of higher enrollment, we recommend avoiding DeVry shares. And at around $18 per share, DeVry could see its stock reach single digits as the weight of the government investigation grows more heavy.

277.     In reaction to these troubling disclosures, DeVry's price target was downgraded by numerous investment research firms.

| Firm | Old Target Price | New Target Price | % Difference |
|---|---|---|---|
| BMO Capital Markets | $30.00 | $21.00 | -30% |
| Compass Point | $28.00 | $18.00 | -36% |
| Deutsche Bank | $28.00 | $22.00 | -21% |
| Morgan Stanley | $33.00 | $27.00 | -18% |
| Barrington Research | $35.00 | $25.00 | -29% |

278.    The Company has also suffered other consequences in the fallout of the public's discovery that DeVry University graduates are not as successful as the Company had advertised. For instance, on March 14, 2016, the U.S. Department of Veterans Affairs cautioned GI Bill participants about DeVry on account of the FTC's lawsuit and the Department of Education's Notice of Intent. In a letter sent to DeVry University, Curtis Coy, the VA Deputy Undersecretary of Economic Opportunity, said: "Effective the date of this letter, VA is suspending DeVry University's status as a [Principles of Excellence] institution at least until the conclusion of the FTC lawsuit," and highlighted that "[t]he FTC findings, [Department of Education] conclusions, and GI Feedback System complaints indicate that DeVry University has not acted in accordance with … Principles of Excellence guidelines."

**D.     After the Class Period, DeVry Settles the FTC Lawsuit for $100 Million and Reforms to Prevent the Company from Further Touting Misleading Student Outcome Data**

279.    On December 15, 2016, DeVry and the FTC announced that DeVry and DeVry University had agreed to settle the FTC Lawsuit.  According to the FTC's press release issued that day, the settlement requires DeVry to refund a total of $100 million to harmed students and graduates in the form of cash and debt relief, and "also includes provisions designed to prevent DeVry from misleading consumers in the future."  As stated by FTC Chairwoman Edith Ramirez in the press release, "[w]hen people are making important decisions about their education and their future, they should not be misled by deceptive employment and earnings claims. . . . The FTC has secured compensation for the many students who were harmed, and I am pleased that DeVry is changing its practices."

280.    Under the terms of the settlement, DeVry will pay $49.4 million in cash to be distributed to qualifying students who were harmed by the deceptive ads that boasted inflated job placement rates and income levels upon graduation, as well as $50.6 million in debt relief.  The

debt relief includes the full balance owed on all private unpaid student loans that DeVry provided to its undergraduate students between September 2008 and September 2015 (totaling $30.35 million), and $20.25 million in student debts for items including tuition, books, and certain course-related fees.

281. Equally as important, the FTC settlement also requires DeVry to discontinue its use of deceptive job placement rates and salary information moving forward and, for a period of ten years, to confirm that it is in compliance with imposed policy reforms.

282. First, DeVry and any of its "officers, agents, employees, and attorneys and all other persons in active concert or participation with any of them" are "permanently restrained and enjoined from:"

- Misrepresenting, expressly or by implication, the success that students or graduates have realized or are likely to realize in starting or obtaining careers, jobs or employment. This prohibition includes, but is not limited to, misrepresenting:

  o the extent to which—whether expressed by a number, a percentage or otherwise—graduates or any subset of graduates have obtained jobs or careers:

    ▪ in their field of study;

    ▪ in any specified field or type of employment;

    ▪ with any given category or type of employer;

    ▪ with any particular employer; or

    ▪ within a given time frame;

  o the extent to which any employment statistic, or any other statement that refers to the employment success or status of students or graduates, reflects the success of students or graduates who were actively seeking employment;

  o the extent to which any employment statistic, or any other statement that refers to the employment success or status of students or graduates, either includes or does not include any subset of students or graduates; or

  o that any individual obtained a job or career, in his or her field of study or otherwise, as a result of attending DeVry.

130

- Misrepresenting, expressly or by implication, the compensation or compensation range that students or graduates of DeVry have received, or can be expected to receive, including but not limited to, misrepresenting that the compensation of any group of students or graduates is or was (a) equal to or greater than a specific amount, average or median, or (b) equal to or greater than the compensation received by any other group of students or graduates;

- Misrepresenting, expressly or by implication, any other fact material to consumers concerning any such product or service;

- Making any representation, expressly or by implication:

  o that any employment statistic reflects the success of graduates in obtaining employment near or after graduation when the statistic includes employment that graduates obtained (a) before purchasing the product or service, or (b) at any time more than six months prior to graduating; provided, however, that nothing in this [subsection] shall be construed to prohibit DeVry from making a representation to a state or federal authority or programmatic or institutional accreditor on a reporting form required by such entity, provided further that DeVry clearly and conspicuously disclose on such form, either as the primary number or in a footnote in 14-point font, the percentage of students who obtained their jobs upon or after graduating; or

  o that any employment statistic reflects the employment status or employment success of graduates who were actively seeking employment if graduates were classified as not actively seeking employment based on (a) having waived career-services assistance, in whole or in part, or (b) the extent to which the graduates used career services.

- Making any representation, expressly or by implication, about the benefit of any educational product or service, or the success or likely success of any student or graduate, unless the representation is non-misleading, and, at the time such representation is made, DeVry possesses and relies upon Competent and Reliable Evidence[16] that is sufficient to substantiate that the representation is true.

283.    Second, DeVry is required to "preserve all Competent and Reliable Evidence relied upon to substantiate any representation" concerning, among other things, student outcomes for DeVry University graduates.  Thus, if DeVry makes such a representation that relates to any class of current or former students or graduates, DeVry must preserve, among other things: (i) all

---

[16] The FTC Settlement Stipulation and Order defines "Competent and Reliable Evidence" as "tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area that have been conducted and evaluated in an objective manner by qualified persons, using procedures generally accepted in the profession to yield accurate and reliable results."

student files relating to the students or graduates; (ii) all communications relating to complaints received from any student or graduate concerning the person's job search experience, compensation or compensation range of jobs, assistance or lack of assistance from DeVry in attempting to find employment, or any advertising or marketing that referred to obtaining employment or to compensation received by past graduates; (iii) all forms completed that relate to a student's or graduate's employment status, job search or use of or attempted use of DeVry's career-related services; (iv) all documents and information relating to any student's or graduate's employment status or income at any point before or after graduation; (v) all documents relating to any audit, review, survey or analysis underlying or supporting any rate or statistic used in any representation, including the employment status or compensation of students or graduates; and (vi) all documents used by DeVry to determine any calculation, rate or statistic used in any representation, including how to classify the employment status of any student or graduate, and any factor utilized in determining the number of students or graduates placed in the numerator or the denominator of any such calculation, rate or statistic.

284. Third, DeVry is also required to establish a "training program for all principals, officers, directors, managers, employees, agents, and representatives who direct or engage in the promotion or sale of any educational product or service." This training program is to remain in place for 20 years and DeVry must "[e]nsure that the training program addresses the trainee's duty not to use or make any representation prohibited under [the Settlement Stipulation]."

285. Fourth, one year after approval of the settlement, DeVry and DeVry University submit a compliance report to the FTC describing, among other things, "whether and how that Defendant is in compliance with each Section of [the Settlement Stipulation] including, but not limited to, describing in detail the way that Defendant calculates, documents and substantiates

any claim covered by [the Settlement Stipulation.]"  For 10 years, DeVry and DeVry University must submit a compliance notice to the FTC, within 60 days of any change in, among other things, "any process or procedure for calculating, documenting or substantiating any claim covered by [the Settlement Stipulation.]"

286.    Fifth, DeVry and DeVry University are required to create certain records for 15 years, including, among others, accounting records showing the revenues from all goods or services sold, certain personnel records, and records of all consumer complaints relating to advertisements, person's experience in attempting to obtain a job or employment, compensation or compensation range of jobs, DeVry's job placement rates or employment statistics, and any assistance the person received or failed to receive from DeVry in attempting to find employment. DeVry and DeVry University are also required to create and maintain "records necessary to demonstrate full compliance with each provision of [the Settlement Stipulation], including all submissions to the Commission[.]"

287.    Finally, to allow the FTC to monitor DeVry's compliance with the terms in the FTC Settlement Stipulation, within 30 days after a written request from the FTC, DeVry must submit additional compliance reports or other requested information, appear for depositions, produce documents, or respond to any other discovery request by the FTC that is prescribed in the Federal Rules of Civil Procedure.  DeVry must also permit the FTC to interview any employee or other person affiliated with any DeVry entity who has agreed to be interviewed. The FTC may also employ any "other lawful means, including posing . . . as consumers, suppliers, or other individuals or entities, to DeVry or any individual or entity affiliated with DeVry, without the necessity of identification or prior notice."

288.    Only four months after DeVry settled with the FTC and DoE, the Company announced that it would change the name of its parent company to Adtalem Global Education in May 2017.  Although the Company's stated purpose for the name change was to highlight its broadened, "education offerings and geographic reach," media outlets remained skeptical of the stated purpose given its proximity in time to DeVry's settlement with the FTC regarding allegations that the Company misled tens of thousands of students about their post-graduation job and income prospects.[17]

### E.    Additional Revelations Following Investigations and Settlements with  New York and Massachusetts Provides Additional Evidence that the Fraudulent Conduct was Pervasive Across the Company

289.    In addition to DeVry's settlements with the FTC and DoE, DeVry settled with two more cases with state attorney generals concerning the exact same conduct.

290.    On January 31, 2017—only a month after settling with the FTC—the NY AG announced a settlement to resolve an investigation by the office into DeVry's inflated employment statics.  A press release explained that the settlement resolved an investigation initiated by New York prosecutors which "revealed that DeVry lured students with ads that exaggerated graduates' success in finding employment at graduation and contained inadequately substantiated claims about graduates' salary success."  Pursuant to the agreement, DeVry agreed to pay $2.75 million in penalties and restitution.

291.    The NY AG investigation revealed that the 90% claim was misleading because, among other reasons:

---

[17] *See, e.g.*, Ally Marotti, *Parent company of DeVry University changes its name,* Chi. Trib. (May 24, 2017), ; Gina Hall, *DeVry University parent company changing its name,* Chi. Bus. J. (May 24, 2017), https://www.bizjournals.com/chicago/news/2017/05/24/devry-university-parent-company-changing-its-name.html

(a)     "DeVry [ ] mischaracterized certain unsuccessful job-seekers as 'inactive,' despite evidence that the graduates had in fact carried out an active, though unsuccessful, job search.  Furthermore, DeVry's 90% claim did not accurately reflect outcomes at all programs offered by DeVry.  Certain programs had employment outcomes that were significantly lower than 90% over consecutive years."

(b)     In addition, "a substantial number of the graduates included in the 90% figure were graduates who were already employed prior to graduating from DeVry" and "DeVry's employment outcome statistics inaccurately classified a significant number of graduates as employed in their field of study, when in reality the graduates were not working in their field.  For example, DeVry counted graduates of DeVry's Technical Management program as 'employed in field' where the graduates were employed as retail salespersons, receptionists, bank tellers, and data entry workers.  In some cases, graduates were counted as employed in their field of study despite holding positions that did not require a college degree."

292.     The conclusions of the NY AG's investigation provides further evidence that Defendants' fraud was pervasive across DeVry, and thus Defendants must have known about it, or recklessly disregarded the problem.

293.     Similarly the Massachusetts AG reached a settlement with DeVry on July 5, 2017 to resolve allegations that DeVry "used deceptive job placement rates."  In its press release announcing the settlement, the Massachusetts AG stated that "DeVry prominently advertised that 90 percent of graduates who sought employment landed jobs in their field of study within six months of graduating."  But in fact, "the AG's investigation found that certain DeVry programs had job placement rates *as low as 52 percent*".  The Massachusetts AG's investigation provides even more evidence that the fraud at issue pervaded the Company.  Thus, it is reasonable to infer

that the Individual Defendants either knew the statistics they repeatedly touted were false, or else they recklessly disregarded the problem.

## VIII. CONFIDENTIAL WITNESSES FURTHER EXPLAIN HOW DEVRY MISLED THE PUBLIC

294.    Multiple former DeVry employees have provided confidential statements describing how, during their tenure, the Company gamed the misleading DeVry University graduate job placement and salary statistics. As certain of these former employees explain, the Company used a system of waivers and opt-outs to select only certain students for inclusion in the student outcomes statistics. Based on their experience working at the Company, certain Confidential Witnesses expressed doubts that the Company's advertised employment and salary statistics could be true. These Confidential Witness statements thus corroborate the allegations made in this Third Amended Complaint—and by the FTC, the DoE, NY AG, and Massachusetts AG—that DeVry University's job placement and higher income claims were false and misleading.

295.    CW3, an Associate Director of Career Services at DeVry University's Fresno and Bakersfield, California Campuses from January 2013 to January 2014, worked directly with graduates to aid them in obtaining jobs. CW3 was familiar with how many graduates from his campus obtained jobs as well as the types of jobs they obtained. CW3 was also familiar with the school's process for determining job placement rates and its policies that determined which students would be counted in those statistics. CW3 stated that DeVry only counted in its job placement statistics the graduates it defined as actively seeking jobs, and omitted graduates who DeVry had determined were "non-job seeking." Since the accrediting agencies of higher-learning institutions did not have specific requirements for how schools calculated job placement statistics, DeVry had its own internal rules for which graduates were counted in those statistics

and which were not.  Furthermore, CW3 added that each DeVry University campus had its own process for deciding if and when a graduate was "non-job seeking."

296.    CW3 described how that process worked at his campuses.  He explained that during the first 90 days after graduation, the career services office would send graduates "canned" weekly emails containing "assignments" to complete.  For example, CW3 said that an assignment might be to contact a certain number of employers, writing and submitting a resume to the school, applying for jobs suggested by the school, communicating with school staff, and so on.  As part of this process, students were also required to fill out a three-page form on a weekly basis.  If a student did not respond to these emails within a certain number of weeks, CW3 said that they could be deemed to be "non-job seeking."  CW3 said that the ultimate decision to classify a graduate as "non-job seeking" would be made by the college president.  According to CW3, if a graduate was classified as non-job seeking, they would not be included in DeVry's employment statistics.

297.    CW3 explained that DeVry graduates were often waived from inclusion in job placement statistics because they would become frustrated with burdensome requirements from the school's career services department.  CW3 stated that the list of all responsibilities and requirements placed on graduates if they wanted to obtain help from the career services department in finding a job was extensive and meant that the career services department was "going to be up in their business."  CW3 added that "they don't want that kind of attention, and after three weeks of phone calls and emails from us, they're like, 'Send me the form [to opt-out].'"  DeVry had a form specifically for students to sign indicating they wanted to opt-out of the career services job placement assistance.  When students signed this form, they could be waived from inclusion in the job placement statistics, and in fact DeVry wanted its graduates to

137

opt out so that they did not have to be counted in the job placement statistics. He believed the opt-outs and waivers were a "choice selection" by the school used for the purpose of boosting the appearance of its job placement statistics. CW3 said that at least five to six graduates of every 30-person cohort would typically opt out, in addition to approximately two who would be waived for being unresponsive.

