**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PENSION TRUST FUND FOR OPERATING ENGINEERS, individually and on behalf of all others similarly situated,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 16 C 5198** |
| **DEVRY EDUCATION GROUP, INC., DANIEL HAMBURGER, RICHARD M. GUNST, PATRICK J. UNZICKER, AND TIMOTHY J. WIGGINS,** | ) | **Judge Jorge L. Alonso** |
| **Defendants.** | ) | |

## ORDER

Defendants' motion to dismiss [91] is denied.

## STATEMENT

In this securities fraud class action, plaintiff filed its Second Amended Complaint on December 23, 2016. Defendants moved to dismiss, and this Court granted the motion, reasoning that although plaintiff had sufficiently alleged that defendants had made materially false statements to investors, it had not sufficiently alleged that defendants acted with scienter. (Dec. 6, 2017 Mem. Op. & Order, ECF No. 80.) Familiarity with that decision is assumed. On January 29, 2018, plaintiff filed a Third Amended Complaint. (ECF No. 84.) Defendants have again moved to dismiss, arguing that the additional allegations do not cure the defects this Court previously identified. The Court has fully considered the parties' positions as set forth in their briefs, and now rules on the motion.

The Private Securities Litigation Reform Act ("PSLRA") imposes heightened pleading requirements on private, class action claims of securities fraud under § 10(b) of the Securities Exchange Act and Rule 10b-5 of the Securities Exchange Commission. In particular, it requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4. The required state of mind is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). A "strong inference" is one that is "strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). That is, it is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of

nonfraudulent intent." *Id.* at 314. Determining whether allegations give rise to such an inference requires courts to "take into account plausible opposing inferences" because "[t]he strength of an inference cannot be decided in a vacuum," and "[t]he inquiry is inherently comparative." *Id.* at 323 (internal quotation marks omitted); *see Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) ("The plausibility of an explanation depends on the plausibility of the alternative explanations.").

This Court previously concluded that inferring scienter from plaintiff's allegations "require[d] a degree of speculation that the PSLRA does not tolerate." (Dec. 6, 2017 Mem. Op. & Order at 26; *see id.* at 26-30.) Now, taking the new allegations into account, the Court must re-weigh the competing inferences to determine whether plaintiff has stated facts giving rise to an inference of scienter that is "cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324.

The Third Amended Complaint makes the same allegations as the Second Amended Complaint, but it includes additional allegations based on (1) newly obtained documents via the Freedom of Information Act ("FOIA") shedding new light on the various government investigations into DeVry University or defendant DeVry Education Group, Inc. ("DeVry") and their marketing practices, and (2) accounts of thirteen new Confidential Witnesses who worked for DeVry or one of its constituent schools in various locations across the country.

The first category includes additional allegations related to investigations the Second Amended Complaint did not address or addressed only briefly: the New York Attorney General's office investigation, which concluded in January 2017 that "DeVry lured students with ads that exaggerated graduates' success in finding employment at graduation and contained inadequately substantiated claims about graduates' salary success" (3d Am. Compl. ¶ 290; *see id.* ¶¶ 291-92), and the Massachusetts Attorney General's office investigation, which concluded in July 2017, after an investigation begun in 2013, that "certain DeVry programs had job placement rates as low as 52 percent." (*Id.* ¶¶ 136, 293.) Further, plaintiff obtained documents from the Federal Trade Commission's ("FTC") investigation showing that "executive officers" of DeVry, including the "Chief Executive Officer," "Chairman," and "Chief Financial Officer, among others," were designated as custodians who had agreed to produce emails and documents on such topics as "job placement rates," "minimum placement rates" reported to government agencies, and "issues raised by consumer complaints." (*Id.* ¶ 396.) Documents produced by the FTC in response to plaintiff's FOIA request also allegedly show "that the FTC's investigation of DeVry's manipulation of . . . employment statistics was wide-ranging and encompassed all of DeVry's campuses and schools." (*Id.* ¶ 398.) In particular, plaintiff obtained a "table . . . listing negotiated modifications to discovery requests[, which] encompasses requests touching upon all of DeVry's colleges [and] allow[ing] for certain requests to be fulfilled through document 'sample[s] of campus presidents' at specific locations.'" (*Id.* ¶ 398.)