298.    CW3 stated that one of the reasons he left DeVry after one year was because he did not like how the school cared only about its placement numbers and statistics, and did not seem to sincerely care about finding jobs for students. The other reason was due to the waivers. The idea that the school could waive a graduate as non-job seeking because that graduate had not submitted a resume to the school or had not responded to some emails bothered him. He said that it made his "skin crawl."

299.    When asked if other DeVry campuses had a similar process for deeming students non-job seeking and not including them in the job placement statistics, CW3 said that the process was the "same" for every DeVry campus; the only difference was when a campus chose to implement the process. He explained that the larger DeVry campuses would deem students non-job seeking more quickly because they had more students and this affected their overall job placement percentages. According to CW3, some campuses (typically the larger ones) would institute the policy within four weeks, whereas other campuses might do it within 90 days, or several months. He reiterated that the protocol for deeming student non-job seeking (waived) to not include them in the job placement statistics was "identical across the board" within the DeVry organization, but the length of time to make that designation was at each campus's discretion. CW3 recalled her peers at other campuses telling her that they had to deem a student non-job seeking because they had to hit specific numbers.

300.    CW3 added that the "directive" on how to designate a student as non-job seeking came from DeVry's corporate office.  According to CW3, in order to designate a graduate as non-job seeking the file required a signature from the campus president as well as approval from DeVry's Vice President of Career Services, Shelly Dubois.  According to CW3, there was a paper file held at the campus for every graduate that received the non-job seeking designation with the actual physical signature of the campus president.  CW3 explained that he met on a monthly basis with the Campus President for a one-on-one meeting.  At those meetings, they would discuss every student in their cohort including recent graduates.  CW3 went on to say that he would "send-up" notes and emails to Downers Grove (DeVry Corporate) on each graduate for their files prior to the graduate being designated as non-job seeking.

301.    CW3 said that DeVry expected its career services department to meet a 95% to 100% job placement rate for graduates within six months of their graduation.  CW3 noted that that rate was only possible due to the number of waivers that were obtained for students who were non-job seeking either voluntarily through opt-outs or as decided by the school.  "That's why DeVry was always at 95 percent placement," he said. "If they are not exhibiting job-seeking behavior, they were waived.  That really disturbed me."  Without waivers, CW3 estimated that the true job placement rate at his campus was at most 60% to 70%.  CW3 said he was fully aware of the actual job placement rate, and that everyone in career services and the campus president (*i.e.*, CW7) were also aware.

302.    According to CW3, the Campus President "would have to be an idiot" to not know that a 95% to 100% job placement rate could only be achieved by not including the graduates that were waived (either voluntarily through opt-out or by the school).  CW3 further confirmed that the 95-100% job placement rate came from DeVry's corporate office and was

139

discussed at regular meetings he attended with representatives of DeVry's corporate office. These meetings took place at "regular intervals." According to CW3, the "expectation was clear. period." But he explained that the target percentage was unattainable without waiving students who either opted out or were designated as non-job seeking. CW3 recounted how that expectation was discussed all the time by the corporate career services team including Dubois. CW3 estimated that if the true job placement statistics were disclosed that included waived graduates, DeVry's job placement statistics (during her tenure) would have been significantly lower (likely in the 70-80% range).

303. CW3 provided reports to CW7 on a regular basis about the progress of job placement for graduates. Each month he submitted information about each student, including details about who was placed in jobs and who was waived as non-job seeking. "He would ask, 'What's the status? What's the situation?'" for each of the students CW3 was working to place in jobs, CW3 said of CW7. According to CW3, CW7 reviewed the job status and situation of all graduates throughout the six months after graduation, and he personally spoke with him about the graduates. He believed CW7 fully understood the true percentage of job placement for the graduating cohorts. "He knew intimately everything that went on with every [graduate] file."

304. CW3 was also required to input all job placement information about each graduate into the school's career services database system, called "HireDeVry." He said that the information and documents input into the system included each graduate's graduation date, field of study, resume, job, income for that job, and any notes the career advisor took about the graduate's job search activities. As described by CW3, if the graduate had been waived as non-job seeking, that information was input into the system as well. He said that the HireDeVry system could be used to determine job placement percentages, but those percentages excluded all

non-job seeking graduates who had been waived. CW3 said, however, that DeVry had another computer software system that could be used to determine job placement rates for all graduates including those who were otherwise waived from the school's official job placement claims. He said if he wanted to run a report showing the actual job placement rate, he would have to go into HireDeVry, save the dataset he wanted to use to run the numbers, then input that into the separate system and run the report. Once the report was run, he said, there was no way to save it in this separate system. He noted, however, that this system provided the school with the capability of running reports showing the actual job placement rate for graduates including students who had been waived in its official statistics.

305. CW3 also recalled DeVry's advertising campaign that claimed its graduates earned 15 percent higher incomes than graduates of other bachelor's degree programs. CW3 remarked that DeVry's claim that its graduates were paid 15% higher was "so fraudulent" and completely frustrated students. CW3 explained that DeVry graduates were primarily getting entry level jobs.

306. CW3 said that those claims were "bogus" and "a lie." From his experience helping graduates find jobs, the jobs were almost always entry-level positions with salaries between $25,000 and $30,000. CW3 said that "there's no way there was any difference" between what DeVry graduates earned and what graduates from other schools earned in these same types of entry-level positions. He recalled that graduates would get angry with him when he explained what their job options would be and what they could expect to earn. CW3 said that many graduates believed they would be earning $40,000 due to marketing and other materials they saw before enrolling. CW3 said a few highly paid graduates and graduates working in cities

with higher wages could skew the averages higher, but that in most areas of the country, the wages remained low for new graduates.

307.    In addition, with respect to wage information, CW3 explained that DeVry's corporate office directed him and his staff to alter starting wage information for graduates who had obtained jobs.  Specifically, between the time each school session ended and the time the school reported employments statistics, CW3 was directed to obtain updated wage information from graduates who were employed.  And if a graduate's wage information had changed—for example if they were promoted—CW3 was instructed to alter the starting wage that was previously listed for the graduate.  Thus, according to CW3, a higher wage could be reported as a graduate's starting wage even though it wasn't.

308.    CW8 served as Senior Director of Academic Effectiveness for DeVry from September 2013 to March 2014.  He was based in Downers Grove, IL and reported to a Vice President at DeVry's Chamberlain College of Nursing, who reported to Susan Groenwald, the President of the Chamberlain College of Nursing, who reported to CEO Daniel Hamburger. CW8, who has analyzed the effectiveness of organizations for 45 years, said he had thought he had seen every way numbers could be manipulated to look better than they were. CW8 said that what was going on at DeVry went beyond what he had encountered elsewhere: there was no way they could be taking the numbers from the schools and getting the success rates they claimed.

309.    CW8 worked on a survey project for DeVry with the goal of collecting statistical data, including placement information, for schools within DeVry Education Group.  CW8 said that he conducted an extensive analysis of Chamberlin College and the other DeVry schools. CW8 said he discovered that DeVry did not have the data to back up the claim that 90% of its graduates got jobs in their field of study within six months of graduation.  In addition, CW8

recalled that his counterpart at DeVry University confirmed there was insufficient data to substantiate DeVry University's job placement claims in DeVry's SEC filings. CW8 described his DeVry University counterpart as a "statistician" who understood the numbers. He added that "no university on the planet can with any integrity" tout the kind of numbers that DeVry was claiming in their SEC filings.

310. Once he discovered the statistics that DeVry was reporting in its SEC filings were false, CW8 reported this to an in-house attorney who worked in DeVry's corporate compliance department. During his meeting with DeVry's in-house attorney, CW8 informed the attorney that DeVry was misrepresenting statistics in their SEC filings. He said that he specifically told the in-house attorney that there was no data to substantiate DeVry's job placement rates and the 90% representation. He told the attorney "you don't have the data to calculate this." CW8 said that his meeting with the in-house attorney occurred in approximately April 2014.

311. When asked if his superiors were aware of those meetings, he responded that Groenwald (who reported to Hamburger) "marched" into his office to discuss the meetings, so he knew she was aware of them and his findings. When asked if Hamburger knew about his findings, CW8 responded that he definitely did. He knew this because Groenwald told him in a meeting that she discussed CW8's findings with Hamburger. CW8 added that Groenwald and Hamburger met all the time. CW8 was fired a month after meeting with DeVry's in-house attorney and said that his meeting with the compliance department and the attorney led to his termination. According to CW8, the numbers for Chamberlain's College of Nursing that he submitted to DeVry's corporate compliance department and the numbers the school later published didn't match up. Specifically, CW8 said that the numbers he was given and the numbers DeVry presented to their shareholders and prospective students were not the same.

Thus, according to CW8 Chamberlain's numbers were "highly inflated"—either by the top-level management at the nursing school or the DeVry's corporate compliance department.

312.     CW8 explained that the "The 90 percent statistic that DeVry provided its shareholders was highly inflated." According to CW8, DeVry obfuscated the numbers to the school's benefit—"they start with a number to produce and find a way to calculate it[.]"

313.     CW8 said that what he witnessed at Chamberlain wasn't just a problem there: DeVry's other schools were using the same flawed formulas to generate numbers as the nursing college. CW8 met regularly with the person in charge of the compliance department for DeVry and recalled that he had about 11 counterparts: colleagues who served in similar roles at DeVry's various schools.

314.     According to CW8, "the numbers DeVry was producing and generating for the SEC reports were just not accurate." According to CW8, the actual numbers were different from what DeVry reported to investors.

315.     CW8 explained that only 15 percent of nursing students who attended DeVry's Chamberlain School of Nursing went on to enjoy careers in nursing, and only 30-to-40 percent of students who completed the program were even allowed to take the NCLEX nursing certification exam. CW8 explained that no more than 20 percent of the students in any of DeVry University or Chamberlain College of Nursing's degree programs completed their degree and found a job in their field of study.

316.     Contrary to Defendants' public statements, CW8 stated that no DeVry program placed 90% of its students in jobs and he had never seen a 90% job placement rate at any of the universities he assisted with institutional effectiveness.

317.     According to CW8, DeVry would allow students to start a nursing program, complete all the necessary programs, graduate, but not be authorized to take the NCLEX nursing exam.  As CW8 explained, the percentage of students who started the program, finished, passed and found an actual nursing job was only 15%.

318.     CW8 recalled that Hamburger wanted to speak with him after CW8 authored a report that isolated certain factors critical to the success of a for-profit college.  CW8 understood that Hamburger had seen his report and wanted to meet with him about it.  According to CW8, Hamburger wanted to see how CW8 created and assessed the spreadsheets he made.  CW8 explained that those specific spreadsheets detailed metrics related to admissions, academics, and "outcomes" which included job placement statistics.  However, CW8 said that Groenwald stepped in and stopped this meeting.

319.     Shortly before CW8 left DeVry in 2014, he said he was asked to generate false reports for the nursing school after it failed an accreditation renewal site visit from the Commission on Collegiate Nursing Education (CCNE).  CCNE evaluators are tasked with assessing how well a school is achieving the outcomes defined in its mission and CW8 said that the nursing school failed the site visit for reasons related to institutional effectiveness.  With Chamberlain's accreditation on the line, CW8 was asked to have his team generate artificial reports for the past years.  CW8 was specifically presented with a list of reports going back three or four years that he wanted run.  CW8's boss told him he intended to submit the reports to CCNE.  CW8 refused to allow his staff to fabricate the missing data necessary to create the reports.  After his departure, CW8 learned a report was generated for the nursing school and submitted to CCNE to validate the school's institutional effectiveness for the previous four years.  Chamberlain was then granted full accreditation for the next ten years.  CW8 stated that he

intended to report Chamberlain's decision to fake numbers instead of improving its offerings to the accrediting agency, CCNE, but he never sent the email.

320.     CW9 was the Director of the Office of Institutional Effectiveness at DeVry's headquarters in Downers Grove, Illinois from March 2014 to August 2015.  When he began work at DeVry, CW9 reported to CW8, who was dismissed unexpectedly shortly after CW9's arrival.  DeVry's Office of Institutional Effectiveness was created with the goal of creating a system to evaluate that effectiveness of the curriculum at all the Chamberlain College of Nursing campuses.  DeVry's Chamberlain school of nursing is comprised of 20 separate campuses in 15 separate states, according to publicly available information.

321.     According to CW9, it was understood that the evaluation system he was working on could be applied to other DeVry's institutions after it was created for the nursing school. CW9 explained that during his tenure, there was no such system in place to obtain information about how many students graduated, obtained licenses, or actually went on to work as nurses after attending DeVry's nursing school.

322.     CW9 said his team didn't know who to ask for data so they made a routine of asking the president of each school.  CW9 said that some locations did not having systems in place to provide the data CW9's team was looking for.

323.     CW9 said he did not know how DeVry calculated the 90% placement rate.  He said that, based on his experience, DeVry didn't have the data available to calculate the 90% statistic.  CW9 said that the nursing school wasn't even able to track the rate its students were graduating at and obtaining licenses.

324.     According to CW9, Defendant Hamburger took an interest in the work CW9 was doing at the Office of Institutional Effectiveness due to the potential information it was going to offer about the nursing school.

325.     CW10 was a Graduate Career Services Advisor at DeVry's Naperville, IL, online center from 2010 to March 2016. He reported to the Manager of DeVry Natalie Pavon, and later to Assistant Dean Jillian Owens. As a Graduate Career Services Advisor and Recruiter for DeVry, CW10 helped recent graduates search for jobs.

326.     According to CW10, the 90 percent placement rate was discussed during staff meetings and he explained that DeVry's marketing department generated materials promoting its 90 percent job-placement rate and distributed them to the school's many locations.  CW10 recalled that there were 90% marketing posters on the bottom floor of the building where CW10 worked said that DeVry graduates found jobs in their field within six months of graduation 90 percent of the time.  The posters were large, roll-up banners, he said. The banners featured stock photography images of students smiling and CW10 said the imagery was part of a broader marketing campaign implemented at the national level across DeVry's many campuses.

327.     CW10 said he was sure the posters were approved and produced at the national level because the content was consistent with DeVry's broader messaging.  According to CW10, DeVry's national strategy was to market high placement rates, then use pressure tactics to get students to enroll.

328.     CW10 believed the 90% statistic could not be accurate and recalled participating in discussions with equally-skeptical colleagues about how difficult it would be to obtain a 90 percent placement rate.  CW10 questioned his boss on more than one occasion about the 90% statistic.  However, his boss never provided a legitimate explanation for the statistic.

329. CW10 spoke with students all over the country in the course of his work and said that, of the students he communicated with, about 20 percent complained they couldn't find work.

330. In response to regulatory scrutiny in 2010, CW10 said that DeVry began working to discover which students were actually finding work in their chosen fields. CW10 recalled being assigned to a project to document recent DeVry graduates' employment status. CW10 was given a list of questions to ask students to verify whether they were employed in their field of study. He recalled that most of the students he tried to contact couldn't be reached, and those who were reached were often out of work or employed in a field that had nothing to do with their degree.

331. Following the negative publicity generated by the Department of Education inquiry about placement rates in and the resulting lawsuits, DeVry changed its name to Adtalem Global Education. CW10 suspected the company did so to distance themselves from their tainted brand.