In the second category are new Confidential Witness allegations from employees of DeVry and its constituent schools in various locations across the country, including Illinois, Idaho, Arizona, Florida, and Washington, D.C. The most serious allegations come from a witness identified as "CW8," a former DeVry Senior Director of Academic Effectiveness from September 2013 to March 2014. CW8, based in Downer's Grove, Illinois, reported to a vice president of the

Chamberlain College of Nursing ("Chamberlain"), a DeVry institution, who reported to Susan Groenwald, the president of Chamberlain, who reported to defendant and DeVry Chief Executive Officer ("CEO") Daniel Hamburger. (*Id.* ¶ 308.) CW8 worked on a survey project with the goal of collecting statistical data, including placement data, from schools within DeVry. CW8 alleges that he extensively analyzed the data of Chamberlain and in other DeVry schools and found that DeVry did not have data to back up the "the claim that 90% of its graduates got jobs in their field of study within six months of graduation" ("the 90% Statement"). (*Id.* ¶ 309.) He recalled that his counterpart at DeVry University, a "statistician" who understood data, confirmed there was insufficient data to substantiate DeVry University's job placement claims in DeVry's SEC filings. CW8 concluded that the "90 percent statistic that DeVry provided its shareholders was highly inflated," and his conclusion was not limited to what he had seen at Chamberlain; "DeVry's other schools were using the same flawed formulas," and "the numbers DeVry was producing and generating for the SEC reports were just not accurate." (*Id.* ¶¶ 312-14.) In approximately April 2014, CW8 reported his findings to a DeVry in-house attorney, informing the attorney that DeVry was misrepresenting statistics in SEC filings and there was no data to substantiate DeVry's job placement rates and the 90% Statement. (*Id.* ¶ 310.) Groenwald came to plaintiff's office to discuss his findings, and she mentioned to him that she had discussed them with Hamburger. (*Id.* ¶ 311.)

A number of other new Confidential Witnesses make allegations similar to those of some of the Confidential Witnesses described in the previous version of the complaint: they allege that they learned in the course of their employment at DeVry or a DeVry school that many DeVry graduates were unable to find new employment in their field of study despite active job-search efforts, but that they were excluded from the statistics DeVry calculated and reported based on a flawed methodology. CW12, Director of Career Services for DeVry's Carrington College in Boise from August 2013 to February 2017, noticed that prior to the FTC investigation, the company was very loose about the way it calculated and tracked post-graduation metrics, by, for example, considering a graduate with a medical assistant degree to be working in his field of study if he had a job as any kind of caregiver. (*Id.* ¶¶ 340-42.) But "after the FTC came in, DeVry became 'a lot more tight.'" (*Id.* ¶ 342.)

CW19, "a senior leader of" DeVry, alleges that DeVry's job placement statistics were taken very seriously within the company's leadership, and they were a topic of discussion in meetings he attended, including Quarterly Leadership Meetings, which were attended by the individual defendants as well as Madeline Slutsky, the Vice President of Career and Student Services. (*Id.* ¶ 369.) CW16, who worked as an Executive Assistant to Slutsky, recalled that in 2013, Slutsky instructed him to find "every marketing document that quoted the 90% rate," and he understood that Slutsky was working with the company's Director of Regulatory Compliance, Pat Duncan, to identify every single document which had 90% verbiage and which DeVry could no longer use. (*Id.* ¶ 362.) CW16 knew that Slutsky received regular reports on job placement statistics. (*Id.*)

CW20, who served as Vice President of Academic Affairs and Chief Academic Officer for Chamberlain from June 2011 to June 2017 and reported to Groenwald, participated in meetings with Hamburger, at which job placement statistics at DeVry University were discussed, and in

other meetings in which defendants Gunst and Wiggins[1] also participated, at which the FTC and Department of Education ("DOE") investigations were discussed. (*Id.* ¶ 370.) CW20 recalled that DeVry "had an ongoing issue related to job placement and accreditation," and "DeVry University was not aggregating data on institutional effectiveness across its different programs, and this lack of data was an issue discussed during meetings led by Hamburger in 2012, 2013, and 2014." (*Id.*)