332. CW11 was Associate Director of Admissions for DeVry's Online Division in Chicago, Illinois during the Class Period. During his tenure, DeVry's Online Division had offices in Chicago, Phoenix and Orlando. CW11 worked as Associate Director of Admissions for DeVry from April 2009 to September 2015 and reported to the Director of Online Admissions in Chicago, Elise Awwad. As Associate Director of Admissions, CW11 managed a team of about 15 Admissions Representatives.

333. According to CW11, DeVry required Online Admissions Representatives to recite the 90% national statistic to prospective students on sales calls and to have the statistic posted in

their cubical.  This policy was approved by DeVry's management, according to CW11, and the failure to abide by it could result in termination.

334.     CW11 explained that he was required to observe and evaluate Admissions Representatives on phone calls with prospective students.  To do this, he used an "Observation Form" provided by DeVry which was used nationwide.  According to CW11, DeVry's Observation Form listed certain "Core Compliance" requirements—information the Representatives were required to tell prospective students "word-for-word."  CW11 stated that DeVry's 90% national statistic for job placement within six months of graduation was one of the Core Compliance items.  According to CW11, representatives "could have a perfect interaction with a potential student on the phone, but if they didn't provide that statistic, I would have to fail them."  CW11 said that if the 90% statistic was not communicated on the call there was no way an Admissions Representative could pass the observation.

335.     CW11 explained that the Observation Form was created by DeVry for use by managers nationwide at the company.  It was accessible to employees throughout the company on an internal digital file sharing database, CW11 called "Sharepoint."  CW11's boss, Elise Awwab, Director of Admissions at the Chicago location, trained CW11 on how to conduct the observations.

336.     CW11 explained that Admissions Representatives were also required to keep the Core Compliance items posted in their cubicles so that they could communicate the information "verbatim" as the company wanted it said.  If an Admissions Representative did not have the Core Compliance items posted in the cubicle, they were "dinged" on their work performance, he said.

337.     According to CW11, the Executive Management Team for Online Admissions was aware of the Observation Form and approved of its use.  During CW11's tenure, DeVry's Executive Management Team for Online Admissions consisted of: (1) Christopher Caywood, the President of Online Admissions; (2) Ted Kuwaliak, the Vice President of Online Admissions; and (3) Paul "Anton" Weber, National Director of Online Admissions.  Because the form was disseminated through DeVry's internal corporate database for use by employees nationwide, CW11 believed corporate employees above the online executive management team were also aware of its use.

338.     CW11 recalled that sometime between 2011 and 2013 DeVry began requiring Representatives to tell potential students about the Core Compliance items, which included the job placement statistics.  "That's when it became more serious," CW11 said, "that's when it became, if you don't do it, you're dinged, you can get fired."  At that time, according to CW11, the company began conducting "rigorous training" about the Core Compliance requirements and handed out documents with the language that Representatives were required to use when speaking with potential students.

339.     CW11 explained that DeVry's policy requiring Representatives to tell all potential students about the job placement statistics was applied to the entire online division.  CW11 recalled that Representatives expressed concern about telling potential students that 90% of DeVry graduates were employed in their field within six months of graduation because they did not trust it was accurate.  CW11 further recalled that Representatives who worked for him had their jobs threatened because they were not telling students about the statistics, and some of them lost their jobs in part due to their refusal to cite the 90% statistic.

340. CW12 was the Director of Career Services for DeVry's Carrington College in Boise from August 2013-February 2017. According to CW12, Boise was one of 17 Carrington campuses, including an online campus. CW12 reported to a woman named Sheryl, and later to a man named Scott.

341. As Director of Career Services, CW12 was responsible for tracking career metrics including placement rates and salaries at Carrington. When asked about the 90% figure that had been touted by DeVry for many years, CW12 responded that he "never experienced that." Rather, according to CW12, for all of Carrington during his tenure, the goal for graduates to be working in their field was typically 76-78%. CW12 said that these post-graduation employment goals were sent by his boss, the head of career services for Carrington. In addition, he added that Carrington measured this metric not within six months but based on DeVry's fiscal year.

342. CW12 was familiar with the FTC investigation and the settlement it reached with DeVry. He said that prior to the FTC investigation, the company was very loose about the way it calculated and tracked post-graduation metrics. CW12 said that, for example, a student who graduated with a medical assistant degree would have been considered to be employed in his field if he found a job as any kind of caregiver. He added that after the FTC came in, DeVry became "a lot more tight."

343. CW12 also explained that for Carrington, many of the students required an accreditation to enter their specific field and these accreditation were used to exclude student from Carrington's employment metrics. For example, according to CW12, if there were ten students in the program and two did not pass the accreditation, DeVry would base the post-graduation employment metric only on the eight students that did pass the program. CW12

further recalled that a former Director of Career Services told him that DeVry frequently misrepresented the employment statistics for business degree graduates.

344.    CW12 was responsible for sending the reports containing employment statistics to his boss, Scott. According to CW12, these reports were then "definitely" being sent to DeVry's corporate office.

345.    CW12 also recalled that most Carrington graduates had "low" salaries and that at least 35% of the graduates were not reporting their salaries to the school.

346.    CW13 was Associate Director of DeVry University in Elk Grove, California from 2009 to 2013. He also worked for DeVry's Carrington College in Boise, Idaho from 2013 to 2014. While in Elk Grove, CW13 reported to the Campus President Marcellus Inglesias, then to Mary Cole.

347.    According to CW13, DeVry's claim that 90% of DeVry graduates were employed in their field within six months of graduation only reflected graduates who were eligible for work. In addition, CW13 was allowed to write off graduates from the statistic who he was unable to contact.

348.    CW13 believed the reason that DeVry got in trouble with the FTC was because DeVry did not have the records to substantiate the employment metrics or salary information. He explained that when he first joined DeVry, they had "on paper" reporting. He explained that he would send a Word document to the student. Each answer had a corresponding code at DeVry. The student would then either have to print out the document to fill it out or type into the document. According to CW13, this process left "a lot of room for manipulation." He explained that the graduate could just "x the box" that said "I'm not interested in any career services." If that happened, the DeVry employee could then "get them off their case load."

349. CW13 also said that DeVry allowed a certain number of students to be written off each year. He explained that students could be written off if they were not actively looking for employment, moved out of state, among other reasons. These students would be coded as "inactive."

350. CW13 described how his counterpart at DeVry's Freemont, California campus was so concerned with achieving the 90% metric that his "ethical foundation" was compromised. He went on to say that DeVry University would have weekly or biweekly meetings to discuss the graduation metrics and the "pressure was on."

351. According to CW13, the starting salaries in his area (Sacramento) were $12/hour or $24,000-$25,000 annually. CW13 confirmed that salary information was reported in the same place as the metric related to being employed in their field of study. CW13 reiterated that being employed in their field of study was "the most important metric" at DeVry during his tenure. CW13 also mentioned that he had been contacted by an FTC attorney and interviewed for a number of hours.

352. CW14 was employed by DeVry for six years. He first worked to open career services offices in the Tampa, Florida area and then was the Associate Director of Career Services in Tampa from March 2010 to July 2012. He then moved to Washington D.C., where he worked as Senior Career Services Liaison for DeVry from July 2012-May 2016.

353. CW14 confirmed that there were codes within the HireDevry system which allowed students to be designated "non-job seeking" and thus waived from inclusion in DeVry's employment statistics. CW14 also advised that during the latter part of his tenure at DeVry, the Company required the application of certain codes—such as the code to designate a graduate non-job-seeking—to be approved by DeVry's corporate office.

354.     According to CW14, DeVry had a "career services manual" detailing procedures for all DeVry campuses to follow. The manual was initially 80-90 pages, but then it was condensed to "20 something" pages.  According to CW14, the career services manual was the "bible" for how to use the codes in HireDevry.  He added that once this was implemented, all the campuses were required to adhere to the manual so that there was a uniform approach to career services throughout DeVry.  According to CW14, the manual would be updated regularly and came from "Home Office-Career Services."

355.     CW15 was employed by DeVry and Carrington from February 2009-January 2017.  He first worked as DeVry's Metro President in the Phoenix market from 2009-2014, then as Senior Director of Operations for Carrington College from 2014-2017.

356.     CW15 confirmed that the 90% job placement rate DeVry touted excluded students who had been waived from the statistics because they were non-job-seeking, but that DeVry also ran a hard number to see how many students they actually placed.  CW15 could not recall the exact number, but estimated that if they had included the waived students, the percentage would have been less than 90%.

357.     CW15 also reported that whenever someone was placed at the campus level, that placement was verified at the corporate level. He explained that after his Director of Career Services verified the placement information, he would also verify it, and then it was sent to DeVry's "home office" for further verification.

358.     CW15 had direct contact with Daniel Hamburger.  He said that the executives, including Hamburger, would visit the campuses he was in charge of and he would also see the executives at annual meetings. CW15 described Hamburger's hands-on management style. Specifically, CW15 recounted how he would get emails from "Daniel [Hamburger] where he

would say that he was reviewing 'your statistics' or 'Hey, I was listening to an enrollment call.'" Hamburger would proceed to tell CW15 what he thought of that particular statistic or how to instruct his employees to handle enrollment calls in the future. CW15 reiterated that Hamburger was "very hands on and very responsive." CW15 recalled that Hamburger came to his campus at least five times during his tenure as Metro President. CW15 went on to say that Hamburger is the kind of guy that, when coming to town, would expect CW15 to pick him up from the airport. CW15 said that he would make sure to meet such expectation.

359.    On the subject of DeVry's 90% claims, CW15 said that "Daniel [Hamburger] had to have approved that advertising" because it was "very provocative advertising and he would not have approved it without doing very detailed, scrutinized research…. He would have asked for the data." When asked CW15 how he knew that Daniel approved the advertising, CW15 responded that, based on his experiences with Hamburger, "that's just how he was." CW15 went on to say that you could go to Hamburger to talk about something and he would call people out by pulling out an email from two years ago on the same topic.

360.    Discussing DeVry's salary statistics, CW15 said that salary was a very important metric at DeVry and it was tracked very carefully. He confirmed that DeVry's corporate office was very interested in starting salaries, since it was being reported publically.

361.    CW16 worked at DeVry as an Executive Assistant for almost seven years. He first worked in the Student Affairs Department; then for Career Services executives; and in November 2013, moved to DeVry's Becker Professional Education business unit, where he remained until the end of his tenure. While working for DeVry's Career Services Department, CW16 was an Executive Assistant for Madeleine Slutsky, DeVry's Vice President of Career and

Student Services. Once he moved to Becker, he worked for Tim McClinton, the former Vice President of Becker.

362. CW16 knew about the FTC's investigation and was not surprised that DeVry settled with the FTC. He specifically recalled that in 2013, he was instructed by Slutsky to find every marketing document that quoted the 90% rate.[18] It was CW16's understanding that Slutsky was working with Pat Duncan, the Director of Regulatory Compliance, to identify every single document which had 90% verbiage and which DeVry could no longer use. According to CW16, Slutsky received reports on job placement statistics on a regular basis, including reports from HireDeVry.

363. CW16 reported that he heard DeVry was including graduates in the 90% job placement statistic who were already employed in their field of study before going to DeVry. In addition, CW16 heard that even if DeVry did not assist in placing a student because they had already had the job prior to studying at DeVry, DeVry would include that person in calculating their job placement statistics. He reiterated that if that person had a pre-existing position in their field, they were still counted by DeVry as "placed in their field" when DeVry was putting together their job placement statistics.

364. CW17 worked in the Career Services Office at DeVry's Phoenix, Arizona Campus from 2014 to 2017. He described the Phoenix campus as a "legacy" campus since it was one of the first on the west coast. CW17 was responsible for advising and helping DeVry graduates find jobs. CW17 reported to the Director of Career Services, Deena Handler.

365. CW17 explained that every student at DeVry was automatically opted-in for career services following their graduation from DeVry, however, CW17 explained that graduates

---

[18] Referring to DeVry's claiming that 90 percent of graduates actively seeking employment landed jobs in their field within six months of graduation.

could opt-out of career services assistance and that DeVry had "waive" codes in HireDevry. CW17 also recounted that the "this is how we code" directives came from DeVry's corporate office, and that he used a guide supplied by DeVry's corporate office which dictated how to code each graduate.

366. CW18 worked as Senior Director of Admissions at DeVry University from 1993 to 2012. Based in Chicago, Illinois, he was responsible for the Chicago, Addison, and Tinley Park campuses. He reported to Chicago Metro-area Dean of Enrollment Management Christine Hierl and later to Vice President of Admissions Virginia Mechnig.

367. CW18 recalled that for the duration of his tenure at DeVry University his team used a mandatory script to guide their recruitment conversations. The script touted the university's claim that within six months of graduation 90% of DeVry graduates landed jobs in their field of study. According to CW18, "the script was developed and then honed by upper management." CW18 explained that that the script was approved by DeVry University's President David Pauldine, Vice President of New Student Recruitment John Holbrook, and Vice President Robert Whitney.

368. CW18 said he participated in meetings with CEO Daniel Hamburger during which the 90% enrollment rate was discussed. CW19 was employed by DeVry as Vice President of Business Services/Operations from August 2009 to July 2016. He worked out of both the Oak Brook and Downers Grove (corporate headquarters) locations in Illinois. CW19 reported directly to the Chief Information Officer Chris Nash, who reported to CEO Daniel Hamburger. CW19's responsibilities included oversight of the business systems that supported students and faculty.

369. CW19 described himself as a "senior leader of the Company," and participated in many meetings involving senior leadership. According to CW19, DeVry student graduate employment metrics were taken very seriously by the Company and was a topic of discussion in meetings he attended. These meetings included Quarterly Leadership Meetings, in which graduate employment metrics were discussed. CW19 also reported that CEO Daniel Hamburger, CFO Daniel Wiggins, CFO Richard Gunst (Wiggins's predecessor), and CAO Patrick Unzicker all participated regularly in Quarterly Leadership Meetings. CW19 also recalled that Madeleine Slutsky, the Vice President of Career and Student Services attended the Quarterly Leadership Meetings.

370. CW20 served as Vice President of Academic Affairs and Chief Academic Officer for Chamberlain College of Nursing's from July 2011 to June 2017. CW20 was primarily based in Downers Grove, IL at DeVry Education Group's headquarters. He reported to Chamberlain College President Susan Groenwald, who reported to DeVry Education Group CEO Daniel Hamburger. During his tenure as the Vice President of Academic Affairs and Chief Academic Officer, CW20 oversaw the academic curriculum for the nursing programs. He spent most of his time in meetings with people in the corporate office discussing various academic matters.

CW20 participated in meetings with Hamburger during which issues related to job placement and accreditation at DeVry were discussed. CW20 explained that he attended meetings with Hamburger in which Hamburger specifically discussed the FTC and DoE investigations. CW20 also recalled attending meetings with Hamburger during which job placement statistics at DeVry University were discussed. CW20 also confirmed that he attended meetings that were attended by Patrick Gunst and Tim Wiggins during which the DoE and FTC investigations were discussed. CW20 also suggested that increased regulatory scrutiny led

DeVry to change its name. CW20 also recalled that DeVry had an ongoing issue related to job placement and accreditation. In addition, CW20 recalled that DeVry University was not aggregating data on institutional effectiveness across its different programs, and this lack of data was an issue discussed during meetings led by Hamburger in 2012, 2013, and 2014.

371. CW20 discussed how marketing materials were approved. He explained that marketing materials went from DeVry's corporate office to the campuses, where they were distributed by teams at the individual locations. "They had a centralized marketing approach," CW20 recalled.