These additional allegations, considered together and in combination with all the other allegations of the Third Amended Complaint, alter the alleged picture with respect to scienter in two important ways. First, they tend to show with a degree of particularity that there is evidence that the problems with DeVry's use of the 90% Statement, as described by the FTC in the Central District of California action, were broad in scope and magnitude, not limited to a relatively few cases of misclassification in California. (*Cf.* December 6, 2017 Mem. Op. & Order at 13-15, 23-24, 27-28.) Plaintiff has included broader allegations of the Attorney General investigations in New York and Massachusetts, which resulted in settlements with DeVry. That these agencies, like the FTC and DOE, took action against DeVry after concluding that DeVry's marketing practices were misleading with respect to job placement issues—even if, as defendants take pains to point out, the settlements did not require DeVry to admit wrongdoing and do not have the force of a judicial finding of wrongdoing—strengthens the inference that these investigations must have given defendants reason to know of a serious risk that the 90% Statement was false. Further, plaintiff has obtained documents and accounts of confidential witnesses showing the breadth and depth of the FTC investigation, which directly touched the individual defendants, including by seeking documents within their possession, and encompassed all of the DeVry schools. The commencement of the FTC investigation seems to have provoked a vigorous, wide-ranging, and far-reaching response throughout DeVry, which weakens the inference that defendants had no reason to know that the problems were pervasive and widespread.

Second, the additional allegations strengthen the inference that evidence of the risk of falsity of the 90% Statement penetrated to defendants, at the top of the DeVry corporate hierarchy. Especially significant is the account of CW8,[2] who offers particularized allegations that he concluded, after extensive analysis, that DeVry could not substantiate its job placement claims, and that Hamburger learned of CW8's findings from Groenwald. Further, according to Confidential Witnesses including CW19 and CW20, the individual defendants had regular meetings about such topics, meetings that also included Groenwald as well as Slutsky, who was knowledgeable about employment statistics and involved herself in understanding how they were being used in DeVry's marketing.

---

[1] Gunst was Chief Financial Officer ("CFO") and a director of the company during a portion of the class period. Wiggins succeeded him as CFO and also served as Treasurer for a portion of the class period. (3d Am. Compl. ¶¶ 70-72.)

[2] The Court notes, as it did in its earlier opinion in this case, that the value of allegations based on information from anonymous sources must be "discounted," *Higginbotham*, 495 F.3d at 757, but it need not be discounted to zero, particularly if the accounts of the confidential witnesses are set forth in "convincing detail" and the witnesses provide enough information about their jobs to demonstrate that they "were in a position to know at first hand the facts to which they are prepared to testify." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711-12 (7th Cir. 2008) ("*Tellabs II*") *on remand from Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). The Confidential Witnesses' accounts, including CW8's, are rendered in sufficient detail to afford them a high degree of reliability.

In summary, then, the fraudulent inference—that is, the inference that defendants had good reason to believe that the 90% Statement was inaccurate because it was based on corrupt or unreliable data—is now buttressed by the following allegations: defendants had notice of not one or two but at least four government investigations that resulted in a conclusion by a government agency that DeVry or its schools had misrepresented job placement statistics; DeVry employees in various parts of the country, including some who were highly placed in its corporate structure, took the investigations seriously; defendant Hamburger had notice of CW8's internal analysis of DeVry's data, which had led CW8 to conclude that DeVry could not substantiate its job placement claims; the FTC investigation sought emails and documents directly from the individual defendants[3]; and the individual defendants discussed the pending government investigations and job statistics regularly, including other high-ranking employees in their discussions.

Taking a holistic look at all the allegations, the Court concludes that the new allegations so strengthen the inference of scienter that it is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. If the allegations are true, defendants had knowledge of numerous serious reasons, which arose out of investigations conducted and information provided by employees in numerous parts of the country, to fear that the 90% Statement was based on unreliable data. By contrast, the non-fraudulent inference—*i.e.*, the inference that defendants had no knowledge of any serious risk that the 90% Statement was inaccurate because they knew only of the possibility of a few diffuse, isolated cases of low-level employees massaging data—smacks of what the Seventh Circuit called, in a related context, "ostrich tactics." *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 762 (7th Cir. 2013). Defendants behaved with the required recklessness if they ignored a danger that was "'so obvious that [they] must have been aware of it.'" *See Tellabs*, 513 F.3d at 704 (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)). "When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk." *Tellabs*, 513 F.3d at 704.