372. CW20 also discussed how Hamburger was very involved in the day-to-day operations and decision-making at DeVry Education Group's schools. "Hamburger visited campuses periodically and he was always engaged with the executive team," CW20 said. In addition, CW20 recalled that Groenwald—who CW20 reported to—met regularly with Hamburger, and Hamburger also met with Chamberlain's head of finance and marketing frequently.

373. CW1, an Admissions Advisor for DeVry University's online programs from August 2011 to November 2012 in Chicago, Illinois, stated that he was highly suspicious of DeVry's claims about a 90% job placement rate. CW1 recalled that he was given a script from DeVry that he was required to read from when speaking to prospective students. The script required him to tell prospective students that "they would have a job after six months," and included claims about the 90% job placement rate. CW1 doubted the accuracy of those job placement claims because he thought it was "impossible" that 90% of students would have jobs within six months. In fact, CW1 eventually refused to make such claims to prospective students because he felt guilty about saying it, and also eventually declined to tell prospective students

159

that they would earn more than graduates of other schools. CW1 believed that the suspicious job placement and higher income claims were powerful statements in recruiting students.

374. CW1 stated that DeVry recorded its Admissions Advisors' calls with prospective students and that the Company would issue warnings and dock the pay of employees who did not provide "the exact rates and exact percentages they would give us." In fact, CW1 recalled being reprimanded for failing to provide the required job placement and salary statistics to prospective students. CW1 believed that other Admissions Advisors also suspected that the job placement and salary statistics were misleading at best, but felt pressure to make the claims to protect their jobs. Admissions Advisors also had quotas which they were required to meet if they wanted to keep their jobs, and were under significant pressure to enroll students.

375. CW2, a Regional Marketing Director of DeVry's Northeast region from September 2008 to August 2013, was in charge of marketing efforts in that area, which included New York City. CW2 worked on physical advertisement campaigns as well as social media efforts. CW2 recalled that DeVry provided him with information about a 90% job placement rate that the school wanted him and his colleagues to use in marketing efforts. He said that the specific language about job placement rates that he was required to use had been reviewed and approved by DeVry's legal and compliance department, and that the Company kept a repository of approved language for use by the marketing department.

376. CW2 said that he was aware that the advertised job placement rates "might not be 100 percent accurate" due to a "grey area" in whether graduates were obtaining jobs in their field of study or in other industries, and he suspected that certain graduates were employed in jobs that most people would not define as being in the graduates' field of study. CW2, who asserted that he was "very close" to the Company's social media efforts, revealed that DeVry's job placement

160

claims had come under online scrutiny "either by disgruntled students or the media," and that such scrutiny further led him to suspect that the Company's asserted job placement rates were not accurate. He said that the "whole marketing department" had similar concerns that the jobs used in the placement statistics were not in graduates' field of study.

377. CW2 believed that the criticism of the 90% job placement claim was likely reported to Dave Pauldine, who was DeVry's Executive Vice President of Marketing and the President of DeVry University. Pauldine reported to Defendant Hamburger.

378. CW4, a National Admissions Advisor for DeVry University's online programs from 2007 to 2011 in Chicago, Illinois, confirmed that DeVry supplied him with statistics about its students as well as other marketing material that he was expected to use when recruiting students. CW4 stated that advisors were encouraged to use the claim that 90% of DeVry University's graduates are employed in their field of study within six months of graduation. CW4 stated that the encouragement to use the claim "came down from the top," noting that "[o]ur managers told us, but their managers told them." According to CW4, he reported to a recruiting manager who, in turn, reported to the recruiting director.

379. CW4 stated that DeVry's Career Services department was responsible for determining the job placement rate. He indicated that he and other admissions advisors were aware that the 90% job placement claim did not include all students, but they were not required, nor expected to inform prospective students of that fact. CW4 explained that DeVry University's job placement rates did not include students that transferred into DeVry. According to CW4, many DeVry graduates would go to community college, transfer their credits, and then go to DeVry to finish their degrees. Those students, according to CW4, were not included in the job placement statistics touted by DeVry. Rather, DeVry's job placement statistics only included "new student enrollments" or "freshmen."

380.    CW5, an online Graduate Career Advisor for DeVry's Keller School of Management from January 2011 to December 2012 based in Naperville, Illinois, stated that he did not keep track of his placement rates because it was done automatically by the Company's computer system, HireDeVry. CW5 explained that he did not run reports about job placement rates on his own, but recalled waiving a significant number of graduates for various reasons based on DeVry's policies. CW5 understood that these waived graduates were not counted in job placement statistics. For example, CW5 estimated that roughly 15% of graduates he dealt with were waived because they advised him that they were not seeking employment and that another 25% were waived because they already had jobs prior to graduation and were not seeking new employment.

381.    CW6 was an Associate Dean at DeVry University's College of Engineering and Information Services in Irving, Texas, from July 2009 to July 2015. In July 2014, CW6's job title changed to Faculty Program Chair but his responsibilities remained the same. CW6 stated that campus-specific job placement rates of DeVry University graduates were reported up the chain of command within the Company. CW6 added that DeVry's corporate policy prohibited employees from releasing campus-specific job placement rates to the public.

382.    CW7, Campus Director and then President of DeVry University's Fresno and Bakersfield, California campuses from January 2009 to May 2016, said that DeVry had a written national policy that described the process and rules for which students were included or excluded in the job placement statistics of DeVry University graduates. CW7 confirmed that certain students were waived from inclusion in those statistics, and as Campus Director and them Campus President, he signed off on those waivers. He said that the waiver decisions and graduates' files were also occasionally reviewed for accuracy by higher-level employees. CW7

separately explained that DeVry kept records on how many graduates were not counted in the job placement statistics, and that that data was kept in the HireDeVry computer system.

## IX.   SCIENTER ALLEGATIONS

383.   Numerous facts demonstrate that Defendants knew, or were severely reckless in not knowing, that DeVry's statements with respect to the graduate employment statistics were false and misleading when made.

### B.   Revelations from Four Separate Government Investigations Show that DeVry's Fraudulent Practices Pervaded the Organization to Such a Degree that the Individual Defendants Either Knew About Them or Recklessly Disregarded the Practices

384.   Evidence uncovered through investigations undertaken by the FTC, DoE, New York State Attorney General's Office, and the Massachusetts AG shows that DeVry maintained a practice of inflating its employment statistics.  The scope of DeVry's practices—as revealed by these government actions—shows that the Individual Defendants either were aware of the practices, or acted recklessly by failing to uncover them.

385.   The FTC's determination that the Company lacked any reasonable basis for the false and misleading DeVry University graduate employment and salary statistics indicates that Defendants Hamburger, Wiggins, Unzicker, and Gunst were at least reckless in disregarding the substantial risk that those statistics were false.

386.   As to the much-publicized DeVry University graduate employment statistics, the FTC determined that the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%."  Indeed, the advertisements described in the FTC Complaint, which are substantially the same as Defendants' statements in the Company's SEC filings, press releases, and during conference calls with securities analysts, asserting that 90% of DeVry

163

University graduates are employed in their field within six months of graduation, the FTC

determined that such statements "are false and unsubstantiated."

387.    The FTC explained that DeVry calculates the 90% figure using information

obtained from DeVry University students and graduates, related information obtained by DeVry

University's Career Services department, and analysis conducted by DeVry University staff.

Those student records, however "[did] not provide a reasonable basis that substantiates

Defendants' 90% claims."  Among other things, the 90% figure "count[s] a substantial number of

[DeVry University] graduates who should not be counted and similarly exclude[s] a substantial

number of [DeVry University] graduates who should not be excluded."  For instance, the 90%

figure "count[s] graduates who did not obtain a job as a result of obtaining a degree from [DeVry

University]," including the "substantial percentage of DVU graduates who, after graduation,

continued with the same job they had when they enrolled in [DeVry University]."  The 90%

figure also counts graduates who did not obtain jobs in their field of study, and indeed a

"significant percentage of the jobs that Defendants count as being in the graduate's field of study

include jobs that employers, industry experts, graduates, and consumers would not reasonably

consider to be in the graduate's field of study."  Notable examples of such improper inclusion

described in the FTC Complaint include:

- graduates with degrees in technical management who were working as: a rural mail carrier (human resources specialization); a yard salesman at a nursery (business information systems specialization); a sales associate at Macy's (general technical specialization); a driver delivering rain gutters for a construction services company; a data entry specialist for a radio station (human resources specialization); and unpaid volunteers at medical centers (human resources management and health services management specializations);

- a graduate with a degree in business administration (health services management specialization) working as a server at the Cheesecake Factory;

- a graduate with a degree in business administration (health care management specialization) working as a car salesman; and

- a graduate with a degree in business administration (accounting specialization) working as a secretary at a prison.

388.    The 90% figure also excluded certain students who were actively seeking employment.  The FTC describes one egregious instance in its complaint:

> For example, in June 2013, Defendants excluded one 2012 graduate who, prior to being classified as inactive: viewed 177 jobs leads in DVU's jobs database; had at least six job interviews in the previous two months (including two interviews eleven days before DVU classified him as inactive); sent an email to DVU's Career Services department, two weeks before being classified as inactive, in which he stated that he "wanted to let you know I've been getting more response now that I am much more actively applying to positions," and that he "had two face to face interviews a while back and now 2 Skype interviews"; attended a DVU "Career Fair" the following day; and then sent the Career Services department an email informing them that, after attending the career fair, he sent three thank you notes to companies whose representatives he had spoken to at the fair.

389.    Thus, lacking any reasonable basis for asserting that 90% of DeVry University graduates are employed in their field within six months of graduation, Defendants were at least severely reckless in making such statements.

390.    With regard to DeVry's claims as to DeVry University graduates' purported earning power, the FTC Complaint makes clear that the "sampling methods and methodology" underlying a third-party survey used to substantiate those claims "*all gave or should have given [DeVry] reason to question the reliability of the conclusions and information*" of that survey, and "[i]n fact, *[DeVry University] personnel expressed concerns over whether the data sufficiently supported the higher-income claim*."  Notably, "statistics that [DeVry University] had directly collected from thousands of its graduates each year about their incomes differed significantly from the third party's statistics, which consisted of information from only several hundred individuals per graduation year."

391.     Moreover, DeVry had "extensive information in [its] own files about the income of [DeVry University] graduates" in addition to "publicly available data reflecting the incomes of graduates of schools throughout the United States, by school and by field." As the FTC explained, a comparison of DeVry's internal statistics with publicly available graduate income data "shows that [DeVry University] graduates a year after graduating do not in fact earn significantly more than graduates from all other schools combined," and so DeVry's "reliance on the third-party data for its higher-income claim was therefore unreasonable."

392.     Additionally, in a Joint Rule 26(f) Report with Errata filed by the parties on June 7, 2016 in FTC's action against DeVry, DeVry included both Defendant Gunst and David Pauldine, who reported directly to Defendant Hamburger, in a list of percipient witnesses likely to have discoverable information. The inclusion of Gunst and Pauldine in the list of percipient witnesses in that litigation indicates that these individuals were knowledgeable regarding how the Company generated the DeVry University graduate employment and salary statistics, and therefore were aware or recklessly disregarding the substantial risk that the job placement and salary statistics touted by Defendants during the Class Period were false.

393.     Lead Plaintiff also obtained internal documents from the DoE through a FOIA request which show DeVry's executives acted in bad faith, and were in fact put on notice that DeVry University's job placements statistics were inaccurate. An internal brief submitted by the DoE to the Office of Hearings and Appeals describes high-level evidence showing that DeVry's executives must have known the job placements statistics they were touting were false. As explained in the DoE:

- "[T]he violation at issue was neither unplanned nor isolated. Rather the representation was developed as part of a multi-year, national advertising campaign that reached millions of prospective students … and that commenced only after extensive consumer and brand research. Relying on this research, DeVry made an initial decision to use, and

repeated decisions to keep using, the Representation even after it certified to the Department its knowledge of, and compliance with, the substantiation requirement. Indeed, **"this was not an isolated instance but part of a pattern whereby DeVry either intentionally or through wanton negligence avoided clear statutory and regulatory requirements."**

- *"DeVry continued to make the representation in advertisements even *after* DeVry staff and others raised questions about DeVry's ability to substantiate the claim. For example, an internal presentation in 2008 on the efficacy of the *Careers* campaign posed questions about the sources of the Representation in seeking to establish the 'truth behind' the claim and whether it could 'substantiate' the 90 percent figure. Moreover, in February 2009, DeVry President David Pauldine posited, in an email sent on his behalf, whether DeVry should "be looking at *alternative* messaging such that it brings the ultimate *credibility* to our employment claims." And in November 2009, staff at an advertisement agency used by DeVry, Leo Burnett USA, questioned certain details of the Representation. In response, DeVry's "Senior Consumer Insights Specialist" dismissed the concerns by affirming a response that DeVry had "dug into these numbers 8 ways to Sunday, and there is no other clear, compelling, and compliant story." Nevertheless, aware of both legal requirements and express questions and concerns about the Representation, DeVry continued to use the Representation in advertisements until after the department asked DeVry for substantiation."

- "DeVry made statements in response to the Substantiation Request that lacked credibility. Specifically, although DeVry claimed to have ceased making the Representation no later than January 2014, this was not true. DeVry's failure to act with candor during the investigation violated its fiduciary duty to the Department."

394. Similarly, a non-public affidavit submitted by DeVry in the DoE action describes

additional evidence showing that high-level DeVry executives must have known that the 90%

misrepresentation was false:

- "DeVry produced to the Department a November 3, 2009 email from Drew Swinger, the "Senior Consumer Insights Specialist" for DeVry, Inc. . . . In that email chain, Lauren Rector, at Leo Burnett USA inquires of Mr. Swinger about wanting to "**dig a little deeper into the 90% employment rate claims**," specifically about the "since 1975" claims. Later in the chain, Mr. Swinger confirms Jay Pauer's statement that DeVry has "dug into these numbers 8 ways to Sunday, and there is no other clear, compelling, compliant story." Mr. Swinger also states that the 90% is not the "percent of graduates" who were employed, but rather the "percent of graduates who were in the active job market 6 months after graduation."

- "Since February 1983, DeVry graduates have been expected to fulfill certain obligations to be considered as 'actively pursuing employment.' Currently, 'actively pursuing employment' after graduation includes maintaining a close relationship with Career Counseling and Placement Office by making a visit, phone, or mail contact at least once

every two weeks. Also, during the first 17 weeks after graduation, graduates are expected to make a personal visit or phone call to an average of three companies each working day."

395.    The fact that the DoE described specific evidence that it possessed showing that DeVry acted in bad faith with respect to the misrepresentations at issue raises the inference that DeVry's senior executives either knew or recklessly disregarded the truthfulness of the 90% representations.  As the DoE explained, (1) DeVry engaged in a pattern of making misrepresentations; (2) DeVry's senior executives were making presentations and sending emails about the 90% representation at a high level as early as about 2008; and (3) continued making misrepresentations after they were put on notice by both a consultant and the DoE during the Class Period about the falsity of the 90% representation.  These internal documents contribute substantially to the inference that the Defendants acted with scienter.