While it would not be "unreasonable to infer that [defendants] acted with mere carelessness, . . . that inference is not *more* plausible or compelling than the inference that they acted recklessly or intentionally." *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 821 (N.D. Ill. 2017); *see id.* at 819-20 (defendants allegedly ignored conclusions of auditors and government investigations); *Erickson v. Corinthian Colleges, Inc.*, No. CV137466, 2015 WL 12732435, at *7-9 (C.D. Cal. Apr. 22, 2015) (defendants had knowledge or were "deliberately reckless in not knowing" of internal reports and communications suggesting that job placement statistics were unreliable). The Court recognizes that it is unclear from the allegations at what point, if at all, the information available to defendants became "bad enough to render Defendants' statements knowingly [or recklessly] false," but the Court does not need to "identify the precise moment at which the culpable inference overtook the innocent one" at this early stage. *In re ITT Educ. Servs., Sec. Litig.*, 34 F. Supp. 3d 298, 310 (S.D.N.Y. 2014). "When the precise moment at which liability attached becomes clear, the Court can limit the class period accordingly," if necessary. *Id.*

---

[3] This tends to show not only that the individual defendants may actually have had in their possession information that may have revealed a risk of the 90% Statement's falsity, but also that, even if they did not have that information, the investigation likely put them on notice of the risk at some stage.

This Court previously called *Ross v. Career Education Corp.*, No. 12 C 276, 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012), plaintiff's "best case," but ultimately agreed with defendants that "by comparison, [it] underscores the weakness of plaintiff's own scienter allegations" because the complaint in *Ross* contained stronger allegations of "'widespread and pervasive' inflation of job placement rates, which were not only common knowledge throughout the company but had reached the notice of the CEO." (Dec. 6, 2017 Mem. Op. & Order at 29 (citing *Ross*, 2012 WL 5363431, at *8-9.)) The Third Amended Complaint has closed the gap in this regard. Plaintiff has alleged widespread and pervasive inflation of job placement rates, and it has alleged numerous serious government investigations into that problem, *see Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 115 (D. Mass. 2014) ("[T]he government investigation can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter."). In sum, the allegations give rise to a strong inference that defendants had notice of a serious risk of such a problem, in which case defendants "'cannot ignore the facts and plead ignorance of the risk,'" *see Ross*, 2012 WL 5363431, at *9 (quoting *Tellabs*, 513 F.3d at 704). While it may be that, based on these allegations, "this is not a strong case of securities fraud," *Washtenaw*, 28 F. Supp. 3d at 115, the allegations are strong enough to survive defendants' motion to dismiss for failure to state a claim.

Two other issues remain to consider. First, defendants argue that their motion to dismiss should be granted because plaintiff has not adequately alleged loss causation. But plaintiff has alleged that the defendants' repetition of the 90% Statement to investors artificially inflated the value of DeVry stock; the January 27, 2016 disclosure of the action taken against DeVry by the FTC and DOE corrected the inflation by revealing the falsity of the 90% Statement; and DeVry's stock price dropped significantly. These allegations are sufficient at this stage, where the Court assumes the falsity of the 90% Statement. *See Akorn*, 240 F. Supp. 3d at 821-22 (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) ("Because pleading loss causation is 'not meant to impose a great burden upon a plaintiff,' loss causation allegations need only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'")); *Erickson*, 2015 WL 12732435, at *16, 17. Second, defendants argue that plaintiff has not properly pleaded control person liability under § 20(a) of the Securities Exchange Act. But whether an individual is a controlling person for purposes of § 20(a) is a fact-intensive issue that is not properly resolved at the pleading stage. *Ross*, 2012 WL 5363431, at *14. Plaintiff's complaint survives these arguments as well.

**SO ORDERED.** **ENTERED: December 20, 2018**



**HON. JORGE ALONSO**
**United States District Judge**