396.    In addition, internal documents produced by the FTC in response to a FOIA request show that the government's investigation specifically sought to uncover what DeVry's corporate executives knew about DeVry's 90% and salary misrepresentations.  These internal documents included charts reflecting the scope of discovery that ***DeVry's own attorneys agreed*** to produce to the FTC.  Critically, the charts show that the "executive officers" of DeVry— defined to include DeVry's "Chief Executive Officer," "Chairman," and "Chief Financial Officer, among others"— were designated as custodians who agreed produce documents on a range of topics including: "emails… which relate to completion rates, job placement rates, [and] students pre-graduation or post-graduation income amounts"; documents concerning "minimum placement rates" reported to government agencies; and "issues raised by consumer complaints. These internal records create an inference that documentary evidence exists showing that the Individual Defendants knew, or recklessly regarded that fact that there was no basis for DeVry's stated employment statistics.

168

397. Internal documents produced by the FTC also show that the FTC's investigation was focused, not only on DeVry's advertising material, but also on the same false statements contained within the Company's SEC filings that are the subject of this lawsuit. These internal records provide even more evidence that the numerous statements Defendants made to investors concerning the 90% statistic and graduating salary information were false and misleading.

398. In addition, internal documents produced by the FTC in response to a FOIA request also show that the FTC's investigation of DeVry's manipulation of the Company's employment statistics was wide-ranging and encompassed all of DeVry's campuses and schools. A table produced by the FTC listing negotiated modifications to discovery requests is 52 pages long, lists 64 separate discovery requests and modifications, encompasses requests touching upon all of DeVry's colleges, and even allows for certain requests to be fulfilled through document "sample[s] of campus presidents" at specific locations.

399. Evidence showing that the Individual Defendants—officers and directors of the Company—must have come to know (or were reckless in not knowing) the truth about the 90% representation during the Class Period also lies with analyst reports showing that DeVry's regulatory profile was important to investors. Throughout the Class Period, analysts repeatedly gave DeVry high marks because of its "lower regulatory risk" and "attractive regulatory profile." For example,

- On September 5, 2011 a Deutsche Bank analyst stated that "[w]e continue to believe DV's overall lower regulatory risk, and strong history of 90%+ placement rates with good salaries, should mean that over time it should trade back at a premium to the campus-based peers."

- On December 7, 2011 a Deutsche Bank analyst said that "Due to [DeVry's'] history of better regulatory metrics and student outcomes, it has typically traded at a 30% premium to the avg. of the campus peers."

- On October 14, 2011, a RBC Capital Markets analyst stated that "[w]e believe that a premium valuation to the peer group is merited due to the company's manageable regulatory profile and attractive long-term growth prospects."

- On August 9, 2013, an analyst with BMO Capital Markets stated that "we have increased this rate for all companies in the sector owing to the regulatory uncertainty and macroeconomic headwinds."

- On October 23, 2014, a JP Morgan analyst commented that "[DeVry] is also subject to the FTC inquiry and several state Attorney General investigations into its business practices. We acknowledge that DeVry has one of the best regulatory records in the sector"

400.    Given that DeVry is a for-profit institution that existed primarily to maximize shareholder value, the Individual Defendants charged with knowledge that Company's regulatory profile was important to investors. Thus, once the FTC investigation was announced, it would make sense for the Individual Defendants to focus on it and determine whether DeVry had a legitimate regulatory problem. Confidential Witness allegations also show that's exactly what they did.

401.    Following its settlements with the FTC, DeVry entered into settlement agreements with both the NY AG and the Massachusetts AG to resolve similar claims that DeVry inflated its employment statistics. Both offices announced they had conducted investigations which shed light on DeVry's practices of inflating its employment statistics that was pervasive across the organization.

402.    The NY AG publicly announced that its investigation showed that "DeVry [ ] mischaracterized certain unsuccessful job-seekers as 'inactive,' despite evidence that the graduates had in fact carried out an active, though unsuccessful, job search."

403.    Similarly, an investigation conducted by the Massachusetts AG revealed that programs had job placement rates "***as low as 52 percent.***" The sheer magnitude of the difference

between the 90% figure that the Individual Defendants touted and the real number, 52%, creates

an inference that Defendants were at least reckless about the practices within their organization.

### C. Confidential Witness Allegations Show that the Individual Defendants Were Informed of the Fraud and Discussed DeVry's Employment Statistics During Internal Meetings

404.    Several Confidential Witnesses provided information that makes it abundantly

clear the Individual Defendants were knowledgeable about DeVry's employment statistics.

These allegations provide further evidence that Defendants either knew the statistics were

inflated, or were reckless with respect to the Company's practice of inflating its employment

numbers.

405.    For example, CW8 reported that he discovered that DeVry did not have the data

to back up the claim that 90% of its graduates got jobs in their field of study within six months of

graduation and, in approximately April 2014, reported this to an in-house attorney who worked

in DeVry's corporate compliance department.  He said that he specifically told the in-house

attorney that there was no data to substantiate DeVry's job placement rates and the 90%

representation.  He told the attorney "you don't have the data to calculate this."  When asked if

Hamburger knew about his findings, CW8 responded that he definitely did. He knew this

because Groenwald told him in a meeting that she discussed CW8's findings with Hamburger.

CW8 added that Groenwald and Hamburger met all the time.  CW8 was fired a month after

meeting with DeVry's in-house attorney and said that his meeting with the compliance

department and the attorney led to his termination.

406.    In addition, CW18 said he knew CEO Daniel Hamburger at DeVry.  He said that

the 90% enrollment rate was discussed during meetings where both he and Hamburger were

present.

407.    Similarly, CW19 stated that DeVry student graduate employment metrics was a topic of discussion in all meetings he attended.  These meeting including Quarterly Leadership Meetings, in which graduate employment metrics were discussed.  CW19 said that CEO Daniel Hamburger, CFO Daniel Wiggins, CFO Richard Gunst (Wiggins's predecessor), and CAO Patrick Unzicker all participated regularly in Quarterly Leadership Meetings. CW19 also recalled that Madeleine Slutsky, the Vice President of Career and Student Services attended the Quarterly Leadership Meetings.

408.    Notably, Madeleine Slutsky is mentioned repeatedly by name as a custodian of relevant records in a document produced by the FTC which shows the scope of discovery sought by the FTC.

409.    CW15 also reported that he had direct contact with Daniel Hamburger.  CW15 stated that Daniel Hamburger likely approved advertising the 90% employment statistic because it was very provocative advertising.   When asked CW15 how he knew that Daniel approved the advertising, CW15 responded that, based on his experiences with Hamburger, "that's just how he was."  CW15 described Hamburger's hands-on management style, recounting how he would get emails from "Daniel [Hamburger] where he would say that he was reviewing 'your statistics' or 'Hey, I was listening to an enrollment call.'"   Hamburger would tell CW15 what he thought of a particular statistic or how to instruct his employees to handle enrollment calls in the future. CW15 recalled that Hamburger came to his campus at least five times during his tenure as Metro President.

410.    Finally, CW20 participated in meetings with Hamburger during which issues related to job placement and accreditation at DeVry were discussed. CW20 explained that he attended meetings with Hamburger in which Hamburger specifically discussed the FTC and DoE

investigations.  CW20 also recalled attending meetings with Hamburger during which job placement statistics at DeVry University were discussed.  CW20 also confirmed that he attended meetings with Hamburger, Patrick Gunst, and Tim Wiggins during which the DoE and FTC investigations were discussed.  CW20 also suggested that increased regulatory scrutiny on DeVry led the Company to change its name.

411.    CW20 also recalled that DeVry had an ongoing issue related to job placement and accreditation.  In addition, CW20 recalled that DeVry University Group was not aggregating data on institutional effectiveness across its different programs, and this lack of data was an issue discussed during meetings led by Hamburger in 2012, 2013, and 2014.

412.    CW20 also discussed how Hamburger was very involved in the day-to-day operations and decision-making at DeVry Education Group's schools.  "Hamburger visited campuses periodically and he was always engaged with the executive team," CW20 said. Further, CW20 recalled that Groenwald—who CW20 reported to—met regularly with Hamburger, and Hamburger also met with Chamberlain's head of finance and marketing frequently.

   **D.    Information Gathered from Confidential Witnesses from Across the Country Show that DeVry's Practice Of Inflating Its Employment Statistics Pervaded The Organization**

413.    Twenty Confidential Witnesses from across the country have provided additional information supporting a strong inference that Defendants recklessly disregarded the likelihood that the DeVry University graduate and employment statistics were false or misleading.  These allegations show that DeVry's practices of inflating its employment numbers was not isolated, but was rather originated with DeVry's corporate office and pervaded numerous DeVry campuses across the country.

414.    For example, as discussed above, CW3—the Associate Director of Career Services at DeVry University's Fresno and **Bakersfield, California** campuses discussed how the "directive" on how to designate a student as non-job seeking came from DeVry's corporate office and how the process was the "same" for every DeVry campus—the only difference was when a campus chose to implement the process.

415.    CW2, a Regional Marketing Director of DeVry's Northeast region which included **New York City** said that job placement rates that he was required to use had been reviewed and approved by DeVry's legal and compliance department, and that the Company kept a repository of approved language for use by the marketing department.

416.    CW6, an Associate Dean at DeVry University's College of Engineering and Information Services in **Irving, Texas**, stated that campus-specific job placement rates of DeVry University graduates were reported up the chain of command within the Company, but added that DeVry's corporate policy prohibited employees from releasing campus-specific job placement rates to the public.

417.    CW14, who worked for DeVry in new campuses in the **Tampa, Florida** area and then was the Associate Director of Career Services in Tampa, Florida, confirmed that there were codes within the HireDevry system which allowed students to be designated "non-job seeking" and thus waived from inclusion in DeVry's employment statistics.

418.    CW17, who worked in the Career Services Office at DeVry's **Phoenix, Arizona** Campus, explained that graduates could opt-out of career services assistance and that DeVry had "waive" codes in HireDevry (so their statistics would not be included in the placement rate). CW17 also recounted that the "this is how we code" directives came from DeVry's corporate office.

419.     Similarly, CW20, Vice President of Academic Affairs and Chief Academic Officer in **Downers Grove, Illinois** stated that marketing materials went from DeVry's corporate office to the campuses, where they were distributed by teams at the individual locations. "They had a centralized marketing approach," CW20 recalled.

420.     CW18, a Senior Director of Admissions for DeVry University's **Chicago, Addison, and Tinley Park** campuses recalled that, for the duration of his tenure at DeVry University, his team used a mandatory script to guide their recruitment conversations which was developed and then honed by upper management. The script touted the university's claim that within six months of graduation 90% of DeVry graduates landed jobs in their field of study. According to CW18, the script was approved by DeVry University's President David Pauldine, Vice President of New Student Recruitment John Holbrook, and Vice President Robert Whitney.

421.     The fact that DeVry's practice of manipulating its job placement statistics pervaded the Company necessarily adds to the inference that the Individual Defendants knew about or were reckless in disregarding the substantial risk that the employment and salary statistics were false.

### E.     Defendants' Own Public Statements Show They Were on Notice that the Company's Reported Employment Statistics Were Inflated

422.     Defendants' public statements about the FTC's investigation and lawsuit make clear that they were knowledgeable about how DeVry's employment statistics were calculated, or were at the very least put on notice of irregularities by the FTC's investigation.  For example, Defendant Hamburger, discussed the FTC's Civil Investigative Demand just days after it was filed during the DeVry's Q2 2014 earning call.  Similarly, during a Q3 2015 earnings call, Defendant Hamburger stated that "[w]e're certainly fully cooperating with the folks over there and having dialogues with the staff." And after the FTC filed suit, Defendant Hamburger

provided detailed thoughts to investors in response to the FTC's allegations, evidencing his

knowledge about how DeVry calculated it statistics, stating:

> There's not now nor has there ever been a national standard for
> calculating employment statistics. We've advocated for there to be
> one for all of higher education. In the absence of regulation, DeVry
> University designed a methodology for calculating the
> employment outcomes of its graduates over 40 years ago. 40 years
> ago. We believe it's a very sound way of doing it.

423.    Thus, Defendants' public statements provide further evidence that Defendants

knew the Company's employment statistics were not accurate.

**F.    The Initiation of an Investigation by the FTC Approximately Two Years
Before it Filed Its Complaint Supports the Inference that Defendants Knew,
or Should Have Known, Advertised Employment And Salary Statistics Were
False**

424.    After two years of investigating DeVry's post-graduation employment and salary

claims, receiving more than 2.3 million pages of documents, and receiving responses to

approximately 64 comprehensive interrogatories from DeVry, the FTC determined that there was

a sufficient basis to file its Complaint.  Even assuming that Defendants were not already acting

with scienter in making their false statements concerning DeVry University graduates'

employment and salary prospects (an assumption readily refuted by the allegations in the FTC

Complaint, the DoE's Action, and the CWs' statements) at the time of the FTC's January 28,

2014 request for documents, the FTC's investigation should have put Defendants on notice that

they needed to conduct their own investigation into the truth of such statements.  Only three

inferences can reasonably be drawn: (1) Defendants were already aware or recklessly

disregarding the risk that their statements were false by the time DeVry received the FTC's

request on January 28, 2014; (2) Defendants thereafter investigated the falsity of their statements

in tandem with the FTC's investigation and learned that the statements were false, but continued

to make the statements in spite of that knowledge; or (3) despite receiving the FTC's request on

January 28, 2014, Defendants failed to investigate the truth of their statements and recklessly continued to tout the employment and salary prospects of DeVry University graduates. Indeed, following the Company's January 28, 2014 receipt of the FTC's CID, Defendants highlighted the false and misleading student outcome statistics with declining frequency—strongly suggesting that Defendants finally began to appreciate the likely consequences of making such false statements. Under any of these three alternatives, Defendants acted with scienter in falsely promoting DeVry by pointing to the misleading DeVry University graduate employment and salary statistics.

> **G.** **The Magnitude and Duration of Defendants' Misstatements Was Extraordinary**

425. During the Class Period, Defendants Hamburger, Wiggins, Unzicker, and Gunst each made repeated false statements regarding DeVry University's graduate employment statistics and/or signed SEC filings containing such statements, certifying the statements' accuracy. Similarly, as described in the FTC Complaint, DeVry engaged in a massive advertising campaign touting the false employment statistics through "television commercials, [DeVry University]'s website, YouTube advertisements, radio spots, brochures, print advertisements, Facebook, Twitter, sales pitches with prospective students, and other advertising and promotional materials" since at least 2008. The extraordinary magnitude and duration of the misstatements at issue in this case, which constituted a critical and core feature of the Company's primary marketing campaigns since at least 2008, demonstrates that the Individual Defendants recklessly failed to ensure that their Class Period statements concerning the DeVry University graduate employment and salary statistics were accurate. Moreover, even putting aside the Individual Defendants' scienter, the dramatic scope of the Company's advertising campaign highlighting the false employment and salary statistics supports an inference that the similarly false statements in

the Company's SEC filings, press releases, and analyst presentations were reviewed and approved by corporate officers sufficiently knowledgeable about the Company to know that the statements were false.

426.    The magnitude and duration of Defendants' misconduct is further underscored by DeVry's $100 million settlement of the FTC lawsuit and the breadth of the corporate reforms that DeVry has agreed to put in place.  For example, DeVry must pay over $49 million directly to the FTC for distribution to students and provide over $50 million in debt relief to its undergraduates, much of which is specifically set aside for students who received loans issued by DeVry between September 2008 and September 2015—a more than seven year period.  Separately, DeVry and, among others, its officers, agents, employees, and attorneys are permanently restrained and enjoined from "[m]isrepresenting, expressly or by implication, the success that students or graduates have realized or are likely to realize in starting or obtaining careers, jobs or employment."  In addition, for 20 years after the settlement, DeVry must "establish and implement a training program for all principals, officers, directors, managers, employees, agents, and representatives who direct or engage in the promotion or sale of any educational product or service[.]"  DeVry is also required to submit a compliance report one year after the order is entered and, for 10 years, each DeVry entity must submit a compliance notice for any change in, among other things, "any process or procedure for calculating, documenting or substantiating any claim covered" by the settlement.

## X.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

427.    Throughout the Class Period, Defendants made numerous materially false and misleading statements concerning the job placement rates and compensation of DeVry University graduates, as set forth herein.

A. **Materially False and Misleading Statements and Omissions in the 2011 AR and 2011 10-K**

428. On August 26, 2011, DeVry released its 2011 AR and 2011 10-K, which was signed by Defendants Hamburger and Gunst. Throughout the 2011 AR and the 2011 10-K, the Company discussed the Company's financial performance and the success of its programs resulting in a high percentage of employed graduates in their field of study. Specifically, the 2011 AR noted the following:

> We measure DeVry University's achievement towards that goal with our "90/40" standard: within six months of graduation, we want 90 percent of our graduates employed in their fields of study at an average salary of $40,000 or more. ***Even in this year's challenging job market, 89 percent of our graduates had jobs in their fields with an average salary of more than $43,000***.

429. The 2011 10-K also emphasized the success of DeVry University's graduates in obtaining employment in their field of study within six months of graduation and its impact on DeVry's financial results:

> DeVry University believes that the employment of its graduates is essential to the achievement of its mission and the ability to attract and retain students.
>
> \* \* \*
>
> One measure of success is the employment outcomes of DeVry University graduates. ***Eighty-nine percent of DeVry University's June 2009, October 2009 and February 2010 graduates in the active job market were employed in fields of their study within six months of graduation at an average salary of $43,035***.

430. These statements in the 2011 AR and the 2011 10-K were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs

that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

**B.**     **Materially False and Misleading Statements and Omissions in the 1Q 2012 Press Release and Earnings Conference Call**

431.     On October 25, 2011, DeVry issued a press release entitled "DeVry Inc. Announces First-Quarter 2012 Results" ("1Q 2012 Press Release").  That same day, the Company held its 1Q 2012 Earnings Conference Call with securities analysts.  With regard to undergraduate student enrollment, the 1Q 2012 Press Release noted that despite a tough job market, "87.3% of DeVry University's June 2010, October 2010 and February 2011 graduates in the active job market were employed in their fields of study within six months of graduation at an average salary of $42,645."  By way of a materially incomplete explanation of those statistics, the Company misleadingly stated in the press release that the employment figures "[e]xclude[] graduates continuing their education, foreign graduates ineligible to work in the United States/Canada and those unable to accept career advising because of extreme circumstances," and further "[e]xclude[] graduates who actively pursued employment for less than 180 days and did not become employed."

432.     During the 1Q 2012 Earnings Conference call with securities analysts, Defendant Hamburger emphasized in his opening presentation the value of a DeVry University education and the correlation to employment following graduation:

> [O]ur graduates are receiving a significant return on their educational investment.  ***As another indicator of the value proposition that we offer students, even in this tough job market, our graduate employment rate for DeVry University students in the active job market employed in their field of study within six months of graduation is 87%.***

433.     These statements from the October 25, 2011 press release and conference call were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and order and Confidential Witnesses described herein, the "actual percentage of [DeVry University] graduates who, at or near the time they

181

graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

C. **Materially False and Misleading Statements and Omissions in the 3Q 2012 Earnings Conference Call**

434.    On April 24, 2012, the Company held a conference call with securities analysts to discuss DeVry's 2012 third quarter results (the "3Q 2012 Earnings Conference Call").  On that call, Defendant Hamburger told analysts: "graduate employment statistics for DeVry University are also holding up pretty strong, still 80%."  Defendant Hamburger added, "We're not meeting our 90% goal, but [it's] still holding up very well," and that "the good news that help us spread the word is the graduates of our institutions are doing quite well."

435.    The statements from the 3Q 2012 Earnings Conference Call with respect to graduate employment statistics set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; and (5) as set forth in the DoE's

Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation."

### D. Materially False and Misleading Statements and Omissions in the 2012 AR and 10-K

436.    On August 28, 2012, DeVry released its 2012 AR and 2012 10-K, which was signed by Defendants Hamburger, Wiggins, and Unzicker. Throughout the 2012 10-K and 2012 AR, the Company discussed the Company's financial performance and the success of its programs resulting in a high percentage of employed graduates in their field of study.

437.    In addition, the 2012 10-K noted the following:

> One measure of success is the employment outcomes of DeVry University graduates. Each year, thousands of DeVry University graduates have started careers in their chosen fields within 6 months or less of their graduation. ***Eighty-six percent of DeVry University's February 2011, June 2011 and October 2011 graduates in the active job market were employed in their fields of study within six months of graduation at an average salary of $42,626***. These statistics include graduates of associate and bachelor's degree programs and those who were already employed in their field of study.

438.    The statements in the 2012 10-K and the 2012 AR set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly

184

counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### E. Materially False and Misleading Statements and Omissions in the 1Q 2013 Press Release and Earnings Conference Call

439. On October 25, 2012, DeVry issued a press release entitled "DeVry Inc. Announces First Quarter 2013 Results" ("1Q 2013 Press Release"). In the press release, the Company underscored employment of its graduates stating:

> As an example of the strong value proposition of our career-focused programs, graduate employment at DeVry University was 85.7 percent in the most recent annual reporting period. This average includes graduates of associate and bachelor's degree programs for the twelve-month period ending February 2012.

440.     A chart which appears in the October 25, 2012 press release notes that in addition to 85.7% of DeVry University graduates being employed, the average salary was $42,623 and that the "[i]formation presented is based on graduate-provided data." In reaching the 85.7% number, the Company misleadingly explained that the "[d]enominator excludes graduates continuing their education, foreign graduates ineligible to work in the United States/Canada and those unable to accept career advising assistance because of extreme circumstances, such as military service or critical illness," and the "[n]umerator excludes graduates who actively pursued employment for less than 180 days and did not become employed."

441.     Also on October 25, 2012, the Company held a conference call with securities analysts to discuss its 1Q 2013 results (the "1Q 2013 Earnings Conference Call"). In his opening presentation, Defendant Hamburger stated:

> The new DeVry University employment statistic we announced today shows that **_86% of DeVry University graduates who are active in the job market were employed in their field of study within 6 months of graduation. Average salary? $42,623_**. Now that's remarkable in this economy. It demonstrates the quality of our academic offerings and the return on investment for our students.

442.     These statements made on October 25, 2012 set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly

counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

**F.     Materially False and Misleading Statements and Omissions in the 2Q 2013 Earnings Conference Call**

443.    On February 6, 2013, the Company held a conference call with securities analysts to discuss its 2Q 2013 results (the "2Q 2013 Earnings Conference Call"). On that call, Defendant Hamburger responded to a question how DeVry University can entice students to enroll, stating:

> We're really focusing on DeVry's long-time reputation for being the career university. . . . We've been at this for decades, and we've got a long track record of a data, third party review data back to 1975. And since that time our graduates in the active job

market have been employed within their field of study within six
months of graduation.  So that's the kind of message that we think
is important to tell[.]

444.    These statements made on February 6, 2013 set forth above were materially false

and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC

Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual

percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs

that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as

further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and

Order and Confidential Witnesses described herein, Defendants included in the false job

placement statistics graduates who did not obtain employment as a result of acquiring a DeVry

University degree, excluded graduates who were actively seeking employment, and misleadingly

counted graduates who were employed but not in their field of study; (3) as described by CW3,

DeVry University's job placement claims were only made possible by the use of waivers and

opt-outs from its career services department; (4) as further described by CW3, due to the high

burdens placed on students in order to be treated as job-seeking for purposes of inclusion in

employment statistics, the waivers and opt-outs acted as a means to choice-select students for the

purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set

forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its

statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market

held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC

complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that

Defendants relied upon for their higher-income claims used a dubious survey methodology and

sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC

Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its

bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

**G.     Materially False and Misleading Statements and Omissions at the Robert W. Baird and Co. Business Solutions Conference**

445.     On February 26, 2013, Defendant Wiggins participated in and presented at the Robert W. Baird and Co. Inc. Business Solutions Conference wherein he discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> *As Daniel Hamburger said recently, and I thought very aptly, he said, when the students think about advancing their education, one thing that is guaranteed is the debt.  And I think in their minds they're not sure that the career at the end is there.  Even though at DeVry University, we have very good statistics, some 88% of students persist and graduate. If you look at those that are actively looking within six months, will find a position in their field of study, and the average pay is $43,000.*
>
> *             \*        \*        \**
>
> And one of the things that is encouraging when we look at DeVry University, one is that we have these good employment statistics. Two, we know that we do well in supporting students to get through this process.

446.     These February 26, 2013 statements set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry

189

University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### H. Materially False and Misleading Statements and Omissions at the Credit Suisse 15th Annual Global Services Conference

447. On March 13, 2013, Defendant Hamburger participated in and presented at the Credit Suisse 15th Annual Global Services Conference wherein he discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> Well, the other measures of quality is successful student outcomes.
> . . . At DeVry University, *nearly 86% of our graduates in the active job market were employed in their field of study within six*

> *months of graduation. And these graduates earned an average*
> *salary of over $43,000*.  So that's a marker of academic quality.

> \*   \*   \*

> One question that we've asked is how do we compete?  How does
> DeVry compete?  What is it that attracts students to our institutions
> in this competitive environment that's out there in higher
> education?  We referred to it as HIRE education.  It's spelled a
> little bit differently, HIRE. . . .   [T]he E, *incredible employment*
> *outcomes, like the 86% employed [at] $43,000* that I referenced
> earlier [at] DeVry University.

448.    These March 13, 2013 statements set forth above were materially false and

misleading because: (1) as explained in the FTC complaint and corroborated by the FTC

Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual

percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs

that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as

further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and

Order and Confidential Witnesses described herein, Defendants included in the false job

placement statistics graduates who did not obtain employment as a result of acquiring a DeVry

University degree, excluded graduates who were actively seeking employment, and misleadingly

counted graduates who were employed but not in their field of study; (3) as described by CW3,

DeVry University's job placement claims were only made possible by the use of waivers and

opt-outs from its career services department; (4) as further described by CW3, due to the high

burdens placed on students in order to be treated as job-seeking for purposes of inclusion in

employment statistics, the waivers and opt-outs acted as a means to choice-select students for the

purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set

forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its

statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market

191

held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

I.    **Materially False and Misleading Statements and Omissions in the 3Q 2013 Press Release and Earnings Conference Call**

449.    On April 23, 2013, the Company issued a press release announcing financial results for 3Q 2013, ended March 31, 2013.  In that press release, the Company stated that while "[e]nrollment results continue to be impacted by lower cyclical demand among the university's target segment of students," the Company's "plan to improve enrollment results includes enhancing communications to students about DeVry University's excellent graduate employment results[.]"

450.    Also on April 23, 2013, the Company held a conference call with securities analysts to discuss its 3Q 2013 results (the "3Q 2013 Earnings Conference Call").  On that call, Defendant Hamburger discussed the steps the Company was taking to increase enrollment growth at DeVry University which included becoming aggressive in its message that a degree from DeVry University translates into quick employment at a very good salary.  Defendant Hamburger stated that:

> [L]et's focus on the steps that we're taking to address these
> challenges and regain . . . enrollment growth at DeVry University.
> Our strategy is centered on the fact that DeVry University offers a
> very strong return on investment, and we need to do more to

demonstrate this inherent value proposition to prospective students. So first, we're changing our message to be more hard hitting on DeVry University as the career university. You know, *86% of graduates active in the job market are employed in their field of study within six months of graduation. And that's with an average salary over $43,000. And the percent is trending up as we're going through this fiscal year*. So we're going to do a better job communicating these impressive results to prospective students.

451. These April 23, 2013 statements set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that

Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

**J.      Materially False and Misleading Statements and Omissions at the William Blair Growth Stock Conference**

452.    On June 13, 2013, Defendant Hamburger participated in and presented at the William Blair & Company LLC Growth Stock Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> So in addition to academic quality investments, the other measure that I would give you of academic quality is successful student outcomes. . . . ***At DeVry University, nearly 86% of our graduates in the active job market were employed in their field of study within six months of graduation.  These graduates earned an average salary of $43,000.***
>
>                              *            *            *
>
> Okay. So two-part question.  How would the Department of Education, which has increased scrutiny on higher education generally as well as in the private sector specifically, view our outcomes?  ***And then how about that, those employment results, the 86% that I mentioned?  By the way, that's, our goal is that nine out of 10 DeVry University graduates in the active job market should be employed in their field of study, not just any job, in their field of study within six months,  not 12 months, not 100 years, it's got to be within six months.***
>
> ***Third party reviewed statistics that we have disclosed publicly with third-party review since 1975,*** so there is a lot of talk now about more disclosure.  We should have tough rules and make everybody disclose it.  We've been disclosing it for a long time. . . . I don't know of too many universities that even talk about what their current statistics are, let alone have third-party review and display those on their website, and hand that to every prospective

student who interviews. I think the Department of Education would also acknowledge, and has many times, that there are good actors and bad actors in the public sector and the private sector. There's no monopoly on one or the other, we do need to make sure we have strong rules of the road for all.

453.   These June 13, 2013 statements set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC

Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### K. Materially False and Misleading Statements and Omissions in the 4Q 2013 Press Release and Earnings Conference Call

454. On August 8, 2013, the Company issued a press release ("4Q 2013 Press Release") stating that "[t]he percentage of DeVry University graduates who were actively seeking employment and had careers in their field within 6 months of graduation increased to 90 percent in calendar 2012," with an average salary of $43,539. As a purported caveat to these figures, the Company misleadingly stated that the employment and salary statistics are "based on 2012 graduates' self-reported data to DeVry University Career Services who were employed at graduation or who were actively seeking employment after graduation and found employment in their field within six months." The Company further misleadingly noted that the figures "[do] not include graduates who were not actively seeking employment, as determined by DeVry University Career Services, or who did not report data on employment status to DeVry University Career Services."

455. Also on August 8, 2013, the Company held a conference call with securities analysts to discuss its 4Q 2013 results (the "4Q 2013 Earnings Conference Call"). On that call, Defendant Hamburger stated:

> A recent Gallup poll found that the factor adult American say is most important in selecting a college is the percent of graduates who find a good job. This is what DeVry University does. **The latest numbers are in, and DeVry University employment statistics increased to more than 90%. 90% of our graduates in the active job market are employed in their field of study within six months of graduation. And they're earning an average of over $43,500**. That's higher than the median family household

196

income of our students before they enrolled at DeVry University.

456.    These August 8, 2013 statements set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its

bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

> **L.    Materially False and Misleading Statements and Omissions in the 2013 AR and 10-K**

457.    On August 29, 2013, DeVry issued its 2013 10-K—which was signed by Defendants Hamburger, Wiggins, and Unzicker—and its 2013 AR.  Throughout the 2013 Form 10-K and the 2013 AR, the Company discussed the Company's financial performance and the success of its programs resulting in a high percentage of employed graduates in their field of study.  Specifically, the 2013 10-K stated:

> One measure of success is the employment outcomes of DeVry University graduates.  Each year, thousands of DeVry University graduates have started careers in their chosen fields within 6 months or less of their graduation.  ***Ninety percent of DeVry University's calendar 2012 graduates in the active job market were employed in their fields of study within six months of graduation at an average salary of $43,539***.  These statistics include graduates of associate and bachelor's degree programs and those who were already employed in their field of study.

458.    Additionally, Defendant Hamburger stated in the 2013 AR:

> The best measure of our quality is the successful outcomes that our students achieve.  ***Notably, 90 percent of DeVry University's 2012 graduates active in the job market were employed in their fields of study within six months of graduation, earning an average of more than $43,500 annually***.

459.    These statements in the 2013 10-K and the 2013 AR set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%";

(2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### M. Materially False and Misleading Statements and Omissions at the Robert W. Baird & Co. Inc. Growth Stock Conference

460.    On May 6, 2014, in response to an analyst's questions about academic outcomes at the Robert W. Baird & Co. Inc. Growth Stock Conference Defendant Wiggins stated:

> *Our graduation rate's in the 30% range, we'd like to see that*
> *higher and we're working hard. But the students that persist,*
> *our graduate employment data is that, over 90% of students*
> *actively seeking jobs have them within six months and the*
> *average pay of those folks is $44,000 give or take.*

461.     These May 6, 2014 statements set forth above were materially false and

misleading because: (1) as explained in the FTC complaint and corroborated by the FTC

Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual

percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs

that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as

further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and

Order and Confidential Witnesses described herein, Defendants included in the false job

placement statistics graduates who did not obtain employment as a result of acquiring a DeVry

University degree, excluded graduates who were actively seeking employment, and misleadingly

counted graduates who were employed but not in their field of study; (3) as described by CW3,

DeVry University's job placement claims were only made possible by the use of waivers and

opt-outs from its career services department; (4) as further described by CW3, due to the high

burdens placed on students in order to be treated as job-seeking for purposes of inclusion in

employment statistics, the waivers and opt-outs acted as a means to choice-select students for the

purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set

forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its

statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market

held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC

complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that

Defendants relied upon for their higher-income claims used a dubious survey methodology and

sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC

Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its

bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as

described by CW3, DeVry University graduates' jobs were almost always entry-level positions

with salaries between $25,000 and $30,000.

**N.     Materially False and Misleading Statements and Omissions at the William Blair & Company LLC Growth Stock Conference**

462.    On June 11, 2014, Defendant Hamburger participated in and presented at the

William Blair & Company LLC Growth Stock Conference wherein he again discussed the

success of DeVry and in particular DeVry University graduates' employment statistics:

> So that's who we are. And what's the investment thesis on DeVry
> Group? It's a clear and powerful formula, quality plus
> diversification plus long-term thinking, a long-term approach.
> That is what drives long-term growth. And when we talk about
> quality, the key measure is successful student academic outcomes.
>
> Let me share three recent examples of quality across our
> institutions. ***At DeVry University, more than 90% of our
> graduates in the active job market were employed in their field of
> study within six months of graduation, and these graduates earn
> an average salary of $44,000. So that's a 90%, $44,000 statistic.
> In strong and weak job markets, employers value DeVry
> University graduates.***

463.    These June 11, 2014 statements set forth above were materially false and

misleading because: (1) as explained in the FTC complaint and corroborated by the FTC

Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual

percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs

that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as

further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and

Order and Confidential Witnesses described herein, Defendants included in the false job

placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

## O. Materially False and Misleading Statements and Omissions in the 4Q 2014 Press Release and Earnings Conference Call

464.    On August 7, 2014, the Company issued a press release announcing financial results for the 4Q and full-year 2014, stating that 90.9 percent of DeVry University graduates were employed in their field of study within 6 months of graduation, earning an average of $44,295.  As in previous announcements of DeVry University graduate employment statistics,

the Company misleadingly noted that the figures were based on graduates' "self-reported data to

DeVry University Career Services who were employed at graduation or who were actively

seeking employment after graduation and found employment in their field within six months."

In addition, the Company misleadingly stated that the figures did "not include graduates who

were not actively seeking employment, as determined by DeVry University Career Services, or

who did not report data on employment status to DeVry University Career Services."

465.    On the same day, the Company held its 4Q 2014 Earnings Conference Call.  In his

opening presentation, Defendant Hamburger touted DeVry University graduate employment

statistics, emphasizing that:

> One of our strongest messages is the value employers attach to a
> DeVry University education, as they consistently hire our
> graduates to fill their jobs and send their existing employees to us
> for continuing education.  We announced the latest graduate
> employment results in today's release, and it remained above our
> goal of 90%.  ***Actually 90.9% of our graduates in the active job
> market were employed in their field of study within six months of
> graduation.  And they're earning an average of about $44,300
> annually***.

466.    Notwithstanding Defendants' misleading explanation of how they reached the

false job placement and salary statistics, these August 7, 2014 statements set forth above were

materially false and misleading because: (1) as explained in the FTC complaint and corroborated

by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, the

"actual percentage of [DeVry University] graduates who, at or near the time they graduated,

found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%";

(2) as further explained in the FTC complaint and corroborated by the FTC Settlement

Stipulation and Order and Confidential Witnesses described herein, Defendants included in the

false job placement statistics graduates who did not obtain employment as a result of acquiring a

DeVry University degree, excluded graduates who were actively seeking employment, and

misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### P. Materially False and Misleading Statements and Omissions in the 2014 AR and 10-K

467. On August 27, 2014, DeVry released its 2014 10-K—which was signed by Defendants Hamburger, Wiggins, and Unzicker—and its 2014 AR. Throughout the 2014 10-K and the 2014 AR, the Company discussed its financial performance and the success of its programs resulting in a high percentage of employed graduates in their field of study.

468.    The Company recognized that its financial success, and those of its graduates, depended on the employment of its graduates.  Thus, the 2014 10-K states with respect to DeVry University:

> ***In 2013, 90.9% of graduates of DeVry University's associate and bachelor's degree programs who were actively seeking employment had careers in their chosen fields within six months of graduation at an average salary of $44,295***.  To a large extent, these figures are based upon self-reported data from graduates. They reflect graduates who were employed in positions relating to their field of study within 180 days of graduation from among those graduates who were eligible for career assistance and who actively pursued employment relating to their field of study.

469.    Additionally, Defendant Hamburger stated in the 2014 AR:

> ***In 2013, 90% of DeVry University graduates actively seeking employment obtained careers in their field of study within six months of graduation or were already employed in their field when they graduated.  These graduates earned an average salary of nearly $44,295***.  In strong job markets and weaker one alike, employers value DeVry University graduates.

470.    Within the discussion of "The Vital Role of Private-Sector Education" in the 2014 AR, the Company noted the following with respect to the success of its graduates:

> Increasingly, students and taxpayers are expecting colleges to prepare students for employment and careers.  ***In 2013, 90 percent of DeVry University graduates actively seeking employment had careers in their fields within six months of graduation, at an average compensation of $44,000***.  In addition, a study conducted by the Cicero Group found that graduates of DeVry Group institutions experienced significant growth in their earnings.

471.    These statements in the 2014 10-K and the 2014 AR set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated,

found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%";
(2) as further explained in the FTC complaint and corroborated by the FTC Settlement
Stipulation and Order and Confidential Witnesses described herein, Defendants included in the
false job placement statistics graduates who did not obtain employment as a result of acquiring a
DeVry University degree, excluded graduates who were actively seeking employment, and
misleadingly counted graduates who were employed but not in their field of study; (3) as
described by CW3, DeVry University's job placement claims were only made possible by the use
of waivers and opt-outs from its career services department; (4) as further described by CW3,
due to the high burdens placed on students in order to be treated as job-seeking for purposes of
inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select
students for the purpose of boosting the appearance of DeVry University's job placement
statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the
truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the
active job market held positions in their fields of study within 6 months of graduation"; (6) as
described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a
third-party study that Defendants relied upon for their higher-income claims used a dubious
survey methodology and sampling methods; (7) as further described in the FTC complaint and
corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data
contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from
other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost
always entry-level positions with salaries between $25,000 and $30,000.

**Q. Materially False and Misleading Statements and Omissions at the BMO Capital Markets Back to School Education Conference**

472. On September 18, 2014, Defendant Hamburger participated in and presented at the BMO Capital Markets Back to School Education Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics. For example, in response to questions from a securities analyst about the value proposition of higher education, he stated:

> And in terms of value proposition and brand, DeVry University has a very strong brand, that's one of the anchors on which we're basing our turnaround and transformation process, and a very strong value proposition. And that value proposition at DeVry University centers around two concepts, careers and care. So careers and care. Careers, that's one of our strongest messages. *We just announced the latest graduate employment statistics, as we do every August, and we remained above 90%, actually, it was 90.9% of our graduates actively seeking employment were employed in their field of study within six months of graduation.* And those figures include students with careers prior to graduation, so, careers.
>
> \* \* \*
>
> So the value proposition of DeVry University is very clear, it's very strong and it's around careers and care.
>
> \* \* \*
>
> [A]nd we've published the results of those career statistics long before the school, long before the administration thought it was a good idea, and we think it's a good idea, too, *that's why for 30 years, 40 years we've published our statistics very consistently, transparency, by program, by market, you as a prospective student or a family can get that information and see, what those outcomes are.*

473. These September 18, 2014 statements were false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual percentage of [DeVry University]

graduates who, at or near the time they graduated, found jobs that could be reasonably

considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC

complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential

Witnesses described herein, Defendants included in the false job placement statistics graduates

who did not obtain employment as a result of acquiring a DeVry University degree, excluded

graduates who were actively seeking employment, and misleadingly counted graduates who were

employed but not in their field of study; (3) as described by CW3, DeVry University's job

placement claims were only made possible by the use of waivers and opt-outs from its career

services department; (4) as further described by CW3, due to the high burdens placed on students

in order to be treated as job-seeking for purposes of inclusion in employment statistics, the

waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the

appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of

Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975,

90.1% of DeVry graduates system-wide in the active job market held positions in their fields of

study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by

the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for

their higher-income claims used a dubious survey methodology and sampling methods; (7) as

further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and

Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates

earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry

University graduates' jobs were almost always entry-level positions with salaries between

$25,000 and $30,000

### R. Materially False and Misleading Statements and Omissions at the J.P. Morgan Ultimate Services Investor Conference

474.     On November 12, 2014, Defendant Wiggins participated in and presented at the

J.P. Morgan Ultimate Services Investor Conference wherein he again discussed the success of

DeVry and in particular DeVry University graduates' employment statistics:

> Let me talk about quality. One of the key measures of quality is successful student outcomes and I'd like to recite or give you three examples. ***At DeVry University, more than 90% of graduates active in the job market were employed in their field of study within six months of graduation. And the average compensation of these graduates was nearly $44,000. In strong and weak job markets, employers value DeVry University grads.***
>
>              \*       \*       \*
>
> ***And that's why we feel good about our statistic of over 90% of our students that persist find work in their field of study.*** So I think what we find is many students are -- don't have money. They're concerned about going into debt. They read the stories -- and maybe there's some generational things going on as well.

475.     These November 12, 2014 statements set forth above were materially false and

misleading because: (1) as explained in the FTC complaint and corroborated by the FTC

Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual

percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs

that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as

further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and

Order and Confidential Witnesses described herein, Defendants included in the false job

placement statistics graduates who did not obtain employment as a result of acquiring a DeVry

University degree, excluded graduates who were actively seeking employment, and misleadingly

counted graduates who were employed but not in their field of study; (3) as described by CW3,

DeVry University's job placement claims were only made possible by the use of waivers and

opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### S. Materially False and Misleading Statements and Omissions at the Robert W. Baird & Co. Inc.'s Growth Stock Conference

476.    On May 5, 2015 Defendant Hamburger participated in and presented at the Robert W. Baird & Co. Inc. Growth Stock Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> So the employment statistics of the graduates at DeVry University. I'm assuming you're talking about DeVry University, you could speak [to] the other institutions as well, and they often have good employment results. ***DeVry University's employment results are actually trending up. That's one of the reasons that we're very confident [in] the ability, among many other reasons, [in] the ability that we have to improve our results and to turn it around is the fundamental value proposition, which is I think what your question gets at for the student is very strong, in fact strengthening. Employment results are up. Salaries are up as***

*well for the graduates. So the percentage we're employed in field in the study within six months of graduation or in the active job market is up, and their salaries are going up.* The employers are very happy with our graduates. And so the Ciscos and the IBMs and the GEs and the Accentures, they're coming back again and again for our graduates.

477. Indeed, these statements were made less than two months after DeVry University released its 2013-2014 Academic Annual Report, on March 20, 2015, stating that "[i]n 2013, 90% of DeVry University graduates actively seeking employment had careers in their field of study within 6 months of graduation at an average salary of $44,295."

478. These May 5, 2015 statements set forth above were materially false and misleading because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its

statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### T. Materially False and Misleading Statements and Omissions in the 2015 AR and 10-K

479. On August 27, 2015, DeVry released its 2015 Annual Report ("2015 AR") and filed with the SEC its Form 10-K ("2015 10-K") for the fiscal year ended June 30, 2015, reiterating DeVry's previously reported financial results reported in the Company's August 18, 2015 press release.

480. In his Letter to Our Shareholders in the 2015 AR, Defendant Hamburger boasted the "foundation of [the Company's] success" stating that:

> Quality means ***delivering career-focused education with strong outcomes for students-ensuring that they are learning, graduating, gaining employment in their fields of study and paying back their loans***. It gives us a competitive advantage, because students want to attend schools with proven high-quality outcomes.
>
> \*   \*   \*
>
> Our success not only strengthen our position, but also differentiates DeVry Group institutions from others that are struggling- an important consideration for students who are being careful about where they make their investments in higher education. In our view, quality leads to growth; Investing in quality academic

> outcomes produces successful students, making our institutions
> more attractive to prospective students, enabling us to grow, and
> generating the resources to invest back into further quality and
> growth initiatives.

481.    These statements were false and misleading because: (1) as explained in the FTC

complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential

Witnesses described herein, the "actual percentage of [DeVry University] graduates who, at or

near the time they graduated, found jobs that could be reasonably considered 'in their field' is

significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated

by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein,

Defendants included in the false job placement statistics graduates who did not obtain

employment as a result of acquiring a DeVry University degree, excluded graduates who were

actively seeking employment, and misleadingly counted graduates who were employed but not

in their field of study; (3) as described by CW3, DeVry University's job placement claims were

only made possible by the use of waivers and opt-outs from its career services department; (4) as

further described by CW3, due to the high burdens placed on students in order to be treated as

job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as

a means to choice-select students for the purpose of boosting the appearance of DeVry

University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was

unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry

graduates system-wide in the active job market held positions in their fields of study within 6

months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC

Settlement Stipulation and Order, a third-party study that Defendants relied upon for their

higher-income claims used a dubious survey methodology and sampling methods; (7) as further

described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order,

DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

### U. Defendants' False and Misleading SOX Certifications

482.    Included in DeVry's 2011 10-K were SOX certifications signed by Defendants Hamburger and Gunst.  Those certifications falsely stated:

> I, [Daniel M. Hamburger/Richard M. Gunst], certify that:
>
> 1.  I have reviewed this annual report on Form 10-K of DeVry Inc. for the fiscal year ending June 30, 2011;
>
> 2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> * * *
>
> 4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > * * *
> >
> > c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report and based on such evaluation[.]

214

483.    Defendants Hamburger, Gunst, and Wiggins made substantially similar false statements in SOX certifications attached to DeVry's regulatory filings throughout the Class Period, including in Forms 10-Q for the periods 1Q 2012, 2Q 2012, 3Q 2012, 1Q 2013, 2Q 2013, 3Q 2013, 1Q 2014, 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, and 1Q 2016, and Forms 10-K for the 2012, 2013, 2014, and 2015 fiscal years.

484.    Defendants' SOX Certifications were materially false and misleading.  Contrary to the representations that those 10-Ks and 10-Qs did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," they materially misstated the DeVry University graduates employment and salary statistics and/or failed to disclose that the DeVry University graduates employment and salary statistics touted during the Class Period were false.  Such employment and salary statistics were false because: (1) as explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) as further explained in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order and Confidential Witnesses described herein, Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) as described by CW3, DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) as further described by CW3, due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment

statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) as set forth in the DoE's Notice of Intent, DeVry was unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) as described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) as further described in the FTC complaint and corroborated by the FTC Settlement Stipulation and Order, DeVry University's own data contradicted its claims that its bachelor's degree graduates earn 15% more than graduates from other schools; and (8) as described by CW3, DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

## XI. LOSS CAUSATION

485.    The market price of DeVry's publicly traded common stock was artificially inflated by the material misstatements and omissions complained of herein, including the misstatements and omissions about the employment and compensation statistics of DeVry University graduates.

486.    The artificial inflation in DeVry's stock price was removed when the facts, conditions, and risks misstated and omitted by Defendants were revealed to the market.  The information was disseminated on January 27, 2016, when it was disclosed that the FTC and DoE had both taken action against the Company in response to its pervasive use of false DeVry University graduate employment and salary statistics.  Those disclosures corrected, *inter alia*, Defendants' prior materially misleading statements and omissions concerning DeVry University graduates' job placement and salary statistics, and reduced the amount of inflation in the price of

DeVry's publicly traded stock that had been caused by Defendants' false statements, causing economic injury to Lead Plaintiff and other members of the Class.

487. In response to the January 27, 2016 corrective disclosures, DeVry's stock price declined from $23.74 per share on January 26, 2016 to close at $20.09 per share on January 27, 2016, declining $3.65 per share, or approximately 15%, on extraordinarily high volume. The Company's stock price continued its slide the next day, falling an additional $0.72 per share to $19.37 per share on January 28, 2016—an 18% decline from the January 26, 2016 closing price.

488. Accordingly, the decline in DeVry's stock price was a direct and proximate result of Defendants' scheme being revealed to investors and to the market. The timing and magnitude of DeVry's stock price decline negates any inference that the economic losses and damages suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Company-specific facts unrelated to the Defendants' fraudulent conduct.

## XII. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

489. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Third Amended Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

490. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading

forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by a corporate officer of DeVry who knew that the statement was materially false or misleading when made.

## XIII. THE PRESUMPTION OF RELIANCE

491.    Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact that there was a duty to disclose.

492.    Lead Plaintiff is also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a)    DeVry's common stock was actively traded in an efficient market on the NYSE;

(b)    DeVry's common stock traded at high weekly volumes;

(c)    As a regulated issuer, DeVry filed periodic public reports with the SEC;

(d)    DeVry was eligible to file registration statements with the SEC on Form S-3;

(e)    DeVry regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(f)    The market reacted promptly to public information disseminated by DeVry;

218

(g)     DeVry securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace;

(h)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of DeVry securities; and

(i)     Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased or acquired DeVry securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

493.     Accordingly, Lead Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for DeVry's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XIV.   CLASS ACTION ALLEGATIONS

494.     Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired DeVry publicly traded common stock during the period from August 26, 2011 through January 27, 2016, inclusive, (the "Class Period") and who were damaged thereby.  Excluded from the Class are: Defendants; DeVry's affiliates and subsidiaries, including DeVry's employee retirement and/or benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); the officers and directors of DeVry and its subsidiaries and affiliates during the Class Period; members of the immediate family of any excluded person; any entity in which any excluded person or entity has

or had a controlling interest; and the heirs, successors, and assigns of any excluded person or entity.

495.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DeVry's publicly traded common stock was actively traded on the NYSE.  As of January 29, 2016, DeVry had approximately 63.117 million shares of common stock issued and outstanding.  Although the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes that there are at least thousands of members of the proposed Class.  Members of the Class can be identified from records maintained by DeVry or its transfer agent(s), and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

496.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

497.    Common questions of law and fact exist to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of fact and law common to the Class are:

(a)    whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

(b)    whether Defendants' misrepresentations and omissions as alleged herein misrepresented material facts about the truthfulness of the employment and compensation statistics of DeVry graduates during the Class Period;

(c)    whether SEC filings, documents, press releases and other statements disseminated to the investing public and statements made by Defendants to the investing public

during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of DeVry;

(d)     whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)     whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

(f)     whether the members of the Class have sustained damages, and the proper measure of damages.

498.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.  Lead Plaintiff has no interest that conflicts with the interests of the Class.

499.     A class action is superior to all other available methods for the fair and efficient adjudication of this action.  Joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

500.     The names and addresses of those persons and entities that purchased or acquired DeVry's common stock during the Class Period are available from DeVry's transfer agent(s). Notice may be provided to such purchasers and record owners *via* first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## XV.   CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER
### (Against Defendant DeVry And The Individual Defendants)

501.   Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

502.   During the Class Period, Defendants DeVry, Hamburger, Unzicker, Wiggins and Gunst carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (i) deceive the investing public regarding DeVry's business, operations, management and the intrinsic value of DeVry securities; (ii) enabled Defendants to artificially inflate the price of DeVry securities; and (iii) caused Lead Plaintiff and other members of the Class to purchase DeVry securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants jointly and individually (and each of them) took the actions set forth herein.

503.   The Defendants named in this count: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of DeVry's securities during the Class Period in an effort to maintain artificially high market prices for DeVry securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  The Defendants named in this count are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons as alleged below.

504.    These Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of DeVry as specified herein.

505.    These Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of DeVry's value and performance and continued substantial growth, which included the making of, and the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about DeVry and its business operations and future prospects in light of the circumstances in which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of DeVry securities during the Class Period.

506.    These Defendants are liable for the following materially false and misleading statements and omissions made during the Class Period as alleged above in Section X:

(a)     Defendant DeVry: Defendant DeVry is liable for the false and misleading statements and omissions made by any Defendant, which are set forth above in Section X.

(b)     Defendant Hamburger: Defendant Hamburger is liable for the false and misleading statements and omissions made in the Company's Forms 10-Q dated February 4, 2011, May 5, 2011, November 4, 2011, and February 6, 2012; Forms 10-K dated August 26, 2011, August 28, 2012, August 29, 2013, August 27, 2014, and August 27, 2015; the SOX Certifications attached as exhibits to the Forms 10-Q and 10-K filed with the SEC on February 4,

2011, May 5, 2011, August 26, 2011, November 4, 2011, February 6, 2012, May 3, 2012,

August 28, 2012, November 5, 2012, February 7, 2013, May 3, 2013, August 29, 2013,

November 5, 2013, February 4, 2014, May 5, 2014, August 27, 2014, November 5, 2014,

February 5, 2015, May 8, 2015, August 27, 2015, and November 4, 2015; Annual Reports issued

on August 29, 2013, August 27, 2014, and August 27, 2015; and conference calls and analyst

presentations conducted on October 25, 2011, April 24, 2012, October 25, 2012, February 6,

2013, March 13, 2013, April 23, 2013, June 13, 2013, August 8, 2013, June 11, 2014, August 7,

2014, September 18, 2014, and May 5, 2015;

   (c)  Defendant Unzicker:  Defendant Unzicker is liable for the false and

misleading statements and omissions made in the Company's Forms 10-Q dated May 3, 2012,

November 5, 2012, February 7, 2013, May 3, 2013, November 5, 2013, February 4, 2014, May

5, 2014, November 5, 2014, February 5, 2015, May 8, 2015 and November 4, 2015; Forms 10-K

dated August 28, 2012, August 29, 2013, August 27, 2014, and August 27, 2015; and Forms 8-K

dated April 25, 2012, July 23, 2012, August 9, 2012, October 25, 2012, February 6, 2013, March

6, 2013, April 23, 2013, August 8, 2013, October 24, 2013, February 4, 2014, April 25, 2014,

August 7, 2014, October 23, 2014, February 5, 2015, April 23, 2015, August 18, 2015,

September 2, 2015, and October 22, 2015;

   (d)  Defendant Wiggins: Defendant Wiggins is liable for the false and

misleading statements and omissions made in the Company's Forms 10-Q dated February 6,

2012, May 3, 2012, November 5, 2012, February 7, 2013, May 3, 2013, November 5, 2013,

February 4, 2014, May 5, 2014, November 5, 2014, February 5, 2015, May 8, 2015, and

November 4, 2015; Forms 10-K dated August 28, 2012, August 29, 2013, August 27, 2014, and

August 27, 2015; the Form 8-K dated January 26, 2012; the SOX Certifications attached as

exhibits to the Forms 10-Q and 10-K filed with the SEC on February 6, 2012, May 3, 2012,

August 28, 2012, November 5, 2012, February 7, 2013, May 3, 2013, August 29, 2013,

November 5, 2013, February 4, 2014, May 5, 2014, August 27, 2014, November 5, 2014,

February 5, 2015, May 8, 2015, August 27, 2015, and November 4, 2015; and analyst

presentations conducted on February 26, 2013, May 6, 2014, and November 12, 2014;

(e) Defendant Gunst: Defendant Gunst is liable for the false and misleading

statements and omissions made in the Company's Forms 10-Q dated February 4, 2011, May 5,

2011, and November 4, 2011; Form 10-K dated August 26, 2011; the Forms 8-K dated April 26,

2011, August 12, 2011, October 25, 2011, and December 12, 2011; and the SOX Certifications

attached as exhibits to the Forms 10-Q and 10-K dated August 26, 2011 and November 4, 2011.

507. Defendants Hamburger, Unzicker, Wiggins, and Gunst, as the most senior officers

of DeVry, are liable as direct participants in the wrongs complained of herein. Through their

high-ranking positions of control and authority as the most senior executive officers of the

Company, each of these Defendants was able to control, and did directly control, the content of

the public statements disseminated by DeVry. Defendants Hamburger, Unzicker, Wiggins, and

Gunst had direct involvement in the daily business of the Company and participated in the

preparation and dissemination of DeVry's materially false and misleading statements set forth

above.

508. The allegations in this Third Amended Complaint establish a strong inference that

Defendants DeVry, Hamburger, Unzicker, Wiggins, and Gunst acted with scienter throughout the

Class Period in that they had actual knowledge of the misrepresentations and omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and disclose such facts. As demonstrated by Defendants' material misstatements and

omissions throughout the Class Period, if Defendants did not have actual knowledge of the misrepresentations and omissions alleged herein, they were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether their statements were false or misleading, even though such facts were available to them. Specifically, Defendants knew or recklessly disregarded that the student outcome statistics concerning graduates of DeVry University were misleading, inflated, and deceptive which caused the FTC and DoE to take action against the Company, as described more fully above.

509. Moreover, the dramatic scope of the Company's advertising campaign highlighting the false employment and salary statistics supports an inference that the similarly false Class Period statements in the Company's SEC filings, press releases, and analyst presentations were reviewed and approved by corporate officers sufficiently knowledgeable about the Company to know that the statements were false.

510. Lead Plaintiff and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market in which the securities trade and/or the material false and misleading statements and omissions made by Defendants, they paid artificially inflated prices for DeVry common stock, which inflation was removed from the stock when the true facts became known. Lead Plaintiff and the other members of the Class would not have purchased DeVry common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

511. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

512.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of DeVry securities during the Class Period.

## COUNT II

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against Defendants Hamburger, Unzicker, Wiggins, and Gunst)

513.     Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

514.     Defendants Hamburger, Unzicker, Wiggins, and Gunst acted as controlling persons of DeVry within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

515.     By reason of their high-level positions of control and authority as the Company's most senior officers, the Individual Defendants had the power and authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause DeVry to engage in the wrongful conduct complained of herein.  The Individual Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the public statements made by DeVry during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.  The Individual Defendants were provided with or had unlimited access to copies of the Company's press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

516.     In their capacities as DeVry's most senior corporate officers, and as more fully described above, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control

or influence the particular transactions giving rise to the securities law violations as alleged herein. Defendants Hamburger, Unzicker, Wiggins, and Gunst signed DeVry's SEC filings and Sarbanes-Oxley certifications, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by DeVry during the Class Period.

517. Each of the Individual Defendants culpably participated in some meaningful sense in the fraud alleged herein. Defendants Hamburger, Wiggins, and Gunst each acted with scienter, as set forth more fully in Section IX.

518. By virtue of their positions as controlling persons of DeVry and as a result of their own aforementioned conduct, Defendants Hamburger, Unzicker, Wiggins, and Gunst together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a) Declaring that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.

## XVII.  JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.


DATED: January 29, 2018                **LABATON SUCHAROW LLP**


                                  By:    /s/ *Carol S. Villegas*
                                         Jonathan Gardner (*admitted pro hac vice*)
                                         Carol C. Villegas (*admitted pro hac vice*)
                                         Theodore J. Hawkins (*admitted pro hac vice*)
                                         140 Broadway
                                         New York, New York 10005
                                         Tel: (212) 907-0700
                                         jgardner@labaton.com
                                         cvillegas@labaton.com
                                         thawkins@labaton.com

                                         Mark S. Willis (*admitted pro hac vice*)
                                         1050 Connecticut Avenue, NW, Suite 500
                                         Washington, D.C. 20036
                                         Tel: 202-772-1880
                                         mwillis@labaton.com

                                         *Counsel for Lead Plaintiff Utah Retirement
                                         Systems, and Lead Counsel*

                                         **WEXLER WALLACE LLP**
                                         Kenneth A. Wexler
                                         Mark R. Miller
                                         55 West Monroe St.
                                         Suite 3300
                                         Chicago, IL 60603
                                         Telephone:  (312) 346-2222
                                         Facsimile:  (312) 346-0022
                                         Email: kaw@wexlerwallace.com
                                                 mrm@wexlerwallace.com

                                         *Liaison Counsel*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on January 29, 2018, he caused true copies of the foregoing Third Amended Class Action Complaint for Violations of the Federal Securities Laws to be served upon all counsel of record using the Court's CM/ECF system.

<u>/s/ Theodore J. Hawkins</u>

Theodore J. Hawkins
